## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GEORGE S. SCHAFFER, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No.: |
| Plaintiff(s), | : : : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | : : : : | |
| HORIZON PHARMA PLC, TIMOTHY P. WALBERT, PAUL W. HOELSCHER, and ROBERT J. DE VAERE, | : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : : : | |

Plaintiff George S. Schaffer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Horizon Pharma plc ("Horizon" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of purchasers of Horizon securities between March 13, 2014 and February 26, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Horizon is a specialty biopharmaceutical company that engages in identifying, developing, acquiring or in-licensing, and commercializing medicines for the treatment of arthritis, pain, inflammatory, and/or orphan diseases in the United States and internationally.

3.     At all relevant times, Horizon has utilized a program called Prescriptions-Made-Easy ("PME"), later renamed HorizonCares, which the Company describes as "a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products."

4.     Horizon's PME program utilizes specialty pharmacies—typically mail-order companies that generally dispense drugs requiring refrigeration, injection, and/or specialized administration—to fill prescriptions for more common drugs, such as medications for acne or arthritis pain.  Sending a prescription to a specialized pharmacy reduces the likelihood that an insurer or pharmacist will try to switch the prescription from a Horizon product to a less expensive generic product.  For example, Horizon's proprietary Duexis product costs approximately $1,500 per month.  However, its two ingredients, ibuprofen and famotidine, prescribed separately, would cost no more than $40 per month; consequently, many health plans and pharmacy benefit managers would not pay for Duexis.  By utilizing specialty pharmacies, Horizon helps ensure that patients receive the more expensive branded Horizon product rather than a cheaper generic equivalent, thereby raising costs for insurers.

5.      Horizon was founded in 2005 and is headquartered in Dublin, Ireland.  The Company's stock trades on the NASDAQ under the ticker symbol "HZNP."

6.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Horizon's PME program was designed to artificially inflate the prices of minor differentiation standard retail drugs; (ii) sales revenues from drugs sold through Horizon's PME were unsustainable at these inflated price levels; (iii) Horizon's use of its PME program left the Company subject to increased regulatory risks; (iv) Horizon received a subpoena from the Office of the U.S. Attorney for the Southern District of New York in November 2015; and (v) as a result of the foregoing, Defendants' statements about Horizon's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

7.      On February 29, 2016, Horizon disclosed in its 2015 annual report that the company received a subpoena in November 2015 from the U.S. attorney's office for the Southern District of New York for documents and information related to the company's patient assistance programs, which include providing free medicines and copay coupons to help cover out-of-pocket drug costs, and other aspects of Horizon's sales and marketing activities.

8.      On this news, Horizon's stock fell $2.63, or 13.3%, to close at $17.16 on February 29, 2016.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the Company's common stock trades on the NASDAQ, located within this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

14.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Horizon common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Horizon is a Delaware corporation with its principal executive offices located at Connaught House, 1st Floor, Dublin, 4, Ireland.  Horizon's common stock trades on the NASDAQ under the ticker symbol "HZNP."

16.     Defendant Timothy P. Walbert ("Walbert") has served at all relevant times as Chairman, Chief Executive Officer and President of Horizon.

4

17.     Defendant Paul W. Hoelscher ("Hoelscher") has served since October 2014 as Chief Financial Officer ("CFO") and Executive Vice President of Finance of Horizon.

18.     Defendant Robert J. De Vaere ("De Vaere") served as CFO and Executive Vice President of Horizon from March 2010 until his retirement in September 2014.

19.     The defendants referenced above in ¶¶ 16-18 are sometimes collectively referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

20.     Horizon is a specialty biopharmaceutical company that engages in identifying, developing, acquiring or in-licensing, and commercializing medicines for the treatment of arthritis, pain, inflammatory, and/or orphan diseases in the United States and internationally.

21.     At all relevant times, Horizon has utilized a program called Prescriptions-Made-Easy, later renamed "HorizonCares," which the Company describes as "a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products."

22.     Horizon was founded in 2005 and is headquartered in Dublin, Ireland.   The Company's stock trades on the NASDAQ under the ticker symbol "HZNP."

**Materially False and Misleading
Statements Issued During the Class Period**

23.     The Class Period begins on March 13, 2014, when Horizon filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K").   For the quarter, the Company reported a net loss of $102.9 million, or $1.56 per diluted share, on revenue of $30.08 million, compared to a net loss of $24.33 million, or $0.40 per diluted share, on revenue of $6.36 million

5

for the same period in the prior year.  For 2013, the Company reported a net loss of $149.01 million, or $2.34 per diluted share, on revenue of $74.02 million, compared to a net loss of $87.79 million, or $2.26 per diluted share, on revenue of $18.84 million for 2012.

24.     In the 2013 10-K, Horizon stated, in part:

PME is a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products. In the fourth quarter of 2013, approximately 27% of DUEXIS prescriptions were processed through the three partner pharmacies that are contracted to run the PME pharmacy services. The three partner pharmacies are geographically located on the east coast, in the midwest and on the west coast. Physician offices can access PME either through electronic prescribing systems or a simple fax form that is linked to one of the partner pharmacies. Then, within four hours, the partner pharmacy places a call to the patient and the prescription is shipped overnight to the patient's home. We have initiated this program for DUEXIS, VIMOVO and RAYOS. Over 85% of prescriptions submitted through the PME program are filled and sent to the patient. In comparison, approximately 62% of prescriptions written at retail pharmacies are filled and received by the patient.

25.     The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Walbert and De Vaere, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On May 9, 2014, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").  For the quarter, the Company reported a net loss of $206.25 million, or $3.07 per diluted share, on revenue of $51.93 million, compared to a net loss of $22.17 million, or $0.36 per diluted share, on revenue of $8.69 million for the same period in the prior year.

27.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by defendants Walbert and De Vaere, stating that the financial information contained in the Q1 2014 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     On June 18, 2014, Horizon announced defendant De Vaere's retirement as the Company's CFO and defendant Hoelscher's appointment as De Vaere's successor.

29.     On August 7, 2014, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, the Company reported a net loss of $27.77 million, or $0.38 per diluted share, on revenue of $66.06 million, compared to a net loss of $18.44 million, or $0.29 per diluted share, on revenue of $11.13 million for the same period in the prior year.

30.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On November 6, 2014, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, the Company reported net income of $2.06 million, or $0.02 per diluted share, on revenue of $75.13 million, compared to a net loss of $5.49 million, or $0.08 per diluted share, on revenue of $24.11 million for the same period in the prior year.

32.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On February 27, 2015, Horizon filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, the Company reported a net loss of $31.65 million, or $0.27 per diluted share, on revenue of $103.84 million, compared to a net loss of $102.9 million, or $1.56 per diluted share, on revenue of $30.08 million for the same period in the prior year.  For 2014, the Company reported a net loss of $236.6 million, or $3.15 per diluted share, on revenue of $296.96 million, compared to a net loss of $149.01 million, or $2.34 per diluted share, on revenue of $74.02 million for 2013.

34.     In the 2014 10-K, the Company stated, in part:

Another key part of our commercial strategy is to encourage physicians to have their patients agree to fill prescriptions through our Prescriptions-Made-Easy, or PME, specialty pharmacy program, which enables uninsured or commercially insured patients' enhanced access to our products by providing financial assistance to reduce eligible patients' out of pocket costs for prescriptions filled via a PME-participating mail order pharmacy. Through PME, prescriptions for our products are filled by designated mail order specialty pharamacies, with the product shipped directly to the patient. Because the patient out of pocket cost for our products when dispensed through the PME program may be significantly lower than such costs when our products are dispensed outside of the PME program, prescriptions filled through our PME program are therefore less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and PBMs, to use less expensive generic or over the counter brands instead of branded products increases. We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs [pharmacy benefit managers].

. . .

In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ensure continued growth of our NSAID portfolio in 2015. Through this program, physicians can have their patients' prescriptions for our products shipped directly to the patient. Because the patient out of pocket cost for our products when dispensed through

8

the PME program may be significantly lower than such costs when our products are dispensed outside of the PME program, prescriptions filled through our PME program are therefore less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and pharmacy benefit managers, or PBMs, to use less expensive generic or over the counter brands instead of branded products increases.

35.     The 2014 10-K contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On May 8, 2015, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, the Company reported a net loss of $19.55 million, or $0.16 per diluted share, on revenue of $113.14 million, compared to a net loss of $206.25 million, or $3.07 per diluted share, on revenue of $51.93 million for the same period in the prior year.

37.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On August 7, 2015, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, the Company reported net income of $31.81 million, or

$0.20 per diluted share, on revenue of $172.82 million, compared to a net loss of $27.77 million, or $0.38 per diluted share, on revenue of $66.06 million for the same period in the prior year.

39.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On October 19, 2015, post-market, Horizon, along with Valeant Pharmaceuticals International ("Valeant"), was the subject of a *New York Times* article entitled "Drug Makers Sidestep Barriers on Pricing."  The article described, in part, how Horizon had "figured out a way to circumvent efforts of insurers and pharmacists to switch patients to . . . generic components, or even to the over-the-counter versions" of certain expensive drugs through using specialty pharmacies:

> The pain reliever Duexis is a combination of two old drugs, the generic equivalents of Motrin and Pepcid.
>
> ***If prescribed separately, the two drugs together would cost no more than $20 or $40 a month. By contrast, Duexis, which contains both in a single pill, costs about $1,500 a month.***
>
> Needless to say, many insurers do not want to pay for Duexis. Yet sales of the drug are growing rapidly, in large part because its manufacturer, Horizon Pharma, has figured out a way to circumvent efforts of insurers and pharmacists to switch patients to the generic components, or even to the over-the-counter versions.
>
> Instead of sending their patients to the drugstore with a prescription, doctors are urged by Horizon to submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company. The pharmacy mails the drug to the patient and deals with the insurance companies, relieving the doctor of the reimbursement hassle that might otherwise discourage them from prescribing such an expensive drug.
>
> Horizon is not alone. Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media

10

scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.

"They are all trying to get rid of the sticker shock of using their drugs," said Dr. Kenneth Beer, a dermatologist in West Palm Beach, Fla. "They become the drugstore now," he said.

He said Valeant's program, which he had used, buffered physicians from insurers and complaints from their patients about high prices.

"It lowers one barrier to using their products," he said.

Valeant revealed last week that it had received subpoenas from federal prosecutors in Manhattan and Massachusetts seeking information about its financial assistance programs for patients, pricing decisions and the distribution of its products. It is not clear if the probes are related in any way to Valeant's relationship with Philidor.

(Emphases added.)

41.     On this news, Horizon stock fell $3.81, or 19.98%, to close at $15.26 on October 20, 2015.

42.     On October 21, 2015, post-market, Horizon issued a press release entitled "Horizon Pharma plc Provides Update on Relationship With Specialty Pharmacies."  In the press release, Horizon stated, in part:

- Horizon primary care and specialty medicines are distributed by both specialty and retail pharmacies.
- All pharmacies that distribute Horizon branded medicines are fully independent. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy. In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.
- Consistent with most pharmaceutical companies, Horizon sells medicines to wholesalers and receives sales proceeds from the wholesaler. Horizon does not own or have any ownership stake in any drug wholesaler nor does Horizon possess an option to purchase any wholesaler.

43.     On this news, Horizon stock fell $0.43, or 2.82%, to close at $14.83 on October 22, 2015.

44.     On October 22, 2015, post-market, the first of several putative securities class action complaints was reported filed against Valeant and certain of its officers regarding the company's undisclosed relationships with specialty pharmacies, as described in the October 19, 2015 *New York Times* article.

45.     On November 6, 2015, Horizon filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, the Company reported net income of $3.28 million, or $0.02 per diluted share, on revenue of $226.54 million, compared to net income of $2.06 million, or $0.02 per diluted share, on revenue of $75.13 million for the same period in the prior year.

46.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by defendants Walbert and Hoelscher, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On November 10 2015, Express Scripts Holding Co. ("Express Scripts"), the largest U.S. manager of prescription drug benefits, announced that it had removed the Linden Care LLC ("Linden Care") specialty pharmacy from its network, stating that Linden was a "captive" pharmacy of Horizon—*i.e.*, primarily dispensed Horizon drugs—and did not fulfill its contractual obligations.  Further, Express Scripts announced that it had filed a complaint against Horizon, seeking recovery of approximately $140 million.

48.     In response, Horizon issued a press release, stating, in part:

Less than five percent of our net sales are from prescriptions that are filled by Linden Care and processed by Express Scripts. In addition, we have a diverse group of pharmacies that participate in our patient support program and no

pharmacy that participates in our primary care patient support programs account for more than 13 percent of our net sales.

The notion that Linden Care is a so-called "captive pharmacy" of Horizon Pharma is entirely false. At best Express Scripts is being reckless in its allegations and at worse it is intentionally attempting to mislead investors. As previously stated, all pharmacies that distribute Horizon branded medicines are fully independent. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy. In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.

49.     On this news, Horizon stock fell $4.39, or 19.62%, to close at $17.99 on November 11, 2015.

50.     The statements referenced in ¶¶ 23-27, 29-39, and 45-46 were materially false and misleading because defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects and performance. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Horizon's PME program was designed to artificially inflate the prices of minor differentiation standard retail drugs; (ii) sales revenues from drugs sold through Horizon's PME were unsustainable at these inflated price levels; (iii) Horizon's use of its PME program left the Company subject to increased regulatory risks; (iv) Horizon received a subpoena from the Office of the U.S. Attorney for the Southern District of New York in November 2015; and (v) as a result of the foregoing, Defendants' statements about Horizon's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

**The Truth Emerges**

51.     On February 29, 2016, Horizon filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K"). For the quarter, the Company reported net income of

$23.99 million, or $0.15 per diluted share, on revenue of $244.54 million, compared to a net loss of $31.65 million, or $0.27 per diluted share, on revenue of $103.84 million for the same period in the prior year.  For 2015, the Company reported net income of $39.53 million, or $0.25 per diluted share, on revenue of $757.04 million, compared to a net loss of $236.6 million, or $3.15 per diluted share, on revenue of $296.96 million for 2013.

52.    With respect to the PME program, now renamed "HorizonCares," Horizon stated, in part:

> Part of our commercial strategy for our primary care and rheumatology business units is to offer physicians the opportunity to have their patients fill prescriptions through pharmacies participating in our HorizonCares patient access program, previously known as Prescriptions Made Easy.
>
> . . .
>
> ***The HorizonCares program may implicate certain state laws related to, among other things, unlawful schemes to defraud, excessive fees for services, tortious interference with patient contracts and statutory or common law fraud.*** We have a compliance program in place to address adherence with various laws and regulations relating to the selling, marketing, and manufacturing of our medicines, as well as certain third-party relationships, including pharmacies. Specifically with respect to pharmacies, the compliance program utilizes a variety of methods and tools to monitor and audit pharmacies, including those that participate in the HorizonCares program, to confirm their activities, adjudication and practices are consistent with our compliance policies and guidance. Despite our compliance efforts, to the extent the HorizonCares program is found to be inconsistent with applicable laws or the pharmacies that participate in our patient access programs do not comply with applicable laws, we may be required to restructure or discontinue such programs, terminate our relationship with certain pharmacies, or be subject to other significant penalties. ***In November 2015, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents and information related to our patient assistance programs and other aspects of our marketing and commercialization activities.*** We are unable to predict how long this investigation will continue or its outcome, but we anticipate that we may incur significant costs in connection with the investigation, regardless of the outcome. We may also become subject to similar investigations by other governmental agencies. The investigation by the U.S. Attorney's Office and any additional investigations of our patient assistance programs may result in damages, fines, penalties or other administrative sanctions against us.

14

*If we are unable to successfully implement our commercial plans and facilitate adoption by patients and physicians of any approved medicines through our sales, marketing and commercialization efforts then we will not be able to generate sustainable revenues from medicine sales which will have a material adverse effect on our business and prospects.*

53.     On this news, Horizon's stock fell $2.63, or 13.3%, to close at $17.16 on February 29, 2016.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Horizon securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Horizon securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Horizon or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Horizon;

- whether the Individual Defendants caused Horizon to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Horizon securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

16

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Horizon securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Horizon securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Horizon securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Horizon securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Horizon securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Horizon's finances and business prospects.

68.    By virtue of their positions at Horizon, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Horizon securities from their personal portfolios.

70.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Horizon, the Individual Defendants had knowledge of the details of Horizon's internal affairs.

71.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Horizon.  As officers and/or directors of a publicly-held company, the Individual Defendants had

a duty to disseminate timely, accurate, and truthful information with respect to Horizon's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Horizon securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Horizon's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Horizon securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

72.     During the Class Period, Horizon securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Horizon securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Horizon securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Horizon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

73.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

75.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     During the Class Period, the Individual Defendants participated in the operation and management of Horizon, and conducted and participated, directly and indirectly, in the conduct of Horizon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Horizon's misstatement of income and expenses and false financial statements.

77.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Horizon's financial condition and results of operations, and to correct promptly any public statements issued by Horizon which had become materially false or misleading.

78.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

21

releases and public filings which Horizon disseminated in the marketplace during the Class Period concerning Horizon's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Horizon to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Horizon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Horizon securities.

79.    Each of the Individual Defendants, therefore, acted as a controlling person of Horizon.  By reason of their senior management positions and/or being directors of Horizon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Horizon to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Horizon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

80.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Horizon.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:   March 8, 2016

Respectfully submitted,

**POMERANTZ LLP**

<u>*/s/ Jeremy A. Lieberman*          </u>
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _George S Schaffer_____, make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Horizon Pharma plc ("Horizon" or the "Company"), and

authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Horizon securities at the direction of plaintiffs counsel or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Horizon securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Horizon

securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed ___3/2/2016___
              **(Date)**

___George S. Schaffer___
              **(Signature)**

___George S. SCHAFFER___
              **(Type or Print Name)**

**HORIZON PHARMA PLC (HZNP)**                                    **Schaffer, George S.**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 12/23/2015 | Purchase | 2,000 | $22.7215 |