# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| GEORGE S. SCHAFFER, Individually and on Behalf of All Others Similarly Situated, | : | |
| Plaintiff(s), | : | Master File No.: 1:16-cv-01763-JMF |
| | : | |
| v. | : | PROPOSED CLASS ACTION |
| | : | |
| HORIZON PHARMA PLC, TIMOTHY P. WALBERT, PAUL W. HOELSCHER, JOHN J. KODY, ROBERT F. CAREY, WILLIAM F. DANIEL, MICHAEL GREY, JEFF HIMAWAN, VIRINDER NOHRIA, RONALD PAULI, GINO SANTINI, H. THOMAS WATKINS, CITIGROUP GLOBAL MARKETS, INC., JEFFERIES LLC, COWEN & COMPANY LLC, AND MORGAN STANLEY & CO. LLC, | : : : : : : : : : : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

**Page**

I.    NATURE OF THE ACTION ................................................................. 2

II.    EXCHANGE ACT CLAIMS ................................................................. 3

    A.    JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS ................. 10

    B.    PARTIES FOR EXCHANGE ACT CLAIMS ...................................... 11

    C.    SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS ............ 14

        1.    Background ................................................................ 14

        2.    Background on Horizon's Drugs and Pricing Practices .......................... 14

        3.    Defendants' Inflated Drug Prices ............................................ 15

        4.    Price Hikes Result in Rejection of Horizon Drugs ................................. 17

        5.    The "Prescriptions Made Easy" Specialty Pharmacy Program Was Essential To The Growth Of The Company ............................................ 18

        6.    Defendants Hid Improper Practices In The Execution And Expansion Of The PME Program ......................................................... 21

    D.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS FOR THE EXCHANGE ACT CLAIMS... 32

        1.    Horizon's January 12, 2015 Announcement of the Expansion of the PME program ................................................................... 33

        2.    Horizon's February 27, 2015 Form 10-K Annual Report (for the Fiscal Year Ending December 31, 2014) ............................................ 35

        3.    Horizon's February 27, 2015 Earnings Conference Call.......................... 36

        4.    Horizon's April 13, 2015 Form 8-K .......................................... 39

        5.    Horizon's May 8, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending March 31, 2015)........................................... 40

        6.    Horizon's May 8, 2015 Earnings Conference Call .............................. 43

        7.    Horizon's Presentation at the June 4, 2015 Jeffries Global Healthcare Conference ................................................................ 44

        8.    Walbert's June 16, 2015 Appearance on Jim Cramer's *Mad Money* ....... 46

        9.    Horizon's August 7, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending June 30, 2015) ............................................ 48

        10.    Horizon's August 7, 2015 Earnings Conference Call.............................. 50

        11.    Walbert's September 17, 2015 Presentation at the Morgan Stanley Healthcare Conference......................................................... 53

        12.    The Truth Begins to Emerge......................................................... 54

13. The *New York Times*' October 19, 2015 Article Critiquing Horizon's PME Program .................................................................................. 54

14. Depomed's Press Release Raising Questions About the Sustainability of Horizon's Business Model ........................................................ 57

15. Defendants Continue to Issue False and Misleading Statement to the Market in  Horizon's November 6, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending September 30, 2015) .............................. 60

16. Horizon's November 6, 2015 Earnings Conference Call ......................... 62

17. Defendant Walbert Continues to Issue False Statements to the Market in his November 9, 2015 Appearance on Jim Cramer's *Mad Money* ........... 64

18. Defendants Continue to Reassure the Market about the PME Program at Horizon's November 9, 2015 Corporate Analyst Meeting ....................... 65

19. November 10, 2015 Termination by PBM Express Scripts of One of Horizon's Top Partner Pharmacies and Horizon's Response to Termination ............................................................................................. 67

20. Additional Analyst Meetings in November - December 2015 ................ 69

21. The Senate Hears Testimony About Horizon's Relationships with Specialty Pharmacies in December 2015 .................................................. 75

22. Walbert Continued to Attempt to Reassure the Market in his January 11, 2016 and January 12, 2016 Television Appearances ............................... 76

23. Horizon's February 29, 2016 Disclosure of DOJ Investigation in 2015 10-K .............................................................................................................. 77

24. Horizon's February 29, 2016 Earnings Conference Call ........................ 80

25. Horizon's April 12, 2016 Disclosure that Net Sales of DUEXIS and VIMOVO had Plunged in Q1 2016 .......................................................... 82

E. POST-CLASS PERIOD DISCLOSURES FOR EXCHANGE ACT CLAIMS ... 84

F. LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS ............................................................................................................. 85

G. ADDITIONAL EVIDENCE OF SCIENTER WITH RESPECT TO THE EXCHANGE ACT CLAIMS ............................................................................. 90

H. PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT CLAIMS ............................................................................................................. 99

I. PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS ........................................... 101

J. THE SAFE HARBOR PROVISION IS INAPPLICABLE ............................... 102

K. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................. 103

1. COUNT I: For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Horizon and the Individual Defendants ................ 103

2.       COUNT II: *For Violations of Section 20(a) of the Exchange Act  Against The Individual Defendants* ..................................................................... 106

III.    THE SECURITIES ACT CLAIMS ................................................................ 107

A.    NATURE OF THE ACTION ............................................................ 107

B.    JURISDICTION AND VENUE FOR THE SECURITIES ACT CLAIMS ....... 108

C.    PARTIES FOR THE SECURITIES ACT CLAIMS ......................................... 109

D.    SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS .. 111

E.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR SECURITIES ACT CLAIMS ........................................................................................... 121

F.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE SECURITIES ACT CLAIMS............................................ 123

G.    THE SAFE HARBOR PROVISION IS INAPPLICABLE ................................ 124

H.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................. 125

1.       COUNT III: *For Violations of Section 11 of the Securities Act Against Horizon, the Director Defendants, and the Underwriter Defendants* .... 125

2.       COUNT IV: *For Violations of Section 12(a)(2) of the Securities Act Against Horizon and the Underwriter Defendants* ................................. 129

3.       COUNT V: *For Violations of Section 15 of The Securities Act Against Defendant Walbert* ................................................................................ 132

PRAYER FOR RELIEF .......................................................................................... 133

DEMAND FOR TRIAL BY JURY ......................................................................... 133

Lead Plaintiffs Locals 302 & 612 of the International Union of Operating Engineers-Employers Retirement Industry Retirement Trust Fund ("I.U.O.E. 302/612") and Carpenters Pension Trust Fund for Northern California ("Northern California Carpenters") and additional named plaintiff Automotive Industries Pension Trust Fund  (together, "Plaintiffs"), by their undersigned attorneys, hereby bring this Consolidated Class Action Complaint ("Complaint") against Horizon Pharma PLC ("Horizon" or the "Company"), Timothy P. Walbert ("Walbert"), Paul W. Hoelscher ("Hoelscher"), John J. Kody ("Kody"), Robert F. Carey ("Carey"), William F. Daniel ("Daniel"), Michael Grey ("Grey"), Jeff Himawan ("Himawan"), Virinder Nohria, M.D., Ph.D. ("Nohria"), Ronald Pauli ("Pauli"), Gino Santini ("Santini"), H. Thomas Watkins ("Watkins"), Citigroup Global Markets, Inc. ("Citigroup"), Jefferies LLC ("Jefferies"), Cowen and Company, LLC ("Cowen"), and Morgan Stanley & Co. LLC ("Morgan Stanley") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes review and analysis of publicly available information, including Securities and Exchange Commission ("SEC") filings by Horizon, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and interviews of former employees of Horizon and other persons with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of: (1) persons or entities who purchased the common stock of Horizon pursuant and/or traceable to the Company's registration statement and prospectus (the "Registration Statement") issued in connection with the Company's April 16, 2015 public offering (the "Offering") seeking to pursue remedies under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"); and (2) persons or entities who purchased the publicly traded common stock of Horizon during the period from January 12, 2015 through April 12, 2016, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) (collectively referred to hereinafter as the "Class").

2.      In this Complaint, Plaintiffs allege two different sets of claims.

(a)      First, Plaintiffs allege scienter-based claims (Counts I and II) under the Exchange Act against Horizon and the Individual Defendants (as defined herein). Plaintiffs allege that these defendants knowingly or with reckless disregard made material misstatements and omissions about Horizon's Prescriptions Made Easy ("PME") program.

(b)      Second, Plaintiffs allege strict liability, negligence, and non-fraud based claims (Counts III-V) under the Securities Act. These claims are brought against those defendants who are statutorily responsible for material misstatements of facts and omissions in the Registration Statement issued in connection with the Offering. The Securities Act defendants include Horizon; the individual members of Horizon's Board of Directors who signed the Registration Statement (the "Director Defendants"); and the underwriters of the Offering

("Underwriter Defendants"). Plaintiffs expressly disclaim any allegations of fraud or intentional

misconduct in connection with these non-fraud claims, which are pleaded separately in this

Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of

opinion or belief made in connection with the Offering are alleged to have been materially

misstated statements of opinion or belief when made at the time of the Offering.

3.       Horizon is a specialty biopharmaceutical company that describes itself as engaged

in "identifying, developing, acquiring or in-licensing, and commercializing medicines for the

treatment of arthritis, pain, inflammatory, and/or orphan diseases in the United States and

internationally." Horizon was founded in 2005 and is headquartered in Dublin, Ireland.  The

Company's stock trades on the NASDAQ under the ticker symbol "HZNP."

## II.    EXCHANGE ACT CLAIMS

4.       This case arises out of a fraudulent scheme and wrongful course of business

pursuant to which Horizon and the Individual Defendants used a small network of undisclosed

controlled partner pharmacies and deceptive sales and marketing practices to mislead

shareholders as to the success and sustainability of its critically important PME program and the

improper manner in which it was expanding that program.

5.       Prior to the start of the Class Period, Horizon's business model was to charge

ever-higher prices for its small portfolio of branded drugs, all of which faced competition from

cheaper generic drugs and over-the-counter ("OTC") alternatives.  By 2Q 2014, Horizon was

marketing just three drugs—DUEXIS, VIMOVO, and RAYOS/LODOTRA—with DUEXIS and

VIMOVO accounting for over 90% of the Company's net sales.

6.       DUEXIS is a combination medicine comprised of ibuprofen (a nonsteroidal anti-

inflammatory drug or "NSAID" marketed under the trade name "Motrin"), and famotidine,

(marketed under the trade name "Pepcid), which helps reduce the risk of ulcers in the stomach or

intestines that can be caused by long-term use of Ibuprofen.  VIMOVO, a competing drug that Horizon bought in 2013, is another pain reliever with gastro-intestinal protection, and could also be described as a combination of Aleve plus Nexium.

7.      The lack of meaningful differentiation between Horizon's branded products and their generic equivalents has not prevented Defendants from relying on overly aggressive sales techniques and strategies to hike up the price of Horizon's portfolio of drugs.  In 2012, the wholesale acquisition cost (WAC) for a 30-day supply of DUEXIS cost approximately $158.40.[1] By 2016, the WAC for 30-day supply of DUEXIS cost $1875.60, or on an annual basis, $22,507. In comparison, to purchase a month's supply of ibuprofen and Pepcid would cost closer to $20 or $40 a month.  Before Horizon acquired VIMOVO, Astra-Zeneca's daily WAC for this drug was $3.82, or $114.74 for a 30-day supply.  After Horizon acquired VIMOVO, Horizon changed the WAC and raised it to $799.20 for a 30-day supply.  Thereafter, Horizon repeatedly and systematically increased the WAC of VIMOVO so that by 2016 a 30-day supply of VIMOVO cost an incredible $1875.60, bringing it in line with DUEXIS.

8.      Horizon's price hikes resulted in DUEXIS and VIMOVO accounting for approximately 83% of Horizon's net sales in 2014 (or $245.9 million).  This made revenue Horizon generated from these drugs central to Horizon's business strategy.  Horizon needed cash to fund mergers and acquisitions to acquire new drugs to allow it to move into other product markets and to service the debt that had been funding it up to that point.  Everything rested on Horizon's ability to keep generating cash flow from these exorbitantly priced drugs.

9.      Ultimately, the inevitable occurred.  Horizon's consistent price hikes, coupled with the fact that its drugs had ***much*** more affordable suitable replacements, resulted in two of

---

[1]      WAC is the list price paid by a wholesaler, distributor and other direct accounts for drugs purchased from the wholesaler's supplier.

the largest Pharmacy Benefit Management companies ("PBMs") placing DUEXIS and VIMOVO on their list of excluded drugs.  On July 28, 2014, Horizon disclosed that it had been notified that CVS Caremark n/k/a CVS Health ("hereafter Caremark") and Express Scripts had determined that effective January 1, 2015, DUEXIS and VIMOVO would no longer be on the Caremark and Express Scripts formularies and would be placed on these PBM's exclusion lists. Horizon disclosed that it estimated that 20%-30% of DUEXIS and VIMOVO prescriptions could be impacted.  After the news broke about the exclusion list, Horizon's share price dropped 34.17%, to $9.15, from a previous-day's close of $13.90.[2]

10.     It would not take long for doctors to get the message and stop writing DUEXIS and VIMOVO prescriptions in order to avoid pushback from PMEs and insurers.  Facing a precipitous drop in sales, Horizon turned to a program it had been market-testing PME, later renamed HorizonCares, which the Company describes as "a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products."  PME was designed to transform the specialty pharmacies— traditionally companies that dispense drugs requiring refrigeration, injection, and/or specialized administration—into a Horizon-controlled vertical distribution system for its branded drugs.

11.     The PME program was designed to get doctors to write prescriptions for Horizon's drugs without considering their inflated cost.  A former Horizon Territory Manager in Houston Texas from February 2012 through February 2015 (Former Employee or "FE-1") explained that sales representatives were given a prescription to sell the ***PME program*** benefits, not the drug benefits, because Horizon's drugs had cheaper alternatives.  To appeal to doctors and patients, Horizon subsidized co-pays, reporting that there were virtually no out-of-pocket

---

[2]     DUEXIS also is on the exclusion lists of the following PBMs: 1) Optum; 2) Cigna; 3) MedImpact; and 4) Envision and on the "non-preferred" list of ProCare RX.

costs for most commercial insured patients, and promised to give the medicine to patients for free if their insurance rejected it.

12.    Though the PME program was in its early stages when DUEXIS and VIMOVO were placed on the exclusion list, defendants assured investors that the Company could rapidly expand that program to compensate for the business lost to the exclusion lists, and that the increased business would pay for the cost of providing the drug for free to patients without insurance or whose commercial insurance would not cover the drug.  And rapidly expand the PME program they did.

13.    However, Defendants failed to disclose to shareholders the fraudulent manner in which this expansion occurred, including the use of a small network of controlled pharmacies and deceptive sales and marketing practices that misrepresented the success and sustainability of the PME program and its impact on Horizon's business operations and financial performance. Specifically, this conduct included:

(a)    concealing that far from having a "non-exclusive," "conservative," and "arm's-length" relationship with its specialty pharmacy partners, Horizon was routing PME prescriptions through a small captive network of specialty pharmacies, *included one that was controlled by both a Horizon executive officer and a member of Horizon's senior management responsible for the PME program*;

(b)    promoting improper personal and financial relationships between Horizon sales representatives and doctors;

(c)    instructing employees to hide pricing information from doctors; and

(d)    marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses.

14.     These practices were carefully designed to deceive shareholders into trusting in the success and sustainability of the PME program.  The deception propped up Horizon's stock price.  And because Horizon ties "the vast majority" of executive compensation "directly to the stock price performance," Defendants quickly capitalized on this lucrative opportunity.  From 2014 to 2015, Walbert's compensation increased more than ***ten-fold*** from $8.97 million in 2014 to total compensation valued at ***$93.4 million*** in 2015 (and more than ***49-fold*** from 2013); Hoelscher's compensation increased more than five-fold; Kody's compensation increased more than six-fold; and Carey's compensation increased more than three-fold.  Indeed, Defendants Hoelscher, Kody, and Carey also saw their total compensation from Horizon increase substantially from 2014 to 2015 – ***with each receiving total compensation valued at more than $18.5 million.***

15.     In October and November 2015, the truth began to emerge regarding the operational control Horizon exercised over its partner/specialty pharmacies and the sustainability of Horizon's PME program.  On October 19, 2015, after the close of the market, the *New York Times* published an article that scrutinized this practice, and specifically targeted Horizon's PME program and the Company's strategy of pushing sales of its drug DUEXIS through affiliated "specialty" pharmacies, which in reality did not resemble traditional specialty pharmacies at all.  Following the release of the *New York Times* article, Horizon's stock price fell $3.81 per share, or 19.98 percent, to close at $15.26 per share on October 20, 2015.

16.     On October 21, 2015, after the market closed and in response to the recent negative media coverage of specialty pharmacy relationships, Horizon issued a press release representing that "***[a]ll pharmacies that distribute Horizon branded medicines are fully independent***. Horizon does not own or have an ownership stake in any pharmacy and does not

possess an option to purchase any pharmacy. In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers." However, Horizon's October 21, 2015 disclosures failed to reveal that Horizon exercised operational control over a number of those pharmacies such that they were nothing more than puppets for Horizon to improperly push its exorbitantly priced drugs on patients, including one pharmacy that was controlled by both a Horizon executive officer and a member of Horizon's senior management responsible for the PME program. Moreover, certain of the specialty pharmacies utilized by Horizon, including Linden Care, LLC ("Linden Care"), were "captive pharmacies" of Horizon in that they derived the majority of their revenues from Horizon.

17.     The next day, on October 22, 2015, before the market opened, Depomed, Inc., a hostile takeover target of Horizon, issued a press release also criticizing Horizon's business model and raising concerns regarding Horizon's aggressive drug pricing practices and use of specialty pharmacies. Specifically, Depomed stated, among other things, that: (i) due to Horizon's dramatic price increases and a lack of meaningful product differentiation, many of Horizon's drugs had recently been removed from the largest PBM drug formularies and will remain on the exclusion lists of the two largest PBMs through 2016; and (ii) Horizon's reliance on PME discounts to generate growth in prescription volumes had caused significant deterioration in Horizon's gross-to-net for many of its drugs.[3] Horizon's stock fell an additional 11.53% from a close on October 21, 2015, of $14.83 per share to close of $13.12 per share on October 22, 2015.

---

[3]     In the pharmaceutical industry, the discount between gross sales figure at the drug's list price (the WAC), and the net sales, after all the discounts and rebates, is called "gross-to-net," or GTN.

18.     Despite Horizon's claim that it did not control the specialty pharmacies in its network, on November 10, 2015, Express Scripts announced that it had removed Linden Care specialty pharmacy from its network, stating that Linden Care was a "captive" pharmacy of Horizon, meaning that it primarily dispensed Horizon drugs. Linden Care's counsel confirmed this claim by revealing that 59 % of its business involved dispensing drugs made by Horizon.[4] In an attempt to blunt this news, Horizon responded by denying it used "captive pharmacies," stating instead that "***all pharmacies that distribute Horizon branded medicines are fully independent***. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy." Defendants failed to disclose that they exercised operational control over a number of the specialty pharmacies they utilized and that certain of the pharmacies, including Linden Care, were in fact "captive pharmacies" of Horizon. On November 11, 2015, Horizon stock price lost almost 20% of its value, falling $4.39 per share to close at $17.99 per share.

19.     On February 29, 2016, the Company surprised the market by announcing that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York in November 2015 requesting information related to the Company's patient assistance programs (*i.e.*, the PME program) and other aspects of Horizon's marketing and commercialization activities. In reaction to this disclosure, Horizon's stock price fell an additional $2.63 per share, or 13.29 percent, to close at $17.16 per share on February 29, 2016.

20.     Following these partial disclosures, investors began to understand that Horizon had bet large on its ability to outsmart the PBMs. However, it was not until April 12, 2016, that investors realized how much Horizon's bet had lost. The full truth was finally revealed that day

---

[4]     *See* Andrew Pollack, *Express Scripts Cuts Ties to New York Specialty Pharmacy*, N.Y. TIMES (Nov. 10, 2015).

when Horizon filed a Report on Form 8-K pre-announcing lower-than-expected revenues for the first half of 2016 (particularly 1Q16) due to higher than anticipated pricing pressure for two of the Company's top selling drugs VIMOVO and DUEXIS, caused in part, by a precipitous decline in net sales of these two products in just one quarter. Indeed, the sequential decreases in net sales for the two products were 51% and 46%, respectively. In reaction to Horizon's disclosure that payor pushback was impacting DUEXUS and VIMOVO much more than defendants previously disclosed, Horizon's stock price plummeted more than 25%, from a close on April 11, 2016, of $18.22 per share, to a close on April 12, 2016, of $13.42 per share. ***This was a decline of 65 % from the Class Period closing high of $38.45 per share.***

21.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

### A.    JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS

22.     The claims in this section of the Complaint arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

23.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

25.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### B.     PARTIES FOR EXCHANGE ACT CLAIMS

#### 1.     Plaintiffs

26.     Court-appointed Lead Plaintiff I.U.O.E. 302/612 is a defined benefit pension plan headquartered in Seattle, Washington that manages approximately $2.4 billion in assets on behalf of its members. As set forth in the attached certification, I.U.O.E. 302/612 purchased Horizon common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Court-appointed Lead Plaintiff Northern California Carpenters is a defined benefit pension plan headquartered in Oakland, California that manages approximately $3.0 billion in assets on behalf of its members. As set forth in the attached certification, Northern California Carpenters purchased Horizon common stock during the Class Period, including common stock pursuant and traceable to the Company's Registration Statement for the Offering, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Additional named plaintiff Automotive Industries Pension Trust Fund is a California-based pension trust fund that consists of participants from three different international unions:  the International Association of Machinists and Aerospace Workers, the International Brotherhood of Teamsters, and the International Brotherhood of Painters and Allied Trades.  As of December 31, 2015, Automotive Industries managed approximately $1.2 billion in assets and served approximately 26,000 participants.  As set forth in the attached certification, Automotive Industries purchased Horizon common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

        2.      **Defendants**

29.     Defendant Horizon is a Delaware corporation with its principal executive office

located at Connaught House, 1st Floor, Dublin, 4, Ireland.  Horizon's common stock trades on

the NASDAQ under the ticker symbol "HZNP."

30.     Defendant Walbert has served at all relevant times as Chairman, Chief Executive

Officer and President of Horizon.  During the Class Period, Defendants Walbert signed the

Company's Report on Form 10-K for the quarters and years ended December 31, 2014 and

December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June

30, 2015, September 30, 2015. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002,

Defendant Walbert signed certifications that were false and misleading because they stated that

Company's Report on Form 10-K for the quarters and years ended December 31, 2014 and

December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June

30, 2015, September 30, 2015 did not contain false and misleading statements. Walbert's total

compensation went from $1,895,162 in 2013 to $8.97 million in 2014 to approximately $93.4

million in 2015.

31.     Defendant Hoelscher has served since October 1, 2014 as Chief Financial Officer

("CFO") and Executive Vice President of Finance of Horizon. From June 23, 2014 through

September 30, 2014, Hoelscher served as Horizon's Executive Vice President, Finance.  During

the Class Period, Defendant Hoelscher signed the Company's Reports on Form 10-K for the

quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form

10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015. Defendant

Hoelscher also signed the Company's April 13, 2015 Form 8-K and the Company's April 12,

2016 Form 8-K. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant

                                           12

Hoelscher signed certifications that were false and misleading because they stated that the Company's Reports on Form 10-K for the quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015 did not contain false and misleading statements.  Hoelscher's total compensation went from $3,443,456 in 2014 to approximately $18.9 million in 2015.

32.     Defendant Kody served as Chief Commercial Officer at Horizon from November 2014 until his termination on January 8, 2016. Kody's total compensation went from $2,866,693 in 2014 to approximately $18.6 million in 2015.

33.     Defendant Carey has served since March 2014 as Executive Vice President, Chief Business Officer of Horizon. Carey's total compensation went from $6,097,536 in 2014 to approximately $18.9 million in 2015.

34.     The defendants referenced in ¶¶ 30-33 are sometimes collectively referred to herein as the "Individual Defendants."[5] As officers and directors of a publicly held company whose common stock was registered with the SEC under the Securities Act, publicly traded and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements, internal controls and to correct any previously issued statements that had become materially misstated or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. These Individual Defendants violated these requirements and obligations during the Class Period.

---

[5]     Horizon and the Individual Defendants are sometimes referred to herein as the "Exchange Act Defendants."

### C.      SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS

#### 1.      Background

35.      Horizon is a specialty pharmaceutical company that was founded in 2005 and went public on July 28, 2011. Unlike other pharmaceutical companies, Horizon does not invest immense resources to develop new drugs.  Instead, Horizon either takes already-existing drugs and combines them into a new product, or it acquires already approved drugs and simply markets them.  In both instances, Horizon aggressively hikes up the costs of its drugs to generate revenue. Consequently, the Company invests far less in research and development than the industry average.  Traditional pharmaceutical companies invest, on average, 15-20% of their revenue in R&D.  Horizon's 2015 research budget, by contrast, was between 5-6% of its 2015 revenues.

#### 2.      Background on Horizon's Drugs and Pricing Practices

36.      At the time Horizon went public, it marketed only one drug—DUEXIS.  DUEXIS has been described as "a combination of two old drugs, the generic equivalents of Motrin and Pepcid," which "if prescribed separately . . . would cost no more than $20 or $40 a month."[6] Specifically, DUEXIS is a combination medicine comprised of ibuprofen (a nonsteroidal anti-inflammatory drug or "NSAID" marketed under the trade name "Motrin"), and famotidine, (marketed under the trade name "Pepcid), which helps reduce the risk of ulcers in the stomach or intestines that can be caused by long-term use of Ibuprofen.  DUEXIS was approved by the FDA for the relief of signs and symptoms of rheumatoid arthritis ("RA") and osteoarthritis ("OA") and to decrease the risk of developing upper gastrointestinal ulcers in patients taking ibuprofen for those indications long term.

---

[6]      *See* Andrew Pollack, *Drug Makers Sidestep Barriers on Pricing,* N.Y. TIMES (Oct. 19, 2015).

37.     As discussed below, in addition to DUEXIS, Horizon's other primary care drugs included RAYOS (FDA approval received in July 2012), VIMOVO (purchased from AstraZeneca in late 2013), and PENNSAID 2% (U.S. rights acquired by Horizon in October 2014), all used in the treatment of RA and OA.  The Company used the same marketing and sales practices for all these drugs.

### 3.     Defendants' Inflated Drug Prices

38.     The lack of meaningful differentiation between Horizon's branded products and their generic equivalents has not prevented Defendants from relying on overly aggressive sales techniques and strategies to hike up the price of Horizon's portfolio of drugs.  In 2012, the wholesale acquisition cost (WAC) for a 30-day supply of DUEXIS cost approximately $158.40.[7] Horizon collected $10.3 million in net sales of the drug for 2012.  In 2013, Horizon tripled the WAC of DUEXIS to $677.70 for a 30-day supply.  At year-end 2013, Horizon reported that net sales for DUEXIS had increased to $59 million.  By 2016, the WAC for 30-day supply of DUEXIS *cost $1875.60, or on an annual basis, $22,507*.

39.     Similarly, RAYOS's net sales skyrocketed from $0.3 million to $5.8 million—85% of which was attributable solely to price increases.  After prodding from the SEC, Horizon revealed that price increases (not increased sales) accounted for an astounding 82% of the Company's net sales increase from 2012 to 2013.

40.     To justify these astronomical price increases, Horizon argued that patients who needed both a pain reliever and a gastro-intestinal protector were more likely to take them both if they were available as a single pill.  This argument faced one problem: DUEXIS also competed with VIMOVO, another branded combined pain reliever and gastro-intestinal protector that

---

[7]     https://pricerx.medispan.com/

could also be described as a "combination of two old drugs"— the generic equivalents of Aleve and Nexium.  Even after Horizon began to hike the price of DUEXIS, VIMOVO cost under $200 a month, making the price of DUEXIS hard to justify. So, in late 2013, Horizon bought VIMOVO from AstraZeneca and hiked up its price consistent with DUEXIS.

41.    Before Horizon acquired VIMOVO, Astra-Zeneca's daily WAC for this drug was $3.82, or $114.74 for a 30-day supply.  After Horizon acquired VIMOVO, Horizon changed the WAC and raised it to $799.20 for a 30-day supply.[8]  In other words, Horizon increased the drug price by more than 596 %.  Thereafter, Horizon repeatedly and systematically increased the WAC of VIMOVO so that by 2016 a 30-day supply of VIMOVO cost an incredible $1875.60, bringing it in line with DUEXIS.  This is staggeringly more than the cost of a similar quantity of Aleve and Nexium.

42.    Tellingly, Horizon's products place these drugs in the rarefied category of "specialty" drugs—ultra-expensive treatments that command an increasingly disproportionate share of the nation's health spending.  Drug manufacturers justify their enormous specialty drug prices based on several factors, including (i) the high cost of bringing innovative therapies to market—the average cost of developing a drug is now estimated to be $2.6 billion; (ii) the high manufacturing or handling costs of drugs to treat such diseases as cancer; (iii) the relatively small patient populations that will often take each drug; and (iv) the high cost that can be avoided, if treatment for the relevant diseases is avoided.  For example, if hepatitis C is eliminated via drugs, hundreds of thousands of dollars of healthcare costs may be avoided.  Similarly, if multiple sclerosis episodes are reduced through the treatment of drugs, hundreds of thousands of dollars of healthcare treatment may be eliminated.

---

[8]      https://pricerx.medispan.com/

43.     None of the above factors can be used to justify the outrageously high costs of Horizon's products. In fact, DUEXIS and VIMOVO had negligible costs to manufacture, serve a large population, and cost relatively little to develop and purchase —$100 million and $35 million, respectively.

44.     Yet, Horizon continued to charge these astronomical prices for its drugs resulting in DUEXIS and VIMOVO accounting for approximately 83% of Horizon's net sales in 2014 (or $245.9 million).  This made revenue Horizon generated from these drugs central to its business strategy.  Horizon needed cash to fund mergers and acquisitions to acquire new drugs to allow it to move into other product markets and to service the debt that had been funding it up to that point.  Everything rested on Horizon's ability to keep generating cash flow from DUEXIS and VIMOVO (and RAYOS, to a lesser extent).

### 4.     Price Hikes Result in Rejection of Horizon Drugs

45.     All drug manufacturers – including Horizon – know that the total volume of their prescription drugs that will be sold will be greatly influenced by PBMs (like Express Scripts, Caremark and Optum), and large insurance companies (like Aetna, Cigna and Humana), responding to numerous factors, including the WAC established by the manufacturers for their drugs.

46.     PBMs and insurers influence plan sponsors in determining which drugs will be included – or excluded – from coverage based in part on a drug's WAC.[9]  If a manufacturer's WACs are too high as compared to the WACs of alternative therapeutically identical or similar treatments, PBMs will exclude – or suggest excluding – the high-cost drugs.

---

[9]     A plan sponsor is a designated party, usually a company or employer, that sets up a healthcare or retirement plan such as a 401(k) for the benefit of the organization's employees.

47.     Ultimately, the inevitable occurred.  Horizon's consistent price hikes, coupled with the fact that its drugs had ***much*** more affordable suitable replacements, resulted in two of the largest PBMs placing DUEXIS and VIMOVO on their list of excluded drugs.  On July 28, 2014, Horizon disclosed that it had been notified that Caremark and Express Scripts had determined that effective January 1, 2015, DUEXIS and VIMOVO would no longer be on the Caremark and Express Scripts formularies and would be placed on these PBM's exclusion lists. Even though Caremark and Express Scripts managed health plans covering more than 50% of Horizon's prescriptions in 2013[10], not all the plans adopted the exclusion list and therefore Horizon disclosed that it estimated that 20%-30% of DUEXIS and VIMOVO prescriptions could be impacted by the exclusions.[11]

48.     The market understood that such a drop could spell disaster for Horizon's business. After the news broke about the exclusion list, Horizon's share price dropped 38.55%, to $9.15, from a previous-day's close of $13.90.

### 5.     The "Prescriptions Made Easy" Specialty Pharmacy Program Was Essential To The Growth Of The Company

49.     Faced with PBM exclusion lists and the risk that traditional retail pharmacies would, in consultation with doctors, swap out DUEXIS (cost per day: $51.00) for ibuprofen and Pepcid (cost per day: $0.66 and $1.33),[12] Horizon needed a place to sell its high-priced drugs in order to maintain and grow its business.  In response, the Company announced that it would be

---

[10]     September 26, 2014 Horizon Presentation at the BioCentury Publications NewsMakers in the Biotech Industry.

[11]     August 7, 2014 Earnings Call Transcript; Form 10-Q Quarterly Report for the Period Ending June 30, 2014.

[12]     *See* Pollack, *Andrew, Drug Makers Sidestep Barriers on Pricing,* N.Y. TIMES (Oct.19, 2015).

accelerating adoption of the PME program, which it had begun testing in 2012. It made clear

that the program was a "key part of [its] commercial strategy."

50.     While true "patient assistance" programs have traditionally been focused on

ensuring that persons in need of financial assistance are not deprived of important and sometimes

lifesaving medications, Horizon used its so-called "patient-assistance" program as a means to

obscure its aggressive price hikes from the private payors it was fleecing. Although Horizon

maintains that its "mission is really simple. Do the right thing for patients," in reality Horizon's

PME program waives and reduces patient obligations for its high-priced drugs to reduce patient

complaints, patient refusal to accept unnecessary refills or enrollment in automatic refill

programs, and negative publicity stemming from its price hikes for ordinary drugs. Far from

trying to ensure that needy patients got lifesaving drugs, Defendants were motivated by greed.

They were focused on being able to quietly charge over $1800 for an alternative to ibuprofen and

Pepcid (which together would cost no more than $20 or $40 a month) without patient, doctor,

PBM, or market pushback. However, the manner in which they executed the PME program

violated PBM rules and exposed the Company to the loss of PBM contracts and relationships,

investigation by the Department of Justice, litigation, and heightened scrutiny by the media,

Congress, and private insurers.

51.     Horizon is not alone in using patient assistance programs or coupons to make an

end-run around a PBM or insurer's Formulary.[13] However, Horizon developed a new twist to

manufacturers' coupon programs: Through the PME program, Horizon sales representatives

provided doctors with fax forms or an electronic application that transmitted prescriptions

---

[13]     Pharmaceutical manufacturers offer copayment coupons to insured patients to reduce or
eliminate the cost of their out-of-pocket copayments for specific brand-name drugs. These
coupons constitute remuneration offered to consumers to induce the purchase of specific items.
oig.hhs.gov/.../docs/alertsandbulletins/2014/SAB_Copayment_Coupons.pdf

directly to pharmacies with which Horizon partnered.[14]   Horizon guaranteed that, if the doctor

prescribed the drug through the PME program (and thus routed the prescription through the

designated specialty pharmacies), commercially insured patients would receive the drugs,

whether or not insurance would cover it, for little or no co-pay.   According to Horizon, once a

prescription was sent, an employee of the pharmacy would call the patient within a few hours,

confirm that the patient had insurance and other information, and then ship the drugs to the

patient within 24 hours.[15]  Then, Horizon's partner pharmacy would attempt to get reimbursement

from the insurance company.   If the patient's health plan rejected the prescription, Horizon's

third party vendor would step in and pay for the prescription and bill that cost to Horizon.

52.     Subsidizing the co-pays and rejected prescriptions was worth it to Horizon. It kept

Horizon's total prescriptions "sold" numbers high (a metric followed by the market), enabling

the Company to capture more patients with generous insurance plans that would cover Horizon's

exorbitantly priced drugs, and DUEXIS and VIMOVO cost very little to make.   Thus, the

profitability of Horizon's PME scheme depended on the Company processing enough claims

whose payors would cover Horizon's drugs. As discussed below, by controlling the select, few

pharmacies in its PME program, Horizon ensured that its drugs would be dispensed.

53.     From the patient's point of view, through the use of the PME program, Horizon's

drugs were suddenly *cheaper* than going to their corner drugstore and buying the

over-the-counter alternatives.   For doctors, use of the PME program allowed them to more easily

prescribe Horizon's expensive drugs than if traditional retail pharmacies or PBMs' mail order

pharmacies were involved.   In essence, the PME program's primary goal was to circumvent

---

[14]     Horizon started the PME with two partner pharmacies.

[15]     March 27, 2014 Corporate Update Conference Call; June 4, 2015 Horizon Presentation at
Jefferies Global Healthcare Conference.

PBMs and the plan design of health plans and sponsors. For a while this worked well for Horizon and they continued to market and grow the program, which was a primary focus of the Company.

> **6.      Defendants Hid Improper Practices In The Execution And Expansion Of The PME Program**

54.      Throughout 2015, Horizon aggressively pushed prescriptions through the PME program. By the end of the first quarter of 2015, 69% of DUEXIS and 58% of VIMOVO prescriptions were going through the PME program (in comparison with 39% of DUEXIS and 14% of VIMOVO going through the PME just three quarters earlier). Horizon also added PENNSAID 2% to the PME program. In a May 8, 2015 conference call, Defendant Walbert projected that eventually 75% of primary care product prescriptions would be in the program. By the end of the second quarter, 71% of DUEXIS, 61% of VIMOVO, and 69% of PENNSAID 2% prescriptions were flowing through the PME program.

55.      Horizon executives painted the expansion of the PME as a huge success. As set forth herein, during a February 27, 2015 conference call about 2014 year-end and fourth quarter financial results, Defendant Walbert told investors that sales were "exceeding" expectations, and that everything was right "on track" in the PME program. In reality, the rapid expansion was a result of a cultivation of a captive pharmacy relationship with a number of key specialty pharmacies through which it executed its PME program and the Company's improper sales and marketing techniques that remained undisclosed to the market.

> **(a)      Horizon's Undisclosed Use of Captive Pharmacies**

56.      In late 2014 and up until the end of 2015, the Company used a "select" few specialty pharmacies in which to distribute its high priced drugs through the PME and over which it maintained steadfast operational control. Horizon refused to name the specialty

pharmacies used in its PME program in public filings and on earnings conference calls, and even

dodged analyst questions when asked.  For example, during Horizon's November 6, 2015

earnings call for the Company's Q315 results, Ken Cacciatore, an analyst from Cowen, asked,

"can you just talk about the specialty pharmacies, how they get compensated, so we just

understand how the mechanism in which they are compensated?"  Walbert answered simply,

"When it comes to how pharmacies are incented, retail pharmacies, mail order pharmacies are all

incented through the system working with payers and PBMs and for filling prescriptions. That is

it, nothing more to add." Nov. 6, 2015 Earnings Call at 15.  During that same call, Walbert

cryptically disclosed that Horizon used "over six" and "less than 10" partner pharmacies.  *Id.* at

17.

57.     Plaintiffs' investigation uncovered that the top "specialty" partner pharmacies

used by Horizon in 2014 and 2015 included: 1) Linden Care (Woodbury, NY); 2) Halstead

Pharmacy (Chicago); 3) American Specialty Pharmacy ("ASP") (Texas); and 4) Perla Pharmacy

a/k/a Tremont Chemists (Bronx, NY).

58.     Linden Care had been one of the four specialty pharmacies that the Company had

used in 2014 to test the PME program.  According to FE-2, former Territory Manager in the

Northeast Region whose tenure stretched from the middle of 2014 to the middle of 2015,

Horizon would sell its drugs at a discount to their specialty pharmacies (cheaper then what they

sold it to McKesson, for instance). In addition, according to FE-2, for every prescription that

Linden Care got through insurance, they received a certain dollar amount. FE-2 explained that

specialty pharmacies in the PME network were benefiting from incentives from Horizon as well

as back rebates. FE-2 believed that given that DUEXIS and VIMOVO cost Horizon

approximately $10 to manufacture, both the specialty pharmacy and Horizon would end up making money.

59.     However, according to FE-2, there were a lot of problems processing prescriptions through Linden Care, including Linden Care failing to fulfill prescriptions.[16] FE-2's understanding was that Horizon was going to station Horizon employees inside Linden Care's call center in an attempt to address these problems, but FE-2 could not confirm whether this ever happened. Indeed, FE-1 also corroborated that starting in mid-2014, Horizon sales representatives were instructed to stop using Linden Care and to switch instead to filling their PME prescriptions through other specialty pharmacies.[17] In fact, according to FE-1, Horizon dropped Linden Care because they were having trouble keeping up with their Horizon business and they were not able to process a lot of prescriptions.

60.     The loss of Horizon business was felt at Linden Care.  It fought to be hired back, which Horizon permitted in or around early 2015, according to FE-1.  FE-1 added that Linden Care only became a partner pharmacy to Horizon again after it did everything in its power to come back.  At some point thereafter, ***59% of Linden Care's business stemmed from dispending Horizon drugs***, as disclosed in November 2015.[18] This kind of financial dependence by Linden Care on Horizon created an environment which allowed Horizon to manipulate Linden Care to work in Horizon's best interest, as opposed to that of patients and other business partners.

---

[16]     FE-2 initially reported to Area Sales Manager Alex Ross, then District Sales Manager Chris Suskowicz who both reported to Lou Scerbo, Northeast Regional Director at Horizon.

[17]     FE-1 initially reported to Scott Yokobosky, Manager of Rheumatology Sales, then Lance Martin, District Manager.

[18]     *See* Andrew Pollack, *Express Scripts Cuts Ties to New York Specialty Pharmacy*, N.Y. TIMES (Nov. 10, 2015).

61.     Despite analyst inquiries, the conflict-ridden relationship that Horizon maintained with Linden Care was previously undisclosed to the market.  It was only when Express Scripts served Linden Care with notice of its termination of its contractual relationship that questions were raised as to the nature of the relationship.  Express Scripts made clear that it was terminating the relationship in part because it found that Linden Care was a "captive pharmacy" as one that predominantly dispensed Horizon prescription drugs.  Express Scripts added that it would continue to "take action when we see pharmacies trying to circumvent solutions, like formulary management, that protect payers and patients from wasteful drug spend."

62.     As detailed by Express Scripts, "captive" pharmacies are "pharmacies that may be operated by manufacturers to push a particular product, or derive the vast majority of prescription volume from one manufacturer and/or product."  Express Script further explained that "[t]he products dispensed by some captive pharmacies don't require special handling, ongoing patient counseling, or FDA safety programs. They are not specialty medications. And the captive pharmacies dispensing these products are not specialty pharmacies….When a captive pharmacy works to circumvent formulary rules to help a patient gain access to a specific drug, the actions of that pharmacy are ultimately increasing the amount that plan sponsors – and the country as a whole – pay for that particular medication."  *See* http://lab.express-scripts.com/lab/insights/pharmacy-options/captive-pharmacies-what-weve-learned.

63.     Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA") expressed similar concerns in his December 9, 2015 testimony before the Senate Special Committee on Aging in a Presentation entitled, "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines." In that presentation, Merritt provided Congress with his concerns over "***the actions and practices of certain bad apple pharmacies—***

*controlled or owned by drug manufacturers—that call themselves specialty pharmacies, but in*

*reality, represent a marketing strategy to skirt plan formularies."*

64.     In providing an example of the problems associated with drug manufacturers

using "bad apple" pharmacies to skirt formularies resulting in higher benefit costs for employers

and higher premiums for patients, Merritt focused on Horizon:

> Recent investigations have found that the manufacturer Horizon Pharma was
> employing an affiliated pharmacy to sell low-value drugs, such as Duexis. The
> pain reliever Duexis is a combination of two old and common drugs, the generic
> equivalents of Motrin and Pepcid. ***If prescribed separately, the two drugs
> together would cost no more than $20 or $40 a month. By contrast, Duexis***,
> which contains both in a single pill, ***costs about $1,500 a month***. This price
> represents poor value for both patient and payer when much cheaper generic
> drugs are available. Nevertheless, ***Horizon has urged doctors to submit
> prescriptions directly to a so-called specialty pharmacy affiliated with the drug
> company. The pharmacy delivers the drug to the patient, circumventing the
> insurers' formulary and utilization management systems, which are designed to
> deliver the safest, highest-value drugs***.

65.     As the truth regarding Horizon's relationship with its specialty pharmacies

emerged, Horizon repeatedly claimed that its pharmacy relationships were all "arm's length" and

"independent." This was false.

66.     Aside from the financial dependence on Horizon, its specialty pharmacies also

lacked the typical separation between PBM mail order pharmacies and drug manufacturers.  For

example, FE-1 also described how Horizon would station its personnel for a week at a time at

various specialty pharmacies to monitor what was happening with Horizon prescriptions and to

ensure that a lot of Horizon prescriptions were going through.  For example, FE-1 recalled

specifically that one of the top producers out of Oklahoma spent one week working at ASP to

ensure that a lot of Horizon prescriptions were going through.  FE-1 also recalled Horizon

employees (including supervisors) being sent to Halstead in early 2014 and that maybe every two

to three months FE-1 would hear that someone was going to be at the pharmacy this week and

that he or she would be making sure everything goes through.[19]  FE-1's believed this happened at all the specialty pharmacies.

67.    That these practices were occurring at Halstead, is corroborated by former partner pharmacy employees as well.  For example, former Halstead Employee – 1 ("FHE-1) was employed at Halstead as a Clinical Pharmacist from August 2014 through late March 2015 and oversaw compounding services there. FHE-1 recalled that one of Halstead's owners, Renny Kurup, was a close companion to Ben Bove, a senior manager at Horizon.  FHE-1 added that Bove would occasionally be physically present at Halstead, but that more often other Horizon representatives would be onsite.

68.    FHE-1 added that Halstead was processing approximately 1,000 Horizon scripts per week. FHE-1 advised that Halsted was earning about $100.00 per Horizon script and that FHE-1 thought that this represented the majority of Halstead's revenue generated during FHE-1's tenure.[20]  Then, in January or February 2015, FHE-1 learned that Kurup and Horizon manager Bove had partnered to open a second pharmacy, Clybourn Park, located about a mile from Halstead in a small shopping center. Clybourn Park was not open to the public to FHE-1's knowledge, and worked exclusively as a mail-order pharmacy for Horizon products when it opened.

69.    Corporate registration documents corroborate FHE-1's testimony. These documents reveal that as of September 19, 2014, Clybourn Park Pharmacy LLC was run by

---

[19]    While FE-1 and FHE-1 provided counsel with specific names of employees and supervisors who were physically present on occasion at specialty pharmacies, in the interest of these employees privacy Plaintiffs have omitted those names herein.  Plaintiffs will provide those names to the Court *in camera*, if requested.

[20]    Typically, a pharmacy makes a very small profit margin on each brand drug dispensed (since its reimbursed cost from the PBM and insurer is only a bit higher (if higher at all) than the pharmacy's acquisition cost), and the pharmacy is only paid a very small "dispensing fee" for its labor cost of dispensing the drug (of approximately $0.95 - $1.50 per script).

Ben Bove, Todd Smith, and Renny Kurup.[21]  Bove was at this time **still employed by Horizon** as a Senior Vice President, Commercial Strategy and Prescription Made Easy Program.  Similarly, Todd Smith was Executive Vice President and Chief Commercial Officer at Horizon.  ***Thus, far from having a "non-exclusive," "conservative," and "arm's-length" relationship with its specialty pharmacy partners, Horizon was instead funneling prescriptions to a pharmacy controlled by both a Horizon executive officer and a member of Horizon's senior management responsible for the PME program***.[22]

70.     These allegations demonstrate the absurdity of maintaining that Horizon's relationship with its specialty pharmacies was "independent" or "arm's length."

### (b)     Horizon's Improper Sales and Marketing Techniques

71.     Being placed on exclusion lists did take its toll—Horizon was suddenly subsidizing thousands of prescriptions, driving down the average price Horizon could get for each prescription.  In the pharmaceutical industry, the discount between gross sales figure at the drug's list price (*i.e.* the WAC), and the net sales, after all the discounts and rebates, is called "gross-to-net," or GTN. As the PME program grew, Horizon's GTN on its primary care drugs was negatively impacted, increasing from approximately 73%, 65%, 64%, and 55% on DUEXIS, VIMOVO, PENNSAID 2%, and RAYOS in the first quarter of 2015, respectively, to an average

---

[21]     State of Illinois Corporation Report for Clybourn Park Pharmacy LLC (accessed July 25, 2016).

[22]     Unsurprisingly, Clybourn Park Pharmacy has embraced the same unscrupulous marketing practices used by Horizon, with one customer noting:  "I was never told that I would be getting automatic refills of a prescription that I had never even tried. . . . I read the instructions when I received the first container and decided not to use the medicine at all. I called to let the pharmacy know that I didn't want anymore after the 2nd one showed up to my surprise since I didn't order it. I was assured that the refills would no longer arrive, but today my 3rd unwanted RX arrived." Available at (https://www.facebook.com/pages/Clybourn-Park-Pharmacy/1563187210628353) (February 19, 2016).

of 79% at the end of the Class period. That meant that Horizon had to drive ever more prescriptions to keep the same profitability.

72.     To drive the sales growth it needed after being put on the exclusion lists, Horizon and the Individual Defendants ratcheted up the pressure on the Company's sales force.  Though the Company claimed throughout the Class Period that it had a "compliance program in place to address adherence with various laws and regulations relating to its sales, marketing, and manufacturing of its products,"[23] it instilled a sales-at-any-price mentality among its sales representatives.

73.     The message came down to the sales representatives through many channels.  If a sales representative's numbers were low, the representative was summarily fired—after just one or two quarters.  If a sales representatives' numbers were high, however, the Company paid the representative bonuses, and broadcast their name to the entire sales-force—no matter how fishy the numbers.

74.     Horizon also encouraged its sales representatives to develop collusive relationships with doctors who could then be relied upon to continue to write these high priced subscriptions to be processed through the PME program.  Indeed, the top executives of Horizon including the Individual Defendants, knew or recklessly disregarded that some sales representatives' prescription volumes were exorbitantly and unnaturally high.  Instead of investigating how that came to pass, Horizon promoted those sales representatives who had formed close knit relationships with doctors that manifested in higher Horizon prescriptions being filled--and bestowed bonuses and praise on them.  For example, FE-1 recalled that while attending Horizon's 2014 National Sales Meeting in Las Vegas Nevada, along with Horizon's

---

[23]     *See, e.g.*, Form 10-Q for the Quarter Ending September 30, 2015.

senior management, including Defendant Walbert, a surgeon from Las Vegas, Dr. Randall Yee, was asked to speak along with his Horizon sales representative.

75.     According to FE-1, at the National Sales Meeting it was announced that the Horizon sales representative was making over $600,000 a year, which could be attributed to his relationship with Dr. Yee, which included spending weekends hunting together.  FE-1 interpreted the presentation as intended to motivate sales representatives to cultivate similar relationships with their doctors.  A review of online records of Open Payments Data further demonstrates the tools used by Horizon and certain sales representatives to cultivate these relationships.[24]  Dr. Yee received $18,234.50 from Horizon in 2014, the bulk of which was for "services other than consulting."  Of the 16 companies that paid Dr. Yee for items including food and beverage, education, and "services other than consulting," in 2014, "Horizon Pharma USA Inc." paid the most.  Of the 14,268 doctors receiving payments from this Horizon entity in 2014, Dr. Yee was the fifth highest paid.  This is the model of what Horizon was pushing on its sales representatives.

76.     Horizon maintains a Code of Business Conduct and Ethics that reflects the Company's "practices and principles" to which "every employee . . . must . . . abide." The Code provides in pertinent part that "[e]mployees must not offer or provide any gifts or entertainment to any healthcare professional" because such gifts may lead to "improper advantage." But such gifts and other generous contributions to doctors by Horizon employees are precisely the type of behavior Horizon promoted. As seen with Dr. Yee, adopters of Horizon's overpriced drugs were richly rewarded.

---

[24]     Open Payments Data is the federally run transparency program that collects information about financial relationships between doctors and health care manufacturing companies. *See* Open Payments Data OpenPaymentsData.CMS.gov.

77.     The same message was pushed at the 2015 National Sales Meeting in Arizona that took place in February of 2015.  FE-2 advised that Defendant Walbert and other executives were at the 2015 National Sales Meeting.  FE-2 recalled that at that meeting – and throughout his tenure – it was always coached that a territory manager should develop strong relationships with doctors.  FE -2 added that at that sales meeting in February of 2015 employees were also told that PME was the direction of the Company and where they had to go.

78.     Sales representatives who were unable to cultivate this sort of relationship with their doctors to promote the PME were placed on Performance Improvement Plans, then fired.

79.     In addition to cultivating conflict ridden relationships with doctors, Horizon sales representatives were also instructed by the Individual Defendants to ensure product adoption by the doctors they called.  One of the ways Horizon advocated going about this was by obscuring the price of the drugs.  According to FE-1, Horizon sales representatives were instructed to lie to their customers about the price of the drugs.  When doctors would ask the cash price of DUEXIS or VIMOVO, according the FE-1, the sales representatives were told to avoid such questions and instead talk about the benefits of the program to the patients.  FE-1 added that they were to tell doctors that there would be a minimal copay to the patient if the prescription went through a specialty pharmacy.  According to FE-2 when some doctors did find out the price of these drugs was $1500, they essentially told the sales representatives to get out and that they would not have insurance pay that amount for Advil and Pepcid.

80.     To continue to grow the PME program rapidly, Horizon had to do more than promote conflict ridden financial and personal relationships between doctors and their sales representative and deceive those doctors that would not be bought—the Company had to market these drugs to doctors who would prescribe the drugs for off label use.

81.     According to FE-1, sales representatives were given a call plan and a territory with roughly about 150 doctors listed on each plan.  FE-1 explained that the majority of the doctors that they were marketing to were orthopedic surgeons who deal with patients that have "acute" pain related to their surgeries, rather than DUEXIS' indicated use.  FE-1 added that Horizon instructed their sales representatives to market DUEXIS to patients outside the FDA indications for which it was intended — OA and RA.  FE-1 could not understand why they were marketing to surgeons when the products were supposed to be for long-term treatment not short-term acute pain.  FE-1 reiterated that despite the medication being intended for OA and RA, the majority of the medical providers they were marketing to were Orthopedic Surgeons and Podiatrists.

82.     Similarly, FE-2 also indicated that Horizon was marketing their drugs off-label. He recalled that the bulk of prescriptions brought in by NY sales representatives were being written under worker's compensation guidelines for off label usage.  FE-2 added the medication is labeled for long term osteoarthritis, which made him question why doctors would write osteoarthritis as a workers' compensation claim.  FE-2 described that he believed that the accrual price of the drug would be paid for by the settlement that the patient received from worker's compensation.

83.     This is the manner in which Defendants executed on Horizon's PME strategy. They encouraged improper sales and marketing tactics and the use of financial and personal incentives to motivate doctors to write Horizon prescriptions through the PME.   They told their sales representatives to lie to doctors about the cost of the drugs when asked.  And when they still could not meet the numbers needed to justify their substantial compensation, they promoted its drugs for off label usage.  They did all of this with the help of a small number of partner

pharmacies who would do anything to keep their business, including at least one that had direct ties to Horizon management.  This conduct was hidden from shareholders, along with the inevitable business and regulatory risks, reputational harm, and increased scrutiny from payors and PBMs.

### D.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS FOR THE EXCHANGE ACT CLAIMS

84.    Throughout the Class Period, Defendants made materially false and misleading statements and omissions about the business and legal risks posed by the Company's PME specialty pharmacy program.  These statements and omissions were false and misleading because they concealed that:

(a)    Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)    in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks,

32

reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 1.    Horizon's January 12, 2015 Announcement of the Expansion of the PME program

85.    On January 12, 2015, Horizon issued a press released entitled, "*Horizon Pharma plc Provides Business Update.*"  In the release, Horizon announced a business update for its primary care businesses. Horizon stated that it had "begun execution of a comprehensive plan creating a new organization ***focused on the acceleration of its Prescriptions-Made-Easy™ (PME) program*** to ensure continued growth of its non-steroidal anti-inflammatory drug (NSAID) portfolio in 2015."[25]  The Company also announced that it had "completed the hiring and training of an additional 75 sales representatives, with a total primary care sales force size of 325 representatives now selling DUEXIS, PENNSAID 2% and VIMOVO – its primary care drugs.  With respect to the PME program, defendant Walbert represented:

> ***We have a unique commercial business model where focused representative promotion, PME-program execution and the maximization of the value of the product are all aligned to drive revenue growth***. We are now executing a comprehensive plan to ensure patients maintain access to DUEXIS and VIMOVO when their physicians prescribe them. With the acceleration of our PME program, the creation of an innovative retail-PME program and recent pricing action, we are confident we will grow combined net revenues for DUEXIS and VIMOVO in the first quarter of 2015 versus the first quarter of 2014.

86.    Further, the January 12, 2015 press release stated:

> The Company has initiated a territory-by-territory PME-activation program, which began in December 2014 and will continue through February 2015. ***Early results are encouraging with PME-activated territories showing a 21 percent increase in DUEXIS and VIMOVO prescriptions versus prescription levels prior to initiation and each product achieving all-time Horizon high prescriptions in the week ending December 19, 2014***.

---

[25]    Unless otherwise indicated, all emphasis has been added.

***The Company has initiated a retail-PME program, which enables patients going to most retail pharmacies to get similar benefits to Horizon's traditional PME program.***

87.     Defendants' statements touting the PME specialty pharmacy program were false and misleading when made because Defendants concealed that:

(a)     Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     in order to meet PME program sales objectives, Horizon  engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

**2.    Horizon's February 27, 2015 Form 10-K Annual Report (for the Fiscal Year Ending December 31, 2014)**

88.    On February 27, 2015, Horizon filed its Report on Form 10-K for the year ending December 31, 2014 (the "2014 Form 10-K"). In the 2014 Form 10-K, Defendants discussed the Company's PME program:

(a)    "*In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ensure continued growth of our NSAID portfolio in 2015;*"

(b)    "*We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs*;" and

(c)    "*We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and PBMs, to use less expensive generic or over the counter brands instead of branded products increases*."

89.    The 2014 Form 10-K was signed by the Defendant Walbert and Hoelscher. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed a certification that was false and misleading because it stated that the 2014 Form 10-K did not contain false and misleading statements.

90.    Defendants' statements touting the PME specialty pharmacy program, including the program's ability to "ensure continued growth of our NSAID portfolio in 2015" and  "largely mitigate the potential impact" of Horizon's products being placed on the exclusion lists were false and misleading when made because Defendants concealed that:

35

(a)      Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)      in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 3.      Horizon's February 27, 2015 Earnings Conference Call

91.      Also on February 27, 2015, after the release of the Company's financial results for the quarter and year ended December 31, 2014 and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Kody, Walbert and Hoelscher. Defendant Walbert emphasized that the PME program was successfully driving the Company's prescription volume despite the fact that DUEXIS and VIMOVO were excluded from the formularies of two large PBMs.

36

Beginning this year, we had the added challenges of two PBMs adding DUEXIS and VIMOVO to their exclusion list. We previously stated that we expected first-quarter 2015 net revenues for DUEXIS and VIMOVO to exceed first-quarter 2014. So far this year, with the data we have, DUEXIS and VIMOVO are meeting our internal expectations. ***Prescriptions are exceeding our expectations, offsetting partially -- offset partially by increased discounts on prescriptions as they accelerate into PME, leaving us feeling very good about early progress this year. The increased investment in subsidizing scripts within PME is having the intended positive effect in driving prescriptions***.

92.     In response to a question about whether the expansion of Horizon's PME program

into retail increased the Company's exposure to subsidies, Walbert stated in part:

> Just since we started our PME activation program in December, even working through the challenges we discussed early in the first quarter, we've seen a 20% increase among these prescribers. For the physicians that enroll into the PME program, where we do subsidize patients who are either switching insurance plans, have high deductibles, and potentially are on exclusion lists*, we've seen a significant increase in the prescriptions in the commercial lives by these same physicians*.
>
> *  *  *
>
> ***We don't see any of the programs increasing exposure.*** We see them as totally designed to be a direct correlate to driving prescriptions in the commercial side of the business***. It's all been designed to ensure access to the medicine the physician intended the patient to get, and as a result of doing the right thing for the patient,*** minimizing the administrative effort in the physician's office, we're seeing greater prescriptions in the commercial, which offset that subsidization. ***The strategy's working at this point***.

93.     In response to a question about being placed on exclusionary lists at Caremark

and Express Scripts and the effect this was having on prescriptions being written, Defendant

Walbert stated:

> ***Each of the measures that we took***, whether it's -- or had guided so expectations on the prescriptions, penetration to PME, impacting price and ability to offset, ***all those things is working exactly as we had planned. Prescriptions are slightly higher than our expectations.*** As they grow, you have increased co-pay, buy-down and other expenses which are a direct correlant. ***Everything's tracking as we expected in the first six to eight weeks, based on the data we have. So we're on track.***

37

94.     Defendants' statements during the February 27, 2015 Conference Call touting the success of the PME program in "driving prescriptions," attributing the success of the program to decreased "administrative" burdens on physicians and "doing the right thing" for patients, and touting the Company's "PME penetration" and "ability to offset" subsidized prescriptions with price increases were false and misleading when made because Defendants concealed that:

(a)     the key driver of the program's success and its ability to effect "offset[ting]" price increases Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     another key driver of the PME program's success was that Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

95.     The Company's sanguine description of its business and PME program impressed

38

investors and gave them confidence in the Company's future.  Upon release of the financial

results for the fourth quarter and full year of 2014, analysts praised the program. For example,

Cowen analysts characterized the program as "an exceptionally good idea" that would "drive []

increased valuable, profitable revenue." *Horizon Pharma: Q&A Session Reinforces Our Belief*

*That Many Are Still Missing the Big Picture*, Cowen & Company, February 27, 2015.

96.     On February 27, 2015, in response to Horizon's news, Horizon's stock price

closed at $20.53 per share – up from a close on February 26, 2015 of $19.07 per share – an

increase of approximately 7% on volume at least four times Horizon's daily average trading

volume.

### 4.      Horizon's April 13, 2015 Form 8-K

97.     On April 13, 2015, Horizon filed a Form 8-K, signed by the Defendant Hoelscher,

which stated:

> ***Weekly prescriptions of our primary care products grew significantly*** during the
> first quarter of 2015. ***Despite being placed on certain formulary exclusion lists***
> beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS ®
> ibuprofen/famotidine) weekly prescriptions rose 42% and VIMOVO ®
> (naproxen/esomeprazole magnesium) weekly prescriptions rose 26%.  Compared
> to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and
> VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID ®
> (diclofenac sodium topical solution) 2% w/w, during the first 12 weeks of 2015,
> weekly prescriptions grew each week, representing a 353% increase during the
> period. ***We also continued to increase Prescriptions-Made-Easy ("PME")***
> ***activation for our primary care products in the first quarter of 2015, with the***
> ***percentage of prescriptions filled through PME rising to 58%, 44% and 56% for***
> ***DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended***
> ***March 27, 2015.***

98.     The above-listed statements in the April 13, 2015 Form 8-K that Horizon had

"continued to increase Prescriptions-Made-Easy . . . activation" and that "weekly prescriptions of

our primary care products grew significantly . . . despite being placed on certain formulary

exclusion lists"  were false and misleading when made because Defendants concealed that:

(a)       Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)       in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 5.       Horizon's May 8, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending March 31, 2015)

99.       On May 8, 2015, Horizon filed its first quarter Form 10-Q for the period ending March 31, 2015 (the "1Q15 Form 10-Q"), which further addressed the Caremark and Express Scripts exclusion lists which were effective January 1, 2015. Among other things, the 1Q15 Form 10-Q stated: "***We expect that continued adoption of our PME program by physicians will be important to our ability to counter this action by the two PBMs and to offset pressure from***

***healthcare payors and PBMs to use less expensive generic or over the counter brands instead
of our branded products***."

100.    Defendants statements touting the PME program's ability to offset the exclusion

of Horizon's drugs from Caremark and Express Scripts formularies were false and misleading

when made because they concealed that the PME program's ability to offset the exclusion of

Horizon's drugs from key PBM formularies was the result of:

(a)    Horizon exercised secret control over a number of its PME specialty

partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to

monitor the pharmacies' operations, wielding enormous economic influence over the

pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies

were nothing more than a vehicle for Horizon to improperly push its high priced drugs on

patients, exposing the Company to increased business and regulatory risks, such as the risk of

violating contracts, incurring reputational harm, investigation by DOJ and other regulators,

increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)    in order to meet PME program sales objectives, Horizon  engaged in

illegal sales and marketing tactics, including promoting improper personal and financial

relationships between Horizon sales representatives and doctors, instructing employees to hide

pricing information from doctors, and marketing drugs to doctors who would almost certainly

not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business

Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks,

reputational harm, and investigations into the Company's marketing activities by regulatory

agencies including the DOJ.

101.    The 1Q15 Form 10-Q also stated that: the "***advertising, promotion, . . . marketing***

and distribution and other possible activities relating to our products and our product candidates

***are, and will be, subject to extensive regulation by the FDA and other regulatory agencies***.

***Failure to comply with FDA and other applicable regulatory requirements may***, ***either before***

***or after product approval, subject us to administrative or judicially imposed sanction***s."

102.    Further, the Company warned:

> ***We are exposed to the risk that our employees***, independent contractors, principal
> investigators, consultants, vendors, distributors and CROs ***may engage in***
> ***fraudulent or other illegal activity***.
>
> ***** *****
>
> ***We have adopted a Code of Business Conduct and Ethic***s, but it is not always
> possible to identify and deter misconduct by our employees and other third
> parties, ***and the precautions we take to detect and prevent this activity may not***
> ***be effective in controlling unknown or unmanaged risks or losses or in***
> ***protecting us from governmental investigations or other actions or lawsuits***
> ***stemming from a failure to be in compliance with such laws or regulations***.

103.    Defendants' representations in the 1Q15 Form 10-Q about applicable marketing

regulations and Horizon's compliance those regulations, the risk that Company employees "may

engage in fraudulent or other illegal activity," and representations concerning the "precautions"

the Company had "taken to detect and prevent this activity" (including adopting a "Code of

Business Conduct and Ethics") were false and misleading because Defendants concealed the fact

that at the time the statement was made that in order to meet PME program sales objectives,

Horizon engaged in illegal sales and marketing tactics, in violation of state laws, regulations and

agreements with PBMs and insurers.

104.    The May 8, 2015 Form 10-Q was signed by Defendants Walbert and Hoelscher.

Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher

signed a certification that was false and misleading because it stated that the May 8, 2015 Form

10-Q did not contain false and misleading statements.

### 6.      Horizon's May 8, 2015 Earnings Conference Call

105.    Also on May 8, 2015, after the release of the Company's financial results for the

quarter ended March 31, 2015 and before the market opened, the Company held a conference

call with analysts. Participating on that call from Horizon were Kody, Walbert and Hoelscher.

Regarding Horizon's PME program, Defendant Walbert touted the success of the PME program:

> *In the first quarter of 2015, we increased the percentage of prescriptions of DUEXIS, PENNSAID 2%, and VIMOVO being processed through our prescriptions-made-easy program, or PME*. And we have now achieved penetration of 69%, 63% and 58% of prescriptions, respectively. *We continue to expect our primary care products will stabilize at [65%], 75% PME penetration.*
>
> As we have communicated previously, gross to net deductions will increase as we increase PME penetration. *And ultimately, net sales will continue to increase as we continue to drive prescriptions. Moving forward, we expect gross to net discount for our primary care brands will stabilize at 65% to 75%, upon achieving this expected PME penetration. We continue to see positive trends in prescription growth across our primary care products,* and DUEXIS and VIMOVO are now at weekly prescription levels in excess of those experienced in the fourth quarter of 2014. . . We are very pleased with the execution of our commercial organization in the first quarter of 2015, and *anticipate continued attractive growth throughout the year*.

106.    Regarding Horizon's PME program, Defendant Kody stated:

(a)      "*We continue to see attractive growth in prescriptions, driven in large

part by our acceleration of prescriptions flowing through our PME program* in the first quarter

of 2015. *We have successfully grown through* the seasonal effects, which occur in the first

quarter each year, and *the inclusion of DUEXIS and VIMOVO on two PBM exclusion lists.*"

107.    Defendant Walbert's and Kody's statements touting the success of the PME

program were false and misleading when made because they concealed that this success was

driven by:

(a)     Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

**7.     Horizon's Presentation at the June 4, 2015 Jeffries Global Healthcare Conference**

108.     On June 4, 2015, Walbert, on behalf of Horizon, presented to analysts at the Jeffries Global Healthcare Conference.  At that meeting, in response to analyst questions, Walbert purported to describe the PME program and the drivers of its success.  Specifically, a Jeffries analyst asked Walbert, "your PME -- Prescriptions Made Easy -- strategy is still not completely understood by investors. Could you talk about the genesis of this program?"  Walbert responded,

So this program has several facets, but it's simple in its construct. We get physicians to either sign up on their e-prescribing tool or to fax prescriptions into a local specialty pharmacy, which then will process prescriptions as any retail pharmacy would.

But there's a third-party vendor that we work with that essentially helps in adjudication of where we'll subsidize the co-pay for a patient coinsurance. Or if the patient is rejected, we will bring their co-pay to zero and fully subsidize that. To not only do the right thing for the patients but to ensure minimal administrative effort by a physician.

So once that prescription comes in, patient gets called within two hours and then the product is delivered the next day. About 65% to 70% of the prescriptions of our primary care products now go through this distribution channel, and *it enables physicians to have control and give what they think is the right product for a patient, and the patient get[s] it at the lowest possible cost. In enabling that access, we've seen physicians in the program write about 10 times the prescriptions of physicians who aren't in the program for our products*.

109.    Following up on Walbert's response, the Jeffries analyst asked, "Related to that, could you talk a little bit about -- you know, a little bit more about the specialty in the older model? Why have you been so successful? It's been a difficult area for some other companies." Walbert answered by citing several purported drivers of the PME program's success.

I think what makes our PME program work is several facets. First, you have to have products that have *clinical differentiation* that our sales force can sell effectively. Distribution model does not sell products. *Sales reps who are well trained, motivated to differentiate the products and drive prescriptions that can then be managed through our distribution system is what drives the success*.

And you add in, we have sufficient margin available on these products to do the right thing and create access for patients to minimize the disruptive efforts. *It takes a comprehensive – both from the clinical trial data to the sales representative effort to then the distribution pathway doing the right thing for patients and physicians that, in aggregate, is what allows us to be successful with it*.

110.    Walbert's statements describing the components of the PME program and attributing the success of the program to the "clinical differentiation" of Horizon's drugs, the strength of the Company's sales force, and the availability of margin on sales were false and

45

misleading when made because Walbert's statements misleadingly portrayed the PME program as made up of only legitimate components and concealed that:

(a)     a key component of the PME program and driver of its success was Horizon's secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     another key component of the PME program and driver of its success was that Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 8.     Walbert's June 16, 2015 Appearance on Jim Cramer's *Mad Money*

111.     On June 16, 2015, Tim Walbert appeared on Jim Cramer's Mad Money segment on CNBC to discuss, among other things, the Company's PME program.  During his appearance, Walbert attributed the success of the PME program to legitimate causes, namely, convenience and economy for both patient and physician.

46

(a)     "It's very simple, Jim. We try to do the right thing for the patient. . . . So the program does the right thing for the patient, the right thing for the physician. It allows them to write what they think is the best for their patients, ***and ultimately, we get much more prescriptions and greater increase in revenue***, as you've seen in our sequential quarterly results;" and

(b)     "***So, prescriptions are rapidly growing and we expect to continue to accelerate the business and meet or beat those expectations***."

112.    Defendant Walbert's statements that the PME program was "rapidly growing" prescriptions and, therefore revenue, and attributing the success of the program to legitimate causes (namely, the fact that it presents a better alternative for doctors and patients) were false and misleading false and misleading  when made because they concealed that in reality the PME program's success was driven by:

(a)     Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing

information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

**9.  Horizon's August 7, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending June 30, 2015)**

113.   On August 7, 2015, Horizon filed its second quarter Form 10-Q for the period ending June 30, 2015 (the "2Q15 Form 10-Q"), which stated, in part:

> Effective January 1, 2015, two significant pharmacy benefit managers or PBMs, placed DUEXIS and VIMOVO on their exclusion lists, which resulted in a loss of reimbursement for patients whose healthcare plans have adopted these PBM exclusion lists. ***However, this action did not negatively impact sales volume for either product. In fact, with successful adoption of our PME program by physicians, we are seeing increases in sales volume for both products***. During the six months ended June 30, 2015, DUEXIS volumes have increased by 72% and VIMOVO volumes have increased by 9%, when compared to the six months ended June 30, 2014.

114.   The August 7, 2015 Form 10-Q was signed by Defendants Walbert and Hoelscher. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed a certification that was false and misleading because it stated that the August 7, 2015 Form 10-Q did not contain false and misleading statements.

115.   Defendants' statements touting the success of the PME program were false and misleading when made because they concealed that in reality this success was driven by:

(a)   Horizon exercised secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies

48

were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

116.    The 2Q15 Form 10-Q also:

(a)     Stated that the "***advertising, promotion, . . . marketing*** and distribution and other possible activities relating to our products and our product candidates ***are, and will be, subject to extensive regulation by the FDA and other regulatory agencies***. ***Failure to comply with FDA and other applicable regulatory requirements may***, ***either before or after product approval, subject us to administrative or judicially imposed sanction***s."

117.    Further, the Company warned:

> ***We are exposed to the risk that our employees***, independent contractors, principal investigators, consultants, vendors, distributors and CROs ***may engage in fraudulent or other illegal activity***.
>
> *****
>
> ***We have adopted a Code of Business Conduct and Ethic***s, but it is not always possible to identify and deter misconduct by our employees and other third parties, ***and the precautions we take to detect and prevent this activity may not***

> *be effective in controlling unknown or unmanaged risks or losses or in*
> *protecting us from governmental investigations or other actions or lawsuits*
> *stemming from a failure to be in compliance with such laws or regulations.*

118.    Defendants' representations in the 2Q15 Form 10-Q about applicable marketing regulations and Horizon's compliance those regulations, the risk that Company employees "**may** engage in fraudulent or other illegal activity," and representations concerning the "precautions" the Company had "taken to detect and prevent this activity" (including adopting a "Code of Business Conduct and Ethics") were false and misleading because Defendants concealed that in order to meet PME program sales objectives, Horizon  engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 10.    Horizon's August 7, 2015 Earnings Conference Call

119.    Also on August 7, 2015, after the release of the Company's financial results for the quarter ended June 30, 2015 and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Defendants Kody, Walbert and Hoelscher. In response to a question on the positive aspects of the PME program, Defendant Walbert touted the success of the PME program:

> I think simple [sic] the positive is we drove over $100 million in net revenue in the second quarter, rapidly increased prescriptions, if you look at weekly prescriptions the year-over-year DUEXIS is up over 100%, VIMOVO over 50%, PENNSAID 2% over 400% and RAYOS up 88% sequentially quarter over quarter. ***So our business continues to execute.*** With this we're doing business different than many others do which raises lots of questions which we certainly appreciate.

120.    In response to a question about why the PME program worked so well for

Horizon, Defendant Walbert falsely attributed the success of the program to entirely legitimate

causes, including the Company's "differentiated products":

(a)    "So for us what it does is we believe we've got differentiated products

where we do the right thing for the patient, the right thing for the physician and that has led as

you can see in the second-quarter results to strong growth in both all three primary care

products[];" and

(b)    "So we will focus on patient access and combine that with our very

successful commercial sales model. And together we think that can accelerate both prescriptions

and net revenue across the asset base and really bring our diversified business unit structure to

accelerate those revenues."

121.    Defendant Kody likewise falsely attributed the Company's success to legitimate

causes, including the "differentiated clinical benefits" of the Company's products and "terrific

execution by our sales, marketing and analytics teams and our ability to increase patient access to

our products through our Prescriptions Made Easy or PME program":

(a)    "The success we've had this year in driving net sales further validates that

we have the ability to successfully manage our business through various market dynamics and

change. This is a result of terrific execution by our sales, marketing and analytics teams and our

ability to increase patient access to our products through our Prescriptions Made Easy or PME

program;" and

(b)    "Acceleration in total prescription growth of our primary care medicines is

driven by their differentiated clinical benefits for patients []."

122.    Defendant Kody's and Walbert's statements touting the success of the PME program and attributing that success to legitimate causes, including Horizon's "differentiated products" and the fact that the program does "the right thing" for physicians and patients, were false and misleading when made because Defendants concealed that in reality:

(a)    the key driver of the program's success was Horizon's secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)    in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 11. Walbert's September 17, 2015 Presentation at the Morgan Stanley Healthcare Conference

123. On September 17, 2015, Walbert presented at the Morgan Stanley Healthcare Conference. Regarding Horizon's PME program, defendant Walbert stated:

> **On the primary care side, the business continues to accelerate at all-time highs. It has never operated better than it is today. A continued efficiency of our PME program.** Year-over-year acceleration of each of the products is ranging from 25% to several hundred percent year-over-year growth and continued sequential growth in net revenue. And excited about the progress heading into the fourth quarter.

> \* \* \*

> Our Prescriptions-Made-Easy program is simply a program to create access for patients to our medicines at the lowest out-of-pocket cost. **We work with specialty pharmacies to distribute through them to physicians, where patients get access to low co-pays**. . . . we are able to reduce the noise or administrative effort for physicians in the office, creating an ability for them to prescribe more patients and get it at low costs. **And ultimately, we've seen rapid acceleration of each of our products. So [we] did the right thing for patients, rapidly accelerated both revenue and prescription**s.

124. Defendant Walbert's statements touting the "efficiency" of the PME program, the program's generation of "sequential growth in net revenue," and attributing the causes of that success to the fact that the PME program gives patients "access to low co-pays," "distribute[s] drugs to physicians," "reduce[s] the noise or administrative effort for physicians in the office," and "did the right thing for patients," and stating that Horizon's merely "work[s] with" specialty pharmacies were false and misleading when made because Defendants concealed that:

(a) the key driver of the program's success was Horizon's secret control over a number of its PME specialty partner pharmacies by, among other things, stationing personnel at "captive" pharmacies to monitor the pharmacies' operations, wielding enormous economic influence over the pharmacies, and even creating a pharmacy to distribute its drugs, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high

priced drugs on patients, exposing the Company to increased business and regulatory risks, such

as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other

regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and

insurers; and

        (b)       another key driver of the PME program's success was that Horizon

engaged in illegal sales and marketing tactics, including promoting improper personal and

financial relationships between Horizon sales representatives and doctors, instructing employees

to hide pricing information from doctors, and marketing drugs to doctors who would almost

certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of

Business Conduct and Ethics, thereby exposing the Company to increased business and

regulatory risks, reputational harm, and investigations into the Company's marketing activities

by regulatory agencies including the DOJ.

### 12.    The Truth Begins to Emerge

125.    In October and November 2015 and continuing until April 2016, the market

learned the truth about the operational control Horizon exercised over its partner/specialty

pharmacies and the Company's improper marketing practices.  Throughout this period, the

market learned that the PME program's profitability was predicated on unsustainable, illegal, and

improper business practices.

### 13.    The *New York Times*' October 19, 2015 Article Critiquing Horizon's PME Program

126.    On October 19, 2015, after the close of the market, the *New York Times* published

an article entitled "Drug Makers Sidestep Barriers on Pricing" which highlighted the pricing

activities of Horizon.  The article raised concerns about Horizon's use of specialty pharmacies,

including Linden Care, in its PME program, comparing Horizon's PME program to Valeant

Pharmaceutical's questionable marketing and sales practices. The article described, in part, how Horizon had "figured out a way to circumvent efforts of insurers and pharmacists to switch patients to . . . generic components, or even to the over-the-counter versions" of certain expensive drugs through using specialty pharmacies, including Linden Care.  In particular, the article stated:

> The pain reliever DUEXIS is a combination of two old drugs, the generic equivalents of Motrin and Pepcid.
>
> ***If prescribed separately, the two drugs together would cost no more than $20 or $40 a month.  By contrast, DUEXIS, which contains both in a single pill, costs about $1,500 a month.***
>
> Needless to say, many insurers do not want to pay for DUEXIS.  Yet sales of the drug are growing rapidly, in large part because its manufacturer, Horizon Pharma, has figured out a way to circumvent efforts of insurers and pharmacists to switch patients to the generic components, or even to the over-the-counter versions.
>
> It is called "Prescriptions Made Easy." Instead of sending their patients to the drugstore with a prescription, doctors are urged by Horizon to submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company.  The pharmacy mails the drug to the patient and deals with the insurance companies, relieving the doctor of the reimbursement hassle that might otherwise discourage them from prescribing such an expensive drug.
>
> Horizon is not alone. Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.
>
> *    *    *
>
> Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by Horizon and Valeant are for common ailments like arthritis pain, acne and toenail fungus.
>
> "What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs," Ronny Gal, a pharmaceutical analyst at Bernstein, said in a note on Friday.

* * *

Deepak Jindal, a pharmacist in Netcong, N.J., said his wife was prescribed Vimovo and he could not fill the prescription in his own store because his insurance would not cover it. But when the doctor submitted the prescription to Horizon's program, a specialty pharmacy called Linden Care sent the drug to her for a $10 co-payment. He said he later learned that his insurance was not billed for the drug.

127.     Following the publication of the *New York Times* article after hours on October 19, 2015, Horizon stock fell $3.81, or 19.98%, from a close of $19.07 per share on October 19, 2015 to close of $15.26 per share on October 20, 2015.

128.     In response to the publication of the October 19, 2015 *New York Times* article, Defendants issued false and misleading statements designed to reassure investors that the specialty pharmacies that distributed Horizon's drugs were entirely independent from the Company.

129.     Specifically, on October 21, 2015, after the market closed, Horizon issued a press release entitled "Horizon Pharma plc Provides Update on Relationships With Specialty Pharmacies." Regarding specialty pharmacies, Horizon stated:

> ***All pharmacies that distribute Horizon branded medicines are fully independent. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy.*** In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.

130.     These statements were false and misleading when made.  Defendants' statements denying that Horizon owned or had an option to purchase "any pharmacy" and that the pharmacies in the PME program were "fully independent" failed to disclose that Horizon secretly exercised operation control over its partner/specialty pharmacies, as described herein. By stating that a pharmacy's independence depended only on its ownership structure (and that a pharmacy was "captive" only if was controlled in the same way Valeant controlled its captive

56

pharmacy network), Defendants misleadingly attempted to deflect concerns about their control over specialty pharmacies.

### 14. Depomed's Press Release Raising Questions About the Sustainability of Horizon's Business Model

131.    On October 22, 2015, before the market opened, Depomed, a hostile takeover target of Horizon for many months, issued a press release entitled, "Depomed Comments on Recent Reports Regarding Horizon Pharma's Business Model Reports Confirm Concerns Raised by Depomed's Board in Rejecting Horizon's Unsolicited Exchange Offer."  Depomed's press release stated that recent news about Horizon's "aggressive drug pricing practices" and "use of specialty pharmacies" raised serious concerns about the sustainability of the Company's business model.  Specifically:

> Depomed, Inc. . . . today issued the following statement in response to numerous recent reports surrounding Horizon Pharma plc's (NASDAQ: HZNP) ("Horizon") business model, in particular concerns raised about aggressive drug pricing practices and Horizon's use of specialty pharmacies:

> Depomed's Board unanimously rejected Horizon Pharma's unsolicited exchange offer on September 11, 2015. . . the Company highlighted the Board's reservations about Horizon's business model and strategy, while observing that the nature of Horizon's business model had the potential to lead to significant volatility in the price of Horizon stock. Importantly, numerous reports in the past days . . . have reiterated and validated these serious concerns.

> For example:

>> o A September 23, 2015 note issued by Express Scripts, one of the largest managers of drug formularies, to its clients criticizes Horizon's price increases, comparing Horizon to Turing Pharmaceuticals, and notes that Horizon, after purchasing the rights to VIMOVO and with its own product, DUEXIS, "soon increased the prices on these older products more than tenfold. This isn't innovation. Akin to a spike in gas and plywood prices just ahead of a hurricane, this is profiteering."

>> o An October 19, 2015 article in The New York Times discusses significant concerns about Horizon's Prescriptions Made Easy ("PME") program and notes that DUEXIS is "a combination of two old drugs, the generic equivalents of Motrin and Pepcid", which "if prescribed

57

separately… would cost no more than $20 or $40 a month", however "DUEXIS, which contains both in a single pill, costs about $1,500 a month."

As noted in Depomed's September 14, 2015 letter to shareholders:

> o ***We believe the frequency and magnitude of Horizon's price increases are unsustainable*** . . . We do not believe these pricing strategies are conducive to building a stable and sustainable company that will create and deliver long-term value for its shareholders.

> o ***Many of Horizon's drugs have recently been removed from the largest PBMs***: Due to Horizon's dramatic price increases and what, in our view, is a lack of meaningful product differentiation, many of Horizon's drugs have recently been removed from the largest PBM drug formularies and remain on the exclusion lists of the two largest PBMs through 2016. We believe that as Horizon continues to increase the prices of its products well beyond the prices of competitive products, the trend of Horizon products being excluded from drug formularies may accelerate, posing further risks to Horizon's business and long-term prospects.

> o ***In our view Horizon's Prescriptions Made Easy ("PME") drug discount program has caused significant deterioration to Horizon's realized net sales as a percentage of gross sales ("gross to net")***. . .

132. On this news, Horizon's stock fell an additional 11.5%, from a close of $14.83 per share on October 21, 2015, to a close of $13.12 per share on October 22, 2015.

133. In response to Depomed's press release, Defendants again attempted to soothe investors' concerns.  Despite having issued a reassuring press release just the day before, on October 22, 2015, after the market closed, Horizon frantically issued yet another press release entitled "Horizon Pharma plc Corrects Misinformation in the Marketplace," which again claimed that the specialty pharmacies distributing Horizon's drugs were entirely independent and not at all "captive."

> Horizon takes seriously its responsibility to ensure patients have access to our medicines. Horizon enhances patients' access through several programs, one of which ensures that patients have a low out-of-pocket cost for Horizon medicines. This has resulted in 96 percent of patients filling prescriptions for Horizon's medicines during the first half of 2015 realizing co-pay amounts of $10 or less.

58

Horizon's average selling price (ASP) of DUEXIS® (ibuprofen/famotidine), VIMOVO® (naproxen/esomeprazole), PENNSAID® (diclofenac sodium topical solution) 2% and RAYOS (prednisone) averaged $462 in the second quarter of 2015, which is unchanged since the first quarter of 2014. Over this same time period, prescriptions of these products increased 154 percent… *__We believe this strong prescription growth is the result of 1) the clear clinical benefits these products provide and 2) our ability to provide access to important medicines in today's healthcare environment.__*

\* \* \*

In addition, Horizon commented yesterday on its relationship with specialty pharmacies. *__All pharmacies that distribute Horizon branded medicines are fully independent, including those that are part of Horizon's Prescriptions Made Easy program__*. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy. In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.

134.    Defendants' statements in the October 22, 2015 press release that prescription growth in Horizon's products is due to "clear clinical benefits" and Horizon's "ability to provide access to important medicines;" and that "[a]ll pharmacies that distribute Horizon branded medicines are fully independent" were false and misleading in their failure to disclose that:

(a)    key drivers of prescription growth also included the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics;

(b)    in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks,

59

reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

135.   Moreover, Defendants' statements denying that Horizon owned or had an option to purchase "any pharmacy" and that the pharmacies in the PME program were "fully independent" failed to disclose that Horizon secretly exercised operation control over its partner/specialty pharmacies, as described herein.  By stating that a pharmacy's independence depended only on its ownership structure (and that a pharmacy was "captive" only if was controlled in the same way Valeant controlled its captive pharmacy network), Defendants misleadingly attempted to deflect concerns about their control over specialty pharmacies.

136.   Defendants' reassurances had their intended effect.  Horizon's October 22, 2015 press release caused the Company's stock to *increase* approximately 30% to a close of $17.06 on October 23, 2015, from a close of $13.12 per share on October 22, 2015.

### 15.   Defendants Continue to Issue False and Misleading Statement to the Market in Horizon's November 6, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending September 30, 2015)

137.   On November 6, 2015, Horizon filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q15 Form 10-Q"), in which Defendants continued to reassure the marketplace about the propriety of the Company's PME program and, in particular, that pharmacies participating in the program were not captive.  The 3Q15 Form 10-Q stated, in part:

> The Company's products are distributed by retail and specialty pharmacies. A key part of the Company's commercial strategy for its primary care and specialty business units is to offer physicians the opportunity to have their patients fill prescriptions through pharmacies who participate in the Prescriptions Made Easy ("PME") program. ***This program is not involved in the prescribing of medicines, and is solely to assist in ensuring that when a physician determines one of the Company's medicines offers a potential clinical benefit to their patient and they prescribe one for an eligible patient, financial assistance may be available to reduce the patient's out-of-pocket costs.*** In the first nine months of 2015, this resulted in 96 percent of commercial patients having co-pay amounts of $10 or less when filling prescriptions for the Company's products through PME. In

addition, the aggregate commercial value of the Company's patient support programs for the nine months ended September 30, 2015 was approximately $670 million. ***All pharmacies that fill prescriptions for the Company's medicines are fully independent, including those that participate in the PME program***, the Company does not own or possess any option to purchase an ownership stake in any pharmacy that distributes its products, and the Company's relationship with each pharmacy is non-exclusive and arm's length. All of the Company's sales are processed through pharmacies independent of the Company.

***The Company has a compliance program in place to address adherence with various laws and regulations relating to its sales, marketing, and manufacturing of its products, as well as certain third-party relationships, including pharmacies***. Specifically with respect to pharmacies, the compliance program utilizes a variety of methods and tools to monitor and audit pharmacies, including those that participate in the PME program, to confirm their activities, adjudication and practices are consistent with the Company's compliance policies and guidance.

138.     The 3Q15 Form 10-Q also reiterated the Company's false statements concerning its compliance with applicable law and regulations, stating: "that the "***advertising, promotion, . . . marketing*** and distribution and other possible activities relating to our products and our product candidates ***are, and will be, subject to extensive regulation by the FDA and other regulatory agencies***. ***Failure to comply with FDA and other applicable regulatory requirements may***, ***either before or after product approval, subject us to administrative or judicially imposed sanction***s."

139.     The November 6, 2015 Form 10-Q was signed by Defendants Walbert and Hoelscher. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed a certification that was false and misleading because it stated that the November 6, 2015 Form 10-Q did not contain false and misleading statements.

140.     Defendants' above-listed statements in the 3Q15 Form 10-Q regarding the PME program, its partner pharmacies, and the Company's marketing practices were false and misleading in their failure to disclose the operational control Horizon secretly exercised over its

partner/specialty pharmacies and in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

### 16.  Horizon's November 6, 2015 Earnings Conference Call

141.    Also on November 6, 2015, after the release of the Company's financial results for the quarter ended September 30, 2015 and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Walbert and Hoelscher.  On that call, Walbert made a number of statements to attempt to soothe the market's concern about the PME program, and particularly the independence of pharmacies participating in the program.  Walbert stated:

(a)    "The pharmacies we work with are fully independent, full-service pharmacies that serve both retail and mail order pharmacies;"

(b)    "*And for any pharmacy that uses this program we work diligently to ensure that they are meeting all of our strict compliance criteria and standards. If they don't, we quickly terminate participation and we have done so*;"

(c)    "*Our patient support programs are designed to subsidize part or all of a commercially insured patient's financial burden*, whether it is a co-pay, a patient's co-insurance payment or a prescription that a commercial payer rejects in spite of the physician's clinical decision;"

(d)     "***Expanding this program earlier this year wasn't without risk, despite the concept of using specific pharmacies that have been around for many years and as used by most major pharmaceutical and biopharmaceutical companies. Still it was a critical strategic decision for us to benefit patients to enable access for them to the medicines their physicians prescribed***;"

(e)     "***So, it is clearly that significant volume growth is driving our net sales, not price. This is an extremely important point that we want to make sure everyone understands. It is why we consistently and transparently discuss our gross and net percentages with you, our investors***;" and

(f)     "***We have and we will continue to be transparent on all aspects of our business.*** We realize that we have to balance what we are doing for patients on the access and affordability side with what you, the investors, expect from us. It is an important balance that we owe to you as well as the patients we serve"

142.    Walbert's statements had their intended effect.  On November 6, 2015, Horizon's stock price closed at $21.00, up from a close on November 5, 2015 of $17.26, an increase of approximately 20% on volume at least three  times Horizon's daily average trading volume.

143.    However, in reality, Defendant Walbert's statements about: (i) the PME program; (ii) the pharmacies in the PME program; and (iii) that Horizon has been "transparent in all aspects of our business" were false and misleading in their failure to disclose:

(a)     the operational control Horizon secretly exercised over its partner/specialty pharmacies and in order to meet PME program sales objectives; and

(b)     Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives

63

and doctors, instructing employees to hide pricing information from doctors, and marketing

drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in

violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the

Company to increased business and regulatory risks, reputational harm, and investigations into

the Company's marketing activities by regulatory agencies including the DOJ.

**17.    Defendant Walbert Continues to Issue False Statements to the Market in his November 9, 2015 Appearance on Jim Cramer's *Mad Money***

144.    On November 9, 2015, Tim Walbert appeared on Jim Cramer's *Mad Money*

segment on CNBC.  During his appearance, Walbert continued to reassure the market about the

propriety of the PME program and the causes of its success.  Specifically, Walbert stated:

(a)    "The pharmacies we work with, whether it's a retail pharmacy;

Walgreens, Duane Reed—you walk into; or a pharmacy that works through our PME Horizon

Cares Program, they . . .one key goal. Doctor writes a prescription for our medicine because it

has a clinical benefit, and the pharmacy insures they get it. They cut out the middlemen who

have financial incentive to do so. ***And, simply our role is to insure that the patient gets what the***

***doctor intended.***"

145.    Defendant Walbert's statements regarding the PME program, the program's aims,

and the causes of its success, including the "clinical benefit" of Horizon's drugs and the

program's role in "cut[ting] out the middlemen" were false and misleading in their failure to

disclose:

(a)    the operational control Horizon secretly exercised over its

partner/specialty pharmacies and in order to meet PME program sales objectives; and

(b)    in order to meet PME program sales objectives, Horizon engaged in illegal

sales and marketing tactics, including promoting improper personal and financial relationships

between Horizon sales representatives and doctors, instructing employees to hide pricing

information from doctors, and marketing drugs to doctors who would almost certainly not

prescribe the drugs for indicated uses, in violation of the Company's own Code of Business

Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks,

reputational harm, and investigations into the Company's marketing activities by regulatory

agencies including the DOJ.

### 18. Defendants Continue to Reassure the Market about the PME Program at Horizon's November 9, 2015 Corporate Analyst Meeting

146.    On November 9, 2015, at approximately 12.30 pm E.S.T., Horizon hosted its

annual Corporate Analyst Meeting. Participants in the analyst meeting from Horizon included

Walbert, Kody, Carey, Hoelscher, and Steve Curtis, General Manager at Horizon.  In discussing

the PME program, renamed HorizonCares, Curtis  stated that Horizon's relationship with

pharmacies participating in the PME program was nothing more than "standard."

> *Worth [noting] along with these facts is that we don't pay for any fees, you know, there's no fee-for-service arrangement with any pharmacy. So, we have a very standard relationship there and, actually, probably more conservative than they ever appear.*

\* \* \*

> And, you know, we experienced some success by the end of 2014. We've expanded to around 75 territories and several more pharmacies. Throughout 2015, we've expanded. Now, every primary care and specialty sales force has access to the program.

147.    Carey addressed the Company's business strategy and described the market's

concerns about it as "unfounded," stating:

> *While the efforts of these priorities in the short-term have led to a considerable decline in our market value, we strongly believe our continued execution, commitment to transparency, and a full disclosure as well as support we have received for many of our investors, analysts and advisers will, overtime, lead to our return to sanity with respect to the perceptions about and value of our business.*

65

Hopefully, volatility and equity markets will settle down soon and sanity will be restored and trading to Horizon. ***Due to this attack, an unfounded concern about our business model, we now trade a considerable discount to the net sales multiples of our peers.*** We've attempted to quantify and exhibit this discount by calculating the embedded value of each of our orphan and primary care specialty businesses in comparing this value to our current enterprise value.

\* \* \*

With continued execution and return to sanity and the equity markets for biopharmaceutical companies, ***we expect to close the valuation gap and achieve multiples in line with our performance***.

148.    During the analyst meeting, Defendant Walbert also tried to quell concern in the market over Horizon's use of specialty pharmacies, dismissing previous disclosures as "misinformation and misunderstanding of facts" and "noise in the marketplace":

So, you've heard us talk about the impact in the industry and ***there's been a lot of misinformation or misunderstanding of facts***. And there's been comments and questions around use of various forms of pharmacies. ***And I can't speak for other companies or what they're doing but you've heard what we're doing and the bottom line is we're focused on our medicines which offered clinical benefits and we enable patients to go them.***

***Those are the facts. There -- we don't believe any of the noise in the marketplace is related to our business*** but a whole sector has been impacted based on a lot of false information for whether that's political or financial reasons. You saw from Terry -- if you look at over the last five years, CMS's own data show that pharmacy or drug cost has not substantially changed. It's about 10%.

149.    Also during the conference call, in response to a question regarding fill fees, Defendant Hoelscher stated:

***And then on the sell side, you know, we're -- when a prescription is commercially paid, there's an [nothing] that we pay to a pharmacy and that's just part of filling the prescription, the managed care, the payer's paying, you know, that prescription to be filled.***

***When the script is rejected and our third party vendor steps in and funds that free prescription, they're also funding, you know, a fill fee to the pharmacy. And again, with our volume this year, we, you know, we really go through that fill rate was the third party vendor and reduce it by about 40%, I believe.***

66

150.     Defendants' statements were false and misleading in their failure to disclose the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers.

### 19.     November 10, 2015 Termination by PBM Express Scripts of One of Horizon's Top Partner Pharmacies and Horizon's Response to Termination

151.     Only weeks after Defendants repeatedly assured the market that Horizon's relationship with the pharmacies participating in the PME program was entirely arm's-length, Express Scripts, one of the country's largest PBMs, revealed that Horizon essentially controlled Linden Care.  On November 10 2015, after the market closed, Express Scripts announced that it had sent specialty pharmacy Linden Care an immediate termination letter and had removed Linden Care from its network stating that Linden Care was a "captive" pharmacy of Horizon - i.e., primarily dispensed Horizon drugs - and did not fulfill its contractual obligations. Further, Express Scripts announced that it had filed a complaint against Horizon, seeking recovery of approximately $140 million.

152.     In response to Express Scripts' action, and in another attempt to assuage investor anxiety, on November 10, 2015, after the market closed, Horizon issued a press release, stating:

> Less than five percent of our net sales are from prescriptions that are filled by Linden Care and processed by Express Scripts.  In addition, we have a diverse group of pharmacies that participate in our patient support program and no pharmacy that participates in our primary care patient support programs account for more than 13 percent of our net sales.
>
> ***The notion that Linden Care is a so-called "captive pharmacy" of Horizon Pharma is entirely false***.  At best Express Scripts is being reckless in its allegations and at worse it is intentionally attempting to mislead investors.  As previously stated, all pharmacies that distribute Horizon branded medicines are fully independent.  ***Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy.  In***

> *addition, the relationship with these pharmacies is non-exclusive where each of*
> *these pharmacies may also fulfill prescriptions for other drug manufacturers.*

153.    On November 10, 2015, after the close of the market, the *New York Times*

published an article entitled "Express Scripts Cuts Ties to New York Specialty Pharmacy"

analyzing the Express Scripts announcement of the removal of Linden Care as a "captive

pharmacy" from its network.  The *Times* characterized the action as "a sign of a further

crackdown on the use of mail-order dispensaries to help lift sales of expensive drugs;" and, in

particular, said that Express Scripts "was taking action against 'captive' pharmacies that seem to

be aimed at pushing a single manufacturer's products."  The *Times* quoted a lawyer for Linden

Care to the effect that "***about 59% of Linden Care's business involves dispensing drugs made***

***by Horizon*.**"  The *Times* noted that "if doctors send a prescription to [a] specialty pharmacy,

there is less chance an insurer or pharmacist will try to switch to a less expensive generic

product."  On that same day, Reuters reported that Express Scripts was "evaluating several other

pharmacies that appear to be predominantly dispensing Horizon drugs."

154.    Astonishingly, in a mad dash to prevent the market from assimilating the

disclosures communicated in Express Script's announcement, Horizon frantically issued ***yet***

***another*** reassuring press release the ***very next morning***, November 11, 2015, before the market

opened, entitled "Horizon Pharma plc Provides Comment on Express Scripts' Business

Practices."  In that press release, Defendants repeated their statements from the night before and

charged Express Scripts with profiteering. Horizon claimed Express Scripts had removed Linden

Care from its network in order to stamp out small, independent pharmacies that compete with its

own specialty pharmacy, Accredo Health Group, Inc., the largest specialty pharmacy in the U.S.

155.    Defendants' statements denying that Linden Care was a "captive pharmacy" and

emphasizing the independence of the pharmacies participating in the PME program were false

and misleading in their failure to disclose the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

156.    Horizon's stock fell $4.39 per share, or 19.62%, from $22.38 per share on November 10, 2015 to $17.99 per share on November 11, 2015.

### 20.    Additional Analyst Meetings in November - December 2015

157.    On November 18, 2015, Horizon presented at Stifel Healthcare Conference. With respect to the primary care division, Walbert stated the following:

> ***Our success has been driven in the primary care and specialty space by having a differentiated commercial model*** where our representatives effectively are able to help physicians understand the clinical benefits and therefore they write a significant number of prescriptions. ***If you look at the third quarter, DUEXIS prescriptions were up 107% over the third quarter of 2014. VIMOVO was up 35%. PENNSAID was up 422%. RAYOS up well over 100%. That's driven by our differentiated commercial model where we can accelerate prescriptions, and then when it comes to distribution***, it is simply finding the right pathway to ensure the patient gets what the physician intended.
>
> I know there's a lot of noise going on around with specialty pharmacies, and what's been interesting is that it has been positioned as something that is new. . . So for us, it's not something that concerns us. We are going to continue to ensure through various distribution pathways and execution that patients get their medicines, and we went through this last year where there was a perception that exclusion lists would prevent patients from getting what their physician prescribed. We found a way to ensure that when a medicine is covered, the patient is covered in that way. If it is not, we will do the right thing for the patient. In fact, we have given 250,000 patients free drug this year alone and that is an

aggregate commercial value of over $700 million. So, we believe in doing the right thing for the patient. Our commercial model is working.

\* \* \*

[W]hen it comes to Linden Care, they are independent of us. We have no idea what's going on. There was a lawsuit. They're looking for an injunction. They apparently held a hearing, and when it's announced, we will see it like you will.

But when we step back and look at it for our business, we are not concerned. When we saw the situation occurring with Valeant, we assumed that there would be piling on and people looking for opportunity to curb different efforts, so we began working alternative strategies. And when we step back and look at what happened last summer around exclusion lists, we guided at that time that it could impact up to 15%, 20% of prescriptions. ***If you look at our execution, we have grown prescriptions in aggregate for the first three quarters well over 100%. In the face of that, this has much less impact because we have grown through that exclusion. So, we believe it is manageable. It is around execution and that's what we've done well.***

\* \* \*

<u>Annabel Samimy - Stifel Nicolaus – Analyst:</u> And just to help people put this into context, how much of your prescriptions run through Linden and how quickly can you move it over to other alternative channels?

<u>Tim Walbert:</u> ***What we have said with that pharmacy is that it impacts less than 5% of our net sales, so with that and as we have said, we have no change in what our guidance is today or going forward based on any of these actions or if these actions occur in a broader way.*** Our focus is continue to drive prescriptions through representatives, clinical differentiation, and then merely finding different strategies and executing on the distribution side, and that's something that we will continue to do.

\* \* \*

<u>Tim Walbert:</u> ***So what we are going to do is continue to drive volume, and the guidance on our gross to net range of that 65% to 75% is going to remain***. And as you drive more volume, it will flow through in a [similar] fashion, and on a quarter-by-quarter basis, you saw the third quarter. It fell under 70%. The prior quarter was slightly over 70%, so we may see some variation on a quarter-by-quarter basis, but in aggregate, our guidance isn't changing. We expect it to stay in the near future through our guidance in 2016 and it is all about driving volume. And that's something that we have continued to show, and when you talk about the broader noise in the marketplace, for us there was a perception that we had prescriptions flattening in August, and when questions around whether our third

quarter, how that was going to play out, we beat revenues by $40 million and EPS by over $0.30. So, we know how to execute and we are going to continue to drive that volume.

* * *

Tim Walbert: So the question for everyone was, have we moved the Linden Care prescriptions and what is our plan moving forward? ***We are not involved with Linden Care, so we haven't moved anything. All we have done is say to them if, for whatever reason, a patient isn't covered, we're going to do the right thing for the patient. So, I don't know what Linden Care is doing beyond that. That is their own business.***

158.    On November 19, 2015, Horizon presented at the Goldman Sachs US Emerging

& SMID Cap Growth Conference. In response to a series of questions about specialty

pharmacies and Horizon's PME, Walbert responded as follows:

Goldman Sachs – Analyst: Okay: So, onto the specialty pharmacies, and specifically Express Scripts recently announced that they are cutting off Linden Care. That is one of the specialty pharmacies that you guys use.

Tim Walbert: ***We don't use or work with any specialty pharmacies. Linden Care is not a specialty pharmacy. They are a retail pharmacy that also does some mail order. Specialty pharmacies are dominated in the US by Accredo, which is owned by Express Scripts.***

Gary Nachman - Goldman Sachs – Analyst: Okay, important clarification. So, specifically -- and you have those types of pharmacy. There is about five to 10 --

Tim Walbert: Correct.

Gary Nachman - Goldman Sachs – Analyst: -- that you use within your network and you could elaborate on that. But Dave described it as a captive pharmacy and you guys have said that is completely false. So I think it's good to just clear the air in terms of how you use these pharmacies within your HorizonCares program.

Tim Walbert: Absolutely, and it is an important question, and maybe just to simply define what captive pharmacy means. ***Captive pharmacy means you have some control of it and what they do. And if you look at Express Scripts trying to define any non -- a specialty pharmacy they don't own as captive, when they have the captive that they mandate people using. In this case, a Linden Care or any pharmacy can write -- can fill any medicine, and we have no involvement whatsoever in  what that pharmacy does.*** A prescription goes into any pharmacy,

Linden Care; a technician punches it in. If it is covered, it goes through the system.

If it is not covered, that pharmacy will then through a third party subsidize and make sure the patient gets the medicine. So what the original intent of the program was simply for patients that aren't covered or too much cost is being passed to them through co-payer and coinsurance; we are creating access to that patient. ***In fact, these pharmacies are not needed and are not any value from the standpoint of helping with a patient that is covered by a plan. . . . Nothing involved here is changing or involved in what a physician's decision is. What any pharmacy does, if we're working with them, is simply if the doctor decided the medicine is what is best for their patients, either it is covered through the system or we try to get it to the patient for free or, in the case of our medicines, 96% of patients pay $10 or less.***

<u>Gary Nachman - Goldman Sachs – Analyst:</u> Right. So for these five to 10 pharmacies like Linden that you work with closely to help facilitate the process, why isn't that number bigger and potentially could it be? And so if Linden, let's just say, is cut off by an Express Scripts, does that matter? Do people need to be concerned that there is going to be a domino effect here and there could be other (multiple speakers)

<u>Tim Walbert:</u> ***It impacts less than 5% of our sales, so it doesn't matter from the big picture. It doesn't factor into any change in our guidance, either 2015 or beyond.***

159.    Defendant Walbert's statements on November 18, 2015 and November 19, 2015 about the PME program and the pharmacies in the PME program were false and misleading in their failure to disclose:

(a)    the operational control Horizon secretly exercised over its partner/specialty pharmacies and in order to meet PME program sales objectives; and

(b)    Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the

Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

160.    On November 19, 2015, Horizon presented at Jefferies Global Healthcare Conference.  In response to a question regarding Horizon's gross-to-net, Hoelscher responded as follows:

> David Steinberg - Jefferies LLC – Analyst: Okay. And one of the other concerns investors have had is relative to your gross to nets, in that they have deteriorated a little bit and people are looking for stabilization. It looks like last quarter they stabilized somewhat. Should we expect stabilization going forward or even improvement, or where do you stand on gross to nets over the next 12 months?
>
> Paul Hoelscher: *Okay, so the guidance that we have given to investors in 2015, I think, carries forward into 2016 where we expect that for the three primary care and the RAYOS on the specialty side, we expect the gross to nets to stay in the 65% to 75% range. So, we had some improvement in the third quarter. We did some -- we made some changes that we talked about where we went out and, because of the growth in volume, were able to negotiate some decreases in our fees paid to wholesalers, and also were able to decrease some of the fees we pay in connection with processing the fully brought down scripts, and those will benefit us over the coming quarters, too, as those get annualized, but we think the 65% to 75% range that we gave previously is still valid for those products.*

161.    On December 1, 2015, Horizon presented at the Piper Jaffray Healthcare Conference.  In response to a question regarding the Company's gross-to-net in the primary care division, Bob Carey stated:

> David Amsellem - Piper Jaffray – Analyst: So wanted to switch gears to the primary care portion of the business and the question I had here is on the gross to net thing you talked about this 65% to 75% range and that's a wide range, that's going to move the needle if it's 65% versus 70% versus 75%. So maybe help us with how to think about where this is going to trend in 2016 for really I mean (inaudible) DUEXIS, VIMOVO and PENNSAID?
>
> Bob Carey: *We have no reason to change that guidance at this point. As we started out talking about we continue to believe that this movement towards less control to more control will be in that low-single digit to mid-single digit range and that's part of our planning scenario. And so that what we're doing is pushing and pulling the different levers that are available to us to manage into that 65% to 75% gross to net range, while still showing the kind of net sales*

*growth that we've guided towards. And so what we see are opportunities to push and pull a number of different levers to make that happen…*And so it's this constant back and forth movement on that that gets us into that range that we think is manageable, which we've been able to accomplish actively over the last three quarters, given some of the headwinds we've faced and we continue to believe that that will be available to us as we move forward.

* * *

Unidentified Audience Member: So what percentage of the overall prescriptions for VIMOVO and DUEXIS are prescriptions that you end up not getting paid either by the PBM or the payor? The patient ends up -- your revenue is the patient's co-pay?

Paul Hoelscher: We've not disclosed that. We've just said that it's less than half.

162.     On December 3, 2015, Horizon presented at the Bank of America Merrill Lynch

Leveraged Finance Conference.  In response to a question about primary care revenues and

Horizon's gross-to-net in that division, Hoelscher stated:

Unidentified Audience Member: What percentage of your primary care revenues are -- come from specialty or dedicated distribution? Can you talk about the impact not only of Linden but Irmat and those type of activities on that revenue stream?

Paul Hoelscher: *Okay, well, Irmat -- and we have no connection with at all. They were not part of our medicines at all. So we've -- the guidance we've given is that I think each of our primary care medicines are in the 65% to 75% of their scripts have been – have gone through our PME program. We expect them to stay in that range from a net sales standpoint.*

*The net sales that flow through there are dramatically less because most of the -- any scripts -- most of the scripts that we fully buy down our through that channel and so on a net sales basis you have dramatically less than the 65% to 75% that flow through that program. We don't have any dedicated pharmacies -*

* * *

*I think we've said they are less, less than 50% is through that channel because of the level of the fully bought down scripts that go through there. And then on the -- you mentioned Linden Care, what we have said is Linden Care was less than 5% of our net sales and no single pharmacy that participates in our programs makes up more than 13% of our net sales.*

163.    Defendants' statements regarding the Company's sales in the PME program and projections regarding gross-to-net were false and misleading in their failure to disclose:

(a)    the operational control Horizon secretly exercised over its partner/specialty pharmacies and in order to meet PME program sales objectives;

(b)    that Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ;

(c)    that Horizon would be forced to slash prices on its biggest growth drivers thereby lowering its margins going forward; and

(d)    Payor pushback was impacting Horizon's primary care drugs, primarily DUEXUS and VIMOVO much more than Defendants disclosed.

### 21.    The Senate Hears Testimony About Horizon's Relationships with Specialty Pharmacies in December 2015.

164.    The Senate Special Committee on Aging heard testimony in December 2015 concerning rising healthcare costs. Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA") testified on December 9, 2015 before that committee and gave a presentation entitled, "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines." In that presentation, Merritt provided Congress with his concerns over "***the actions and practices of certain bad apple pharmacies—controlled or owned by drug manufacturers—***

*that call themselves specialty pharmacies, but in reality, represent a marketing strategy to skirt*

*plan formularies."*

165.    In providing an example of the problems associated with drug manufacturers

using "bad apple" pharmacies to skirt formularies resulting in higher benefit costs for employers

and higher premiums for patients, Merritt focused on Horizon:

> Recent investigations have found that the manufacturer Horizon Pharma was
> employing an affiliated pharmacy to sell low-value drugs, such as Duexis. The
> pain reliever Duexis is a combination of two old and common drugs, the generic
> equivalents of Motrin and Pepcid. *If prescribed separately, the two drugs*
> *together would cost no more than $20 or $40 a month. By contrast, Duexis*,
> which contains both in a single pill, *costs about $1,500 a month*. This price
> represents poor value for both patient and payer when much cheaper generic
> drugs are available. Nevertheless, *Horizon has urged doctors to submit*
> *prescriptions directly to a so-called specialty pharmacy affiliated with the drug*
> *company. The pharmacy delivers the drug to the patient, circumventing the*
> *insurers' formulary and utilization management systems, which are designed to*
> *deliver the safest, highest-value drugs*.

### 22.    Walbert Continued to Attempt to Reassure the Market in his January 11, 2016 and January 12, 2016 Television Appearances

166.    On January 11, 2016, Walbert appeared on Jim Cramer's *Executive Decision*

segment on CNBC. During his appearance Walbert stated in regard to the PME program:

> Jim Cramer: All right, Tim. I gotta go there because the *Journal* started again with
> a – you know – the price increases. Could you please explain to our viewers, why
> specialty pharmas are not something that you should be afraid of, and not
> something that's driving the cost of healthcare up?
>
> Timothy Walbert: Well, the first thing is when you look at the average price that
> was discussed, in much of the media, you have to factor in what the net price is to
> patients. So in our case, across many of our medicines, we use a lot of that money
> that is charged from the list price, it's discounted, we use that money to create
> access. *And our programs are purely designed to ensure that that patient gets*
> *the medicine their physician prescribed, and over 95% of our patients are*
> *paying less than $10 for their medicines, Jim. And we're trying to do the right*
> *thing, to create that access.*

167.    On January 12, 2016, Walbert spoke with Stephanie Ruhle on *Bloomberg GO*.

When asked if Horizon would be cutting ties with Linden Care, Walbert stated:

> *We don't have any ties with Linden Care. We have no contracts or direct relationships with any pharmacies, including Linden Care.* Linden Care made up less than 5% of our sales in the primary care business, and we have no direct relationship. *They were a pharmacy like any other in the United States that had the right to distribute a medicine that their physician prescribed.*

168.    Defendant Walbert's statements regarding Horizon's PME program and relationship with Linden Care were false and misleading in their failure to disclose:

(a)    the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives; and

(b)    that Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

(c)    Indeed, Walbert failed to disclose that Horizon had already received notice from the DOJ that its marketing practices and relationship with specialty pharmacies was under investigation.

169.    Walbert's false reassurances prevented further declines in Horizon's stock price.

### 23.    Horizon's February 29, 2016 Disclosure of DOJ Investigation in 2015 10-K

170.    On February 29, 2016, the market learned additional information indicating that Horizon's relationships with specialty pharmacies were inappropriate and its marketing practices were improper when Horizon disclosed that the DOJ was investigating the PME program and the Company's "marketing and commercialization activities." Specifically, in Horizon's Report on

77

Form 10-K for the quarter and year ending December 31, 2015 (the "2015 10-K"), Horizon

disclosed:

> In November 2015, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents and infor-mation related to our patient assistance programs and other aspects of our marketing and commercialization activities.  We are unable to predict how long this investigation will continue or its outcome, but we anticipate that we may incur significant costs in connection with the investigation, regardless of the outcome.  We may also become subject to similar investigations by other governmental agencies.  The investigation by the U.S. Attorney's Office and any additional investigations of our patient assistance programs may result in dam-ages, fines, penalties or other administrative sanctions against us.

171.    On this news, Horizon's stock fell $2.63, or 13.3%, from a close of $19.79 per

share on February 26, 2016 to a close of $17.16 per share on February 29, 2016 on trading

volume more than triple Horizon's average daily trading volume

172.    According to analysts covering the Company, while Horizon had announced solid

fourth quarter revenues of $244 million and EPS of $0.63, both of which came in ahead of

consensus estimates, that positive news was "trumped however by the disclosure of a subpoena

from the Southern District NY Attorney related to the co's sales & marketing practices – causing

the stock to drop 11% intraday."  *See* Jefferies research report dated February 29, 2016 entitled,

"Horizon (HZNP) Solid Q4 Results Overshadowed by Subpoena; 4 Key Takeaways."  *See also*

Guggenheim Securities research report dated February 29, 2016 entitled, "HZNP - BUY - Stock

Likely to Regain Consciousness After Some of the Headline Risks Subside" ("4Q15 and positive

'16 outlook overshadowed by subpoena").

173.    However, Defendants continued to issue false statements to the market, reassuring

investors about the propriety and commercial success of the PME program, now renamed

"HorizonCares."  Specifically, Horizon's 2015 10-K stated:

(a)      "The HorizonCares program may implicate certain state laws related to, among other things, unlawful schemes to defraud, excessive fees for services, tortious interference with patient contracts and statutory or common law fraud. *We have a compliance program in place to address adherence with various laws and regulations relating to the selling, marketing, and manufacturing of our medicines, as well as certain third-party relationships, including pharmacies;*"

(b)      "Effective January 1, 2015, two significant PBMs placed DUEXIS and VIMOVO on their exclusion lists, which resulted in a loss of reimbursement for patients whose healthcare plans have adopted these PBM exclusion lists. *However, this action did not negatively impact sales volume for either medicine. In fact, with successful adoption of our HorizonCares program by physicians, we are seeing increases in sales volume for both medicines.* During the year ended December 31, 2015, DUEXIS sales volumes have increased by 70% and VIMOVO sales volumes have increased by 14%, each, when compared to the year ended December 31, 2014."

174.    The 2015 Form 10-K was signed by Defendant Walbert and Hoelscher. . Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed a certification that was false and misleading because it stated that the 2015 Form 10-K did not contain false and misleading statements.

175.    The statements in the 2015 10-K regarding Horizon's PME program were false and misleading in their failure to disclose:

(a)      the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives; and

(b)      that Horizon engaged in illegal sales and marketing tactics, including promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ.

**24.      Horizon's February 29, 2016 Earnings Conference Call**

176.      Also on February 29, 2016, after the release of the Company's financial results for the quarter and year ending December 31, 2015, and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Walbert and Hoelscher.  Walbert reiterated that DOJ was investigating the Company's marketing practices and relationship with specialty pharmacies.  At the same time, Walbert tried to downplay the investigation by saying that while the Company had received a subpoena from, and were providing information to, the DOJ:

> *[T]here are no specific allegations against the company.* [A]s we described in the 10-K relative to the subpoena, we received it from the Southern District of New York.
>
> And as expected, this inquiry relates primarily to our patient assistance programs and interactions with specialty pharmacies. *As you know that there's been a lot of noise and confusion in the marketplace.*

177.      Walbert also attempted to soothe the market by touting the Company's financial and operating results.  In response to a question regarding expectations for gross-to-net for 2016 and Horizon's relationship with payors, Walbert stated that "[p]rescriptions were tracking well" and that the Company was "seeing solid momentum" in prescriptions:

So, if we look at 2015 for the full year, DUEXIS was 71%, VIMOVO and PENNSAID were 69%, and RAYOS just under 60%. For the fourth quarter, DUEXIS was 72%, VIMOVO 71%, and PENNSAID 68%. So, on average, for the full year and the fourth quarter, about 70%.

*We believe the range will stay in that 70% to 75% range, based on the information we have today*. And always, in the beginning of the year, with patients resetting deductibles, switching plans -- we make sure all patients have access to the drugs.

*So, we expect that to be higher initially, and then we'll monitor it over time. But nothing so far this year has indicated that we're going to see anything different than we've seen in the past*.

*Prescriptions are tracking well.* We look at a rolling 13-week and a rolling 14-week basis -- or a 13-week and a rolling 4-week basis.

And when you look at DUEXIS, VIMOVO and PENNSAID ranging from 4% to 8% increase in TRx's. On a rolling four-week basis, significantly higher than the rolling 13 weeks.

*So, we are seeing solid momentum coming out of the first month of the year, where you always see an impact; so, feeling good about where the business is.*

And then from a payer standpoint, we're always working with payers, having discussions, and open to having a dialogue with them about different arrangements, whether that be contracting or otherwise.

So, we will continue dialogue. And if there is an opportunity to do something different or contract with a PBM, and not be on an exclusion list, we're going to be open to that, and maintain that dialogue, and look for opportunities to continue to ensure access for patients receiving the medicines that their physicians prescribed.

178.    Defendants' statements on the February 29, 2016 earnings call regarding net sales

of VIMOVO and DUEXIS, that "[p]rescriptions were tracking well" and that the Company was

"seeing solid momentum" in prescriptions, the estimated gross-to-net for these drugs in Q1 2016,

and the "sequential decline in net sales from the fourth quarter to the first quarter in the high

single-digit range" were false and misleading in their failure to disclose,

(a)     that already two months into the first quarter of 2016,  sales in Horizon's primary care division, which almost exclusively utilized the PME program, had plunged compared to the prior quarter. Indeed, by February 29, 2016, net sales for DUEXIS and VIMOVO were tracking at only a portion of net sales of these drugs for the fourth quarter 2015, despite high prescription rates, and the average net realized sales price was continuing to fall.

(b)     that Horizon would be forced to slash prices on its biggest growth drivers thereby lowering its margins going forward.

(c)     Payor pushback was impacting Horizon's primary care drugs, primarily DUEXUS and VIMOVO much more than Defendants disclosed.

179.    Likewise, Defendants' statements on the February 29, 2016 earnings call concerning Horizon's compliance program were false and misleading in their failure to disclose the operational control Horizon secretly exercised over its partner/specialty pharmacies and that in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers.

### 25.    Horizon's April 12, 2016 Disclosure that Net Sales of DUEXIS and VIMOVO had Plunged in Q1 2016

180.    The full truth was finally revealed on April 12, 2016 when Horizon filed a Report on Form 8-K, signed by Defendant Hoelscher, including an updated investor presentation that contained "projections of net sales and adjusted EBITDA for the first quarter ended March 31, 2016, the second quarter 2016, as well as prescription results for certain of Horizon Pharma's medicines during the first quarter of 2016." The investor presentation was, in fact, a pre-announcement of  lower-than-expected revenues for the 1st half of 2016 (particularly 1Q16) due to higher than anticipated pricing pressure for two of the Company's top selling drugs, VIMOVO and DUEXIS.  The pricing pressure was due, in part, to resetting deductibles for patient

insurance plans. Specifically, the Company disclosed that it expected the second half of 2016 to be back-end loaded with approximately 60% of its net sales projected for the second half of the year. The Company also disclosed recent prescription data for DUEXIS, VIMOVO and Pennsaid 2% for the first quarter 2016 which showed a decreasing growth rate for these drugs and increasing gross-to-net discounts.

181.    According to analysts covering the Company, higher deductibles most impacted the gross-to-net for VIMOVO and DUEXIS as demonstrated by the Company's reduced guidance for these two drugs.

(a)    According to an April 12, 2016 research report from UBS Securities: "The bad news is that it's clear from our conversations with management that our sales estimates for DUEXIS/VIMOVO were too high." According to a research report from Piper Jaffray dated April 12, 2016, "we can concede that there are real question marks regarding HZNP's primary care segment…" due to "an incrementally more restrictive payor environment…"

(b)    An April 13, 2016 research report from JP Morgan noted:

> VIMOVO and DUEXIS are experiencing the greatest pressure, with GTN [Gross-to-net] discounts of 78-79% expected in 1Q16 and 75-80% expected for the full year. Pennsaid 2% is still experiencing TRx growth and Horizon expects GTN discounts of 65-75% for the full year. Based on weekly TRx data, the primary care business had a modest slowdown in TRx at the beginning of the year as patients obtained new insurance plans and deductibles reset…

(c)    An April 13, 2016 research report from Guggenheim Securities noted that the decrease in revenue from Horizon's primary care drugs (including DUEXIS and VIMOVO) in Q1 2016 "almost all fell directly to net income, which drove the larger decrease in relative EBITDA adjustment."

(d)    An April 14, 2016 research report from Brean Capital stated that: "[b]ased on our discussion with management, the gross-to-net adjustment headwinds on these two

products [DUEXIS and VIMOVO] could mean a 25% reduction in net realized revenue. We are revising our estimates for a couple of reasons: 1) prescription volume growth likely to fall to mid double-digit range, though at a higher clip for Duexis, beyond 2016; and 2) major headwinds from gross-to-net adjustments unlikely to be offset by volume growth."

182.    In reaction to this disclosure, Horizon's stock price fell from a close on April 11, 2016 of $18.22 per share to a close on April 12, 2016 of $13.42, a decline of more than 25% from the prior day close and a decline of 65% from the Class Period closing high of $38.45 per share.

183.    As a result of the wrongful acts and omissions of Horizon and the Individual Defendants, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### E.    POST-CLASS PERIOD DISCLOSURES FOR EXCHANGE ACT CLAIMS

184.    On May 9, 2016, Horizon issued a press release announcing its first-quarter 2016 financial results. The Company's first-quarter 2016 GAAP net loss was $(45.4) million, compared to a net loss of $(19.6) million in the first quarter of 2015. The Company also reported declining sales of DUEXIS and VIMOVO, which it attributed to in part "increased control by certain pharmacy benefit managers and payors."  The Company also confirmed its full-year and second-quarter net sales and adjusted EBITDA guidance.  According to the release: "DUEXIS and VIMOVO sales in the first quarter of 2016 were $29.6 million and $25.5 million, respectively, and sequentially declined compared to the fourth quarter of 2015."

185.    Indeed, sales in Horizon's primary care division declined 32% quarter-to-quarter. DUEXIS' net sales increased just 3% compared to Q1 2015,  to $29.6 million while VIMOVO's net sales dropped 23% compared to Q1 2015, to $25.5 million. The sequential decreases in net sales for the two brands were 51% and 46%, respectively. ***The company lost half of net sales on***

84

*these two products in just one quarter*. Gross-to-net discounts in Q1 were 79% and average net realized sales price was $411 in Q1 2016 compared to $483 in Q4 2015 and $567 in Q1 2015.

186.    On May 25, 2016, Horizon participated in the UBS Global Healthcare Conference. During the conference, Bob Carey confirmed that the DOJ investigation of Horizon was still ongoing and that the Company had been steadily producing information concerning the structure and nature of Horizon's patient assistance programs.

## F.    LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS

187.    During the Class Period, as detailed herein, Horizon and the Individual Defendants engaged in a course of conduct that artificially inflated the price of Horizon common stock and operated as a fraud or deceit on the Class Period purchasers of Horizon common stock by making the materially false and misleading statements and omissions recited above.

188.    When the truth was disclosed and became known to the market, the price of Horizon common stock declined precipitously as the prior artificial inflation was removed from the price of the stock.  As a result of their purchases of Horizon common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws).  The price decline in Horizon common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market.  Thus, the defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

189.    The truth about Horizon's business was disclosed through a series of corrective disclosures between October 19, 2015 and April 12, 2016.  Over that period, Horizon's stock

price declined approximately 30%, from $19.07 per share on October 19, 2015 to $13.42 per share on April 12, 2016.

    (a)    **First Corrective Disclosure**:

    (i)    On October 19, 2015, after the market closed, the *New York Times* published an article entitled "Drug Makers Sidestep Barriers on Pricing."  As detailed above, the *Times* article raised concerns about Horizon's use of specialty pharmacies, including Linden Care, in its PME program.  The *Times* article also discussed how "Horizon has figured out a way to circumvent efforts of insurers and pharmacists to switch patients to the generic components or to [the OTC formulations]" through use of its "Prescriptions Made Easy" program."  On this news, Horizon's stock price fell 19.98%, from $19.07 per share on October 19, 2015 to $15.26 per share on October 20, 2015.  Trading volume exceeded 19 million shares, more than five times the average trading volume during the Class Period. On October 21, 2015, the price fell another $.43.  Again, trading volume exceed 23 million shares, almost 6 times the average class period trading volume.

    (ii)    Analysts attributed the sharp decline in Horizon's stock price to the disclosures about Horizon business practices in the *Times* article.  For instance, on October 20, 2015, UBS published a note observing that "with the recent article in the New York Times, investors are now very focused on the sustainability of the PME program and whether the business model is dead." In its note, UBS identified several "new concerns" including: "***Concern #1. The business model is dead. Horizon is no longer under the radar but instead in the New York Times. The other payers that have been subsidizing the success of the PME program will now wonder why they are reimbursing any Rxs, or political pressure will force Horizon to shut down.***"

     (b)    **Second Corrective Disclosure**:

     (i)    On October 22, 2015, before the market opened, Depomed issued a press release entitled, "Depomed Comments on Recent Reports Regarding Horizon Pharma's Business Model, Reports Confirm Concerns Raised by Depomed's Board in Rejecting Horizon's Unsolicited Exchange Offer."  As detailed above, the press release raised concerns regarding Horizon's aggressive drug pricing practices and Horizon's use of specialty pharmacies. Depomed expressed concerns about Horizon's use of specialty pharmacies, including the frequency with which  Horizon's products are "dispensed through specialty pharmacies."

     (ii)    On this news, ***Horizon's stock fell 11.5%***, from $14.83 per share on October 21, 2015 to $13.12 per share on October 22, 2015, on volume of 15,282,338 shares.

     (c)    **Third Corrective Disclosure**:

     (i)    On November 10, 2015, after the market closed, Express Scripts announced that it had removed the Linden Care specialty pharmacy from its network, stating that Linden Care was a "captive" pharmacy of Horizon.

     (ii)    Shortly after Express Scripts' disclosure, several analysts published reports expressing concerns about the business ramifications on Horizon of Express Scripts' decision to stop doing business with Linden Care and, more generally, about the risk that other PBMs might sever business ties with other specialty pharmacies.  For example, on November 11, 2015, JP Morgan analysts focused on Express Scripts' allegation that Linden Care was a "captive pharmacy" as the reason for terminating its business relationship with Linden Care (JMP Securities, Nov 11, 2015).  On November 11, 2015, UBS issued a research report that noted that "investors appear concerned that this is the beginning of a chain of negative announcements regarding the reimbursement supply chain for Horizon."

(iii)     On the Express Scripts' disclosure and the commentary that followed, ***Horizon's stock fell 19.62%***, from $22.38 per share on November 10, 2015 to $17.99 per share on November 11, 2015.  Again, trading volume exceeded 27 million shares, or almost *7 times* the class period average.

(d)     **Fourth Corrective Disclosure**:

(i)     On February 29, 2016, Horizon disclosed in its 2015 annual report that the Company received a subpoena in November 2015 from the Office of the U.S. Attorney for the Southern District of New York for documents and information related to the Company's patient assistance programs and other aspects of Horizon's marketing and commercialization activities.

(ii)     Analysts identified Horizon's disclosure of the DOJ investigation of its use of those "specialty pharmacies" as the cause of the sharp decline in the Company's shares. On February 29, 2016, for instance, Cowen wrote:

> Despite this [strong operating] performance, the ***shares are weak this morning on [] what appears to be an unfavorable reaction to the disclosures of a subpoena from the U.S. Attorney's Office for the Southern District of New York***[.] Specifically, the 10K discloses "In November 2015, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York ***requesting documents and information related to our patient assistance programs and other aspects of our marketing and commercialization activities***."

(iii)     On March 1, 2016, UBS also wrote that "the Attorney's Office is looking for information about the specialty pharmacies business model..." UBS added that, "Since November, the Attorney's Office has asked for a series of requests for information regarding the structure and nature of the patient assistance programs." UBS reported that management chose not to disclose the DOJ investigation earlier although the Company conceded that "it chose to have a 3rd party review its practices, even before receiving the subpoena."

88

(iv)     On this news, ***Horizon's stock fell 13.3%***, from $19.79 per share on February 26, 2016 to $17.16 per share on February 29, 2016, on volume of 16,113,382 shares.

(e)     **Final Corrective Disclosure**:

(i)     On April 12, 2016, Horizon filed a Report on Form 8-K pre-announcing lower than expected revenues for the 1st half of 2016 (particularly 1Q16) due to higher than anticipated pricing pressure for two of the Company's top selling drugs (VIMOVO and DUEXIS) caused, in part, by increased deductibles that patients were required to cover before drug costs are covered by payors. According to analysts covering the Company, higher deductibles most impacted the gross-to-net for VIMOVO and DUEXIS as demonstrated by the Company's reduced guidance for these two drugs.

(ii)     According to an April 12, 2016 research report from UBS Securities: "The bad news is that it's clear from our conversations with management that our sales estimates for DUEXIS/VIMOVO were too high." According to a research report from Piper Jaffray dated April 12, 2016, "we can concede that there are real question marks regarding HZNP's primary care segment" due to "an incrementally more restrictive payor environment."

(iii)     With Horizon's April 12, 2016 disclosures, analysts now appreciated the risk that Horizon's business model, to the extent that it relied upon the distribution of its highly-priced and minimally differentiated primary care drugs through a "specialty pharmacy" channel, may be unsustainable.

(iv)     On this news, ***Horizon's stock price plummeted more than 25%***, from $18.22 on April 11, 2015 to $13.42 per share on April 12, 2016, on volume of 47,831,062 shares.

190.    Each of the declines discussed above in the price of the Company's common stock was statistically significant at a high level after taking into account changes on the same days in the overall securities market and in relevant industry indices.  Furthermore, as set forth above, each of the price declines in Horizon common stock is attributable to the disclosure of previously concealed information relating to the materially false and misleading statements and omissions alleged herein.  The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiffs and other Class members were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the alleged fraudulent conduct.  As the truth about the fraud was revealed, the price of Horizon common stock declined, the artificial inflation came out of the price of the stock, and Plaintiffs and other members of the Class suffered damages.

## G.    ADDITIONAL EVIDENCE OF SCIENTER WITH RESPECT TO THE EXCHANGE ACT CLAIMS

191.    Throughout the Class Period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about Horizon's business, operating model, and PME program. The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.

192.    Horizon and the Individual Defendants participated in a scheme to defraud investors about the Company's PME program and the control it exercised over the pharmacies that participated in that program. The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein. The Individual Defendants were also personally aware of, or were severely reckless in disregarding, the improper and deceptive

marketing tactics forced upon Horizon's sales representatives. Other facts evidencing the Individual Defendants' scienter, including their motive to engage in the fraudulent conduct detailed herein, are detailed below.

193.    In addition to the allegation set forth above, during the Class Period, Horizon and the Individual Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Horizon and the Individual Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Horizon's securities during the Class Period.

194.    As set forth herein, statements by former employees corroborate that Horizon was increasingly dependent on its PME program in order to sell its high-priced drugs, and to prevent insurers and pharmacists from switching patients from Horizon drugs to less expensive generic alternatives. Without the PME program, Horizon's primary sales were small. As discussed herein, before implementation of its PME program, pharmacies and PBMs would not cover Horizon's RA/OA drugs, its most lucrative and important drugs by far, which had both effective and significantly less expensive generic and therapeutic alternatives.

195.    Further, Horizon's executive compensation plan provided the Individual Defendants with a powerful and direct monetary incentive to commit fraud during the Class Period.  The executive compensation plan provided that the Individual Defendants could dramatically increase their total annual compensation during the Class Period (and thereafter) by driving up the share price of Horizon's stock, and by driving up Horizon's revenue and EBITDA.

### 1. The PME Program Was Extremely Important to the Company's Short Term Growth

196.    The Individual Defendants designed and implemented every aspect of the PME program, which was central to Horizon's ability to drive prescriptions of DUEXIS and VIMOVO—among the Company's most important products during the Class Period.  Indeed, much of the Company's net sales were attributable to the drugs in the PME program.  In 2014, DUEXIS and VIMOVO accounted for 83% of the Company's net sales.  In 2015, roughly two-thirds of Horizon's net sales were attributable to DUEXIS, VIMOVO, and PENNSAID 2%. In fact, during a June 4, 2015 conference call, Defendant Walbert highlighted the core nature of the PME program, stating that, "About 65% to 70% of the prescriptions of our primary care products now go through [the PME program]."  The fact that: (i) both DUEXIS and VIMOVO were such significant parts of the Company's business and were responsible for such a high percentage of net sales during the Class Period and (ii) the PME program was central to the Company's success is strong evidence of scienter.

197.    In particular, the PME program was essential to the Company's efforts to mitigate the impact of Express Scripts' and Caremark's exclusion of DUEXIS and VIMOVO from the PBM's formularies, which jeopardized the Company's ability to secure reimbursement for at least 20% and 30% of the prescriptions for DUEXIS and VIMOVO passing through those two PBMs, and raised the specter of adverse action by other PBMs.

198.    The critical importance of the PME program was reflected in analysts' and investors' intense focus on the program throughout the Class Period.  Indeed, as alleged above, the Individual Defendants held themselves out to investors as the persons most knowledgeable about the PME program on nearly every conference call with investors during the Class Period. The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout

the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.  For example, during a February 27, 2015  conference call Defendant Walbert stated: "***We are highly focused on increasing the penetration of PME*** among physicians who treat a high percentage of commercially insured patients." In a May 8, 2015 earnings conference call, Defendant Kody also emphasized the importance of the PME, stating: "***We continue to see attractive growth in prescriptions, driven in large part by our acceleration of prescriptions flowing through our PME program in the first quarter of 2015***."

199.    Similarly, in public filings, Horizon emphasized that the PME program was an important driver of prescriptions.  For example, in the 1Q15 Form 10-Q filed May 8, 2015, Defendants stated: "We expect that continued adoption of our PME program by physicians will be important to our ability to counter this action by the two PBMs and to offset pressure from healthcare payors and PBMs to use less expensive generic or over the counter brands instead of our branded products."  Throughout 2014 and most of 2015, Horizon referred to the PME as a "key part" of its commercial strategy in its filings with the SEC.[26]

200.    Given the exponentially growing size of the PME program, its critical importance to the growth of Horizon's overall business, and the fact that it was the Company's revenue life-blood, the illegal practices discussed herein could not have occurred without the Individual Defendants' knowledge and approval.

---

[26]     *See* 2014 Form 10-K, 1Q15 Form 10-Q, 2Q15 Form 10-Q, and 3Q15 Form 10-Q. Beginning with the 2015 Form 10-K, filed February 29, 2016, with the announcement that the PME program was the subject of a government investigation, Horizon began to downplay the importance of the program, dropping the "key" and referring to it as just "[p]art of our commercial strategy . . ."

### 2.     The Nature of the Undisclosed Practices that Drove the PME Program Give Rise to an Inference of Scienter

201.    For most of the Class Period, Horizon relied on only a small number of pharmacies from across the country to handle the Company's PME program and the dispensing of its key DUEXIS and VIMOVO drugs.  Given that this network was responsible for the successful implementation and execution of the PME program (and, thus the Company's continued growth) and that the Company handpicked the specific pharmacies in the network, it is not plausible that the Individual Defendants were not aware of the control that the Company exercised over the pharmacies.

202.    For instance, as alleged above, Ben Bove, a senior Horizon manager founded one of the pharmacies responsible for distributing drugs through the PME program - Clybourn Park.  At the time that he was employed by Horizon, Bove actually signed the  pharmacies' organizing documents and was involved in running the pharmacy when it was part of the PME pharmacy network.  It is implausible that Bove would have *created a pharmacy* to sell drugs on Horizon's behalf without the Individual Defendants' approval or reckless disregard.

203.    Similarly, the major contract that allowed Linden Care to rejoin the PME network after it was expressly terminated from the PME program could only have been approved by the Individual Defendants.  This is especially true given the fact that (i) Linden Care spent months petitioning Horizon for readmission to the network and (ii) the fact that shortly after its readmission to the program, Linden Care became an economic captive to Horizon with the vast majority of its business coming from Horizon.

204.    Likewise, Horizon paid commission-type payments, on top of rebates, to pharmacies dispensing its drugs through the PME program.  In the case of Halstead *alone*, for instance, these payments approximated $100 per single prescription and $100,000 *per week*.

94

Payments of that magnitude would not have occurred without the knowledge and/or reckless disregard of the Individual Defendants.

205.    Additionally, the undisclosed improper marketing practices employed by Horizon sales representatives could not have been implemented without the direction or sanction of the Individual Defendants.  For instance, presentations encouraging employees to form improper relationships with health care providers were broadcast at Company-wide seminars, which the Individual Defendants attended, and sales personnel who boosted sales by cultivating such relationships received official Company-wide praise while employees who failed to do so were reprimanded or terminated.  Moreover, official sales scripts and directives instructed employees to dodge questions about pricing and to target health care providers who, almost certainly, would not prescribe Horizon's drugs for indicated uses.

206.    Indeed, Horizon *affirmatively received a subpoena* from the Department of Justice in November 2015, alerting senior management that both Horizon's control over its network of PME pharmacies and its sales and marketing practices were being investigated by the DOJ for improprieties.  At a minimum, senior management's failure to discover the undisclosed misconduct alleged herein after receiving a subpoena *explicitly targeting it* is evidence of scienter.  Horizon and the Individual Defendants received the subpoena four months before disclosing it and six months before the end of the Class Period.  As the Company admitted on May 25, 2016, it had been in a "pretty steady state" with a series of information requests and the Company providing responses to the Government.  Thus, by no later than November 2015, when it received the subpoena from the DOJ and started responding to it, the Company knew or recklessly disregarded the secret control Horizon exercised over the pharmacies in the captive PME network and the improper marketing practices employed by Horizon.

3.      **Horizon's Executive Compensation Plan Provided the Individual Defendants A Powerful Motive to Commit Fraud During the Class Period**

207.    Horizon's executive compensation plan (the "EC Plan") provided the Individual Defendants with a powerful and direct monetary incentive to commit fraud during the Class Period.  The EC Plan provided that the Individual Defendants could dramatically increase their total annual compensation during the Class Period (and thereafter) by driving up Horizon's share price, revenue, and EBITDA, all metrics directly influenced by Defendants' fraud.  Indeed, as alleged above, Individual Defendants' compensation increased *dramatically* during the Class Period; from 2014 to 2015:  Walbert's compensation increased more than *ten-fold* (and *more than 49-fold* from 2013); Hoelscher's compensation increased more than *five-fold*; Kody's compensation increased more than *six-fold*; and Carey's compensation increased more than *three-fold*.

208.    Indeed, the Individual Defendants' total compensation structure at Horizon emphasizes incentive-based pay.  Total compensation consists of the following components: (a) base salary; (b) annual bonuses; (c) grants under Horizon's Cash Long-Term Incentive Program ("Cash LTIP"); (d) grants under Horizon's equity incentive compensation plan; and (e) severance and change in control benefits.  This compensation structure (which was driven by Horizon's equity performance *and* was heavily weighted toward equity-based awards) provided a powerful incentive to the Individual Defendants to drive Horizon's stock price up by whatever means available to them.

209.    On March 15, 2016, Horizon filed a preliminary proxy ("2016 Proxy") disclosing, among other things, lavish incentive-based payouts to the Company's executives.

210.    The 2016 Proxy makes clear that executive pay is *unusually* dependent on Horizon's stock price and the achievement of revenue-based performance metrics.  Indeed, the

2015 Proxy states:  "***We are not aware of another equity incentive program in which senior management has assumed as much risk for generating long-term, above market equity appreciation***[.]"

211.    The 2016 Proxy explains that executive pay was heavily influenced by Horizon's stock price.  "*The vast majority (97%+) of named executive officer compensation . . . is tied directly to the stock price performance of HZNP . . .*, For example, approximately 99% of our Chief Executive Officer's total 2015 pay package was at risk[.].[27]

212.    For instance, Horizon executives were eligible for "performance share unit awards" ("PSUs") that were based directly upon the price of Horizon's shares.  The Proxy explained that, "In order for PSUs to have any value at the end of the performance period, our share price needs to consistently trade above the range of $31.58 to $33.86 in the period from December 2017 through June 2018[.]"  (p. 93).  Further, "In order for the maximum number of PSUs to vest, our share price needs to consistently trade above the range of $78.30 to $99.04 in the period from December 2017 through June 2018[.]"  (p. 93).

213.    In addition to its PSUs, Horizon awarded other forms of compensation to its executives that were based upon performance metrics that were directly influenced by Defendants' fraud.  The Proxy explains, for instance, that Horizon's "2015 Annual Cash Incentive Compensation" awards (cash bonuses) were driven by whether the Company achieved "total net sales of $512 million," whether it achieved "adjusted EBITDA (non-GAAP) of $216 million" and whether it added additional net revenues through the acquisition of "new

---

[27]    Notably, the 2016 Proxy acknowledges that the more senior the Horizon executive, the more influence they wield over the Company's stock price:  "Employees in more senior roles have an increasing proportion of their total pay package at risk and tied to performance *because they are in a position to have a greater influence on the Company's performance results*."

product(s)." (p. 36).  Importantly, the compensation committee also considered "total shareholder return" (including stock price appreciation) in the award of cash bonuses.  (p. 40).

214.    Likewise, "total shareholder return" drove awards to executives under Horizon's "Cash Long-Term Incentive Program," Horizon's "2015 Equity Incentives" program (stock options and PSUs), and Horizon's "Performance Share Unit Awards" program (pp. 41-44).  In addition, Horizon awarded "Time-Based Equity Grants" (stock options) and "Discretionary Bonuses" among other compensation (pp. 40, 44).

215.    Each of these additional metrics was directly driven by the success of the PME program, which Horizon heavily relied on to generate revenue and grow EBITDA.  Accordingly, under this pay structure, the Individual Defendants were rewarded generously for their actions, statements and omissions during the Class Period.

(a)    All told, Defendant Walbert was awarded total compensation valued at more than $93 million for 2015, which was *more than 10 times* his compensation of $9 million for 2014, and *more than 49 times* his compensation of $1.9 million for 2013.  For 2015, Walbert was awarded (a) $859,375 in salary; (b) $67,650 bonus; (c) $47.4 million in stock options; and (d) $43.5 million in restricted shares, along with other compensation.  (p. 48).

(b)    Defendant Hoelscher was awarded total compensation valued at $18.9 million for 2015, which was *more than five times* his compensation of $3.4 million for 2014.  For 2015, Hoelscher was awarded (a) $454,375 in salary; (b) $46,750 bonus; (c) over $4 million in stock options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

(c)    Defendant Kody was awarded total compensation valued at $18.6 million for 2015, which was *more than six times* his compensation of over $2.8 million for 2014.  For

2015, Kody was awarded (a) $427,000 in salary; (b) $0 bonus; (c) over $4 million in stock

options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

     (d)     Defendant Carey was awarded total compensation valued at $18.9 million

for 2015, which was *more than three times* his compensation of $6 million for 2014.  For 2015,

Carey was awarded (a) $454,375 in salary; (b) $46,750 bonus; (c) over $4 million in stock

options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

### H.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT CLAIMS

216.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Horizon

common stock during the Class Period (the "Class"); and were damaged upon the revelation of

the alleged corrective disclosures.  Excluded from the Class are: (i) Defendants; (ii) members of

the immediate family of any Defendant who is an individual; (iii) any person who was an officer

or director of Horizon during the Class Period; (iv) any firm, trust, corporation, or other entity in

which any Defendant has or had a controlling interest; (v) Horizon's employee retirement and

benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or

assigns of any such excluded person.

217.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Horizon securities were actively traded on the

NASDAQ.  As of February 29, 2016, Horizon had 159,884,455 shares of common stock

outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and

can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Horizon or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

219.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

220.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)    whether statements made by Horizon and the Individual Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Horizon including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices;

      (c)    whether the Individual Defendants caused Horizon to issue false and misleading financial statements during the Class Period;

      (d)    whether Horizon and the Individual Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

      (e)    whether the prices of Horizon securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

      (f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

221.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## I.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS

222.    At all relevant times, the market for Horizon's securities was efficient for the

following reasons, among others:

(a)     Horizon's stock met the requirements for listing, and was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, Horizon filed periodic reports with the SEC and Nasdaq;

(c)     Horizon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Horizon was followed by numerous securities analysts  including Piper Jaffray & Co., Stifel, Nicolaus & Co., Inc., JP Morgan; UBS Securities, Morgan Stanley, Guggenheim Securities, LLC,  Cowen, Brean Capital, BMO Capital Markets Corp., Citigroup, Goldman Sachs & Co., Inc., Jefferies, Mizuho Securities USA, Inc. which wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

223.    As a result of the foregoing, the market for Horizon stock promptly digested

current information regarding Horizon from all publicly available sources and reflected such

information in Horizon's stock price.  Under these circumstances, all purchasers of Horizon

securities during the Class Period suffered similar injury through their purchase of Horizon

securities at artificially inflated prices, and a presumption of reliance applies.

224.     Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute v.*

*United States*, 406 U.S. 128 (1972), because the claims asserted herein against Horizon and the

Individual Defendants are primarily predicated upon omissions of material fact for which there

was a duty to disclose.

## J.     THE SAFE HARBOR PROVISION IS INAPPLICABLE

225.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to the allegedly false statements pled in this complaint.  The

statements alleged to be false and misleading herein all relate to then-existing facts and

circumstances.  To the extent certain of the statements alleged to be false and misleading may be

characterized as forward-looking, they were not adequately identified as "forward-looking"

statements when made, and were not accompanied by meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the

purportedly forward-looking statements.  Alternatively, to the extent that the statutory

safe harbor is intended to apply to any forward-looking statements pled herein, Horizon and the

Individual Defendants are liable for those false and misleading forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker

knew that the particular forward-looking statement was false and misleading, and/or the forward-

looking statement was authorized and/or approved by an executive officer of Horizon who knew

that those statements were false and misleading when made.

### K.      CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

**1.      COUNT I: For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Horizon and the Individual Defendants**

226.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

227.    This Count is asserted against Horizon and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

228.    During the Class Period, Horizon and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

229.    Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Horizon securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Horizon securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

230.    Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the defendants made statements in quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Horizon securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Horizon's finances and business prospects, including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices.

231.    As described above, Horizon and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

232.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Horizon. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Horizon's businesses, operations, future financial condition and future prospects.

233.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Horizon securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Horizon's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Horizon securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities

and/or upon statements disseminated by Horizon and the Individual Defendants, and were damaged thereby.

234.    During the Class Period, Horizon securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Horizon and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Horizon securities at prices artificially inflated by defendants' wrongful conduct.

235.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Horizon securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Horizon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

236.    By reason of the conduct alleged herein, Horizon and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

237.    As a direct and proximate result of the wrongful conduct of Horizon and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

2. **<u>COUNT II</u>:** *For Violations of Section 20(a) of the Exchange Act Against The Individual Defendants*

238.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

239.    During the Class Period, the Individual Defendants participated in the operation and management of Horizon, and conducted and participated, directly and indirectly, in the conduct of Horizon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Horizon's finances and business prospects, including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices..

240.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Horizon's financial condition and results of operations, and to correct promptly any public statements issued by Horizon which had become materially false or misleading.

241.    Because of their positions of control and authority as senior officers of Horizon, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other statements which Horizon made and disseminated in the marketplace during the Class Period concerning Horizon's results of operations.  In their capacities as senior officers of Horizon, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in, among other things, the conduct of Horizon's PME program, overseeing the Company's relationships with pharmacies in the PME network, supervising the Company's regulatory and legal compliance, ensuring the Company was fulfilling its contractual obligations to PBMs, and reviewing and approving the Company's public statements.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Horizon to engage in the wrongful acts complained of herein.  The

Individual Defendants therefore, were "controlling persons" of Horizon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Horizon securities.

242.    Each of the Individual Defendants, therefore, acted as a controlling person of Horizon.  By reason of their senior management positions and/or being directors of Horizon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Horizon to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Horizon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

243.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Horizon.

## III.   THE SECURITIES ACT CLAIMS

### A.    NATURE OF THE ACTION

244.    This is a federal securities class action on behalf of persons or entities who purchased the common stock of Horizon pursuant and/or traceable to the Registration Statement issued in connection with the Company's April 16, 2015 public offering of 17,652,500 shares of common stock at a price of $28.25 per share (defined herein as the "Offering") seeking to pursue remedies under §§ 11, 12(a)(2) and 15 of the Securities Act.

245.    Plaintiffs allege strict liability, negligence, and non-fraud based claims (Counts III – V) under the Securities Act. These claims are brought against those defendants who are statutorily responsible for material misstatements of facts and omissions in the Registration Statement issued in connection with the Offering. The Securities Act defendants include Horizon; the individual members of Horizon's Board of Directors who signed the Registration

Statement (the "Director Defendants"); and the underwriters of the Offering ("Underwriter Defendants").

246.    Each of these defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement.

247.    Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against Horizon and the Underwriter Defendants and control person liability claims under Section 15(a) of the Securities Act against the Individual Defendants.

248.    Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made at the time of the Offering.

### B.    JURISDICTION AND VENUE FOR THE SECURITIES ACT CLAIMS

249.    The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a) and 77(o)).

250.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act.

251.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the Company's securities trade on the NASDAQ, located within this Judicial District.

252.    In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### C.    PARTIES FOR THE SECURITIES ACT CLAIMS

#### 1.    Plaintiff

253.    Court-appointed Lead Plaintiff Northern California Carpenters purchased Horizon common stock pursuant and traceable to the Company's Registration Statement for the Offering, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

#### 2.    Defendants

254.    Defendant Horizon is a Delaware corporation with its principal executive office located at Connaught House, 1 Burlington Road, Dublin 4, Ireland.  Horizon's common stock trades on the NASDAQ under the ticker symbol "HZNP."

255.    Defendant Walbert has served at all relevant times as Chairman, Chief Executive Officer and President of Horizon.  Defendant Daniel signed or authorized the signing of the Registration Statement for the Offering and signed the Company's Report on Form 10-K for the quarter and year ended December 31, 2014.

256.    Defendant William F. Daniel was, at all relevant times a director of the Company. Defendant Daniel signed or authorized the signing of the Registration Statement for the Offering.

257.    Defendant Michael Grey was, at all relevant times a director of the Company. Defendant Grey signed or authorized the signing of the Registration Statement for the Offering.

258.    Defendant Jeff Himawan was, at all relevant times a director of the Company. Defendant Himawan signed or authorized the signing of the Registration Statement for the Offering.

259.    Defendant Virinder Nohria, M.D., Ph.D. was, at all relevant times a director of the Company. Defendant Nohria signed or authorized the signing of the Registration Statement for the Offering.

260.     Defendant Ronald Pauli was, at all relevant times a director of the Company. Defendant Pauli signed or authorized the signing of the Registration Statement for the Offering.

261.     Defendant Gino Santini was, at all relevant times a director of the Company. Defendant Santini signed or authorized the signing of the Registration Statement for the Offering.

262.     Defendant H. Thomas Watkins was, at all relevant times a director of the Company. Defendant Watkins signed or authorized the signing of the Registration Statement for the Offering.

263.     Defendants referred to in ¶¶ 255-262 are collectively referred to in this Complaint as the "Director Defendants."

264.     Defendant Citigroup ("Citigroup") served as an underwriter in connection with the Offering.  Citigroup purchased 5,737,062.50 shares of Horizon common stock in the Offering.  Citigroup was paid $7,293,240.70 by Horizon for its participation in the Offering.

265.     Defendant Jefferies LLC (f/k/a Jefferies & Company, Inc.) ("Jefferies") served as an underwriter in connection with the Offering. Jefferies purchased 5,737,062.50 shares of Horizon common stock in the Offering.  Jefferies was paid $7,293,240.70 by Horizon for its participation in the Offering.

266.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter in connection with the Offering. Cowen purchased 3,089,187.50 shares of Horizon common stock in the Offering.  Cowen was paid $3,927,129.61 by Horizon for its participation in the Offering.

267.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in connection with the Offering. Morgan Stanley purchased 3,089,187.50 shares of

Horizon common stock in the Offering.  Morgan Stanley was paid $3,927,129.61 by Horizon for its participation in the Offering.

268.    Defendants Citigroup, Jefferies, Cowen, and Morgan Stanley are collectively referred to hereinafter as the "Underwriter Defendants."[28]

### D.    SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

#### 1.    The Offering

269.    On September 19, 2014, Horizon filed a Form S-3ASR - Automatic Shelf Registration Statement - with the SEC "to register the offer and sale of an indeterminate number of the Company's ordinary shares, nominal value $0.0001 per share, as may from time to time be sold at indeterminate prices" (hereafter called the "Registration Statement"). Horizon reported that on September 19, 2014, "the last reported sale price of our ordinary shares on The NASDAQ Global Market was $12.70 [per share]."  The Director Defendants signed the Registration Statement.

270.    On April 13, 2015, Horizon filed a Preliminary Prospectus Supplement to the Registration Statement for the offering of at least 12,000,000 of its ordinary shares ("Preliminary Prospectus Supplement").

271.    On April 15, 2015, Horizon filed a Final Prospectus Supplement to the Registration Statement for the offering of at least 15,350,000 of its ordinary shares at a price to the public of $28.25 per share ("Final Prospectus Supplement").

272.    On April 21, 2015, Horizon announced the exercise in full by the underwriters of their option to purchase up to 2,302,500 additional ordinary shares – bringing the total number of shares sold in the Offering to 17,652,500 at a price of $28.25 per share. According to Horizon's

---

[28]    The "Securities Act Defendants" includes Horizon, the Director Defendants and the Underwriter Defendants.

press release on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million after deducting underwriting discounts and other offering expenses payable by Horizon.

273.    The Preliminary and Final Prospectus Supplements were issued pursuant to the Registration Statement (referred to as the "Offering Documents"). Pursuant to Rule 430B and Rule 430C (17 C.F.R. § 230.430B and 17 C.F.R.§ 230.430C), the information contained in the prospectus supplements is deemed part of and included in the Registration Statement to which the Prospectus Supplements relate.

274.    Further, the Registration Statement  incorporated by reference Horizon's Report on 10-Q for 3Q 2014 (filed on November 6, 2014), Report on Form 10-K for the quarter and year ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015 which contained false and misleading statements as described herein. The Company had a duty to disclose additional information called for under Item 303 of Regulation S-K [17 C.F.R. § 220.303] in those filings.

275.    Horizon and the Director Defendants had a duty to update the prospectus and Registration Statement under Section 10(a)(3) of the Securities Act to reflect any fundamental changes.

276.    The Offering Documents were false and misleading as they omitted to disclose the truth about Horizon's Prescriptions-Made-Easy Program and the Company's relationships with its specialty pharmacies.

### 2.    Factual Background: Horizon's Prescriptions-Made-Easy Program

277.    As discussed above, Horizon launched its PME, later renamed HorizonCares, in order to protect the Company's exorbitantly priced drugs from generic substitution and mitigate the financial impact of key PBM's decision to exclude Horizon's leading drugs, DUEXIS and

VIMOVO, from their formularies.  The PME program's primary goal was to circumvent PBMs and the plan design of health plans and sponsors by transforming specialty pharmacies—traditionally companies that dispense drugs requiring refrigeration, injection, and/or specialized administration—into a Horizon-controlled vertical distribution system for its branded drugs.

278.    Unbeknownst to investors, however, in executing and expanding the PME program, Horizon employed a variety of improper operational, sales, and marketing practices that seriously undermined the sustainability of Horizon's business model.

279.    First, Horizon exercised secret operational control over the specialty pharmacies that distributed the Company's drugs through the PME program.  Among other things,

(a)    As a former employee of Horizon (FE-2)[29] explained, specialty pharmacies in the PME network were benefiting from incentives from Horizon as well as back rebates when they filled Horizon prescriptions;

(b)    Horizon also stationed personnel at its "captive" pharmacies to monitor the pharmacies' operations.  For instance, Former Halstead Employee -1 "FHE-1,"[30] confirmed that one of Halstead's owners, Renny Kurup, was a close companion to Ben Bove, a senior manager at Horizon and that Bove would occasionally be physically present at Halstead, but that more often other Horizon representatives would be onsite at Halstead.  Horizon Former Employee, FE-1,[31] also described how Horizon would station its personnel for a week at a time at various specialty pharmacies to monitor what was happening with Horizon prescriptions and to ensure that a lot of Horizon prescriptions were going through;

---

[29]    FE-2 is a former Territory Manager in the Northeast Region whose tenure stretched from the middle of 2014 to the middle of 2015.

[30]    FHE-1 was employed at Halstead as a Clinical Pharmacist from August 2014 through late March 2015 oversaw compounding services there.

[31]    FE-1 is a former Horizon Territory Manager in Houston Texas from February 2012 through February 2015 who reported initially to Scott Yokobosky and later Lance Martin.

(c)      Senior Horizon personnel actively created some of the pharmacies responsible for distributing drugs through the PME program.  For instance, in January or February 2015, FHE-1 learned that Kurup, an owner of Halstead, and Horizon manager Ben Bove had partnered to open a second pharmacy, Clybourn Park, located about a mile from Halstead. Clybourn Park, to FHE-1's knowledge, worked exclusively as a mail-order pharmacy for Horizon products when it opened. FHE-1's recollection is further corroborated by Illinois state filings, which reveal that as of September 19, 2014, Clybourn Park Pharmacy LLC was run by Ben Bove, Todd Smith, and Renny Kurup.  Bove was at this time still employed by Horizon, as was Todd Smith; and

(d)      A number of the specialty pharmacies in the PME network significantly depended on their relationships with Horizon for their survival.  For example, 59% of captive pharmacy Linden Care's business stemmed from dispensing Horizon drugs.[32]

280.     PBMs and insurers vigorously object to this degree of manufacturer control over dispensing pharmacies because it misaligns pharmacy incentives and creates opportunities, as it did in Horizon's case, for pharmacies and manufacturers to collude for the purpose of circumventing cost control safeguards enshrined in PBM contracts and policies.  While exerting an unusual degree of control over dispensing pharmacies was essential to the success of the PME program, that control threatened Horizon's relationships with PBMs and insurers and, as a result, exposed the Company to serious negative commercial consequences and ultimately an investigation by the DOJ.

281.     Horizon sales representatives were also instructed by Horizon to ensure product adoption by the doctors they called.  One of the ways Horizon advocated going about this was by

---

[32]     *See* Andrew Pollack, *Express Scripts Cuts Ties to a Specialty Pharmacy*, N.Y. TIMES (Nov. 11, 2015).

obscuring the price of the drugs.  According to FE-1, Horizon sales representatives were instructed to lie to their customers about the price of the drugs.  When doctors would ask the cash price of DUEXIS or VIMOVO, according the FE-1, the sales representatives were told to avoid such questions and instead talk about the benefits of the program to the patients.  FE-1 added that they were to tell doctors that there would be a minimal copay to the patient if the prescription went through a specialty pharmacy.  According to FE-2 when some doctors did find out the price of these drugs was $1500, they essentially told the sales representatives to get out and that they would not have insurance pay that amount for Advil and Pepcid.

282.    These facts about Horizon's true business practices were omitted from the Offering Documents.

### 3.    The False and Misleading Offering Documents

283.    Among other things, the Final Prospectus Supplement represented the following:

> ***Another key part of our primary care commercial strategy is to encourage physicians to have their patients fill prescriptions through our Prescriptions-Made-Easy, or PME, specialty pharmacy program***, which enables uninsured or commercially insured patients to have enhanced access to our products by providing financial assistance to reduce eligible patients' out of pocket costs for prescriptions filled via a PME-participating mail order pharmacy. Through PME, prescriptions for our products are filled by designated mail order specialty pharmacies, with the products shipped directly to the patient. Because our products when dispensed through the PME program do not require involvement of a traditional retail pharmacy, prescriptions filled through our PME program are less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. ***We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and pharmacy benefit managers, or PBMs, to use less expensive generic or over the counter brands instead of branded products increases. We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs.***

284.    The Final Prospectus Supplement also stated that:

> ***Weekly prescriptions of our primary care products grew significantly during the first quarter of 2015***. Despite being placed on certain formulary exclusion lists beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS weekly prescriptions rose 42% and VIMOVO weekly prescriptions rose 26%. Compared to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID 2%, during the first 12 weeks of 2015, weekly prescriptions grew each week, representing a 353% increase during the period.  ***We also continued to increase PME activation for our primary care products in the first quarter of 201***5, with the percentage of prescriptions filled through PME rising to 58%, 44% and 56% for DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended March 27, 2015.

285.    Further, the Company warned in the Final Prospectus Supplement:

(a)    that "***the PME program may implicate certain state laws*** related to, among other things, unlawful interference with schemes to defraud, excessive fees for services, tortious patient contracts and statutory or common law fraud. To the extent the PME program is found to be inconsistent with applicable laws, we may be required to restructure or discontinue such program, or be subject to other significant penalties;" and

(b)    that "***[w]e may also experience pressure from payors concerning certain promotional approaches that we may implement such as PME program*** or any other co-pay programs whereby we assist qualified patients with certain out-of-pocket expenditures for our product.  In addition, pharmaceutical manufacturer co-pay initiatives are the subject of evolving interpretations of applicable regulatory requirements, and any change in the regulatory or enforcement environment regarding such programs could impact our ability to offer such programs. If we are unsuccessful with our PME program or any other co-pay initiatives, we would be at a competitive disadvantage in terms of pricing versus preferred branded and generic competitors, or be subject to significant penalties."

286.     The statements in the Final Prospectus Supplement regarding prescription growth in its primary care products and the expansion of the PME program failed to disclose that

(a)     Horizon exercised secret control over a number of its PME specialty partner pharmacies, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     in order to meet PME program sales objectives, Horizon  engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers.

287.     In addition to the above representations, the Final Prospectus Supplement incorporated by reference certain documents and advised that potential investors to "should read this prospectus supplement and the accompanying prospectus, including the information incorporated by reference, and any free writing prospectus that we have authorized for use in connection with this offering in their entirety before making an investment decision."

288.     The Final Prospectus Supplement incorporated by reference Horizon's 2014 Form 10-K, in which Defendants discussed the Company's PME program:

(a)     "***In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ensure continued growth of our NSAID portfolio in 2015***;"

(b)     "***We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs***;" and

(c)     "***We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and PBM***s, to use less expensive generic or over the counter brands instead of branded products increases."

289.    The Final Prospectus Supplement also incorporated by reference Horizon's Form 8-K dated April 13, 2015, which stated:

> ***Weekly prescriptions of our primary care products grew significantly*** during the first quarter of 2015. ***Despite being placed on certain formulary exclusion lists*** beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS ® ibuprofen/famotidine) weekly prescriptions rose 42% and VIMOVO ® (naproxen/esomeprazole magnesium) weekly prescriptions rose 26%.  Compared to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID ® (diclofenac sodium topical solution) 2% w/w, during the first 12 weeks of 2015, weekly prescriptions grew each week, representing a 353% increase during the period. ***We also continued to increase Prescriptions-Made-Easy ("PME") activation for our primary care products in the first quarter of 2015, with the percentage of prescriptions filled through PME rising to 58%, 44% and 56% for DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended March 27, 2015.***

290.    The 2014 Form 10-K and Form 8-K dated April 13, 2015 failed to disclose that:

(a)     Horizon exercised secret control over a number of its PME specialty partner pharmacies, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

118

(b)      in order to meet PME program sales objectives, Horizon  engaged in

illegal sales and marketing tactics, in violation of state laws, regulations and agreements with

PBMs and insurers.

291.    The Company warned in the Final Prospectus Supplement:

> *We are exposed to the risk that our employees*, independent contractors, principal investigators, consultants, vendors, distributors and CROs *may engage in fraudulent or other illegal activity*.
>
> *   *   *
>
> *We have adopted a Code of Business Conduct and Ethic*s, but it is not always possible to identify and deter misconduct by our employees and other third parties, *and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations*.

292.    Statements in the Offering Documents warning that Horizon employees "may

engage in fraudulent or other illegal activity" despite the Company's adoption of a "Code of

Business Conduct and Ethics" and the "precautions [Horizon has] taken to detect and prevent

this activity" failed to disclose that, in order to meet PME program sales objectives, Horizon

engaged in illegal sales and marketing tactics, in violation of state laws, regulations and

agreements with PBMs and insurers.

293.    The Final Prospectus Supplement also warned that the "advertising, promotion,

export, marketing and distribution and other possible activities relating to our products and our

product candidates are, and will be, subject to extensive regulation by the FDA and other

regulatory agencies. *Failure to comply with FDA and other applicable regulatory requirements*

*may, either before or after product approval, subject us to administrative or judicially imposed*

*sanctions*."

294.    Statements warning that "Failure to comply with" applicable regulations "may . . . subject us to administrative or judicially imposed sanctions," failed to disclose that, in order to meet PME program sales objectives, Horizon  engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers.

295.    The statements in the Final Prospectus Supplement regarding the PME program failed to disclose:

(a)    Horizon exercised secret control over a number of its PME specialty partner pharmacies, such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)    in order to meet PME program sales objectives, Horizon  engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers.

296.    The omitted information was required to be disclosed in the Form S-3 pursuant to Item 11 of the instructions to Form S-3, which requires the registrant to "[d]escribe any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year . . . and which have not been described in a report on Form 10-Q [or] Form 8-K." Moreover, pursuant to SEC Regulation C, registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading. Specifically, Rule 408 states "In addition to information expressly required to be included in a registration statement, there shall be added such further material information, if

120

any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 240.408(a).

297.    Further, the Registration Statement  incorporated by reference Horizon's Report on 10-Q for 3Q 2014 (filed on November 6, 2014), Report on Form 10-K for the quarter and year ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015 which contained false and misleading statements as described herein. The Company had a duty to disclose additional information called for under Item 303 of Regulation S-K [17 C.F.R. § 220.303] in those filings.

### E.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR SECURITIES ACT CLAIMS

298.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of persons or entities who purchased the common stock of Horizon pursuant and/or traceable to the Registration Statement  issued in connection with the Offering and were damaged.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Horizon during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Horizon's employee retirement and benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

299.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Horizon securities were actively traded on the NASDAQ.  As of February 20, 2015, Horizon had 125,100,210 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and

can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Horizon or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

300.    Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

301.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and securities litigation.

Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

302.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

> (a)    whether the federal securities laws were violated by defendants' acts as
> alleged herein;

> (b)    whether statements made by Horizon and the Director Defendants in the
> Offering Documents misrepresented or omitted material facts about the
> business, operations and management of Horizon including Horizon's
> relationship with pharmacies in the PME network and the Company's
> marketing practices;

> (c)    whether the price of Horizon stock on the Offering was artificially inflated
> because of the defendants' conduct complained of herein; and

> (d)    whether the members of the Class have sustained damages and, if so, what
> is the proper measure of damages.

303.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

> **F.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE**
> **WITH RESPECT TO THE SECURITIES ACT CLAIMS**

304.    At all relevant times, the market for Horizon's securities was efficient for the

following reasons, among others:

> (e)    Horizon's stock met the requirements for listing, and was listed
> and actively traded on Nasdaq, a highly efficient and automated
> market;

> (f)    As a regulated issuer, Horizon filed periodic reports with the SEC
> and Nasdaq;

> (g)    Horizon regularly communicated with public investors via
> established market communication mechanisms, including through
> regular disseminations of press releases on the national circuits of
> major newswire services and through other wide-ranging public
> disclosures, such as communications with the financial press and
> other similar reporting services; and

> (h)    Horizon was followed by numerous securities analysts  including
> Piper Jaffray & Co., Stifel, Nicolaus & Co., Inc., JP Morgan; UBS
> Securities, Morgan Stanley, Guggenheim Securities, LLC,  Cowen,
> Brean Capital, BMO Capital Markets Corp., Citigroup, Goldman
> Sachs & Co., Inc., Jefferies, Mizuho Securities USA, Inc. which
> wrote reports which were distributed to those brokerage firms'
> sales force and certain customers.  Each of these reports was
> publicly available and entered the public market place.

305.    As a result of the foregoing, the market for Horizon stock promptly digested

current information regarding Horizon from all publicly available sources and reflected such

information in Horizon's stock price.  Under these circumstances, all purchasers of Horizon

securities during the Class Period suffered similar injury through their purchase of Horizon

securities at artificially inflated prices, and a presumption of reliance applies.

123

306.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Horizon and the Individual Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

### G.    THE SAFE HARBOR PROVISION IS INAPPLICABLE

307.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Horizon and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Horizon who knew that those statements were false and misleading when made

H.      **CLAIMS FOR RELIEF UNDER THE SECURITIES ACT**

1.      <u>COUNT III:</u> *For Violations of Section 11 of the Securities Act Against Horizon, the Director Defendants and the Underwriter Defendants*

308.    Plaintiffs incorporate ¶¶ 244-307 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

309.    Lead Plaintiff Northern California Carpenters brings this claim pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and other members of the Class who purchased Horizon common stock in the Offering against Horizon, the Director Defendants and the Underwriter Defendants. Northern California Carpenters and other members of the Class purchased or otherwise acquired Horizon common stock issued in the Offering pursuant to a materially inaccurate Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

310.    As issuer of the shares, Horizon is strictly liable to Plaintiffs and the Class for the misstatements and omissions. Horizon, the Director Defendants, and the Underwriter Defendants named herein were responsible for the contents and dissemination of the  Registration Statement.

311.    On or about April 15, 2015, Horizon announced it was planning to offer to sell 12,000,000 of its ordinary shares in an underwritten public offering and that Citigroup, Jefferies, Cowen and Morgan Stanley were acting as joint book-running managers for the Offering. The Offering was conducted pursuant to the Offering Documents.

312.    Pursuant to the Offering Documents, the Company issued and sold a total of 17,652,500 shares of common stock via an underwriting syndicate composed of the Underwriter Defendants. According to Horizon's press release on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million after deducting

underwriting discounts and other offering expenses payable by Horizon. The Underwriter

Defendants received over $22.4 million. The number of shares sold by each Underwriter

Defendant and their resulting discounts and commissions are set forth in the chart below.

| Underwriter | Number of Shares | Discounts and Commissions |
|---|---:|---:|
| Citigroup | 5,737,062.50 | $7,293,240.70 |
| Jefferies | 5,737,062.50 | $7,293,240.70 |
| Cowen | 3,089,187.50 | $3,927,129.61 |
| Morgan Stanley | 3,089,187.50 | $3,927,129.61 |
| **TOTAL** | **17,652,499** | **$22,440,740.62** |

313.    None of the defendants named herein made a reasonable investigation or

possessed reasonable grounds for the belief that the statements contained in the Registration

Statements were true and without omissions of any material facts and were not misleading. This

claim is not based on and does not sound in fraud. For purposes of asserting this claim under the

Securities Act, Plaintiffs do not allege that the defendants named in this count acted with scienter

or fraudulent intent, which are not elements of a Section 11 claim.

314.    By reasons of the conduct herein alleged, each defendant violated, and/or

controlled a person who violated Section 11 of the Securities Act.

315.    Plaintiffs assert this claim on behalf of the members of the Class who purchased

and/or acquired Horizon  shares pursuant and/or traceable to the Registration Statement for the

Offering.

316.     The Class has sustained damages. The value of Horizon common stock has declined substantially subsequent to and due to Horizon, the Underwriter Defendants, and the Director Defendants' violations.

317.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the Registration Statement.

Failure to Disclose Information Required Under Items 303 and 503 of SEC Regulation S-K

318.     In addition, Item 303 required the Offering Documents and the 10-Q for 3Q 2014 (filed on November 6, 2014), 10-K for the quarter and year ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015 incorporated into the Final Prospectus Supplement to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). Similarly, the regulation required the 10-Q for the third quarter of 2014 (filed on November 6, 2014) and the 10-K for the quarter and year ending December 31, 2014 (filed February 27, 2015) to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i)(ii).

319.     In violation of Item 303, the above-listed SEC filings omitted that at the time of the Offering, Horizon exercised  control over a number of its PME specialty partner pharmacies, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and in order to meet PME program sales objectives, Horizon engaged in illegal sales and marketing tactics, in violation of state laws, regulations and agreements with PBMs and insurers. Further, Horizon failed to disclose the Company would be forced to slash prices on its biggest growth drivers thereby lowering its margins going forward and that payor pushback would impact Horizon's primary care drugs, primarily DUEXUS and VIMOVO in the short term.

320.     Additionally, Item 503 of SEC Regulations S-K, 17 C.F.R. §299.503 ("Item 503"), required the Offering Documents to include among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §299.503(c). Although the Offering Documents included a discussion or risk factors, it was materially incomplete and therefore misleading.

321.     In violation of Item 503, the Offering Documents did not disclose that one of the most significant factors that made the Offering speculative or risky to investors was the fact that Horizon was operating an unsustainable business model based on undisclosed practices designed to drive short-term sales prices but had exposed the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers. Nowhere in the Offering Documents did Horizon disclose these material facts which it was required to do under Item 503.

2.      **COUNT IV**: *For Violations of Section 12(a)(2) of the Securities Act Against Horizon and the Underwriter Defendants*

322.    Plaintiffs incorporate ¶¶ 244-307 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

323.    Lead Plaintiff Northern California Carpenters brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of itself and other members of the Class who purchased Horizon common stock in the Offering against Horizon and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). Northern California Carpenters and other members of the Class purchased or otherwise acquired Horizon common stock issued in the Offering pursuant to a materially inaccurate Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

324.    This particular cause of action is based on Horizon and the Underwriter Defendants' lack of reasonable care, not fraud or intentional or reckless misconduct. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Horizon or the Underwriter Defendants acted with scienter or fraudulent intent which are not elements of a Section 12(a)(2) claim.

325.    The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff Northern California Carpenters and other members of the Class by means of the Registration Statement and Prospectus Supplements and they did so for the benefit of Horizon and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions, and other transaction-related payments. According to Horizon's press release

on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million, after deducting underwriting discounts and other offering expenses payable by Horizon. The Underwriter Defendants received over $22.4 million. The number of shares sold by each Underwriter Defendant and their resulting discounts and commissions are set forth in the chart below.

| Underwriter | Number of Shares | Discounts and Commissions |
|---|---|---|
| Citigroup | 5,737,062.50 | $7,293,240.70 |
| Jefferies | 5,737,062.50 | $7,293,240.70 |
| Cowen | 3,089,187.50 | $3,927,129.61 |
| Morgan Stanley | 3,089,187.50 | $3,927,129.61 |
| **TOTAL** | **17,652,499** | **$22,440,740.62** |

326.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

327.    Horizon and the Underwriter Defendants used the means and instrumentalities of interstate commerce and the U.S. mail.

328.    Each of the defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the Offering Documents including statements regarding Horizon's PME program and failed to do so. Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

329.     Horizon and the Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Registration Statement at the time of the Offering were true and that there were no omissions of any material fact. Accordingly, Horizon and the Underwriter Defendants are each liable to Northern California Carpenters and/or other members of the Class who purchased in the Offering.

330.     The value of Horizon common stock declined substantially subsequent to the consummation of the Offering and Northern California Carpenters and the other members of the Class have sustained damages.

331.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

332.     By reason of the foregoing, Horizon and the Underwriter Defendants are liable under Section 12(a)(2) of the Securities Act to Northern California Carpenters and other members of the Class who purchased in the Offering. Northern California Carpenters and other members of the Class have the right to rescind and recover the consideration paid for their securities on which they suffered damages. In addition, Northern California Carpenters and the members of the Class who have sold and suffered damages on their securities that they originally purchased through the Offering are entitled to rescissory damages.

     **3.**      **<u>COUNT V</u>:** *For Violations of Section 15 of The Securities Act Against Defendant Walbert*

333.    Plaintiffs incorporate ¶¶ 244-307 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

334.    This count is asserted against defendant Walbert and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

335.    Defendant Walbert, by virtue of his executive position and directorship and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of Horizon within the meaning of Section 15 of the Securities Act. Walbert had the power and influence and exercised the same to cause Horizon to engage in the acts described herein.

336.    Walbert's positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

337.    By virtue of the conduct alleged herein, Walbert is liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages.

338.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity the Offering Documents. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the Offering Documents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 25, 2016

LABATON SUCHAROW LLP


/s/Serena Hallowell
Jonathan Gardner
Serena Hallowell
Christine M. Fox
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
        shallowell@labaton.com
        cfox@labaton.com

**Counsel for Lead Plaintiffs and the Putative Class**


Bernstein Litowitz Berger & Grossmann LLP
Blair A. Nicholas
12481 High Bluff Drive, Suite 300
San Diego, California 92130

133

Telephone:  (858) 793-0070
Facsimile:  (858) 793-0323
Email: BlairN@blbglaw.com

-and-

Hannah G. Ross
Abe Alexander
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
Email: Hannah@blbglaw.com
              Abe.Alexander@blbglaw.com

**_Counsel for Plaintiffs and the Putative Class_**

**CERTIFICATE OF SERVICE**

I, Jonathan Gardner, certify that on this 25th day of July, 2016, I electronically filed this Consolidated Class Action Complaint for Violations of the Federal Securities Laws with the Clerk of the U.S. District Court using the CM/ECF system which will be sent electronically to all counsel of record.

*/s/ Jonathan Gardner*
Jonathan Gardner