# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GEORGE S. SCHAFFER, Individually and on Behalf of All Others Similarly Situated, | **:** | |
| | **:** | |
| Plaintiff(s), | **:** | Master File No.: 1:16-cv-01763-JMF |
| | **:** | |
| v. | **:** | PROPOSED CLASS ACTION |
| | **:** | |
| HORIZON PHARMA PLC, TIMOTHY P. WALBERT, PAUL W. HOELSCHER, JOHN J. KODY, ROBERT F. CAREY, WILLIAM F. DANIEL, MICHAEL GREY, JEFF HIMAWAN, VIRINDER NOHRIA, RONALD PAULI, GINO SANTINI, H. THOMAS WATKINS, CITIGROUP GLOBAL MARKETS, INC., JEFFERIES LLC, COWEN & COMPANY LLC, AND MORGAN STANLEY & CO. LLC, | **:** | JURY TRIAL DEMANDED |
| | **:** | |
| Defendants. | **:** | |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ................................................................... 2

II.  EXCHANGE ACT CLAIMS .................................................................. 3

    A.   JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS ................. 12

    B.   PARTIES FOR EXCHANGE ACT CLAIMS ..................................... 13

    C.   SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS ............ 16

        1.   Horizon's Drugs and Pricing Practices ..................................... 16

        2.   Horizon's Inflated Drug Prices .................................................. 17

        3.   Price Hikes Result in Rejection of Horizon Drugs ................... 19

        4.   The "Prescriptions Made Easy" Specialty Pharmacy Program Was Essential to the Growth of the Company ................................... 20

        5.   The Exchange Act Defendants Secretly Relied on Improper Practices in the Execution and Expansion of the PME Program ............. 22

        6.   THE TRUTH BEGINS TO EMERGE ...................................... 44

    D.   THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS (FOR THE EXCHANGE ACT CLAIMS) ................................................................. 52

        1.   The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning the Nature and Success of Horizon's PME Program ................................................................ 53

        2.   The Exchange Act Defendants' False and Misleading Statements and Omissions Touting the Company's Financial Results and Attributing Those Results to Entirely Legitimate Factors ....................... 64

        3.   The Exchange Act Defendants' False and Misleading Statements Concerning Horizon's Compliance With FDA Regulations, Marketing, and Advertising Regulations and the Company's Code of Business Ethics ................................................................ 71

        4.   Defendant Walbert's and Defendant Hoelscher's  Signed Certifications that Horizon's Mandatory Periodic Filings with the SEC were Free from Material Misstatements were, Themselves, False and Misleading ................................................................ 74

        5.   Defendants Attempted to Cover Up the Truth About the PME Program ................................................................ 75

    E.   POST-CLASS PERIOD DISCLOSURES FOR EXCHANGE ACT CLAIMS ................................................................ 94

    F.   LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS ................................................................ 94

G.    ADDITIONAL EVIDENCE OF SCIENTER WITH RESPECT TO THE EXCHANGE ACT CLAIMS ................................................................. 96

    1.    The PME Program Was Extremely Important to the Company's Short Term Growth ...................................................................... 97

    2.    The Nature of the Undisclosed Practices that Drove the PME Program Give Rise to an Inference of Scienter ......................... 99

    3.    Horizon's Executive Compensation Plan Provided the Individual Defendants A Powerful Motive to Commit Fraud During the Class Period ................................................................................... 104

H.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT CLAIMS ............................................................................... 107

I.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS ................ 109

J.    THE SAFE HARBOR PROVISION IS INAPPLICABLE .............. 110

K.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............ 111

    1.    COUNT I:  *For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Horizon and the Individual Defendants* ............................................................................. 111

    2.    COUNT II:  *For Violations of Section 20(a) of the Exchange Act Against The Individual Defendants* ...................................... 114

III.    THE SECURITIES ACT CLAIMS ................................................. 116

A.    NATURE OF THE ACTION ......................................................... 116

B.    JURISDICTION AND VENUE FOR THE SECURITIES ACT CLAIMS ....... 117

C.    PARTIES FOR THE SECURITIES ACT CLAIMS ...................... 117

    1.    Plaintiff ............................................................................... 117

    2.    Defendants ........................................................................... 117

D.    SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ............................................................................... 120

    1.    The Offering ........................................................................ 120

    2.    Factual Background: Horizon's Prescriptions-Made-Easy Program ...... 121

    3.    The False and Misleading Offering Documents ..................... 137

E.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR SECURITIES ACT CLAIMS ............................................................................... 143

F.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE SECURITIES ACT CLAIMS ............... 145

G.    THE SAFE HARBOR PROVISION IS INAPPLICABLE .............. 146

H.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............ 147

1.   COUNT III: *For Violations of Section 11 of the Securities Act Against Horizon, the Director Defendants and the Underwriter Defendants* ............................................................................ 147

2.   COUNT IV: *For Violations of Section 12(a)(2) of the Securities Act Against Horizon and the Underwriter Defendants* ......................... 151

3.   COUNT V: *For Violations of Section 15 of The Securities Act Against Defendant Walbert* ................................................................... 154

PRAYER FOR RELIEF ................................................................................. 155

DEMAND FOR TRIAL BY JURY ................................................................. 155

Lead Plaintiffs Locals 302 & 612 of the International Union of Operating Engineers-Employers Retirement Industry Retirement Trust Fund ("I.U.O.E. 302/612") and Carpenters Pension Trust Fund for Northern California ("Northern California Carpenters") and additional named plaintiff Automotive Industries Pension Trust Fund  (together, "Plaintiffs"), by their undersigned attorneys, hereby bring this Amended Consolidated Class Action Complaint ("Complaint") against Horizon Pharma PLC ("Horizon" or the "Company"), Timothy P. Walbert ("Walbert"), Paul W. Hoelscher ("Hoelscher"), John J. Kody ("Kody"), Robert F. Carey ("Carey"), William F. Daniel ("Daniel"), Michael Grey ("Grey"), Jeff Himawan ("Himawan"), Virinder Nohria, M.D., Ph.D. ("Nohria"), Ronald Pauli ("Pauli"), Gino Santini ("Santini"), H. Thomas Watkins ("Watkins"), Citigroup Global Markets, Inc. ("Citigroup"), Jefferies LLC ("Jefferies"), Cowen and Company, LLC ("Cowen"), and Morgan Stanley & Co. LLC ("Morgan Stanley") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes review and analysis of publicly available information, including Securities and Exchange Commission ("SEC") filings by Horizon, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and interviews of former employees of Horizon and other persons with knowledge of the matters alleged herein. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will

exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.    NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of (1) persons or entities who purchased the publicly traded common stock of Horizon during the period from January 12, 2015 through April 12, 2016, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and (2) persons or entities who purchased the common stock of Horizon pursuant and/or traceable to the Company's registration statement and prospectus (the "Registration Statement") issued in connection with the Company's April 16, 2015 public offering (the "Offering") seeking to pursue remedies under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") (collectively referred to hereinafter as the "Class").

2.     In this Complaint, Plaintiffs allege two different sets of claims.

(a)     First, Plaintiffs allege scienter-based claims (Counts I and II) under the Exchange Act against Horizon and the Individual Defendants (as defined herein). Plaintiffs allege that these defendants knowingly or with reckless disregard made material misstatements and omissions about Horizon's Prescriptions Made Easy ("PME") program.

(b)     Second, Plaintiffs allege strict liability, negligence, and non-fraud based claims (Counts III-V) under the Securities Act. These claims are brought against those defendants who are statutorily responsible for material misstatements of facts and omissions in the Registration Statement issued in connection with the Offering. The Securities Act defendants include Horizon; the individual members of Horizon's Board of Directors who signed the Registration Statement (the "Director Defendants"); and the underwriters of the Offering

("Underwriter Defendants"). Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made at the time of the Offering.

3.     Horizon is a specialty biopharmaceutical company that describes itself as engaged in "identifying, developing, acquiring or in-licensing, and commercializing medicines for the treatment of arthritis, pain, inflammatory, and/or orphan diseases in the United States and internationally." Horizon was founded in 2005 and is headquartered in Dublin, Ireland.  The Company's stock trades on the NASDAQ under the ticker symbol "HZNP."

## II.     EXCHANGE ACT CLAIMS

4.     This case arises out of a fraudulent scheme pursuant to which Horizon and the Individual Defendants used a small network of undisclosed Horizon-controlled pharmacies and deceptive sales and marketing practices to mislead shareholders as to the success and sustainability of Horizon's critically important PME program and the improper manner in which it was expanding and executing that program.

5.     Prior to the start of the Class Period, Horizon's business model was to charge ever-higher prices for its small portfolio of branded drugs, all of which faced competition from cheaper generic drugs and over-the-counter ("OTC") alternatives.  By 2Q 2014, Horizon was marketing three drugs—DUEXIS, VIMOVO, and RAYOS/LODOTRA—with DUEXIS and VIMOVO accounting for over 90% of the Company's net sales.

6.     Horizon's branded products lacked any meaningful differentiation from their generic competitors.  For instance, DUEXIS is a combination medicine comprised of ibuprofen (a nonsteroidal anti-inflammatory drug or "NSAID" marketed under the trade name "Motrin"),

3

and famotidine (marketed under the trade name "Pepcid"), which helps reduce the risk of ulcers in the stomach or intestines that can be caused by long-term use of Ibuprofen.  VIMOVO, a competing drug that Horizon bought in 2013, is another pain reliever with gastro-intestinal protection, and could also be described as a combination of Aleve plus Nexium.

7.      The lack of meaningful differentiation between Horizon's branded products and their generic equivalents has not prevented Defendants from relying on aggressive sales techniques and strategies to hike up the price of Horizon's portfolio of drugs.  In 2012, the wholesale acquisition cost (WAC) for a 30-day supply of DUEXIS cost approximately $158.40.[1] By 2016, the WAC for 30-day supply of DUEXIS cost $1,875.60, or on an annual basis, $22,507.  In comparison, to purchase a month's supply of ibuprofen and Pepcid would cost closer to $20 or $40 a month.  Before Horizon acquired VIMOVO, Astra-Zeneca's WAC was $114.74 for a 30-day supply.  After acquisition, Horizon immediately raised that price to $799.20, and then systematically increased its price until it, too, cost $1,875.60 in 2016.

8.      Horizon's price hikes resulted in DUEXIS and VIMOVO accounting for approximately 83% of Horizon's net sales in 2014 (or $245.9 million).  This made revenue Horizon generated from these drugs central to Horizon's business strategy.  Horizon needed cash to fund mergers and acquisitions to acquire new drugs to allow it to move into other product markets and to service the debt that had been funding it up to that point.  Everything rested on Horizon's ability to keep generating cash flow from these exorbitantly priced drugs.

9.      Ultimately, Horizon's consistent price hikes, coupled with the fact that its drugs had ***much*** more affordable, suitable replacements, resulted in two of the largest Pharmacy

---

[1]      WAC is the manufacturer's list price and typically does not reflect adjustments, discounts, rebates, purchasing allowances, or other commercial arrangements.  Manufacturers do not typically publish WAC's publicly.  Unless otherwise noted, this Complaint derives the WAC prices for Horizon's drugs from Medi-Span's WAC database.

Benefit Management companies ("PBMs") placing DUEXIS and VIMOVO on their list of excluded drugs.  PBMs manage prescription drug spending for health insurers and other third-party payors, and wield immense influence over which drugs will be covered.  On July 28, 2014, Horizon disclosed that it had been notified that two of the largest PBMs, CVS Caremark n/k/a CVS Health ("hereafter Caremark") and Express Scripts had decided to place DUEXIS and VIMOVO on their exclusion lists.  Horizon disclosed that an estimated 20%-30% of DUEXIS and VIMOVO prescriptions could be impacted immediately.  Horizon and its investors understood that that number could quickly grow: Once doctors began facing pushback from PBMs and insurers, they would soon stop writing DUEXIS and VIMOVO prescriptions. After the news broke about the exclusion list, Horizon's share price dropped 34.17%, to $9.15, from the previous-day's close of $13.90.

10.     The Company assured investors that it had a plan to avoid a precipitous drop in net sales.  The plan focused on a program Horizon was commercially testing called "Prescriptions Made Easy" or "PME" (later renamed HorizonCares).  The Company described the program to the market as "a novel program that we have developed to address the impact of pharmacies switching from branded products prescribed by doctors to substitute products."

11.     Horizon publicly described the PME as an improved version of the standard pharmaceutical sales model.  In the standard model, the sales representative educates the doctor about a drug, the doctor writes a prescription, and the patient decides which pharmacy to use.  In the standard model, however, many patients would get to the pharmacy and find that the PBMs would not cover Horizon's drugs, and would either have to switch to the generic or go without.

12.     The Exchange Act Defendants told investors that they had solved their PBM problems by cutting retail pharmacies out of this model:  A sales representatives would pitch

DUEXIS and VIMOVO and tell the doctor that if he or she sent the prescription directly to one of Horizon's so-called "partner" pharmacies—instead of using the patient's local pharmacy—the patient would receive the drug within a day or two, at little to no cost, guaranteed.  In all cases, Horizon would provide a coupon to reduce the co-pay. Then, the pharmacy would ship the drug to the patient, and if insurance covered it, Horizon could reap enormous profits on that sale.  If the patient's insurance rejected the claim, Horizon would provide the drug for free.  Though the program would lower the average amount Horizon collected for prescriptions, the Exchange Act Defendants told investors that increased prescription volume would more than make up for that discount.  And, as the Exchange Act Defendants were quick to point out, it was all to benefit the patients.  For example, Walbert said in a February 27, 2015 conference call, "As we look at the PME program, we see the ability to subsidize and ***do the right thing for the patients*** as a direct correlate with prescription."[2]

13.     To the market, this plan appeared to work. Horizon reported *increases* in net sales of DUEXIS and VIMOVO after their exclusion from the formularies took effect on January 1, 2015.  For example, Defendant Kody during the 2Q2015 Earnings Call reported that "[t]otal prescription growth rates for both medicines [DUEXIS and VIMOVO] increased strong double digits versus the first quarter of 2015" attributing the Company's "success" to "terrific execution by our sales, marketing and analytics teams and our ability to increase patient access to our products through our Prescriptions Made Easy or PME program."  Analysts responded with praise.  For example, on August 7, 2015, Piper Jaffrey praised Horizon's "strong execution across the product portfolio."  And on August 10, 2015, Brean Capital, LLC rated Horizon a "Buy" and set a target price of $40.00 a share, based in part on the success of the PME program.

---

[2]     Unless otherwise indicated, all emphasis has been added.

14. But, in reality, the PME program as the Exchange Act Defendants publicly portrayed did not drive the increased sales numbers to the extent Horizon promised. Beginning in late 2014 and continuing through the Class Period, as the Exchange Act Defendants were touting the PME program to investors, they were secretly increasing their control of a small network of so-called partner pharmacies on which Horizon depended to route its PME prescriptions. And rather than being the simple, scalable model Horizon described—a model that purportedly involved "arm's length" relationships with a variety of independent pharmacies—former personnel at Horizon and these controlled pharmacies and documents obtained during Plaintiffs' investigation show that, undisclosed to the market, Horizon exerted both financial and operational control over these pharmacies in order to push substantial amounts of Horizon drugs through.

15. In fact, in 2014, one of Horizon's then-executive officers and senior manager responsible for the PME program helped create a captive Horizon pharmacy in Chicago called Clybourn Park. The pharmacy, which was created to dispense *exclusively* Horizon drugs, was effectively run by current and former Horizon employees into 2015. By late 2015, Clybourn Park—a single pharmacy—was filling up to *one third* of prescriptions for DUEXIS, VIMOVO, and PENNSAID 2% written *nationwide*, making it one of the most critical components of Horizon's captive pharmacy network. *See* ¶¶ 79–80.

16. During the Class Period, Horizon was also involved in directing and overseeing the operations of another controlled pharmacy in Chicago called Halsted. This pharmacy processed as many as 1,000 Horizon prescriptions a week, making it one of the most important and lucrative spokes in Horizon's captive network. Horizon exercised control over Halsted's operations, including, by stationing employees in Halsted when Horizon drug sales were low and

directing Horizon as to which doctors Halsted was to enroll in an ostensibly pharmacy-run pilot program for Horizon drugs at Clybourn Park.  The pharmacy received exorbitant commission-type payments for each Horizon prescription it filled, allowing Halsted, for instance, to earn approximately $100 per Horizon prescription, dwarfing the typical margin earned by dispensing pharmacies in typical arms-length relationships. *See* ¶ 70. Once Horizon had established its own pharmacy, it transferred Halsted's prescriptions, *en masse*, to Clybourn Park, apparently without obtaining patient authorization, evincing Horizon's control over both pharmacies. *See* ¶¶ 74–77.

17.     In yet another example, Horizon exercised enormous economic control over another captive pharmacy called Linden Care, which depended significantly on its participation in the PME program for revenue.  To be part of the PME program, Linden Care created a Horizon-only department with more than 40 employees, and was monitored by Horizon employees.  *See* ¶ 87.  Again, the pharmacy received improper commission-type payments for filling Horizon prescriptions.  *See* ¶ 85.

18.     Horizon used its control over its captive pharmacies to direct them to engage in a host of illegal, deceptive, and improper business practices.  For instance, in order to boost prescription volume, Horizon instructed its captive pharmacies to refill patient prescriptions without patient authorization, ship drugs to states in which the individual pharmacies were not licensed, withhold pricing information from patients and doctors, and mislead patients into believing that prescriptions would be covered by insurers when they would not be.  Horizon and its controlled pharmacies worked in tandem to conceal these facts from PBMs and investors.  As discussed below, the captive pharmacies went to great lengths to hide their participation in the PME program from PBM auditors, and even as facts about the program emerged in partial

disclosures, Horizon continued to issue public statements that attempted to obscure the role of the captive pharmacies in the PME program.

19.     Horizon also instructed its sales force to engage in improper sales and marketing practices that violated the Code of Business Conduct and Ethics to which the Company publicly claimed to adhere.  Among other things, Horizon directed sales personnel to market Horizon drugs to doctors who would almost certainly prescribe them for off-label uses, and encouraged its employees to cultivate improper financial and personal relationships with doctors to prescribe Horizon drugs, with no questions asked.  ¶¶ 104–110.

20.     These practices by Horizon and its controlled pharmacies violated the law, relevant pharmacy regulations, and ran counter to certain pharmacy's contracts with the PBMs. Horizon hid these practices to deceive shareholders into trusting in the success and sustainability of the PME program.  The deception artificially propped up Horizon's stock price.

21.     Because Horizon ties "the vast majority" of executive compensation "directly to the stock price performance," the Exchange Act Defendants quickly capitalized on this lucrative opportunity.  From 2014 to 2015, Walbert's compensation increased more than ***ten-fold*** from $8.97 million in 2014 to total compensation valued at ***$93.4 million*** in 2015 (and more than ***49-fold*** from 2013); Hoelscher's compensation increased more than five-fold; Kody's compensation increased more than six-fold; and Carey's compensation increased more than three-fold.  Indeed, Defendants Hoelscher, Kody, and Carey also saw their total compensation from Horizon increase substantially from 2014 to 2015—***with each receiving total compensation valued at more than $18.5 million.***  Far from doing the "right thing for patients" *or shareholders*, the PME Program and the manner in which the Exchange Act Defendants

(defined below) executed it, was aimed at getting a huge payday before the full truth about the unsustainable nature of their program emerged.

22.   In October and November 2015, the truth began to emerge regarding the operational control Horizon exercised over its so-called "partner" pharmacies and the sustainability of Horizon's PME program.  Even as the truth was gradually disclosed, the Exchange Act Defendants denied any wrongdoing in the PME Program and steadfastly maintained that their relationship with the pharmacies was "fully independent," "arm's length," and "not exclusive."  When analysts pressed to understand how these so-called "fuily independent" pharmacies were compensation and incented, the Exchange Act Defendants obscured the truth regarding improper incentive payments, insisting that there was "nothing more to add."  On October 19, 2015, after the close of the market, the *New York Times* published an article that scrutinized this practice, and specifically targeted Horizon's PME program and the Company's strategy of pushing sales of its drug DUEXIS through affiliated "specialty" pharmacies, which in reality did not resemble traditional specialty pharmacies at all.  Following the release of the *New York Times* article, Horizon's stock price fell $3.81 per share, or 19.98 percent, to close at $15.26 per share on October 20, 2015.

23.   Defendants denied the charges set forth in this article.  Then, on October 22, 2015, before the market opened, Depomed, Inc., a hostile takeover target of Horizon, issued a press release also criticizing Horizon's business model and raising concerns regarding Horizon's aggressive drug pricing practices and use of specialty pharmacies. The letter specifically noted that Horizon's business practices were "unsustainable."  Horizon's stock fell an additional 11.53% from a close on October 21, 2015, of $14.83 per share to close of $13.12 per share on October 22, 2015.  The only reason Horizon stock did not decline further is because that same

day, Horizon issued a responsive press release denying wrongdoing, claiming that the specialty pharmacies distributing Horizon's drugs were "*fully independent*," and falsely attributing the Company's success to a host of legitimate factors.

24.     Despite Horizon's claim that it did not control the so-called "partner" pharmacies in its network, on November 10, 2015, Express Scripts announced that it had removed Linden Care specialty pharmacy from its network, stating that Linden Care was a "captive" pharmacy of Horizon, meaning that it primarily dispensed Horizon drugs. Linden Care's counsel confirmed this claim by revealing that 59% of its business involved dispensing drugs made by Horizon.[3] Despite the Exchange Act Defendants' reaffirmation that "*all pharmacies that distribute Horizon branded medicines are fully independent*," Horizon's stock price lost almost *20%* of its value, on November 11, 2015, falling $4.39 per share to close at $17.99 per share.

25.     Finally, on February 29, 2016, after the onslaught of negative information being released about Horizon's PME practices and use of controlled pharmacies, the Company surprised the market by announcing that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York—at least two months prior—in November 2015, requesting information related to the Company's patient assistance programs (*i.e.*, the PME program) and other aspects of Horizon's marketing and commercialization activities. In reaction to this disclosure, Horizon's stock price fell an additional $2.63 per share, or 13.29 percent, to close at $17.16 per share on February 29, 2016.

26.     Following these partial disclosures, the emerging visibility of Horizon's scheme to the PBMs, state and federal regulators, and investors, forced the Exchange Act Defendants to curtail its use of controlled pharmacies and improper marketing and sales activities to push

---

[3]      *See* Andrew Pollack, *Express Scripts Cuts Ties to New York Specialty Pharmacy*, N.Y. TIMES (Nov. 10, 2015).

Horizon drugs out to patients.  The impact was immediate.  On April 12, 2016, Horizon filed a Report on Form 8-K that pre-announced lower-than-expected revenues for the first half of 2016 (particularly 1Q16), and attributed the drop to higher than anticipated pricing pressure for VIMOVO and DUEXIS, causing a precipitous decline in net sales of these two products in just one quarter. Indeed, the sequential decreases in net sales for the two products were 51% and 46%, respectively. In reaction to Horizon's disclosure that payor pushback was impacting DUEXIS and VIMOVO much more than the Exchange Act Defendants previously disclosed, Horizon's stock price plummeted more than 25%, from a close on April 11, 2016, of $18.22 per share, to a close on April 12, 2016, of $13.42 per share. ***This was a decline of 65% from the Class Period closing high of $38.45 per share.***

27.     As a result of the Exchange Act Defendants' wrongful acts and omissions, Horizon became the subject of congressional testimony and investigations by the DOJ and the Department of Health and Human Services ("HHS").  The misconduct also resulted in Horizon shareholders suffering significant damages, with the Exchange Act Defendants' fraud having resulted in a market capitalization loss of ***approximately $3 billion*** from the Class Period high.

### A.     JURISDICTION AND VENUE FOR EXCHANGE ACT CLAIMS

28.     The claims in this section of the Complaint arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

29.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

31.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**B.     PARTIES FOR EXCHANGE ACT CLAIMS**

**1.     Plaintiffs**

32.     Court-appointed Lead Plaintiff I.U.O.E. 302/612 is a defined benefit pension plan headquartered in Seattle, Washington that manages approximately $2.4 billion in assets on behalf of its members. As set forth in the previously filed certification, I.U.O.E. 302/612 purchased Horizon common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

33.     Court-appointed Lead Plaintiff Northern California Carpenters is a defined benefit pension plan headquartered in Oakland, California that manages approximately $3.0 billion in assets on behalf of its members. As set forth in the previously filed certification, Northern California Carpenters purchased Horizon common stock during the Class Period, including common stock pursuant and traceable to the Company's Registration Statement for the Offering, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.     Additional named plaintiff Automotive Industries Pension Trust Fund is a California-based pension trust fund that consists of participants from three different international unions: the International Association of Machinists and Aerospace Workers, the International Brotherhood of Teamsters, and the International Brotherhood of Painters and Allied Trades.  As of December 31, 2015, Automotive Industries managed approximately $1.2 billion in assets and

served approximately 26,000 participants.  As set forth in the previously filed certification, Automotive Industries purchased Horizon common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

2.      **The Exchange Act Defendants**

35.      Defendant Horizon Pharma plc is public limited company formed under the laws of Ireland, with its principal executive office located at Connaught House, 1st Floor, Dublin, 4, Ireland and its U.S. headquarters at Lake Forest, Illinois.  Horizon's common stock trades on the NASDAQ under the ticker symbol "HZNP."

36.      Defendant Walbert has served at all relevant times as Chairman, Chief Executive Officer, and President of Horizon.  During the Class Period, Defendant Walbert signed the Company's Report on Form 10-K for the quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Walbert signed certifications that were false and misleading because they stated that Company's Report on Form 10-K for the quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015 did not contain false and misleading statements. Walbert's total compensation went from $1,895,162 in 2013, to $8.97 million in 2014, to being valued at approximately $93.4 million in 2015.

37.      Defendant Hoelscher has served since October 1, 2014 as Chief Financial Officer ("CFO") and Executive Vice President of Finance of Horizon. From June 23, 2014 through September 30, 2014, Hoelscher served as Horizon's Executive Vice President, Finance.  During

14

the Class Period, Defendant Hoelscher signed the Company's Reports on Form 10-K for the quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015. Defendant Hoelscher also signed the Company's April 13, 2015 Form 8-K and the Company's April 12, 2016 Form 8-K. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Hoelscher signed certifications that were false and misleading because they stated that the Company's Reports on Form 10-K for the quarters and years ended December 31, 2014 and December 31, 2015, and the Reports on Form 10-Q for the quarters ended March 31, 2015, June 30, 2015, September 30, 2015 did not contain false and misleading statements.  Hoelscher's total compensation went from $3,443,456 in 2014 to being valued at approximately $18.9 million in 2015.

38.     Defendant Kody served as Chief Commercial Officer at Horizon from November 2014 until his termination on January 8, 2016. Kody's total compensation went from $2,866,693 in 2014 to being valued at approximately $18.6 million in 2015.

39.     Defendant Carey has served since March 2014 as Executive Vice President, Chief Business Officer of Horizon. Carey's total compensation went from $6,097,536 in 2014 to being valued at approximately $18.9 million in 2015.

40.     The defendants referenced in ¶¶ 36-39 are sometimes collectively referred to herein as the "Individual Defendants."  As officers and directors of a publicly held company whose common stock was registered with the SEC under the Securities Act, publicly traded and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements, internal controls and to correct any previously issued statements that had become

materially misstated or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. These Individual Defendants violated these requirements and obligations during the Class Period.  Horizon and the Individual Defendants are sometimes referred to herein as the "Exchange Act Defendants."

### C.     SUBSTANTIVE ALLEGATIONS FOR EXCHANGE ACT CLAIMS

#### 1.     Horizon's Drugs and Pricing Practices

41.     Horizon is a specialty pharmaceutical company that was founded in 2005 and went public on July 28, 2011. Unlike many other pharmaceutical companies, the development of novel drugs is not Horizon's primary business.  Instead, Horizon either takes extant drugs and combines them into a new product, or it acquires already approved drugs and simply markets them.  In both instances, Horizon aggressively hikes up the costs of its drugs to generate revenue.

42.     Horizon marketed only one drug when it went public in 2011, DUEXIS, a combination medicine comprised of ibuprofen (an NSAID marketed under the trade name "Motrin"), and famotidine (a stomach acid-reducer marketed under the trade name "Pepcid"). Combining famotidine with ibuprofen purportedly helps reduce the risk of ulcers in the stomach or intestines that can be caused by long-term use of ibuprofen.  The FDA approved DUEXIS for the relief of signs and symptoms of rheumatoid arthritis ("RA") and osteoarthritis ("OA") and to decrease the risk of developing upper gastrointestinal ulcers in patients taking ibuprofen for those conditions long-term.  As discussed further below, Horizon's initial acquisition strategy focused on adding other drugs for chronic pain management, including RAYOS (FDA approval received in July 2012), VIMOVO (purchased from AstraZeneca in late 2013), and PENNSAID 2% (U.S. rights acquired by Horizon in October 2014).

43.     In late 2014, Horizon moved its corporate offices to Ireland (in part, to avoid

paying U.S. taxes), and announced plans to focus on developing its orphan drug business.[4]

Afterwards, Horizon began to refer to DUEXIS, VIMOVO and PENNSAID 2% as its "primary

care" drugs.  Throughout the Class Period, even as Horizon grew its orphan drug division, these

primary care drugs were central to Horizon's revenue and growth model.

### 2.     Horizon's Inflated Drug Prices

44.     All of Horizon's primary care drugs face competition from generic and

over-the-counter alternatives.  For example, DUEXIS has been described as "a combination of

two old drugs, the generic equivalents of Motrin and Pepcid," which "if prescribed separately . . .

would cost no more than $20 or $40 a month."[5]

45.     The lack of meaningful differentiation between Horizon's branded products and

their generic equivalents has not prevented the Exchange Act Defendants from relying on

dramatic price increases to drive revenues.  In 2012, the wholesale acquisition cost (WAC) for a

30-day supply of DUEXIS cost approximately $158.40.[6]  Horizon collected $10.3 million in net

sales of the drug for 2012.  In 2013, Horizon tripled the WAC of DUEXIS to $677.70 for a

30-day supply and its net sales had increased to $59 million.  By 2016, the WAC for a 30-day

supply of DUEXIS *cost $1,875.60, or on an annual basis, $22,507*.

46.     To justify these astronomical prices for a combination of two old drugs, Horizon

argued in part that patients who needed both a pain reliever and a gastro-intestinal protector were

more likely to take them both if they were available as a single pill.  This argument faced a

---

[4]     Orphan drugs are those indicated for treating extremely rare diseases and thus have small
patient populations.
[5]     *See* Andrew Pollack, *Drug Makers Sidestep Barriers on Pricing,* N.Y. TIMES (Oct. 19,
2015).
[6]     https://pricerx.medispan.com/

problem: DUEXIS also competed with VIMOVO, another branded combination pain reliever and gastro-intestinal protector that could also be described as the generic equivalents of Aleve and Nexium.  Even after the price of DUEXIS neared $700 a month, VIMOVO cost just over $100 for the same supply—making the price of DUEXIS hard to justify. So, in late 2013, Horizon bought VIMOVO from AstraZeneca and raised *its* price.

47.     Before Horizon acquired VIMOVO, Astra-Zeneca's WAC for this drug was $114.74 for a 30-day supply.  After buying VIMOVO, Horizon raised that price to $799.20[7]—or **596%**.  Thereafter, Horizon repeatedly and systematically increased the WAC of VIMOVO so that by 2016, a 30-day supply of VIMOVO matched DUEXIS' incredible $1,875.60 price tag. This is staggeringly more than the cost of a similar quantity of Aleve and Nexium.

48.     Although Horizon's drugs were not "specialty" drugs—expensive treatments for complex, chronic conditions like cancer that command an increasingly disproportionate share of the nation's health spending—they were just as expensive.  Specialty drugs are expensive because, among other things, they are difficult and expensive to develop, manufacture, and distribute, and because they are not widely-used.

49.     By contrast, Horizon's products, such as the pain-killers DUEXIS and VIMOVO cost little to develop and manufacture and are commonly used. Yet, Horizon continued to charge astronomical prices for its drugs.

50.     DUEXIS and VIMOVO accounted for approximately 83% of Horizon's net sales in 2014 (or $245.9 million).  This made revenue Horizon generated from these drugs central to its business strategy.  Horizon needed cash to service its debt and to fund mergers and acquisitions, the Company's primary method of obtaining new drugs.  Even as Horizon sought to

---

[7]     https://pricerx.medispan.com/

diversify into the orphan drug market, the Company's success rested on Horizon's ability to keep generating cash flow from DUEXIS and VIMOVO (and RAYOS, to a lesser extent). But Horizon soon discovered that the payors—the PBMs and the big insurers—were not willing to pay for its high-priced, barely differentiated drugs forever.

### 3.    Price Hikes Result in Rejection of Horizon Drugs

51.    Because few patients could afford the inflated price of DUEXIS and VIMOVO, sales of the drugs depended on plan sponsors being willing to pay the cost.[8]  And plan sponsors, in turn, are greatly influenced by large PBMs (like Express Scripts, Caremark and Optum), and large insurance companies (like Aetna, Cigna and Humana), responding to numerous factors, including the WAC established by the manufacturers for their drugs.  PBMs and insurers influence plan sponsors in determining which drugs will be included in—or excluded from— coverage based in part on a drug's WAC.  If a manufacturer's WACs are too high as compared to the WACs of alternative therapeutically identical or similar treatments, PBMs will exclude— or suggest excluding—the high-cost drugs.

52.    Ultimately, Horizon's consistent price hikes, coupled with the fact that its drugs had *much* more affordable, suitable replacements, resulted in two of the largest PBMs placing DUEXIS and VIMOVO on their list of excluded drugs.  On July 28, 2014, Horizon disclosed that it had been notified that Caremark and Express Scripts had determined that effective January 1, 2015, DUEXIS and VIMOVO would be excluded from Caremark and Express Scripts formularies.  Horizon disclosed that an estimated 20%-30% of DUEXIS and VIMOVO prescriptions could be immediately impacted by the exclusions.

---

[8]    A plan sponsor is a designated party, usually a company or employer, that sets up a healthcare or retirement plan such as a 401(k) for the benefit of the organization's employees.

53.     But there was also the danger of a bigger impact.  Not only could more health plans and PBMs follow suit, doctors who might have been receptive to Horizon's sales pitch could be turned off by repeated rejections by the payors and stop writing prescriptions for those drugs altogether.  Each rejection would be a hassle for the doctor—a call from the pharmacist, consultation with the patient, and the decision whether to substitute the generic or perhaps a different drug all together.  Any doctor who faced this repeatedly would think twice about prescribing DUEXIS and VIMOVO in the first place and might instead prescribe the cheaper and medicinally equivalent alternatives.

54.     The market understood that being added to the excluded list could spell disaster for Horizon's business. After the news broke, on July 28, 2014, Horizon's share price dropped 34.17%, to $9.15, from a previous-day's close of $13.90.

### 4.     The "Prescriptions Made Easy" Specialty Pharmacy Program Was Essential to the Growth of the Company

55.     Faced with PBM exclusion lists and the risk that traditional retail pharmacies would, in consultation with doctors, swap out DUEXIS (cost per day: $51.00) for ibuprofen and famotidine (cost per day: around a dollar),[9] Horizon needed a way to keep selling its high-priced drugs.  In response, Horizon announced that it would accelerate its adoption of the PME, program, a "patient assistance" program it had begun testing in 2012.  The Company made clear that the program was a "key part of [its] commercial strategy."

56.     The PME's place at the center of Horizon's commercial operation distinguished it from other "patient assistance" programs.  True patient assistance programs focus on ensuring that high prices do not deprive patients of important and sometimes lifesaving medications.

---

[9]     *See* Pollack, Andrew, *Drug Makers Sidestep Barriers on Pricing*, N.Y. TIMES (Oct.19, 2015).

Horizon adopted the language of these programs, maintaining that its "mission is really simple. Do the right thing for patients." In reality, however, the Exchange Act Defendants set up the program as a Horizon-controlled vertical distribution system to ensure that, once Horizon's army of sales representatives convinced doctors to write prescriptions for Horizon drugs, no one in the system could alert patients to the availability of truly cheaper, equally effective alternatives.

57.     Through the PME program, Horizon sales representatives provided doctors with fax forms or an electronic application that transmitted prescriptions directly to pharmacies Horizon designated.  Horizon guaranteed that, if the doctor prescribed the drug through the PME program (and thus routed the prescription through the designated specialty pharmacies), commercially insured patients would receive the drugs, whether or not insurance would cover it, for little or no money.  According to Horizon, once a prescription was sent, an employee of the pharmacy would call the patient within a few hours, confirm that the patient had insurance and other information, and then ship the drugs to the patient within 24 hours.[10] Then, Horizon's captive pharmacy would attempt to get reimbursement from the insurance company.  If the patient's health plan rejected the prescription, Horizon's third party vendor would step in and pay for the prescription and bill that cost to Horizon.

58.     Subsidizing the co-pays and rejected prescriptions was worth it to Horizon.  Not only did it combat the negative publicity caused by the price increases, but by making Horizon drugs easy for doctors to prescribe and cheap or free for patients, Horizon could neutralize an important check on drug pricing—the patient.  From the patient's point of view, Horizon's drugs could appear cheaper than going to their corner drugstore and buying the OTC alternatives. Patients receiving the drug for $10 or under a month are less likely to complain to their doctor or

---

[10]     March 27, 2014 Corporate Update Conference Call; June 4, 2015 Horizon Presentation at Jefferies Global Healthcare Conference.

refuse to accept unnecessary refills or enroll in automatic refill programs.  Similarly, the PME

program allowed Horizon to bypass truly independent pharmacies that might attempt to actually

"do the right thing for patients," and switch them to the low cost equally effective alternatives.

59.     But ultimately, the PME program was not about helping patients, as Horizon

claimed, it was about the Exchange Act Defendants' compensation packages, worth hundreds of

millions of dollars if they could keep the stock price up long enough without PBMs and

regulators catching on to what Horizon was doing.  Having reduced oversight from doctors,

patients, and independent pharmacies, Horizon chose to implement aggressive and illegal tactics

behind the scenes to keep total prescriptions "sold" numbers high (a metric followed by the

market), enabling the Company to capture more patients with generous insurance plans that

*would* cover Horizon's exorbitantly priced drugs, subsidizing the patients that were not covered.

And, because Horizon charged so much to those plans, and DUEXIS and VIMOVO cost very

little to make, Horizon could make a profit even as increasing numbers of health plans refused to

cover the drugs.  But Horizon's sales at any cost mentality trampled on regulations designed to

protect patients and the health care system as a whole.

### 5.    The Exchange Act Defendants Secretly Relied on Improper Practices in the Execution and Expansion of the PME Program

60.     Throughout 2015, Horizon aggressively pushed prescriptions through the PME

program.  By the end of the first quarter of 2015, 69% of DUEXIS and 58% of VIMOVO

prescriptions were going through the PME program (in comparison with 39% of DUEXIS and

14% of VIMOVO going through the PME just three quarters earlier). Horizon also added

PENNSAID 2%—a topical analgesic—to the program. In a May 8, 2015 conference call,

Defendant Walbert projected that eventually 75% of primary care product prescriptions would be

in the program.  By the end of the second quarter of 2015, 71% of DUEXIS, 61% of VIMOVO, and 69% of PENNSAID 2% prescriptions were flowing through the PME program.

61.     Horizon executives painted the expansion of the PME as a huge success.  As set forth below, during a February 27, 2015 conference call about 2014 year-end and fourth quarter financial results, Defendant Walbert told investors that sales were "exceeding" expectations, and that everything was right "on track" in the PME program.  While the program initially allowed Horizon to report increased revenues even after being placed on the exclusion lists, the manner in which the Exchange Act Defendants executed the PME program relied on captive pharmacies that violated state laws and pharmacy regulations, exposing Horizon to the loss of PBM contracts and relationships, investigation by the DOJ and the Department of Health and Human Services, litigation, and heightened scrutiny by the media, Congress, and private insurers.[11]

**(a)     Horizon's Undisclosed Use of Controlled Pharmacies**

62.     The Company's PME program was wholly dependent on a solid distribution network that Horizon could use to sell its product, despite its exorbitant prices and undifferentiated clinical benefits.  In order to meet this need, in late 2014 and up until the end of 2015, Horizon created relationships with a select few "specialty" pharmacies that it used to sell Horizon drugs, and when that was not enough, its executives and managers created their own pharmacy to cater to the PME program.  Unbeknownst to shareholders though, Horizon structured these pharmacy relationships in such a way as to maintain steadfast operational and financial control over them.

---

[11]     Horizon disclosed the DOJ investigation in its Form 10-K for the year ending 2015. Upon information and belief,  the Department of Health and Human Services' ("HHS") Office of the Inspector General also has an open and ongoing investigation concerning related to Horizon's PME program, its sales and marketing activities, and its relationships with its partner pharmacies.

23

63.     When investors and analysts sought more information about this integral part of

Horizon's PME program, the Exchange Act Defendants refused to provide any substantive

information on these pharmacies, or the manner in which they operated.  For example, during

Horizon's November 6, 2015 earnings call for the Company's Q315 results, Ken Cacciatore, an

analyst from Cowen, asked, "can you just talk about the specialty pharmacies, how they get

compensated, so we just understand how the mechanism in which they are compensated?"

Defendant Walbert's response was less than forthright, "When it comes to how pharmacies are

incented, retail pharmacies, mail order pharmacies are all incented through the system working

with payers and PBMs and for filling prescriptions. That is it, nothing more to add." Nov. 6,

2015 Earnings Call at 15.  During that same call, Defendant Walbert cryptically disclosed that

Horizon used "over six" and "less than 10" pharmacies.  *Id.* at 17.

64.     In addition to dodging questions about the compensation structure and identity of

Horizon's controlled pharmacies, the Exchange Act Defendants affirmatively sought to portray

the pharmacies' relationship with Horizon as "arm's length," "conservative," and "standard."

For example, on November 9, 2015, at an analyst conference, Steve Curtis, Horizon's General

Manager misleadingly stated that, "Worth [noting] along with these facts is that we don't pay for

any fees, you know, there's no fee-for-service arrangement with any pharmacy. So, *we have a*

*very standard relationship* there and, actually, *probably more conservative than they ever*

*appear*."  Horizon's contemporaneous public filing echoed these misstatements.  For example, in

its third quarter 2015 Form 10-Q, Horizon represented, *inter alia*, that "the Company's

relationship with each pharmacy is *non-exclusive and arm's length*. All of the Company's *sales*

*are processed through pharmacies independent of the Company*."

65.     Indeed, rather than come clean about Horizon's PME sales being driven by a small network of Horizon-controlled pharmacies, the viability of which depended upon its existence remaining hidden from PBMs, Defendants routinely attributed the success of its PME program and its booming net sales to its "differentiated" products and its well-trained sales force.

66.     These statements were false. They failed to disclose that the Company wielded outsized control and influence over the pharmacies in its captive network.  Internal documents and former employees of Horizon and the various Horizon-controlled pharmacies have described in detail how Horizon controlled and manipulated its PME pharmacies.  In one case, Horizon simply founded its own pharmacy—one that was opened by its own employees to dispense solely Horizon drugs and to cater to Horizon's PME program.  In other cases, Horizon was able to control the pharmacies with financial incentives—channeling money to cooperative pharmacies, or cutting them out if they did not cooperate.

### (i)     Horizon's Control of Halsted Pharmacy

67.     Based in Chicago, like Horizon's U.S. headquarters, Halsted Pharmacy had participated in the pilot of the PME program and continued to participate in the PME program as it rapidly expanded in late 2014 and early 2015.  Statements by a former Halsted employee and documents obtained through Plaintiffs' investigation describe how Horizon employees worked closely with Halsted Pharmacy to boost prescriptions in the PME program, and, when the time came, to transfer prescriptions to a new, Horizon-only pharmacy.  Documents provided by a former Clinical Pharmacist who worked at Halsted from August 2014 through late March 2015 ("Former Halsted Pharmacist")[12] show Horizon's control over Halsted.  For example, a text

---

[12]     The Former Halsted Pharmacist oversaw compounding services at Halsted Pharmacy. From a review of documents obtained from the Former Halsted Pharmacist during the course of Plaintiffs' investigation, it is clear that the Former Halsted Pharmacist has personal knowledge of

message that one of Halsted's owners, Renny Kurup, sent to the Former Halsted Pharmacist on

August 26, 2014 details Kurup making clear that as a result of their poor Horizon prescription

numbers, Horizon was sending Lori Sampson, Horizon's Associate Director, Pharmacy

Operations, ("Horizon's Associate Director") to manage the situation.  Specifically, Kurup writes

in that text message that they needed "***ppl to type and call. For duexis. Lori, called me yesterday***

***and she's coming today. Our numbers where [sic] that bad yesterday***".  He goes on to inform

the Former Halsted Pharmacist that although he knows she has compounding duties to attend to

that she needed to "give mail order a lil attn. today." The next day the texts continue with Kurup

writing that "because of yesterday's visit ***Lori is going to be coming in every day for awhile***

***[sic] to help organize***."   This was not uncommon behavior for Horizon. According to the former

Horizon Territory Manager, Texas also described how Horizon would station its personnel for a

week at a time at various specialty pharmacies to monitor what was happening with Horizon

prescriptions and to ensure that a lot of Horizon prescriptions were going through.

68.    Internal Halsted emails further confirm that Horizon closely monitored Halsted's

participation in the PME program.  For example, Horizon's Associate Director, Lori Sampson,

exchanged no fewer than 104 emails with Kurup in the fall of 2014 and spring of 2015 and was

sent "weekly official reports" from Halsted.[13]

69.    Additional documents obtained from the Former Halsted Pharmacist show that

Sampson was not the only Horizon director making sure Halsted was delivering on Horizon drug

sales.  Text messages exchanged on September 14, 2014 and November 7, 2014, also show that

Kurup met with the "COO and exec vps of Horizon" on or around September 15, 2014 and again

---

the PME program at Halsted, its dispensing of Horizon drugs, and the illegal manner in which
Halsted operated.

[13]    These reports were sent twice weekly to Horizon, on Monday and Thursday, according to
a text message sent January 29, 2015 from Kurup to the Former Halsted Pharmacist.

had breakfast with the "COO of Horizon" on or around November 7, 2014.[14]   The Former

Halsted Pharmacist also recalled that Kurup, was a close companion to Ben Bove.  Bove was

Horizon's then-Senior Vice President, Commercial Strategy and Prescriptions Made Easy. In an

email communication dated October 24, 2014, Kurup refers to Bove as "the boss of all bosses for

PME" before detailing that he will be meeting with Bove later that day. The Former Halsted

Pharmacist added that Bove would occasionally be physically present at Halsted, but that more

often other Horizon representatives would be on site.  This physical oversight and involvement

by Horizon at every level in Halsted's day to day operations and drug sales demonstrates the

misleading nature of Horizon's statements and that its relationship with its PBM pharmacies was

not "arm's length," "conservative," or "standard."

   70. Horizon also wielded enormous economic control over Halsted, which included

improper commission-type payments made to Halsted for each Horizon prescription filled.  The

Former Halsted Pharmacist added that Halsted was processing approximately 1,000 Horizon

prescriptions per week.  This is corroborated by a text message sent from Kurup to the Former

Halstead Pharmacist on August 16, 2014 wherein Kurup writes "***I filled the first duexis script***

***myself with the CCO of Horizon April/May of last year.  Never really dreamed it would become***

***1181rx a week in a year***."[15]  The Former Halsted Pharmacist advised that Halsted was earning

about $100.00 per Horizon prescription and thought that this represented the majority of

Halstead's revenue generated during the Former Halsted Pharmacist's tenure.  The result was

---

[14] On information and belief, Kurup is referring to Barry Moze as COO.  Moze's LinkedIn profile (accessed September 26, 2016) lists him as the Chief Operating Officer of Horizon from May 2014 to the Present.  Further bolstering this belief is the Former Clybourn Manager, who also recognized Barry Moze, the COO of Horizon, reporting that he visited Clybourn Park three times.

[15] In April/May of 2013 the EVP and CCO of Horizon was Todd Smith, later to become Kurup's partner at Clybourn Park.

that Halsted was likely being paid at least $100,000 a week by Horizon to distribute its drugs. That sort of financial compensation is unheard of in a traditional pharmacy model, creates incentives to do anything to keep sales up or risk losing Horizon's business and related commission like compensation.[16]

71.     Though Halsted worked closely with Horizon to further the PME program, it still had non-Horizon clients.  When Horizon announced to the market in 2014 that it was drastically expanding the PME, Horizon apparently realized that they needed a pharmacy that was completely dedicated to it.  So it created its own.  In response, documents obtained by Plaintiffs show that in September of 2014, Kurup worked with Horizon executives and top management in the PME program to create a new pharmacy—Clybourn Park—solely to serve the needs of the PME program by dispensing DUEXIS, VIMOVO, and other Horizon drugs.

### (ii)     Horizon's Control of Clybourn Park

72.     As Horizon expanded the PME, it sought to create its own pharmacy that would be wholly and exclusively dedicated to dispensing DUEXIS, VIMOVO, and other Horizon drugs.  Documents obtained by Plaintiffs show that in September of 2014, Kurup worked with Horizon executives and top PME management to create Clybourn Park Pharmacy LLC.

73.     Corporate registration documents reveal that Clybourn Park was created by senior Horizon executives—as of September 19, 2014, Todd Smith, Ben Bove, and Renny Kurup were the pharmacy's only Officers.[17]  ***Todd Smith was Executive Vice President and Chief***

---

[16]     A traditional pharmacy model usually involves a very small profit margin on each brand drug dispensed (since its reimbursed cost from the PBM and insurer is only a bit higher, if higher at all) than the pharmacy's acquisition cost), and the pharmacy being only paid a very small "dispensing fee" for its labor cost of dispensing the drug (approximately $0.95–$1.50 per script).

[17]     State of Illinois Corporation Report for Clybourn Park Pharmacy LLC (accessed on July 25, 2016), detailed under "Officers and Directors" that Smith, Bove, and Kurup were Clybourn Park's only three officers as of 9/19/14 and that "Clybourn Park Pharmacy LLC" was

*Commercial Officer at Horizon when Clybourn Park was incorporated*.  In his Horizon role, Smith was responsible as an executive for the company's commercial organization, business development and investor relations.[18]  Bove was also at that time *employed by Horizon as a Senior Vice President, Commercial Strategy and Prescription Made Easy Program*.[19]  In this position, Bove helped oversee all aspects of the PME program.  Emails and text messages obtained in Lead Plaintiffs' investigation make clear that Clybourn Park was developed by Horizon to distribute Horizon drugs.  These documents further show that Bove was communicating with Halsted on his Horizon email, or was copied on Horizon/Halsted emails, as to drug coverage issues and the Clybourn Park Pilot program, through at least February 2015. *Thus, far from having a "non-exclusive," "conservative," or "arm's length" relationship with its so called "specialty pharmacies, Horizon was instead funneling prescriptions to a pharmacy legally controlled, at times, by both a Horizon executive officer and a member of Horizon's senior management responsible for the PME program*.

74.     An internal Halsted email obtained from the Former Halsted Pharmacist dated November 4, 2014 details that Kurup referred to Clybourn Park as a "new state of the art pharmacy *to be able to handle the PME program to perfection*." To the Former Halsted Pharmacist's knowledge, Clybourn Park worked exclusively as a mail-order pharmacy for

---

incorporated as of September 18, 2014.  Other corporate documents, indicate that prior to Clybourn Park's incorporation, if was known as "Sheffield Specialty Pharmacy LLC," until September 16, 2014 when Ben Bove signed a Certificate of Amendment of Certificate of Formation for Sheffield Specialty Pharmacy LLC, to change its name to Clybourn Park Pharmacy LLC.

[18]     *See* http://www.iirusa.com/pharmastrategic/2014-speakers.xml?speakerId=419 (accessed September 28, 2016).

[19]     In his capacity as a Horizon SVP Senior Vice President, Commercial Strategy and Prescriptions Made Easy, Bove also participated on the November 6, 2014 conference call with investors to discuss Horizon's Q3 2014 financial results.  Though that call included extensive discussions of the PME program, neither Bove nor any of the other managers on the call informed investors that Bove and Smith had founded a pharmacy to dispense Horizon products.

Horizon products when it opened.  This is corroborated by a Former Clybourn Park Pharmacy

Technician ("Former Clybourn Technician") who reported that Clybourn Park only kept

Horizon's primary care drugs in stock, and if a patient came in with a prescription for any other

drug—a rare occurrence—Clybourn Park had to special order the medicine for them.[20]  This

demonstrates the falsity of Defendant Walbert's statement on November 6, 2015 that, "[t]hese

pharmacies are **non-exclusive** and ***also fulfill prescriptions for many other drug***

***manufacturers***."

75.     Horizon executives also exercised control over Clybourn Park in other ways,

including helping to manage Clybourn Park's operations by providing the pharmacy with a roster

of doctors whose prescriptions should be funneled through the pharmacy.  For example, on

February 26 and 27, 2015, Horizon's Associate Director, Lori Sampson emailed Clybourn Park

and Halsted employees, copying Bove, with a list of doctors Horizon was directing the pharmacy

to enroll in ***an ostensibly pharmacy-run*** pilot program for Horizon drugs.  Then in a March 10,

2015 text message to the Former Halsted Pharmacist, Renny Kurup detailed how Horizon

Associate Director "Lori [Sampson] is gonna add more illinois docs today . . . .  Illinois docs to

go to ClyPark I meant."

76.     Moreover, Horizon prescriptions were transferred seamlessly between captive

pharmacies Clybourn Park and Halsted, evincing Horizon's control over both.  A lawsuit filed by

an investor in Halsted makes clear that Horizon, through Kurup, transferred 23,000 prescriptions

from Halsted to Clybourn Park without either patient authorization or payment to Halsted.  The

seamless transfer of thousands of prescriptions from one pharmacy to another demonstrates that

---

[20]     The Former Clybourn Technician was employed by Clybourn Park from August 2015 to
February 2016 as a former Pharmacy Technician at Clybourn Park, whose responsibilities
included contacting patients and processing prescriptions and insurance claims.

both Halsted and Clyborn Park were nothing more than instrumentalities of Horizon.  *See*

Complaint, *Halsted v. Renny Kurup*, 2015CH18353 (Ill. Cir. Ct., Cook Cty, Chancery Div., Dec.

18, 2015) (the "Halsted Complaint").[21]

77.     The transfer of Horizon prescriptions from Halsted to Clybourn Park took place

with the consent and knowledge of Horizon, whose current and former executive and senior

manager ran the new pharmacy, and whose employees also directed Clybourn as to what doctors

to include in the Clybourn Park Pilot program (*see* ¶ 75).

78.     Horizon employees, including high ranking executives, were also regularly on site

at Clybourn Park.  A former manager at Clybourn Park from March 2015 through February 2016

("Former Clybourn Manager")[22] recognized several Horizon employees as having visited

Clybourn Park throughout the Class Period.  For example, *the Former Clybourn Manager*

*recognized Defendant Paul Hoelscher, Horizon's CFO, stating that he visited Clybourn Park*

*in December 2015, after it moved to a larger facility*. *The Former Clybourn Manager also*

*recognized Barry Moze, the COO of Horizon, reporting that he visited Clybourn Park three*

*times*.  According to the Former Clybourn Manager, Horizon's Associate Director,

Lori Sampson, attended the regular meetings with Clybourn Park management and the Northeast

Regional Account Manager for the PME Program, Russell Wilson, also visited often.

79.     These Horizon visits made sense because not only was Clybourn Park a dedicated

arm of the PME program, it processed even more Horizon prescriptions than Halsted, making it

---

[21]     Internal Halsted documents confirm that drugs transferred to Clybourn Park were *Horizon* drugs.  For example, one Halsted email exchanged between Kurup and the Former Halsted Pharmacist on September 29, 2014 details how Kurup instituted a pharmacist "mail order" bonus in order to incentivize pharmacists to increase "production" levels and ship out more Horizon product at Halsted, so that eventually there would be more *Horizon* prescriptions to transfer to Clybourn Park.

[22]     The Former Clybourn Manager was manager of the filling team, with responsibilities that included overseeing  the filling of prescriptions and customer relations at Clybourn Park.

even more crucial to the Company's scheme to keep prescription volume up.  In contrast to

Halsted processing approximately 1,000 prescriptions weekly (¶ 70), Clybourn Park was filling

approximately **900 to 1,000 prescriptions** of Horizon prescriptions **every day in May 2015**,

according to the Former Clybourn Manager.  The Former Clybourn Manager added that that

number climbed to **1,200 a day in September**, and then to between **8,000 and 10,000**

**prescriptions a week** in November 2015.  The Former Clybourn Manager recalled Clybourn

Park's manager, Matt Cunningham, telling employees in November that Clybourn Park was

dispensing more Horizon prescriptions than any other pharmacy.

80.     According to analyst reports, Horizon's total weekly prescriptions for those three

drugs were never more than 30,000 in 2015.[23]  **That means that, at times, Clybourn Park could**

**have been processing between 25% and 33% of all Horizon's prescriptions of those drugs**.

81.     Despite Horizon's efforts to conceal its misconduct, the PBMs eventually

discovered Clybourn Park's connection to the PME program.  For example, according to Former

Clybourn Manager, in the spring of 2016, Express Scripts terminated its contract with Clybourn

Park.  The Former Clybourn Manager recalled that prescriptions subsequently dropped to as few

as 20 a day.  According to the Former Clybourn Manager, Horizon's prescriptions, along with

many of Clybourn Park's employees, were shifted to other area pharmacies, including Lombard

Pharmacy and Mall Pharmacy.

82.     But the PME program continued. The Former Clybourn Technician described

how Horizon brought these new pharmacies into the fold.  After leaving Clybourn Park, the

Former Clybourn Technician briefly worked at Upgrade Pharmacy, and saw a Horizon employee

---

[23]     *See* Piper Jaffrey Analyst Report, June 19, 2015; Piper Jaffrey Analyst Report July 31,
2015; Guggenheim Securities Analyst Report, October 12, 2015; and Morgan Stanley Analyst
Report, December 1, 2015.

approach the owner about becoming an affiliated pharmacy and promise benefits such as additional money and the opportunity to close the retail side of the pharmacy.

### (iii)    Horizon's Control of Linden Care

83.     Around the time that Horizon executives opened their own pharmacy in Chicago in late 2014, Horizon made a power play to exert more control over another pharmacy that had been an early participant in the PME program.  Based in New York, Linden Care had been one of the four specialty pharmacies that the Company used in 2014 to test the PME program.  In late 2014, Horizon kicked Linden Care out of the PME program.  When Linden Care was allowed back, in early 2015, it created a Horizon-only department, with at least 40 to 50 employees processing prescriptions for Horizon's primary care drugs.

84.     According to a former Horizon Territory Manager in the Northeast Region ("Former Horizon Territory Manager, Northeast") whose tenure stretched from the middle of 2014 to the middle of 2015, there were a lot of problems processing prescriptions through Linden Care, including Linden Care failing to fulfill prescriptions.[24]  Indeed, another former Horizon Territory Manager in Houston, Texas ("Former Horizon Territory Manager, Texas") corroborated that starting in mid-2014, Horizon sales representatives were instructed to stop using Linden Care and to switch instead to filling their PME prescriptions through other specialty pharmacies.[25]  In fact, according to the Former Horizon Territory Manager, Texas, Horizon dropped Linden Care because they were having trouble keeping up with their Horizon business and they were not able to process a lot of prescriptions.

---

[24]     Former Horizon Territory Manager, Northeast was previously referred to as FE-2 in the Consolidated Class Action Complaint (ECF No. 77).

[25]     Former Horizon Territory Manager, Texas worked as a Territory Manager at Horizon from February 2012 through February 2015.  Former Horizon Territory Manager, Texas was previously referred to as FE-1 in the Consolidated Class Action Complaint (ECF No. 77).

85.     Linden Care's Horizon business had been extremely profitable, as the pharmacy received commission-type payments above and beyond the profits pharmacies normally collect. According to the Former Horizon Territory Manager, Northeast, Horizon would sell its drugs at a discount to their specialty pharmacies (cheaper then what they sold them to McKesson, for instance).  In addition, according to the Former Horizon Territory Manager, Northeast, for every prescription that Linden Care got through insurance, they received a certain dollar amount. The Former Horizon Territory Manager, Northeast explained that specialty pharmacies in the PME network were benefiting from incentives from Horizon as well as back rebates.

86.     The loss of Horizon business was felt at Linden Care. It fought to be hired back, which Horizon permitted in or around early 2015, according to Former Horizon Territory Manager, Texas.  The Former Horizon Territory Manager, Texas added that Linden Care only became a partner pharmacy to Horizon again after it did everything in its power to come back. At some point thereafter, *59% of Linden Care's business stemmed from dispensing Horizon drugs*, as disclosed in November 2015.[26]

87.     The experience of a former Linden Care employee demonstrates the outsized influence Horizon was able to exert when Linden Care was allowed back into the PME program in 2015.  According to a former Customer Service Representative in the Horizon-only department at Linden Care ("Former Linden Care Employee"),[27] the Horizon department only had around a dozen employees in February of 2015.  The Former Linden Care Employee added that between February and October 2015 *Linden Care hired at least an additional 40 to 50*

---

[26]     *See* Andrew Pollack, *Express Scripts Cuts Ties to New York Specialty Pharmacy*, N.Y. TIMES (Nov. 10, 2015).

[27] The Former Linden Care Employee worked at Linden Care from February 9, 2015 through January 15, 2016, with responsibilities that included reaching out to patients and processing insurance claims and prescription vouchers.

*employees to work exclusively* on filling prescriptions for Duexis, Vimovo, and Pennsaid 2%.[28]
At its height, ***Linden Care was filling over 1,000 Horizon scripts per day***, according to the
Former Linden Care Employee.  And, similar to the employees at other pharmacies, the Former
Linden Care Employee recalled seeing Horizon employees on site.

88.    The allegations about Halsted, Clybourn Park, and Linden Care pharmacies
demonstrate the falsity of Defendants' repeated statements characterizing its relationships with
the pharmacies participating in the PME program as "independent" and "arm's length," such as
Defendant Walbert's statement during a November 6, 2015 earnings call, that: "The pharmacies
we work with are ***fully independent***, full-service pharmacies that serve both retail and mail order
pharmacies. These pharmacies are ***non-exclusive*** and also ***fulfill prescriptions for many other
drug manufacturers***."  Nor did Horizon take control of these pharmacies to "do the right thing
for patients," as Horizon maintained.  Instead, as detailed below, the Exchange Act Defendants
and their controlled pharmacies' sole focus was rapidly driving Horizon sales to customers in
order to maximize personal and corporate financial incentives.  To do so, as detailed below, the
Exchange Act Defendants employed numerous illegal and deceptive marketing and sales
practices to boost Horizon's profits.

**(b)    Horizon Pushes Sales Through its Controlled Pharmacies that
Rely on Illegal and Unstainable Conduct that Violated
Applicable Laws, Regulations and PBM Contracts**

89.    As discussed above, Horizon subsidized the cost of drugs dispensed through the
PME program that insurers would not cover.  In order to mitigate the impact of those subsidies
on the Company's bottom line, Horizon needed to maximize prescription volume.  To
accomplish its goal of maximizing prescription volume and boosting net sales, Horizon and its

---

[28]    At some point, Rayos was added, according to the former Linden Care employee.

35

controlled pharmacies relied on improper, dishonest, and illegal conduct in violation of various laws, regulations, and PBM contractual terms.

90.     Horizon did not inform investors that it directly controlled pharmacies to engage in practices that put the pharmacies and the Company in danger of facing Congressional scrutiny, private lawsuits, and possible government investigations, and sanctions.  Just the opposite.  On November 6, 2015, Defendant Walbert stated that "And for any pharmacy that uses this program, we work diligently to ensure that they are meeting all of our strict compliance criteria and standards. If they don't, we quickly terminate participation and we have done so."  Importantly, Horizon repeatedly attributed the success of its PME program and its booming net sales to its "differentiated" products and its well-trained sales force, but failed to disclose the improper and illegal practices described below were a key driver of those results.

### (i)     Improper Auto-Refill Practices

91.     The Former Clybourn Manager advised that the majority of Horizon prescriptions processed by Clybourn Park were being filled by auto-refill—that is, at the end of each month, Clybourn Park employees were instructed to refill the patients' prescription and ship the drug to them, without first contacting the patient. The Former Clybourn Technician confirmed this account, explaining that Clybourn Park management instructed employees to refill the prescriptions *even if they had not obtained patient authorization*.[29]

---

[29]     A customer complaint confirms these abuses:  "I was never told that I would be getting automatic refills of a prescription that I had never even tried. . . . I read the instructions when I received the first container and decided not to use the medicine at all. I called to let the pharmacy know that I didn't want anymore after the 2nd one showed up to my surprise since I didn't order it. I was assured that the refills would no longer arrive, but today my 3rd unwanted RX arrived." Available at (https://www.facebook.com/pages/Clybourn-Park-Pharmacy/1563187210628353) (Feb. 19, 2016).

92.     These practices were not limited to Clybourn Park.  According to the Former

Linden Care Employee, that pharmacy also relied on "auto-refill" to drive prescriptions.  The

Former Linden Care Employee recalled that managers at Linden Care told the employees at one

point that—***per Horizon's instructions***—all prescriptions should be put on auto-refill.[30]

Horizon's directive to place patients on auto-refill, and the use of the scheme at two high

prescribing pharmacies of Horizon, provides strong evidence that Horizon implemented this

practice at its other captive pharmacies and that Horizon knew of it and fully intended it.

93.     Such conduct put the Company at grave risk of liability to the third party payers

and PBMs, that paid claims based upon the implicit representation that the patient had requested

the refill.  Making such misrepresentations to third parties likely violated pharmacy regulations

and state laws.  For instance, a pharmacy or drug manufacturer that uses "deceit and

misrepresentation" is subject to disciplinary action by various state boards of pharmacy.[31]  A

state board may deny, refuse, revoke, or suspend the registration of a drug manufacturer, not

renew its registration, or order it to cease and desist from violations.  Similarly, most states have

laws banning deceptive practices in business, and consumer protection laws, that could apply.[32]

---

[30]     The Former Linden Care Employee added that initially they were instructed to only put the $0 co-pay patients on auto-refill but then they were told to do the $10 co-pay patients. The Former Linden Care Employee recalled being uncomfortable with charging patient's credit cards without their authorization.

[31]     For example, in Illinois, where Horizon was headquartered and where these three Horizon-controlled pharmacies were located, such actions may be considered "Unprofessional or Unethical Conduct" under 68 Ill. Adm. Code 1330.30(f), as "[s]ubmitting fraudulent billing or reports to a third party payer or claiming a fee for a  service that is not performed or earned").

[32]     For example, the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits companies such as Horizon from employing "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

### (ii)     Filling Prescriptions Without State Licenses

94.     Horizon used its controlled pharmacies to fill prescriptions and obtain reimbursements in states where these pharmacies were not licensed.  For example, the Halsted Complaint details how Halsted shipped drugs into states in which it was unlicensed, in violation of the state pharmacy laws in states including Arkansas and Texas.  This practice was also described in email communications from Former Halsted Pharmacist to Kurup, including allegations that drugs were improperly mailed into Kentucky and Louisiana.  For example, in an email to Kurup dated December 10, 2014 the Former Halsted Pharmacist writes, "I realize ***when I have previously expressed concern for sending medications into states we do not have licenses for your response was the pharmacy and PIC (you) were the only ones taking the risk***. I accepted that then but should not have. I will not be verifying prescriptions to be sent to Kentucky and hope that you consider ceasing sending them immediately."  And, when Halsted finally sought licensing in Louisiana, Kurup gave the former Clybourn Pharmacist the following instructions in an October 7, 2014 text message: "Don't mention we are already sending to LA[.] [A]lso don't mention exact nature of what we are doing.  If need be follow the script of what we send [sic] IOWA board verbatim."  The Halsted Complaint further details that these illegal practices were confirmed by PBM audits of Halsted in 2015, which caused Caremark and Express Scripts to sever their business relationships with Halsted resulting in a financial loss of up to ***$3 million monthly*** in lost revenue.  By then, however, Horizon had begun to process its prescriptions through Clybourn Park pharmacy, over which it could exercise complete control.

---

Similarly, the New York General Business Law  ("NY GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any  business, trade or commerce." N.Y. Gen. Bus. Law § 349. Both the Illinois CFA and the NY GBL are enforceable by both the state attorney general and via a private right of action.

95.     Such conduct violated the pharmacy regulations in the states Horizon's captive pharmacies shipped to, such as AR Code § 17-92-402 (Arkansas), KRS 315.0351 & 0320 (Kentucky), and Tex. Occ. Code § 558.001 (Texas).  Additionally, this conduct threatened Horizon's ability to operate in those states; if the pharmacies were found out, they would have to stop shipping into those states, and Horizon would have transfer those prescriptions to another pharmacy.

### (iii)     Misrepresenting Drug Cost

96.     According to the Former Clybourn Technician, whose responsibilities (as discussed above at ¶ 74) included contacting patients and processing insurance claims, Clybourn Park employees were instructed not to tell patients the price of the drugs or what their insurance company was being billed; patients were only supposed to know their individual co-pay cost, after the coupon.  As a result of this practice, Horizon provided misleading information to patients and patients with high insurance deductibles were likely charged for the medicine.  This was a practice that was also employed directly at Horizon, whose sales representatives were instructed to avoid disclosing the full cost of DUEXIS and VIMOVO to doctors when pitching the drug and instead to emphasize the patient's low out-of-pocket cost (*see* ¶ 109).

97.     Such conduct harms both patients and, if it convinced them to accept refills or charges to their insurer, harms third party payors as well, triggering some of the same statutory and regulatory protections as Horizon's auto-refill policy. *See* ¶ 93, above.

98.     Horizon did not inform investors that it directly controlled pharmacies to engage in practices that put the pharmacies and the Company in danger of facing private lawsuits and possible government investigations and sanctions.  Just the opposite.  On November 6, 2015, Defendant Walbert stated: "And for any pharmacy that uses this program, we work diligently to

ensure that they are meeting all of our strict compliance criteria and standards. If they don't, we quickly terminate participation and we have done so."

### (iv)    Conduct Aimed at Evading PBM Detection

99.     Clybourn Park went to great lengths to conceal its relationship with Horizon and its integral role in the PME program both from the PBM auditors, who routinely inspect pharmacies for compliance with contract provisions, and the state auditors, who verify that pharmacies meet regulations.  The Former Clybourn Manager explained that employees would be given the day off when audits were scheduled so that the auditors could not ask them any questions.  On one occasion, the Former Clybourn Manager said that other managers removed the computers from the office, ostensibly for cleaning, then sent the employees to a bowling alley for a party.  The Former Clybourn Manager subsequently learned that an audit had been scheduled for that day.

100.    In another attempt to hide the relationship between Clybourn Park and Horizon, the Former Clybourn Manager said that before an audit, the managers stayed up all night to ship out all Horizon orders, then hid the remaining Horizon drugs.

101.    The former employees described other attempts by Clybourn Park's management to avoid detection.  For example, the Former Clybourn Manager recalled management hiding Horizon drugs in black garbage bags and then buying non-Horizon drugs to make Clybourn Park look like an ordinary pharmacy.

102.    Halsted similarly worked to conceal its relationship with Horizon.  In an October 15, 2014 text message, Renny Kurup wrote to the Former Halsted Pharmacist, "remember how everything looked and was quiet and NOT looking like we are running mail order out of Halsted for last audit[?] This is the same thing." (emphasis in original).

103.    This conduct runs afoul of PBM contractual obligations and exposed Horizon and its controlled pharmacies to the risk of increased PBM scrutiny and exclusion if caught.

**(c)      Horizon's Improper Sales and Marketing Techniques**

104.    In direct contravention of the Company's Code of Business Conduct and Ethics, Horizon encouraged and incentivized its sales representatives to develop collusive relationships with doctors who could then be relied upon to continue to write these high priced prescriptions to be processed through the PME program.

105.    Specifically, Horizon's Code of Business Conduct and Ethics, which reflects the Company's "practices and principles" to which "every employee . . . must . . . abide," provides, in pertinent part, that "[e]mployees must not offer or provide any gifts or entertainment to any healthcare professional" because such gifts may lead to "improper advantage."  Rather than enforce this clear directive, Horizon executives instituted a culture where sales were pushed regardless of the method.  Horizon promoted those sales representatives who had formed close knit relationships with doctors that resulted in higher Horizon prescriptions being filled—and bestowed bonuses and praise on them.  For example, Former Horizon Territory Manager, Texas recalled that at Horizon's 2014 National Sales Meeting in Las Vegas Nevada—attended by Horizon's senior management, including Defendant Walbert—a surgeon from Las Vegas, Dr. Randall Yee, was asked to speak along with his Horizon sales representative.

106.    According to Former Horizon Territory Manager, Texas, at the National Sales Meeting it was announced that the Horizon sales representative was making over $600,000 a year, which could be attributed to his relationship with Dr. Yee, which included spending weekends hunting together.  Former Horizon Territory Manager, Texas interpreted the presentation as intended to motivate sales representatives to cultivate similar relationships with their doctors.  A review of online records of Open Payments Data further demonstrates the tools

used by Horizon to cultivate these relationships.[33]  Dr. Yee received $18,234.50 from Horizon in 2014, the bulk of which was for "services other than consulting."

107.    Dr. Yee also apparently had a close relationship with at least one of Horizon's controlled pharmacies.  Former Clybourn Manager witnessed a manager from Clybourn Park calling Dr. Yee and telling him they hadn't seen any prescriptions from him that day.  Shortly thereafter, Dr. Yee sent over 200 prescriptions.

108.    Horizon continued to push its sales force to develop improper relationships at the 2015 National Sales Meeting in Arizona that took place in February of 2015.  Former Horizon Territory Manager, Northeast advised that Defendant Walbert and other executives were at the 2015 National Sales Meeting.  Former Horizon Territory Manager, Northeast recalled that at that meeting—and throughout his tenure—Horizon always coached its territory managers to develop strong relationships with doctors.  Former Horizon Territory Manager, Northeast added that at that sales meeting in February of 2015, employees were also told that PME was the direction of the Company and where they had to go.

109.    In addition to cultivating conflict-ridden relationships with doctors, Horizon sales representatives were instructed to mislead doctors about the price of the drugs.  When doctors would ask the cash price of DUEXIS or VIMOVO, according the Former Horizon Territory Manager, Texas, the sales representatives were told to avoid such questions and instead talk about the benefits of the program to the patients.  The Former Horizon Territory Manager, Texas added that they were to tell doctors that there would be a minimal copay to the patient if the prescription went through a specialty pharmacy.  According to the Former Horizon Territory

---

[33]    Open Payments Data is the federally run transparency program that collects information about financial relationships between doctors and health care manufacturing companies. *See* OpenPaymentsData.CMS.gov.

Manager, Northeast when some doctors did find out the price of these drugs was $1,500, they essentially told the sales representatives to get out and that they would not have insurance pay that amount for Advil and Pepcid.

110.    In order to maximize prescription volume, Horizon instructed its sales force to market their primary care drugs to doctors who would prescribe the drugs for off label use. According to the Former Horizon Territory Manager, Texas, sales representatives were given a call plan and a territory with roughly about 150 doctors listed on each plan.  The Former Horizon Territory Manager, Texas explained that the majority of the doctors that they were marketing to were orthopedic surgeons who deal with patients that have "acute" pain related to their surgeries, rather than DUEXIS' indicated use. Former Horizon Territory Manager, Texas added that Horizon instructed their sales representatives to market DUEXIS to patients outside the FDA indications for which it was intended—OA and RA.  Former Horizon Territory Manager, Texas could not understand why they were marketing to surgeons when the products were supposed to be for long-term treatment not short-term acute pain.  Former Horizon Territory Manager, Texas reiterated that despite the medication being intended for OA and RA, the majority of the medical providers they were marketing to were Orthopedic Surgeons and Podiatrists.

111.    Similarly, Former Horizon Territory Manager, Northeast also indicated that Horizon was marketing their drugs off-label.  Indeed, he believed based on conversations with other territory managers, that the bulk of prescriptions brought in by NY sales representatives were being written under worker's compensation guidelines for ***off label usage***.

112.    This is the manner in which the Exchange Act Defendants executed on Horizon's PME strategy.  They encouraged improper sales and marketing tactics and the use of financial and personal incentives to motivate doctors to write Horizon prescriptions through the PME.

They told their sales representatives to mislead doctors about the cost of the drugs when asked. And when they still could not meet the numbers needed to justify their substantial compensation, they promoted the Company's drugs for off label usage.  They did all of this with the help of a small number of captive pharmacies who would do anything to keep Horizon's business, including at least one that had direct ties to Horizon management that was created specifically to serve the PME program.  This conduct was hidden from shareholders, along with the inevitable business and regulatory risks, reputational harm, and increased scrutiny from payors and PBMs.

### 6.    THE TRUTH BEGINS TO EMERGE

113.    Beginning in October 2015, through a series of partial disclosures, the market learned that, contrary to the Exchange Act Defendants' false and misleading statements and omissions throughout the Class Period, Horizon exercised operational and financial control over the so-called specialty pharmacies participating in the PME program, and that the PME program's profitability was predicated on unsustainable, illegal, and improper business practices.

### (a)    The October 2015 New York Times Article Raised Concerns About Horizon's PME Program

114.    On October 19, 2015, after the close of the market, the *New York Times* published an article entitled "Drug Makers Sidestep Barriers on Pricing" which highlighted the pricing activities of Horizon.  The article raised concerns about Horizon's use of specialty pharmacies, including Linden Care, in its PME program.  The article further compared Horizon's PME program to Valeant Pharmaceutical's questionable sales practices and use of specialty pharmacies. In particular, the article noted that given the high cost of Horizon's drugs and their dubious clinical benefit, "many insurers do not want to pay for" those drugs, including Duexis. The article described how Horizon had "figured out a way to circumvent" this obstacle by using

"specialty pharmacies," including Linden Care, to dispense its drugs and avoid generic

substitution:

> It is called "Prescriptions Made Easy." Instead of sending their patients to the drugstore with a prescription, doctors are urged by Horizon to submit prescriptions directly to a mail-order specialty pharmacy affiliated with the drug company.  The pharmacy mails the drug to the patient and deals with the insurance companies, relieving the doctor of the reimbursement hassle that might otherwise discourage them from prescribing such an expensive drug.

> Horizon is not alone. Use of specialty pharmacies seems to have become a new way of trying to keep the health system paying for high-priced drugs. Valeant Pharmaceuticals International, which has attracted government and media scrutiny for its huge price increases, does much the same thing for its dermatology products with a specialty pharmacy called Philidor Rx Services.

> \* \* \*

> Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by Horizon and Valeant are for common ailments like arthritis pain, acne and toenail fungus.

> "What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs," Ronny Gal, a pharmaceutical analyst at Bernstein, said in a note on Friday.

115.   Following the publication of the *New York Times* article after hours on October

19, 2015, Horizon stock fell $3.81, or 19.98%, from a close of $19.07 per share on October 19,

2015 to close of $15.26 per share on October 20, 2015.

116.   Analysts attributed the sharp decline in Horizon's stock price to the disclosures

about Horizon's business practices in the *New York Times* article.  For instance, on October 20,

2015, UBS published a note observing that "with the recent article in the New York Times,

investors are now very focused on the sustainability of the PME program and whether the

business model is dead." In its note, UBS identified several "new concerns" including: "***Concern***

***#1. The business model is dead. Horizon is no longer under the radar but instead in the New***

***York Times. The other payers that have been subsidizing the success of the PME program will***

***now wonder why they are reimbursing any Rxs, or political pressure will force Horizon to shut***

***down."***

117.    Thereafter, on October 21, 2015, Citron Research released a report that raised

additional concerns about drug manufacturers' use of specialty pharmacies to support "massive

price raises on pharmaceuticals."  While the report focused primarily on Valeant's own captive

pharmacy network, the market recognized that this report had serious negative implications for

Horizon's PME program.  That parallel was especially clear given the *Times*' article's

comparison between the two companies' programs, which was specifically mentioned in the

Citron report.  Market commentators, including *Reuters*, *The Street*, and *Barron's*, among others,

all recognized that the Citron report implicated Horizon.  For example, in an October 21 report,

*Barron's* stated that "[t]he [Citron] report has also hammered" Horizon.

118.    In response to the  *New York Times* article and the Citron report, Horizon and the

Individual Defendants denied any wrongdoing.  They falsely assured investors that the specialty

pharmacies that distributed Horizon's drugs were "fully independent" from Horizon.  In

particular, on October 21, 2015, after the market closed, Horizon issued a press release entitled

"Horizon Pharma plc Provides Update on Relationships With Specialty Pharmacies." Regarding

specialty pharmacies, Horizon stated:

>      ***All pharmacies that distribute Horizon branded medicines are fully***
> ***independent. Horizon does not own or have an ownership stake in any***
> ***pharmacy and does not possess an option to purchase any pharmacy***. In
> addition, the relationship with these pharmacies is non-exclusive where each of
> these pharmacies may also fulfill prescriptions for other drug manufacturers.

**(b)     Depomed's Press Release Commenting on Horizon's Business Model**

119.     On October 22, 2015, before the market opened, Depomed, a hostile takeover target of Horizon for many months, issued a press release entitled, "Depomed Comments on Recent Reports Regarding Horizon Pharma's Business Model Reports Confirm Concerns Raised by Depomed's Board in Rejecting Horizon's Unsolicited Exchange Offer."  Depomed's press release stated that its serious "concerns" about Horizon's "aggressive drug pricing practices" and "use of specialty pharmacies," and the sustainability of the Company's business model in light of those practices, had been vindicated by "numerous reports in the past days."  Specifically, the press release stated that "the nature of Horizon's business model had the potential to lead to significant volatility in the price of Horizon stock."

> Depomed, Inc.  . . . today issued the following statement in response to numerous recent reports surrounding Horizon Pharma plc's (NASDAQ: HZNP) ("Horizon") business model, in particular concerns raised about aggressive drug pricing practices and Horizon's use of specialty pharmacies:
>
> Depomed's Board unanimously rejected Horizon Pharma's unsolicited exchange offer on September 11, 2015. . . the Company highlighted the Board's reservations about Horizon's business model and strategy, while observing that the nature of Horizon's business model had the potential to lead to significant volatility in the price of Horizon stock.

120.     On this news, Horizon's stock fell an additional 11.5%, from a close of $14.83 per share on October 21, 2015, to a close of $13.12 per share on October 22, 2015. Indeed, Nicholas Donato, a financial reported with *Benzinga*, noted that "Depomed Inc. called out Horizon Pharma PLC over its business methods."  In another article reporting on Depomed's press release issued that day, Donato noted that Horizon's "business model . . . shares similarities to that of Valeant," further substantiating Depomed's concerns about the "sustainability" of Horizon's PME.

121.    In response to Depomed's press release, Horizon and the Individual Defendants again attempted to soothe investors' concerns.  On October 22, 2015, after the market closed, Horizon frantically issued yet another press release entitled "Horizon Pharma plc Corrects Misinformation in the Marketplace."   In this release, the Exchange Act Defendants again stated which again claimed that the specialty pharmacies distributing Horizon's drugs were "***fully independent***." The also falsely attributed the strong prescription growth of its drugs to "1) the clear clinical benefits these products provide and 2) our ability to provide access to important medicines in today's healthcare environment," as opposed to the Company's control over its captive pharmacies and its illegal and unstainable business practices.

### (c)     Express Scripts Removes Horizon's Captive Pharmacy from Its Network

122.    Only weeks after the Exchange Act Defendants repeatedly assured the market that Horizon's relationship with the pharmacies participating in the PME program was entirely arm's length and independent, Express Scripts, one of the country's largest PBMs, revealed that Horizon essentially controlled Linden Care.  On November 10, 2015, after the market closed, Express Scripts announced that it  had sent specialty pharmacy Linden Care an immediate termination letter and had removed Linden Care from its network stating that Linden Care was a "captive" pharmacy of Horizon—*i.e.*, primarily dispensed Horizon drugs—and did not fulfill its contractual obligations. Further, Express Scripts announced that it had filed a complaint against Horizon, seeking recovery of approximately $140 million.

123.    Also on November 10, 2015, after the close of the market, the *New York Times* published an article entitled "Express Scripts Cuts Ties to New York Specialty Pharmacy" analyzing the Express Scripts announcement of the removal of Linden Care as a "captive pharmacy" from its network.  The *New York Times* characterized the action as "a sign of a

further crackdown on the use of mail-order dispensaries to help lift sales of expensive drugs;" and, in particular, said that Express Scripts "was taking action against 'captive' pharmacies that seem to be aimed at pushing a single manufacturer's products." The *New York Times* quoted a lawyer for Linden Care who stated that "***about 59% of Linden Care's business involves dispensing drugs made by Horizon***." The *New York Times* noted that "if doctors send a prescription to [a] specialty pharmacy, there is less chance an insurer or pharmacist will try to switch to a less expensive generic product." On that same day, Reuters reported that Express Scripts was "evaluating several other pharmacies that appear to be predominantly dispensing Horizon drugs."

124.    In response to this news, Horizon's stock fell $4.39 per share, or 19.62%, from $22.38 per share on November 10, 2015 to $17.99 per share on November 11, 2015.

### (d)    The Senate Hears Testimony About Horizon's Relationships with Specialty Pharmacies in December 2015

125.    One month later, a Senate subcommittee heard testimony impugning Horizon's use of "controlled" pharmacies to sustain the Company's bloated drug prices. Specifically, Mark Merritt, President and CEO of the Pharmaceutical Care Management Association ("PCMA") testified on December 9, 2015 before the Senate Special Committee on Aging and gave a presentation entitled, "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines." In that presentation, Merritt provided Congress with his concerns over "***the actions and practices of certain bad apple pharmacies—controlled or owned by drug manufacturers— that call themselves specialty pharmacies, but in reality, represent a marketing strategy to skirt plan formularies.***"

126.    In providing an example of the problems associated with drug manufacturers using "bad apple" pharmacies to sell their drugs, Merritt focused on Horizon:

Recent investigations have found that the manufacturer Horizon Pharma was employing an affiliated pharmacy to sell low-value drugs, such as Duexis. The pain reliever Duexis is a combination of two old and common drugs, the generic equivalents of Motrin and Pepcid. ***If prescribed separately, the two drugs together would cost no more than $20 or $40 a month. By contrast, Duexis***, which contains both in a single pill, ***costs about $1,500 a month***. This price represents poor value for both patient and payer when much cheaper generic drugs are available. Nevertheless, ***Horizon has urged doctors to submit prescriptions directly to a so-called specialty pharmacy affiliated with the drug company. The pharmacy delivers the drug to the patient, circumventing the insurers' formulary and utilization management systems, which are designed to deliver the safest, highest-value drugs***.

> **(e)      U.S. Attorney Issues Subpoena to Horizon Seeking Information About Its PME Program**

127.      Less than three months later, the market learned additional information indicating that Horizon's relationships with its so-called specialty pharmacies and its marketing practices were improper.  Specifically, on February 29, 2016, Horizon disclosed that the DOJ had been investigating the PME program and the Company's "marketing and commercialization activities" since November 2015.  This disclosure revealed to the market that the Company's improper business practices exposed Horizon to significant legal liability.  Specifically, in Horizon's Report on Form 10-K for the quarter and year ending December 31, 2015 (the "2015 10-K"), Horizon disclosed:

> In November 2015, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents and information related to our patient assistance programs and other aspects of our marketing and commercialization activities. . . . The investigation by the U.S. Attorney's Office and any additional investigations of our patient assistance programs may result in damages, fines, penalties or other administrative sanctions against us.

128.      On this news, Horizon's stock fell $2.63, or 13.3%, from a close of $19.79 per share on February 26, 2016 to a close of $17.16 per share on February 29, 2016 on trading volume more than triple Horizon's average daily trading volume.

129.     Analysts specifically identified Horizon's disclosure of the DOJ investigation of its use of those "specialty pharmacies" as the cause of the sharp decline in the Company's shares. On February 29, 2016, for instance, Cowen wrote:

> Despite this [strong operating] performance, the ***shares are weak this morning on what appears to be . . . an unfavorable reaction to the disclosures of a subpoena from the U.S. Attorney's Office for the Southern District of New York***[.] Specifically, the 10K discloses "In November 2015, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York ***requesting documents and information related to our patient assistance programs and other aspects of our marketing and commercialization activities***."

130.     On March 1, 2016, UBS also wrote that "the Attorney's Office is looking for information about the specialty pharmacies business model..." UBS added that, "Since November, the Attorney's Office has asked for a series of requests for information regarding the structure and nature of the patient assistance programs." UBS reported that management chose not to disclose the DOJ investigation earlier although the Company conceded that "it chose to have a 3rd party review its practices, even before receiving the subpoena."

### (f)     Financial Results Impacted by Concerns Over the Sustainability of Horizon's PME Program

131.     As the above disclosures emerged and the Company could no longer rely on its captive Horizon-controlled pharmacies and its aggressive and improper sales tactics, the market learned the full truth about the Company's PME program and its dwindling primary care drug sales.  Specifically, on April 12, 2016, Horizon filed a Report on Form 8-K pre-announcing lower than expected revenues for the 1st half of 2016 (particularly 1Q16) due to higher than anticipated pricing pressure for two of the Company's top selling drugs (VIMOVO and DUEXIS) caused, in part, by increased deductibles that patients were required to cover before drug costs are covered by payors. According to analysts covering the Company, higher

deductibles most impacted the gross-to-net for VIMOVO and DUEXIS as demonstrated by the Company's reduced guidance for these two drugs.

132.    According to an April 12, 2016 research report from UBS Securities: "The bad news is that it's clear from our conversations with management that our sales estimates for DUEXIS/VIMOVO were too high." According to a research report from Piper Jaffray dated April 12, 2016, "we can concede that there are real question marks regarding HZNP's primary care segment" due to "an incrementally more restrictive payor environment."

133.    With Horizon's April 12, 2016 disclosures, analysts now appreciated the risk that Horizon's business model, to the extent that it relied upon the distribution of its highly-priced and minimally differentiated primary care drugs through its "specialty pharmacy" channel, was—without its concealed control over its pharmacies and illegal sales—unsustainable.

134.    In reaction to this disclosure, Horizon's stock price fell from a close on April 11, 2016 of $18.22 per share to a close on April 12, 2016 of $13.42, a decline of more than 25% from the prior day close and a decline of 65% from the Class Period closing high of $38.45 per share.

### D.    THE EXCHANGE ACT DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS (FOR THE EXCHANGE ACT CLAIMS)

135.    Throughout the Class Period, the Exchange Act Defendants made a series of false and misleading statements and omissions regarding the truth about the Company's PME program and how it marketed and distributed its key NSAID drugs, including DUEXIS, VIMOVO, and PENNSAID 2%.  As set forth below, in regular press releases, conference calls, investor presentations, and filings with the SEC, the Exchange Act Defendants made materially false and misleading statements and omissions concerning, among other things, the following four principal categories: (1) the nature of Horizon's PME program and the reasons for its success;

(2) the Company's sales results, including its results for DUEXIS, VIMOVO, and PENNSAID

2% and the drivers of those sales results; (3) the potential, future risk of liability if Horizon was

not able to maintain compliance with the laws and regulations governing the promotion, sale, and

distribution of its drugs when that noncompliance was actual and the risk was real and present;

(4) certifications that Horizon's SEC filings were free of materially false and misleading

statements and omissions. At the end Defendants continued to cover up the truth about the PME

program while the truth was emerging through partial disclosures.  The Exchange Act

Defendants' misleading statements and omissions are set forth below, organized topically, along

with explanations for their falsity.

> **1.    The Exchange Act Defendants' False and Misleading Statements and Omissions Concerning the Nature and Success of Horizon's PME Program**

136.    Throughout the Class Period, the Exchange Act Defendants made false and

misleading statements and omissions concerning the nature of the PME program and the positive

impact the PME program was having on Horizon's growth and its ability to counterbalance the

exclusion of its drugs from PBM formularies.  In particular, the Company frequently touted the

PME program's success throughout the Class Period and misleadingly attributed that success to

entirely legitimate causes.  These statements and omissions were materially false and misleading

when made because they failed to disclose that key drivers of the PME program's success were

Horizon's use of (a) a small network of controlled pharmacies; and (b) a host of illegal and

improper business practices, employed both by Horizon and its controlled pharmacies, in order

to insulate Horizon's drugs from competition and artificially inflate the Company's drug sales.

(a)     **Horizon's January 12, 2015 Announcement of the Expansion of the PME Program**

137.    On January 12, 2015, Horizon issued a press release entitled, "*Horizon Pharma plc Provides Business Update.*"  In the release, Horizon announced a business update for its primary care businesses, and stated that it had "begun execution of a comprehensive plan creating a new organization focused on the acceleration of its Prescriptions-Made-Easy™ (PME) program to ensure continued growth of its non-steroidal anti-inflammatory drug (NSAID) portfolio in 2015."  With respect to the PME program, Defendant Walbert represented:

> We have a unique commercial business model where focused representative promotion, PME-program execution and the maximization of the value of the product are all aligned to drive revenue growth. ***We are now executing a comprehensive plan to ensure patients maintain access to DUEXIS and VIMOVO when their physicians prescribe them. With the acceleration of our PME program, the creation of an innovative retail-PME program and recent pricing action, we are confident we will grow combined net revenues for DUEXIS and VIMOVO in the first quarter of 2015 versus the first quarter of 2014.***

138.    The January 12, 2015 press release also touted increased "prescription levels" attributable to the PME program:

> Early results [of the PME program] are encouraging with PME-activated territories showing a 21 percent increase in DUEXIS and VIMOVO prescriptions versus prescription levels prior to initiation and each product achieving all-time Horizon high prescriptions in the week ending December 19, 2014."

139.    The Exchange Act Defendants' statements touting the PME program, the program's effect on "prescription levels" and revenue growth, and claiming that the program is designed to "ensure" patients' access to drugs "when their physicians prescribe them" were materially false and misleading when made.  The Exchange Act Defendants' statements omitted to disclose that:

(a)     Horizon exercised operational and/or financial control over a small network of its PME specialty pharmacies by, among other things, stationing personnel at its

controlled pharmacies to direct and monitor the pharmacies' operations (including at Halsted and

Clybourn); wielding enormous economic influence over the pharmacies (including Halsted,

Clybourn, and Linden Care) through unconventional and exorbitant payment structures (allowing

Halsted, for instance, to earn approximately $100 per Horizon prescription, dwarfing the typical

margin earned by dispensing pharmacies in typical arms-length relationships) and/or by

comprising a substantial portion of these controlled pharmacies sales (for instance, almost *60%*

of Linden Care's business involved dispensing Horizon drugs); and even creating and running a

pharmacy, Clybourn Park, that was created by then-Horizon executives and managers to be

devoted to the distribution of Horizon drugs; such that these pharmacies were nothing more than

a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the

Company to increased business and regulatory risks, such as the risk of violating state law,

contracts with PBMs and payors, incurring reputational harm, investigation by DOJ and other

regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and

insurers; and

       (b)     Horizon's PME program relied on illegal sales and marketing tactics, both

internally and at its controlled pharmacies, including promoting improper personal and financial

relationships between Horizon sales representatives and doctors; instructing employees to hide

pricing information from doctors; ordering prescriptions to be automatically refilled without

patient authorization; making commission-type incentive payments to personnel at the

Company's captive pharmacies when they filled Horizon prescriptions; shipping drugs to states

in which the pharmacy in question, e.g., Halsted, was not licensed; concealing material

information from PBM auditors (including concealing Horizon drugs and prescriptions from

auditors in order to mask the exclusive or near exclusive nature of the relationship between

Horizon and its controlled pharmacies); making false statements to patients, including statements that their insurance would not be billed for drugs dispensed to them; and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses; some of which was in violation of state laws (as discussed above), the Company's own Code of Business Conduct and Ethics, and PBM contractual obligations, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies, including the DOJ and HHS.

> **(b)    Horizon's February 27, 2015 Form 10-K Annual Report (for the Fiscal Year Ending December 31, 2014) and Earnings Conference Call**

140.    On February 27, 2015, Horizon filed its Report on Form 10-K for the year ending December 31, 2014 (the "2014 Form 10-K"). In the 2014 Form 10-K, the Exchange Act Defendants described the PME program's ability to "mitigate" the financial impact of PBM's efforts to exclude the Company's drugs from formularies, as follows:

(a)    "In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ***ensure continued growth of our NSAID portfolio in 2015***;"

(b)    "We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs."

141.    Also on February 27, 2015, after the release of the Company's financial results for the quarter and year ended December 31, 2014 and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Defendants Kody, Walbert and, Hoelscher. Defendant Walbert emphasized that the PME program was successfully driving the Company's prescription volume, particularly with respect to Horizon's

key drugs, DUEXIS and VIMOVO, despite the fact that those drugs were excluded from the
formularies of two large PBMs.  For example, Defendant Walbert stated:

> Beginning this year, we had the added challenges of two PBMs adding DUEXIS
> and VIMOVO to their exclusion list. We previously stated that we expected first-
> quarter 2015 net revenues for DUEXIS and VIMOVO to exceed first-quarter
> 2014. So far this year, with the data we have, DUEXIS and VIMOVO are meeting
> our internal expectations. ***Prescriptions are exceeding our expectations,
> offsetting partially -- offset partially by increased discounts on prescriptions as
> they accelerate into PME, leaving us feeling very good about early progress this
> year. The increased investment in subsidizing scripts within PME is having the
> intended positive effect in driving prescriptions***.

142.    Defendant Walbert continued to emphasize the PME program's success in driving

prescription increases, and as designed to deliver prescriptions in a way that was consonant with

the prescribing doctor's medical judgment, and was "the right thing for the patient" (as opposed

to automatically refilling prescriptions without regard to the patient's wishes).  In response to a

question about whether the expansion of Horizon's PME program into retail increased the

Company's exposure to subsidies, Walbert stated in part:

> Just since we started our PME activation program in December, even working
> through the challenges we discussed early in the first quarter, ***we've seen a 20%
> increase among these prescribers***. For the physicians that enroll into the PME
> program, where we do subsidize patients who are either switching insurance
> plans, have high deductibles, and potentially are on exclusion lists, ***we've seen a
> significant increase in the prescriptions in the commercial lives by these same
> physicians***.
>
> *  *  *
>
> ***We don't see any of the programs increasing exposure.*** We see them as totally
> designed to be a direct correlate to driving prescriptions in the commercial side of
> the business**.** ***It's all been designed to ensure access to the medicine the
> physician intended the patient to get, and as a result of doing the right thing for
> the patient,*** minimizing the administrative effort in the physician's office, we're
> seeing greater prescriptions in the commercial, which offset that subsidization.
> ***The strategy's working at this point***.

143.    Similarly, in response to a question about being placed on exclusion lists at CVS and Express Scripts and the effect this was having on prescriptions being written, Defendant Walbert stated:

> ***Each of the measures that we took***, whether it's -- or had guided so expectations on the prescriptions, penetration to PME, impacting price and ability to offset, ***all those things is working exactly as we had planned. Prescriptions are slightly higher than our expectations.*** As they grow, you have increased co-pay, buy-down and other expenses which are a direct correlant. ***Everything's tracking as we expected in the first six to eight weeks, based on the data we have. So we're on track.***

144.    The Exchange Act Defendants' statements in ¶¶ 140–143 touting the success of the PME program in "driving prescriptions" to "higher than . . . expectations," attributing the success of the program to decreased "administrative" burdens on physicians and "doing the right thing" for patients, and its design to "ensure access to the medicine the physician intended the patient to get," and touting the Company's "PME penetration" and "ability to offset" subsidized prescriptions with price increases omitted to state the truth and were materially false and misleading when made for the reasons previously articulated in ¶ 139(a)-(b).

> **(c)**    **Horizon's May 8, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending March 31, 2015) and Earnings Conference Call**

145.    On May 8, 2015, Horizon filed its first quarter Form 10-Q for the period ending March 31, 2015 (the "1Q15 Form 10-Q"), which further addressed the Caremark and Express Scripts exclusion lists which were effective January 1, 2015. Among other things, the 1Q15 Form 10-Q stated: "We expect that continued adoption of our PME program by physicians will be important to our ability to counter this action by the two PBMs and to offset pressure from healthcare payors and PBMs to use less expensive generic or over the counter brands instead of our branded products."

146.     Also on May 8, 2015, after the release of the Company's financial results for the

quarter ended March 31, 2015 and before the market opened, the Company held a conference

call with analysts. Participating on that call from Horizon were Kody, Walbert and Hoelscher.

Regarding Horizon's PME Program, Defendant Walbert touted the success of the PME program:

> ***In the first quarter of 2015, we increased the percentage of prescriptions of DUEXIS, PENNSAID 2%, and VIMOVO being processed through our prescriptions-made-easy program, or PME. And we have now achieved penetration of 69%, 63% and 58% of prescriptions, respectively***. We continue to expect our primary care products will stabilize at [65%], 75% PME penetration.
>
> As we have communicated previously, gross to net deductions will increase as we increase PME penetration. ***And ultimately, net sales will continue to increase as we continue to drive prescriptions.*** Moving forward, we expect gross to net discount for our primary care brands will stabilize at 65% to 75%, upon achieving this expected PME penetration. ***We continue to see positive trends in prescription growth across our primary care products, and DUEXIS and VIMOVO are now at weekly prescription levels in excess of those experienced in the fourth quarter of 2014***. . . We are very pleased with the execution of our commercial organization in the first quarter of 2015, and ***anticipate continued attractive growth throughout the year***.

147.     Regarding Horizon's PME Program, Defendant Kody also touted the PME

program's success:   "We continue to see attractive growth in prescriptions, driven in large part

by our acceleration of prescriptions flowing through our PME program in the first quarter of

2015. We have successfully grown through the seasonal effects, which occur in the first quarter

each year, and the inclusion of DUEXIS and VIMOVO on two PBM exclusion lists."

148.     Defendant Walbert's and Kody's statements in ¶¶ 145–147 touting the success of

the PME program omitted to state the truth and were false and misleading when made for the

reasons stated in ¶ 139(a)–(b).

**(d)     Defendant Walbert's June 2015 Presentations**

**Jeffries Global Healthcare Conference**

149.   On June 4, 2015, Walbert, on behalf of Horizon, presented to analysts at the Jeffries Global Healthcare Conference.  At that meeting, in response to analyst questions, Walbert purported to describe the PME program and the drivers of its success.  Specifically, a Jeffries analyst asked Walbert, "your PME -- Prescriptions Made Easy -- strategy is still not completely understood by investors. Could you talk about the genesis of this program?"  Walbert responded,

> So this program has several facets, but it's simple in its construct. We get physicians to either sign up on their e-prescribing tool or to fax prescriptions into a local specialty pharmacy, which then will process prescriptions as any retail pharmacy would.

> But there's a third-party vendor that we work with that essentially helps in adjudication of where we'll subsidize the co-pay for a patient coinsurance. Or if the patient is rejected, we will bring their co-pay to zero and fully subsidize that. To not only do the right thing for the patients but to ensure minimal administrative effort by a physician.

> So once that prescription comes in, patient gets called within two hours and then the product is delivered the next day. About 65% to 70% of the prescriptions of our primary care products now go through this distribution channel, and it enables physicians to have control and give what they think is the right product for a patient, and the patient get[s] it at the lowest possible cost. In enabling that access, we've seen physicians in the program write about 10 times the prescriptions of physicians who aren't in the program for our products.

150.   Following up on Walbert's response, the Jeffries analyst asked, "Related to that, could you talk a little bit about -- you know, a little bit more about the specialty in the older model? Why have you been so successful? It's been a difficult area for some other companies." Walbert answered by citing several purported drivers of the PME program's success.

> I think what makes our PME program work is several facets. First, you have to have products that have *clinical differentiation* that our sales force can sell effectively. Distribution model does not sell products. ***Sales reps who are well trained, motivated to differentiate the products and drive prescriptions that can then be managed through our distribution system is what drives the success***.

And you add in, we have sufficient margin available on these products to do the right thing and create access for patients to minimize the disruptive efforts. *It takes a comprehensive – both from the clinical trial data to the sales representative effort to then the distribution pathway doing the right thing for patients and physicians that, in aggregate, is what allows us to be successful with it*.

### Appearance on Jim Cramer's *Mad Money*

151.    On June 16, 2015, Tim Walbert appeared on Jim Cramer's Mad Money segment on CNBC to discuss, among other things, the Company's PME program.  During his appearance, Walbert attributed the success of the PME program to legitimate causes, namely, convenience and economy for both patient and physician:

(a)     "It's very simple, Jim. We try to do the right thing for the patient. . . . So the program does the right thing for the patient, the right thing for the physician. It allows them to write what they think is the best for their patients, and ultimately, we get much more prescriptions and greater increase in revenue, as you've seen in our sequential quarterly results;" and

(b)     "*So, prescriptions are rapidly growing and we expect to continue to accelerate the business and meet or beat those expectations*."

152.    Defendant Walbert's statements in ¶¶ 149–151 that the PME program was "rapidly growing" prescriptions and, therefore revenue, and attributing the success of the program to legitimate causes (namely, the "clinical differentiation" of the Company's products, its "well trained" sales force, and the fact that it does "the right thing for patient, the right thing for the physician") were false and misleading when made because they omitted and failed to disclose that the PME program was not "doing the right thing for the patient" and that instead its success was driven by Horizon's use of (i) a small network of captive pharmacies as detailed previously at ¶ 139(a); and (ii) a host of illegal and improper business practices, employed both

by Horizon and its controlled pharmacies, in order to insulate Horizon's drugs from competition

and artificially inflate the Company's drug sales, including practices detailed above at ¶ 139(b).

> **(e)    Horizon's August 7, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending June 30, 2015) and Earnings Conference Call**

153.    On August 7, 2015, Horizon filed its second quarter Form 10-Q for the period

ending June 30, 2015 (the "2Q15 Form 10-Q"), which stated, in part:

> Effective January 1, 2015, two significant pharmacy benefit managers or PBMs, placed DUEXIS and VIMOVO on their exclusion lists, which resulted in a loss of reimbursement for patients whose healthcare plans have adopted these PBM exclusion lists. ***However, this action did not negatively impact sales volume for either product. In fact, with successful adoption of our PME program by physicians, we are seeing increases in sales volume for both products***. During the six months ended June 30, 2015, DUEXIS volumes have increased by 72% and VIMOVO volumes have increased by 9%, when compared to the six months ended June 30, 2014.

154.    Also on August 7, 2015, after the release of the Company's financial results for

the quarter ended June 30, 2015 and before the market opened, the Company held a conference

call with analysts. Participating on that call from Horizon were Defendants Kody, Walbert, and

Hoelscher. In response to a question on the positive aspects of the PME program, Defendant

Walbert touted the success of the PME program:

> I think simple [sic] the positive is we drove over $100 million in net revenue in the second quarter, ***rapidly increased prescriptions, if you look at weekly prescriptions the year-over-year DUEXIS is up over 100%, VIMOVO over 50%, PENNSAID 2% over 400% and RAYOS up 88% sequentially quarter over quarter***. So our business continues to execute. With this we're doing business different than many others do which raises lots of questions which we certainly appreciate.

155.    In response to a question about why the PME program worked so well for

Horizon, Defendant Walbert falsely attributed the success of the program to entirely legitimate

causes, including the Company's "differentiated products":

(a)     "So for us what it does is we believe we've got differentiated products where **we do the right thing for the patient**, the right thing for the physician and that has led as you can see in the second-quarter results to strong growth in both all three [sic] primary care products[];" and

(b)     "So we will focus on patient access and combine that with our very successful commercial sales model. And together we think that can accelerate both prescriptions and net revenue across the asset base and really bring our diversified business unit structure to accelerate those revenues."

156.    The Exchange Act Defendants' statements touting the success of the PME program were false and misleading when made because they omitted to disclose that in reality this success was driven by Horizon's use of (i) a small network of controlled pharmacies, as detailed above at ¶ 139(a); and (ii) a host of illegal and improper business practices, employed both by Horizon and its controlled pharmacies, in order to insulate Horizon's drugs from competition and artificially inflate the Company's drug sales, including practices detailed above at ¶ 139(b).

**(f)     Walbert's September 17, 2015 Presentation at the Morgan Stanley Healthcare Conference**

157.    On September 17, 2015, Walbert presented at the Morgan Stanley Healthcare Conference.  Regarding Horizon's PME Program, Defendant Walbert stated:

> **On the primary care side, the business continues to accelerate at all-time highs. It has never operated better than it is today. A continued efficiency of our PME program**. Year-over-year acceleration of each of the products is ranging from 25% to several hundred percent year-over-year growth and continued sequential growth in net revenue**.** And excited about the progress heading into the fourth quarter.

* * *

Our Prescriptions-Made-Easy program is simply a program to create access for patients to our medicines at the lowest out-of-pocket cost. ***We work with specialty pharmacies to distribute through them to physicians, where patients get access to low co-pays***. . . . we are able to reduce the noise or administrative effort for physicians in the office, creating an ability for them to prescribe more patients and get it at low costs. ***And ultimately, we've seen rapid acceleration of each of our products. So [we] did the right thing for patients, rapidly accelerated both revenue and prescription***s.

158.    Defendant Walbert's statements touting the "efficiency" of the PME program, the program's generation of "sequential growth in net revenue," and attributing the causes of that success to the fact that the PME program gives patients "access to low co-pays," "distribute[s] drugs to physicians," "reduce[s] the noise or administrative effort for physicians in the office," and "did the right thing for patients," and stating that Horizon merely "work[s] with" specialty pharmacies were false and misleading when made because the Exchange Act Defendants omitted to disclose that the key driver of the program's success and its ability to effect "offset[ting]" price increases was Horizon's use of (i) a small network of controlled pharmacies, as detailed above at ¶ 139(a); and (ii) a host of illegal and improper business practices, employed both by Horizon and its controlled pharmacies, in order to insulate Horizon's drugs from competition and artificially inflate the Company's drug sales, including practices detailed above at ¶ 139(b).

2.    **The Exchange Act Defendants' False and Misleading Statements and Omissions Touting the Company's Financial Results and Attributing Those Results to Entirely Legitimate Factors**

159.    Throughout the Class Period, the Exchange Act Defendants reported strong net sales for Horizon and for its flagship drugs, including DUEXIS, VIMOVO, and PENNSAID 2%. In each instance, the Exchange Act Defendants attributed these results to entirely legitimate business practices and operational factors, while failing to disclose that key drivers of the Company's results were Horizon's use of (a) secret control over a network of captive pharmacies; and (b) a host of illegal and improper business practices to insulate its drugs from

generic substitution, mitigate the impact of exclusion from PBM formularies, and artificially inflate the Company's drug sales.

160.     During the Class Period, the Exchange Act Defendants reported the following financial results for the Company's net sales, and for net sales of individual drugs:

| Net Sales[34] | 4Q 2014 | Year End 2014 | 1Q 2015 | 2Q 2015 | 3Q 2015 | 4Q 2015 | Year End 2015 |
|---|---|---|---|---|---|---|---|
| Pennsaid 2% | N/A | N/A | $18.3 | $29.4 | $43.9 | $55.4 | $147.0 |
| Duexis | $28.8 | $83.3 | $28.8 | $44.2 | $56.9 | $60.4 | $190.4 |
| Vimovo | $43.3 | $163.0 | $33.0 | $39.8 | $46.9 | $47.0 | $166.7 |
| Total Net Sales | $103.8 | $297.0 | $113.1 | $172.8 | $226.5 | $244.5 | $757.0 |

161.     These reported results were false and misleading because they failed to disclose that the reported net sales were not a result of legitimate business practices as Defendants had described over the quarters, but instead were a direct result of Horizon's control over a small network of captive pharmacies and its illegal and improper sales and marketing practices, including those described above at ¶ 139(a)–(b).

**(a)     The Exchange Act Defendants' Statements and Omissions Concerning Horizon's Full-Year 2014 Financial Results**

162.     In Horizon's 2014 Form 10-K, filed February 27, 2015, the Exchange Act Defendants reported a $222.9 million increase in year-over-year net sales.  The Exchange Act Defendants stated, "The increase in net sales during the year ended December 31, 2014 was primarily due to growth in net sales of DUEXIS, our initiation of VIMOVO sales in January 2014 and our recognition of ACTIMMUNE sales following the acquisition of Vidara in September 2014."

---

[34] All amounts in millions.  Also note that while VIMOVO, DUEXIS, and PENNSAID were primary contributors to the Company's net sales, "total net sales" includes net sales attributable to some additional drugs.

163.    In particular, the Exchange Act Defendants reported that "In 2014, DUEXIS net sales increased approximately $39.2 million as the result of ***prescription volume growth driven by the expansion of our field sales force*** and the continued rollout of our PME program, partially offset by $15.1 million due to lower net pricing."

164.    The Exchange Act Defendants' statements and omissions attributing Horizon's reported net sales results to legitimate business factors and conditions, were misleading because they failed to disclose that the key drivers of those results were instead directly attributable to Horizon's use of illegal and improper sales and marketing practices, employed both by Horizon and its controlled pharmacies, including practices described above at ¶ 139(b).  The Exchange Act Defendants' statements that their "prescription volume growth [was] being driven by the expansion of [their] field sales force" was further misleading in that it failed to disclose that Horizon's field sales force was successful as a result of their illegal and unsustainable practices, including Horizon's improper encouragement of its sales representatives to develop collusive relationships with doctors who could then be relied upon by Horizon's controlled pharmacies to write prescriptions effectively on command (*see, e.g.*, ¶ 107), Horizon's instruction to its employees to hide pricing information from doctors; and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses.

> **(b)     Defendants' Statements and Omissions Concerning Horizon's First Quarter 2015 Financial Results**

165.    On April 13, 2015, Horizon filed a prospectus supplement with the SEC, signed by the Defendant Hoelscher, which stated:

> ***Weekly prescriptions of our primary care products grew significantly*** during the first quarter of 2015. ***Despite being placed on certain formulary exclusion lists*** beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS ® ibuprofen/famotidine) weekly prescriptions rose 42% and VIMOVO ® (naproxen/esomeprazole magnesium) weekly prescriptions rose 26%.  Compared to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and

VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID ®
(diclofenac sodium topical solution) 2% w/w, during the first 12 weeks of 2015,
weekly prescriptions grew each week, representing a 353% increase during the
period. ***We also continued to increase Prescriptions-Made-Easy ("PME")
activation for our primary care products in the first quarter of 2015***, with the
percentage of prescriptions filled through PME rising to 58%, 44% and 56% for
DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended
March 27, 2015.

166.    Likewise, in a May 8, 2015 press release, Horizon featured a quote from Walbert

attributing the Company's success to legitimate factors, stating, "'Horizon's strong first-quarter

2015 performance reflects the outstanding work of our commercial team as we continue to

execute our strategy of accelerating growth through strong commercial performance and

expanded access for patients and targeted acquisitions.'"

167.    Horizon's 1Q15 Form 10-Q also reported that the Company's "[n]et sales

increased $61.2 million, or 118%, to $113.1 million during the three months ended March 31,

2015, from $51.9 million during the three months ended March 31, 2014."

168.    In particular, Horizon reported that "DUEXIS net sales increased approximately

$8.4 million as the ***result of prescription volume growth driven by the expansion of our field

sales force*** and the continued rollout of our Prescriptions-Made-Easy, or PME, program and

increased $6.6 million due to higher net pricing."

169.    Exchange Act Defendants' statements attributing Horizon's reported net sales

results to legitimate business factors and conditions, were misleading because they failed to

disclose that the key drivers of those results were instead directly attributable to Horizon's

control over a small network of captive pharmacies and its illegal and improper sales and

marketing practices, including those described above at ¶ 139(a)–(b).  The Exchange Act

Defendants' statement that DUEXIS net sales increased "as the ***result of prescription volume

growth driven by the expansion of our field sales force***" was further misleading in that it failed

to disclose that Horizon's field sales force was successful as a result of their illegal and unsustainable practices, including Horizon's improper encouragement of its sales representatives to develop collusive relationships with doctors who could then be relied upon by Horizon's controlled pharmacies to write prescriptions effectively on command (*see, e.g.*, ¶ 107), Horizon's instruction to its employees to hide pricing information from doctors; and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses.

> **(c)     The Exchange Act Defendants' Statements and Omissions Concerning Horizon's Second Quarter 2015 Financial Results**

170.    In its 2Q15 Form 10-Q, Horizon yet again reported net sales growth despite having its key drugs excluded from two of largest PBMs' formularies.   In particular, the Company reported "Net sales increased $106.8 million, or 161%, to $172.8 million during the three months ended June 30, 2015, from $66.1 million during the three months ended June 30, 2014."

171.    Further, the Company reported net sales growth for DUEXIS, which it claimed was "***the result of prescription volume growth driven by the expansion of our field sales force*** and the continued rollout of our Prescriptions-Made-Easy, or PME, program, and increased $11.9 million due to higher net pricing."

172.    On Horizon's August 7, 2015 earnings call for the second quarter of 2015, Defendant Kody likewise falsely attributed the Company's success to legitimate causes, including the "***differentiated clinical benefits***" of the Company's products and "***terrific execution by our sales, marketing and analytics teams*** and our ability to increase patient access to our products through our Prescriptions Made Easy or PME program":

(a)     "The success we've had this year in driving net sales further validates that we have the ability to successfully manage our business through various market dynamics and

change. This is a result of terrific execution by our sales, marketing and analytics teams and our ability to increase patient access to our products through our Prescriptions Made Easy or PME program;" and

       (b)    "Acceleration in total prescription growth of our primary care medicines is driven by their differentiated clinical benefits for patients . . . ."

      173.    The Exchange Act Defendants' statements attributing Horizon's reported net sales results to legitimate business factors and conditions including the "differentiated clinical benefits" of the Company's products and "terrific execution by our sales, marketing and analytics teams," were misleading because they failed to disclose that the key drivers of those results included Horizon's control over a small network of captive pharmacies and its illegal and improper sales and marketing practices, including those described above at ¶ 139(a)–(b).

      **(d)    The Exchange Act Defendants' Statements Concerning Horizon's Third Quarter 2015 Financial Results**

      174.    In its 3Q15 Form 10-Q, Horizon once again reported strong net sales growth of $151.4 million, which represented 202% growth versus third quarter 2014 results.  The Company again attributed these stellar results to entirely legitimate causes and business conditions:

> "The increase in net sales during the three months ended September 30, 2015 was primarily due to the recognition of PENNSAID 2% sales following our acquisition of the U.S. rights to PENNSAID 2% from Nuvo in October 2014, the recognition of RAVICTI and BUPHENYL sales following the acquisition of Hyperion in May 2015, the growth in net sales of DUEXIS, and full-period recognition of ACTIMMUNE sales during the three months ended September 30, 2015, compared with partial-period recognition during the three months ended September 30, 2014, following the Vidara Merger on September 19, 2014."

      175.    In particular the Company reported strong growth for DUEXIS:

> Net sales increased $34.1 million, or 150%, to $56.9 million during the three months ended September 30, 2015, from $22.8 million during the three months ended September 30, 2014. DUEXIS net sales increased approximately $19.5 million due to higher net pricing resulting from wholesale acquisition cost, or WAC, price increases partially offset by additional patient co-pay reimbursements

and increased approximately $14.6 million as the result of prescription volume growth driven by the expansion of our field sales force.

176.     The Company likewise reported strong growth for VIMOVO.   "Net sales increased $3.6 million to $46.9 million during the three months ended September 30, 2015, from $43.2 million during the three months ended September 30, 2014. VIMOVO net sales increased by approximately $6.5 million resulting from prescription volume growth, offset by approximately $2.9 million decrease due to lower net pricing."

177.     The Exchange Act Defendants' statements attributing Horizon's reported net sales results to legitimate business practices and conditions, including "higher net pricing resulting from wholesale acquisition cost," were misleading because they failed to disclose that the key drivers of those results included Horizon's control over a small network of captive pharmacies and its illegal and improper sales and marketing practices, as described above at ¶ 139(a)–(b).

> **(e)     The Exchange Act Defendants' Statements and Omissions Concerning Horizon's Fourth Quarter and Full-Year 2015 Financial Results**

178.     In its 2015 Form 10-K, filed February 29, 2016, the Company reported increased net sales for 2015, again, despite adverse action taken by PBMs.   "Net sales increased $460.1 million,   or   155%, to $757.0   million during   the   year   ended   December 31,   2015, from $296.9 million during the  year ended December 31, 2014."   The Company attributed this growth to entirely legitimate causes and business conditions.

> The increase in net sales during the year ended December 31, 2015 was primarily due to the recognition of PENNSAID 2% sales beginning in January 2015 following our acquisition of the U.S. rights to PENNSAID 2% from Nuvo in October 2014, the growth in sales of DUEXIS, the recognition of RAVICTI and BUPHENYL sales following the acquisition of Hyperion in May 2015, full-period recognition of ACTIMMUNE sales during the year ended December 31, 2015 compared with partial-period recognition during the year ended December 31, 2014, following the Vidara Merger on September 19, 2014, and the growth of RAYOS sales.

179.    The Company reported increased net sales for DUEXIS.  "Net sales increased $107.1 million, or 129%, to $190.4 million during the year ended December 31, 2015, from $83.3 million during the year ended December 31, 2014. DUEXIS net sales increased $58.0 million as a result of prescription volume growth driven by the ***expansion of our field sales force*** and increased $49.1 million due to higher net pricing resulting from wholesale acquisition cost, or WAC, price increases partially offset by additional patient co-pay reimbursements."

180.    With respect to VIMOVO, the Company reported, "Net sales increased $3.7 million, or 2%, to $166.7 million during the year ended December 31, 2015, from $163.0 million during the year ended December 31, 2014. VIMOVO net sales increased by $23.5 million resulting from prescription volume growth, offset by a decrease of $19.8 million due to lower net pricing."

181.    The Exchange Act Defendants' statements in ¶¶ 178–180 attributing Horizon's reported net sales results to legitimate business factors and conditions, including "higher net pricing resulting from wholesale acquisition cost," were misleading because they failed to disclose that the key drivers of those results included Horizon's control over a small network of captive pharmacies and its illegal and improper sales and marketing practices, as described above at ¶ 139(a)–(b).

**3.    The Exchange Act Defendants' False and Misleading Statements Concerning Horizon's Compliance With FDA Regulations, Marketing, and Advertising Regulations and the Company's Code of Business Ethics**

182.    In Horizon's first, second, and third quarter 2015 Forms 10-Q, the Exchange Act Defendants claimed that Horizon "may" face some future risk of liability if it was unable to maintain compliance with applicable laws and regulations governing the promotion, sale, and distribution of its drugs.  These statements failed to disclose that the Company was, in fact,

already not in compliance with applicable laws and regulations, and was already incurring these risks, by virtue of its illegal and improper business practices.  The Company also claimed it had implemented various "precautions" to "identify and deter misconduct by our employees and other third parties," including adopting a Code of Business Ethics, but failed to disclose that it was actively flouting these prophylactic measures.  Specifically, in these filings, the Exchange Act Defendants stated that:

> (a)     the "advertising, promotion, . . . marketing and distribution and other possible activities relating to our products and our product candidates are, and will be, subject to extensive regulation by the FDA and other regulatory agencies. Failure to comply with FDA and other applicable regulatory requirements may, either before or after product approval, subject us to administrative or judicially imposed sanctions;" and

> (b)     if the Company is "not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained and we may not achieve or sustain profitability, which would have a material adverse effect on our business, results of operations, financial condition and prospects."

183.    Further, the Company warned:

> **We are exposed to the risk that our employees**, independent contractors, principal investigators, consultants, vendors, distributors and CROs **may engage in fraudulent or other illegal activity**.

> \* \* \*

> We have adopted a Code of Business Conduct and Ethics, but it is not always possible to identify and deter misconduct by our employees and other third parties, ***and the precautions we take to detect and prevent this activity* may *not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations***.

184.   The Exchange Act Defendants' statements set forth in ¶¶ 182–183, were materially false and misleading when made because they failed to disclose that the risks described were not merely contingent and uncertain.  Instead, Horizon, by engaging in illegal and improper marketing and sales practices, was already not in compliance with applicable laws and regulations, and was already actively and presently incurring these risks in an effort to sustain the Company's untenable business model and counterbalance the impact of adverse PBM action.  In particular, these statements failed to disclose that the Company was promoting improper personal and financial relationships between Horizon sales representatives and doctors, instructing employees to hide pricing information from doctors, refilling prescriptions without patient authorization, making commission-type incentive payments to personnel at the Company's captive pharmacies when they filled Horizon prescriptions, shipping Horizon drugs to states in which the individual pharmacies were not licensed, concealing material information from PBM auditors, instructing personnel to falsely assure patients that their insurance would not be billed, and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies, including the DOJ and the HHS.

185.   Moreover, while the statements set forth in ¶¶ 182–183 represented that Horizon's Code of Business Conduct and Ethics served as a check on malfeasance and fraud inside Horizon, the Company was actively flouting its own policies, by, among other things, marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses (for instance, marketing drugs indicated for the treatment of chronic pain to orthopedic surgeons who

would prescribe it only for the treatment of acute pain); and by improperly providing gifts and other *quid pro quo* to healthcare providers, such as Dr. Yee, who would effectively then write Horizon prescriptions at the request of Horizon-controlled pharmacies (*see, e.g.*, ¶ 107).

> **4.    Defendant Walbert's and Defendant Hoelscher's  Signed Certifications that Horizon's Mandatory Periodic Filings with the SEC were Free from Material Misstatements were, Themselves, False and Misleading**

186.    Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed certifications appearing in Horizon's mandatory periodic filings with the SEC throughout the Class Period, stating those filings  did not contain false and misleading statements.  Defendants Walbert and Hoelscher signed these certifications in connection with Horizon's:

> (a)    2014 Form 10-K, filed on February 27, 2015;

> (b)    Form 10-Q, filed May 8, 2015;

> (c)    Form 10-Q, filed August 7, 2015;

> (d)    Form 10-Q, filed November 6, 2015; and

> (e)    Form 10-K, filed  February 29, 2016.

187.    Specifically, Defendants Walbert and Hoelscher certified that "the information contained in [Horizon's SEC filings] fairly presents, in all material respects, the financial condition and results of operations of the Company."  Moreover, Defendants Walbert and Hoelscher certified that these SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [those] report."

188.    Defendant Walbert's and Defendant Hoelscher's representations in the foregoing certifications that Horizon's filings with the SEC were free from material misrepresentations were themselves materially false and misleading when made because, as set forth above, each of those filings contained material misrepresentations.

### 5.    Defendants Attempted to Cover Up the Truth About the PME Program

189.    As noted above in Section II.D, in October and November 2015 and continuing until April 2016, the market learned the truth about the operational control Horizon exercised over its specialty pharmacies and the Company's improper marketing practices.  Throughout this period, the market learned that the PME program's profitability was predicated on unsustainable, illegal, and improper business practices.  Nevertheless, the Exchange Act Defendants continued to make materially false and misleading statements to the investing public, denying any misconduct or captive relationships with its pharmacies and maintaining that its success was based on legitimate factors.

### (a)    The Exchange Act Defendants Response to the *New York Times*' October 19, 2015 Article Critiquing Horizon's PME Program

190.    In response to the publication of the October 19, 2015 *New York Times* article raising concerns about the PME program and the relationship between Horizon and its so-called specialty pharmacies discussed at ¶ 114 above, Horizon and the Individual Defendants issued additional false and misleading statements designed to reassure investors that the specialty pharmacies that distributed Horizon's drugs were entirely independent from the Company.

191.    Specifically, on October 21, 2015, after the market closed, Horizon issued a press release entitled "Horizon Pharma plc Provides Update on Relationships With Specialty Pharmacies." Regarding specialty pharmacies, Horizon stated:

> *All pharmacies that distribute Horizon branded medicines are fully
> independent. Horizon does not own or have an ownership stake in any
> pharmacy and does not possess an option to purchase any pharmacy.* In
> addition, the relationship with these pharmacies is non-exclusive where each of
> these pharmacies may also fulfill prescriptions for other drug manufacturers.

192.    The Exchange Act Defendants' statements in ¶ 191 denying that Horizon owned

or had an option to purchase "any pharmacy" and that the pharmacies in the PME program were

"fully independent" were false and misleading when made because they misleadingly

characterized a pharmacy's "independence" as merely a function of its ownership structure (and

that a pharmacy was "captive" only if was controlled in the same way Valeant controlled its

captive pharmacy network) and failed to disclose that Horizon had exercised secret control over

the pharmacies in the PME program using the tactics described in ¶ 139(a)–(b).

> **(b)    The Exchange Act Defendants' Response to Depomed's Press
> Release Raising Questions About the Sustainability of
> Horizon's Business Model**

193.    In response to Depomed's press release, raising serious concerns about the

sustainability of Horizon's business model discussed  in ¶ 119 above,  Horizon and the

Individual Defendants again attempted to soothe investors' concerns.  Despite having issued a

reassuring press release just the day before, on October 22, 2015, after the market closed,

Horizon frantically issued yet another press release entitled "Horizon Pharma plc Corrects

Misinformation in the Marketplace," which again claimed that the specialty pharmacies

distributing Horizon's drugs were entirely independent and not at all "captive":

> Horizon takes seriously its responsibility to ensure patients have access to our
> medicines. Horizon enhances patients' access through several programs, one of
> which ensures that patients have a low out-of-pocket cost for Horizon medicines.
> This has resulted in 96 percent of patients filling prescriptions for Horizon's
> medicines during the first half of 2015 realizing co-pay amounts of $10 or less.

> Horizon's average selling price (ASP) of DUEXIS® (ibuprofen/famotidine),
> VIMOVO® (naproxen/esomeprazole), PENNSAID® (diclofenac sodium topical
> solution) 2% and RAYOS (prednisone) averaged $462 in the second quarter of

2015, which is unchanged since the first quarter of 2014. Over this same time period, prescriptions of these products increased 154 percent… ***We believe this strong prescription growth is the result of 1) the clear clinical benefits these products provide and 2) our ability to provide access to important medicines in today's healthcare environment.***

\* \* \*

In addition, Horizon commented yesterday on its relationship with specialty pharmacies. ***All pharmacies that distribute Horizon branded medicines are fully independent, including those that are part of Horizon's Prescriptions Made Easy program***. Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy. In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.

194.     The Exchange Act Defendants' statements  that prescription growth in Horizon's products is due to "clear clinical benefits" and Horizon's "ability to provide access to important medicines" were false and misleading because they failed to disclose that Horizon's net sales relied on the misleading sales and marketing practices described in ¶ 139(b); and the Exchange Act Defendants' statements that  "[a]ll pharmacies that distribute Horizon branded medicines are fully independent" were false and misleading in their failure to disclose that Horizon exercised secret control over a network of specialty pharmacies as described in ¶ 139(a).

195.     The Exchange Act Defendants' reassurances had their intended effect.  Horizon's October 22, 2015 press release caused the Company's stock to ***increase*** approximately 30% to a close of $17.06 on October 23, 2015, from a close of $13.12 per share on October 22, 2015.

**(c)     Horizon and the Individual Defendants Continue to Issue False and Misleading Statement to the Market in  Horizon's November 6, 2015 Report on Form 10-Q (Financial Results for the Quarter Ending September 30, 2015)**

196.     On November 6, 2015, Horizon filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q15 Form 10-Q"), in which the Exchange Act Defendants continued to reassure the marketplace about the propriety of the Company's PME program and, in

particular, that pharmacies participating in the program were not captive.  The 3Q15 Form 10-Q

stated, in part:

> The Company's products are distributed by retail and specialty pharmacies. A key part of the Company's commercial strategy for its primary care and specialty business units is to offer physicians the opportunity to have their patients fill prescriptions through pharmacies who participate in the Prescriptions Made Easy ("PME") program. ***This program is not involved in the prescribing of medicines, and is solely to assist in ensuring that when a physician determines one of the Company's medicines offers a potential clinical benefit to their patient and they prescribe one for an eligible patient, financial assistance may be available to reduce the patient's out-of-pocket costs.*** In the first nine months of 2015, this resulted in 96 percent of commercial patients having co-pay amounts of $10 or less when filling prescriptions for the Company's products through PME. In addition, the aggregate commercial value of the Company's patient support programs for the nine months ended September 30, 2015 was approximately $670 million. ***All pharmacies that fill prescriptions for the Company's medicines are fully independent, including those that participate in the PME program***, the Company does not own or possess any option to purchase an ownership stake in any pharmacy that distributes its products, and ***the Company's relationship with each pharmacy is non-exclusive and arm's length.*** All of the Company's sales are processed through pharmacies independent of the Company.
>
> ***The Company has a compliance program in place to address adherence with various laws and regulations relating to its sales, marketing, and manufacturing of its products, as well as certain third-party relationships, including pharmacies***. Specifically with respect to pharmacies, the compliance program utilizes a variety of methods and tools to monitor and audit pharmacies, including those that participate in the PME program, to confirm their activities, adjudication and practices are consistent with the Company's compliance policies and guidance.

     (a)    The Exchange Act Defendants' above-listed statements in the 3Q15 Form

10-Q the PME program exists "solely to assist in assuring that . . . financial assistance may be

available to reduce the patient's out-of-pocket cost," that its captiave pharmacies were "fully

independent," and that the Company's practices adhered to a compliance program, were false

and misleading because they failed to disclose that the key drivers of those results included

Horizon's control over a small network of captive pharmacies and its illegal and improper sales

and marketing practices, as described in ¶ 139(a)–(b).

**(d)       Horizon's November 6, 2015 Earnings Conference Call**

197.    Also on November 6, 2015, after the release of the Company's financial results for the quarter ended September 30, 2015 and before the market opened, the Company held a conference call with analysts.  On that call, Walbert made a number of statements to attempt to soothe the market's concern about the PME program, and particularly the independence of pharmacies participating in the program.  Walbert stated:

(a)       "***These pharmacies are not owned by Horizon Pharma; we do not have any type of ownership stake***, we do not have any options to purchase them in the future. ***These pharmacies solely dispense the prescriptions that physicians prescribe*** and we work to ensure that patients receive what his or her physician has prescribed;"

(b)       "The pharmacies we work with are ***fully independent, full-service pharmacies that serve both retail and mail order pharmacies***. These pharmacies are ***non-exclusive*** and also fulfill prescriptions for ***many other drug manufacturers***;"

(c)       "In fact, ***no one pharmacy makes up more than approximately 13% of our net sales*** in our primary care and specialty businesses;"

(d)       "And for any pharmacy that uses this program ***we work diligently to ensure that they are meeting all of our strict compliance criteria and standards***. If they don't, we quickly terminate participation and we have done so;"

(e)       "Furthermore, it is important to understand that ***these are independent businesses*** that operate in a very competitive and complex marketplace;"

(f)       "***When it comes to how pharmacies are incented, retail pharmacies, mail order pharmacies are all incented through the system working with payers and PBMs and for filling prescriptions. That is it, nothing more to add***;" and

(g)     "When it comes to our pharmacies and mail versus retail, *all the pharmacies that we work with are both retail and mail order*. So they all do both."

198.    Defendant Walbert's statements that the pharmacies in the PME program were "independent" in ¶ 197(a), (b), and (e) were false and misleading because they failed to disclose that Horizon exercised secret control over the pharmacies in the PME program, as described in ¶139(a).  Defendant Walbert's statement in ¶ 197(c) that no one pharmacy "makes up more than approximately 13% of our net sales in our primary care and specialty businesses" was false and misleading because it sought to  obscure that Horizon was heavily dependent on a small network of controlled pharmacies to dispense its prescriptions, and that at the time Clybourn Park was dispensing between 25 and 33 percent of all Horizon's primary care prescriptions. *See* ¶ 79–80. Defendant Walbert's statement in ¶ 197(d) that Horizon had a strict compliance program was false and misleading because it failed to disclose that Horizon and its captive pharmacies continued to rely on illegal and improper sales and marketing practice as described in ¶¶ 91–111, and 139(a).  Defendant Walbert's statement in ¶ 197(f) was false and misleading because, as alleged above, Horizon provided non-standard commission-like payments to pharmacies in the PME program.  Defendant Walbert's statement in ¶ 197(g) was false and misleading because the pharmacies in the PME program were either entirely mail order, like Clybourn Park, or had huge mail order operations, like Linden Care.

199.    Walbert's statements had their intended effect.  On November 6, 2015, Horizon's stock price closed at $21.00, up from a close on November 5, 2015 of $17.26, an increase of approximately 20% on volume at least three times Horizon's daily average trading volume.

(e)   **Defendant Walbert Continues to Issue False Statements to the Market in his November 9, 2015 Appearance on Jim Cramer's** *Mad Money*

200.   On November 9, 2015, Defendant Walbert appeared on Jim Cramer's Mad Money segment on CNBC.  During his appearance, Defendant Walbert continued to reassure the market about the propriety of the PME program and the causes of its success.  Specifically, Defendant Walbert stated:

> "The pharmacies we work with, whether it's a retail pharmacy; Walgreens, Duane Reed—you walk into; or a pharmacy that works through our PME Horizon Cares Program, they . . .one key goal. Doctor writes a prescription for our medicine because it has a clinical benefit, and the pharmacy ensures they get it. They cut out the middlemen who have financial incentive to do so. And, ***simply our role is to insure that the patient gets what the doctor intended***."

201.   In that same appearance, the following exchange took place:

> Speaker 1: Ok. You do not . . . You have no ownership position or anything . . .
> Walbert: . . . ***No ownership, whatsoever*** . . .
> Speaker 1: . . . with any of these specialty . . .
> Walbert: . . . ***None***. . .
> Speaker 1 . . Although they do about 60% of this kind of work.
> Walbert: . . .For certain medicines. . .
> Speaker 1: . . For certain medicines . . .

202.   Defendant Walbert's statements in ¶¶ 200–201 attributing the PME's success to legitimate factors including the drugs' "clinical benefit" and emphasizing that Horizon had no "ownership" of the pharmacies in the PME program were false and misleading when made because they failed to disclose that Horizon continued to rely on a small network of captive pharmacies and illegal and improper sales and marketing practices to drive net sales, as described in ¶ 139(a)–(b).

> **(f)     The Exchange Act Defendants Continue to Reassure the
> Market about the PME Program at Horizon's November 9,
> 2015 Corporate Analyst Meeting**

203.     On November 9, 2015, at approximately 12.30 pm E.S.T., Horizon hosted its

annual Corporate Analyst Meeting. Participants in the analyst meeting from Horizon included

Walbert, Kody, Carey, Hoelscher, and Steve Curtis, General Manager at Horizon.  In discussing

the PME program, renamed HorizonCares, Curtis stated that Horizon's relationship with

pharmacies participating in the PME program was nothing more than "standard:"

> ***Worth [noting] along with these facts is that we don't pay for any fees, you
> know, there's no fee-for-service arrangement with any pharmacy. So, we have a
> very standard relationship there and, actually, probably more conservative than
> they ever appear.  And one other thing to note that no pharmacy consist of more
> than 13% of our net revenue for our business.***

204.     Carey addressed the Company's business strategy and described the market's

reaction to the partial disclosures as "***unfounded concern about our business model***."

205.     During the analyst meeting, Defendant Walbert also tried to quell concern in the

market over Horizon's use of specialty pharmacies, dismissing previous disclosures as

"misinformation and misunderstanding of facts" and "noise in the marketplace":

> So, you've heard us talk about the impact in the industry and ***there's been a lot of
> misinformation or misunderstanding of facts***. And there's been comments and
> questions around use of various forms of pharmacies. ***And I can't speak for other
> companies or what they're doing but you've heard what we're doing and the
> bottom line is we're focused on our medicines which offered clinical benefits
> and we enable patients to go them.***
>
> ***Those are the facts. There -- we don't believe any of the noise in the
> marketplace*** *is related to our business* . . . .

206.     Also during the conference call, in response to a question regarding fill fees,

Defendant Hoelscher stated:

> ***And then on the sell side, you know, we're -- when a prescription is
> commercially paid, there's an [nothing] that we pay to a pharmacy and that's***

82

*just part of filling the prescription, the managed care, the payer's paying, you know, that prescription to be filled.*

207.    The Exchange Act Defendants' statements in ¶¶ 203–205 that concerns over Horizon's business model were "unfounded," that its business was "standard," that the "noise" in the marketplace was unrelated to Horizon's business were false and misleading because Horizon's PME program was unsustainable because it did, in fact, rely on a small network of secret captive pharmacies and illegal and improper sales tactics to drive prescriptions, as described in ¶139(a)–(b).  The Exchange Act Defendants' statements in ¶¶ 203 and 206 denying the Horizon paid any special fees to pharmacies in the PME Program were false and misleading when made because Horizon had, in fact, paid special incentive payments to Halsted Pharmacy as alleged in ¶ 70.

> **(g)**    **The Exchange Act Defendants' Responses to the November 10, 2015 Termination by PBM Express Scripts of One of Horizon's Top Partner Pharmacies and Horizon's Response to Termination**

208.    In response to Express Scripts' November 10, 2015 announcement, that it was terminating its relationship with Linden Care because it was a "captive" pharmacy of Horizon. Horizon issued a press release, stating:

> Less than five percent of our net sales are from prescriptions that are filled by Linden Care and processed by Express Scripts.  *In addition, we have a diverse group of pharmacies that participate in our patient support program and no pharmacy that participates in our primary care patient support programs account for more than 13 percent of our net sales.*
>
> *The notion that Linden Care is a so-called "captive pharmacy" of Horizon Pharma is entirely false*.  At best Express Scripts is being reckless in its allegations and at worse it is intentionally attempting to mislead investors.  As previously stated, all pharmacies that distribute Horizon branded medicines are fully independent.  *Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy.  In addition, the relationship with these pharmacies is non-exclusive where each of these pharmacies may also fulfill prescriptions for other drug manufacturers.*

209.    Astonishingly, in a mad dash to prevent the market from assimilating the disclosures communicated in Express Script's announcement, Horizon frantically issued *yet another* reassuring press release the *very next morning*, November 11, 2015, before the market opened, entitled "Horizon Pharma plc Provides Comment on Express Scripts' Business Practices."  In that press release, the Exchange Act Defendants repeated their statements from the night before and charged Express Scripts with profiteering. Horizon claimed Express Scripts had removed Linden Care from its network in order to stamp out small, independent pharmacies that compete with its own specialty pharmacy, Accredo Health Group, Inc., the largest specialty pharmacy in the U.S.

210.    The Exchange Act Defendants' statements in ¶¶ 208–209 denying that Linden Care was a "captive pharmacy," and stating that it had a "diverse group of pharmacies" in the PME program and that no pharmacy was responsible for more than 13% of Horizon's net sales were false and misleading when made because Horizon had, in fact, exercised control over Linden Care, as alleged in ¶¶ 83–87, and following Express Scripts' announcement, Horizon became even more dependent on its controlled pharmacy, Clybourn Park, which was processing 8,000 to 10,000 Horizon prescriptions a week, roughly a third of Horizon's total prescription volume, as alleged in ¶ 79.

> **(h)    The Exchange Act Defendants Continue to Mislead Investors in Analyst Meetings in November – December 2015**

211.    On November 18, 2015, Horizon presented at Stifel Healthcare Conference. With respect to the primary care division, Walbert stated the following:

> *Our success has been driven in the primary care and specialty space by having a differentiated commercial model* where our representatives effectively are able to help physicians understand the clinical benefits and therefore they write a significant number of prescriptions. *If you look at the third quarter, DUEXIS prescriptions were up 107% over the third quarter of 2014. VIMOVO was up 35%. PENNSAID was up 422%. RAYOS up well over 100%. That's driven by*

*our differentiated commercial model where we can accelerate prescriptions, and then when it comes to distribution*, it is simply finding the right pathway to ensure the patient gets what the physician intended.

\* \* \*

*[W]hen it comes to Linden Care, they are independent of us. We have no idea what's going on. There was a lawsuit.* They're looking for an injunction. They apparently held a hearing, and when it's announced, we will see it like you will.

\* \* \*

*If you look at our execution, we have grown prescriptions in aggregate for the first three quarters well over 100%. In the face of that, this has much less impact because we have grown through that exclusion. So, we believe it is manageable. It is around execution and that's what we've done well.*

\* \* \*

<u>Annabel Samimy - Stifel Nicolaus – Analyst:</u> And just to help people put this into context, how much of your prescriptions run through Linden and how quickly can you move it over to other alternative channels?

<u>Tim Walbert:</u> *What we have said with that pharmacy is that it impacts less than 5% of our net sales, so with that and as we have said, we have no change in what our guidance is today or going forward based on any of these actions or if these actions occur in a broader way.*

\* \* \*

<u>Tim Walbert:</u> *So what we are going to do is continue to drive volume, and the guidance on our gross to net range of that 65% to 75% is going to remain.* And as you drive more volume, it will flow through in a [similar] fashion, and on a quarter-by-quarter basis, you saw the third quarter. It fell under 70%. The prior quarter was slightly over 70%, so we may see some variation on a quarter-by-quarter basis, but in aggregate, our guidance isn't changing. We expect it to stay in the near future through our guidance in 2016 and it is all about driving volume. And that's something that we have continued to show, and when you talk about the broader noise in the marketplace, for us there was a perception that we had prescriptions flattening in August, and when questions around whether our third quarter, how that was going to play out, we beat revenues by $40 million and EPS by over $0.30. So, we know how to execute and we are going to continue to drive that volume.

\* \* \*

<u>Tim Walbert:</u> So the question for everyone was, have we moved the Linden Care prescriptions and what is our plan moving forward? *We are not involved with*

> *Linden Care, so we haven't moved anything. All we have done is say to them if, for whatever reason, a patient isn't covered, we're going to do the right thing for the patient. So, I don't know what Linden Care is doing beyond that. That is their own business.*

212.   On November 19, 2015, Horizon presented at the Goldman Sachs US Emerging & SMID Cap Growth Conference. In response to a series of questions about specialty pharmacies and Horizon's PME, Walbert responded as follows:

> Goldman Sachs – Analyst: Okay. So, onto the specialty pharmacies, and specifically Express Scripts recently announced that they are cutting off Linden Care. That is one of the specialty pharmacies that you guys use.
>
> Tim Walbert: *We don't use or work with any specialty pharmacies. Linden Care is not a specialty pharmacy. They are a retail pharmacy that also does some mail order. Specialty pharmacies are dominated in the US by Accredo, which is owned by Express Scripts.*
>
> Gary Nachman - Goldman Sachs – Analyst: Okay, important clarification. So, specifically -- and you have those types of pharmacy. There is about five to 10 --
>
> Tim Walbert: Correct.
>
> Gary Nachman - Goldman Sachs – Analyst: -- that you use within your network and you could elaborate on that. But Dave described it as a captive pharmacy and you guys have said that is completely false. So I think it's good to just clear the air in terms of how you use these pharmacies within your HorizonCares program.
>
> Tim Walbert: Absolutely, and it is an important question, and maybe just to simply define what captive pharmacy means. *Captive pharmacy means you have some control of it and what they do. . . . . . . In this case, a Linden Care or any pharmacy can write -- can fill any medicine, and we have no involvement whatsoever in what that pharmacy does.* A prescription goes into any pharmacy, Linden Care; a technician punches it in. If it is covered, it goes through the system.
>
> \* \* \*
>
> *Nothing involved here is changing or involved in what a physician's decision is. What any pharmacy does, if we're working with them, is simply if the doctor decided the medicine is what is best for their patients, either it is covered through the system or we try to get it to the patient for free or, in the case of our medicines, 96% of patients pay $10 or less.*

213.     During that same exchange, Walbert also stated that "***When you talk about pharmacies, there needs to be a key differentiator, and that's 10,000 pharmacies have dispensed our primary care medicines this year***. *There are some pharmacies that we have worked with that simply help when a patient has rejected a prescription because a payer wants them to use something different or a PBM does*. We give the patient the medicine for free."

214.     Defendant Walbert's statements in ¶¶ 211–213 claiming that Linden Care and the other pharmacies were "independent," that Linden Care was a "retail pharmacy" that did "some mail order," and that Horizon was not involved with Linden Care and had not moved any prescriptions were false and misleading when made because Horizon had, in fact, exercised control over Linden Care (¶¶ 83–87), Linden Care had at least 40–50 employees in its Horizon-only mail order department (¶ 87), and Horizon also heavily relied on Clybourn Park, which was essentially a mail-order pharmacy that existed only to dispense Horizon drugs.

215.     Defendant Walbert's statements  about "10,000" pharmacies dispensing Horizon's drugs were false and misleading when made for the additional reason that, following Linden Care's rejection by Express Scripts, rather than diversifying to "10,000 pharmacies," Horizon's PME program became even more dependent on Clybourn Park, which was processing 8,000 to 10,000 Horizon prescriptions a week, roughly a third of Horizon's total prescription volume, as alleged in ¶ 79.

216.     On November 19, 2015, Horizon presented at the Jefferies Global Healthcare Conference.  In response to a question regarding whether investors could expect Horizon's gross-to-net discount to stabilize over the next twelve months, Hoelscher responded as follows:

> <u>Paul Hoelscher</u>: ***Okay, so the guidance that we have given to investors in 2015, I think, carries forward into 2016 where we expect that for the three primary care and the RAYOS on the specialty side, we expect the gross to nets to stay in the 65% to 75% range. So, we had some improvement in the third quarter. We did***

> *some -- we made some changes that we talked about where we went out and,*
> *because of the growth in volume, were able to negotiate some decreases in our*
> *fees paid to wholesalers, and also were able to decrease some of the fees we pay*
> *in connection with processing the fully brought down scripts, and those will*
> *benefit us over the coming quarters, too, as those get annualized, but we think*
> *the 65% to 75% range that we gave previously is still valid for those products.*

217.    In that same exchange, Defendant Hoelscher sought to downplay Horizon's

control of its partner pharmacies, stating that pharmacies in the PME program are "*really just*

*like any other pharmacy in the country*"  and that "*the pharmacies we work with are just*

*another tool to help ensure that the patients have access to our medicines at a low out of cost*

*pocket.*"

218.    On December 1, 2015, Horizon presented at the Piper Jaffray Healthcare

Conference.  In response to a question regarding whether Horizon's gross-to-net in the primary

care division would continue to grow, Bob Carey stated:

> Bob Carey: *We have no reason to change that guidance at this point.* As we
> started out talking about we continue to believe that this movement towards less
> control to more control will be in that low-single digit to mid-single digit range
> and that's part of our planning scenario. *And so that what we're doing is pushing*
> *and pulling the different levers that are available to us to manage into that 65%*
> *to 75% gross to net range, while still showing the kind of net sales growth that*
> *we've guided towards. And so what we see are opportunities to push and pull a*
> *number of different levers to make that happen…*And so it's this constant back
> and forth movement on that that gets us into that range that we think is
> manageable, which we've been able to accomplish actively over the last three
> quarters, given some of the headwinds we've faced and we continue to believe
> that that will be available to us as we move forward.

219.    On December 3, 2015, Horizon presented at the Bank of America Merrill Lynch

Leveraged Finance Conference.  In response to a question about primary care revenues and

Horizon's gross-to-net in that division, Hoelscher stated:

> Unidentified Audience Member: What percentage of your primary care revenues
> are -- come from specialty or dedicated distribution? Can you talk about the
> impact not only of Linden but Irmat and those type of activities on that revenue
> stream?

<u>Paul Hoelscher</u>: *Okay, well, Irmat -- and we have no connection with at all. They were not part of our medicines at all. So we've -- the guidance we've given is that I think each of our primary care medicines are in the 65% to 75% of their scripts have been – have gone through our PME program. We expect them to stay in that range from a net sales standpoint.*

*The net sales that flow through there are dramatically less because most of the -- any scripts -- most of the scripts that we fully buy down our through that channel and so on a net sales basis you have dramatically less than the 65% to 75% that flow through that program. We don't have any dedicated pharmacies -*

\* \* \*

*I think we've said [net sales] are less, less than 50% is through [the PME program] because of the level of the fully bought down scripts that go through there. And then on the -- you mentioned Linden Care, what we have said is Linden Care was less than 5% of our net sales and no single pharmacy that participates in our programs makes up more than 13% of our net sales.*

220.     The Exchange Act Defendants' statements in ¶¶ 216–219 regarding the

Company's net sales in the PME program were false and misleading when made because they

failed to disclose that Horizon had been relying on the small network of captive pharmacies and

its illegal and improper sales and marketing practices to keep up prescription numbers and drive

net sales, as discussed ¶ 139(a) –(b).

> **(i)     The Exchange Act Defendants Continued to Attempt to Reassure the Market in his  January and February 2016**

221.     On January 12, 2016, Walbert spoke with Stephanie Ruhle on *Bloomberg GO*.

When asked if Horizon would be cutting ties with Linden Care, Walbert stated:

> We don't have any ties with Linden Care.  We have no contracts or direct relationships with any pharmacies, including Linden Care.  Linden Care made up less than 5% of our sales in the primary care business, and we have no direct relationship. They were a pharmacy like any other in the United States that had the right to distribute a medicine that their physician prescribed.

222.     On January 13, 2016, Walbert participated in an audience Q&A, on behalf of

Horizon, at the JPMorgan Healthcare Conference.   Walbert stated:

> *[W]e don't have any direct relationships, all we do is work to ensure that there is an independent pharmacy available that when a physician prescribes a medicine for clinical reasons, that the patient gets it. That's the only role that is played* . . .

223.    Defendant Walbert's statements in ¶¶ 221–222 that Horizon did not have ties with Linden Care, that Horizon had no "direct relationships with any pharmacies," and that the pharmacies in the PME program were "like any other in the United States" were false and misleading when made because they failed to disclose that the PME program had relied on a small network of Horizon-controlled pharmacies to drive sales as alleged in ¶ 139(a).  Indeed, Walbert failed to disclose that Horizon had already received notice in November 2015 from the DOJ that its marketing practices and relationship with specialty pharmacies were under investigation.

224.    Walbert's false reassurances prevented further declines in Horizon's stock price.

225.    On February 10, 2016, Defendant Carey spoke, on behalf of Horizon, at the Leerink Partners Global Healthcare Conference.  In response to an analyst question, he made the following representation about the PME program:

> *And so these pharmacies [participating in the PME program] now make up -- we're a substantial minority of their business.* I should say -- not substantial. We're an insubstantial part of their overall business, which was a part of the strategy, is to create a risk-managed portfolio out there and so that's what we've done with it.

* * *

> *But we've tried to be very transparent about the program. The relationship between ourselves and the pharmacies is arm's length.* When a script comes into that *independent pharmacy* they're responsible for adjudicating that in whatever way they see as appropriate. We have no control over that. The *financial relationship between the two of us is we pay them a fee for those scripts that are not reimbursed*, but what happens in getting that script reimbursed is up to them, not to us. And so what we do is we incentivize them to ensure that the script gets fulfilled by providing that fee, *but that's the extent of the relationship*.

90

226.    Defendant Carey's statements that Horizon made up a "substantial minority" of its controlled-pharmacies' business, that the relationships were "arm's length," and the pharmacies were "independent" were false and misleading when made because they failed to disclose that Horizon had been relying on a small network of controlled pharmacies to distribute its drugs, as discussed in ¶ 139(a).  Further, Defendant Carey's statement that Horizon was trying to be "very transparent" about the program, was false and misleading because it failed to disclose that Horizon had received notice in November 2015 that the DOJ was investigating the PME program and Horizon's sales and marketing practices.

<strong>(j)      Horizon's February 29, 2016 Disclosure of DOJ Investigation in 2015 10-K</strong>

227.    As discussed in ¶ 127, Horizon disclosed on February 29, 2016 in its Form 10-K (the "2015 10-K) that it had received a subpoena in November 2015 from the DOJ investigating the PME program and the Company's "marketing and commercialization activities."  However, Defendants issued contemporaneous false statements to the market in the same 2015 10-K, reassuring investors about the propriety and commercial success of the PME program, now renamed "HorizonCares."  Specifically, Horizon's 2015 10-K stated:

(a)      "The HorizonCares program may implicate certain state laws related to, among other things, unlawful schemes to defraud, excessive fees for services, tortious interference with patient contracts and statutory or common law fraud.  ***We have a compliance program in place to address adherence with various laws and regulations relating to the selling, marketing, and manufacturing of our medicines, as well as certain third-party relationships, including pharmacies***;" and

(b)      "Effective January 1, 2015, two significant PBMs placed DUEXIS and VIMOVO on their exclusion lists, which resulted in a loss of reimbursement for patients whose

91

healthcare plans have adopted these PBM exclusion lists. ***However, this action did not negatively impact sales volume for either medicine. In fact, with successful adoption of our HorizonCares program by physicians, we are seeing increases in sales volume for both medicines.*** During the year ended December 31, 2015, DUEXIS sales volumes have increased by 70% and VIMOVO sales volumes have increased by 14%, each, when compared to the year ended December 31, 2014."

228.   The 2015 Form 10-K was signed by Defendants Walbert and Hoelscher. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Walbert and Hoelscher signed a certification that was false and misleading because it stated that the 2015 Form 10-K did not contain false and misleading statements.

229.   The statements in the 2015 10-K that Horizon had a compliance program in place, that being placed on the exclusion list had not impacted Horizon's sales, and that sales volume was increasing were false and misleading when made because they failed to disclose that Horizon had relied on the a small network of captive pharmacies and illegal and improper sales and marketing practices to drive net sales following the placement of DUEXIS and VIMOVO on the exclusion lists, as described in ¶ 139(a)–(b).

**(k)     Horizon's February 29, 2016 Earnings Conference Call**

230.   Also on February 29, 2016, after the release of the Company's financial results for the quarter and year ending December 31, 2015, and before the market opened, the Company held a conference call with analysts. Participating on that call from Horizon were Walbert and Hoelscher.  Walbert reiterated that DOJ was investigating the Company's marketing practices and relationship with specialty pharmacies.  At the same time, Walbert tried to downplay the investigation by saying that while the Company had received a subpoena from, and were providing information to, the DOJ:

> *[T]here are no specific allegations against the company.* [A]s we described in the 10-K relative to the subpoena, we received it from the Southern District of New York.
>
> And as expected, this inquiry relates primarily to our patient assistance programs and interactions with specialty pharmacies. *As you know that there's been a lot of noise and confusion in the marketplace.*

231.    Walbert also attempted to soothe the market by touting the Company's financial and operating results.  In response to a question regarding expectations for gross-to-net for 2016 and Horizon's relationship with payors, Walbert stated that "[p]rescriptions were tracking well" and that the Company was "seeing solid momentum" in prescriptions:

> So, if we look at 2015 for the full year, DUEXIS was 71%, VIMOVO and PENNSAID were 69%, and RAYOS just under 60%. For the fourth quarter, DUEXIS was 72%, VIMOVO 71%, and PENNSAID 68%. So, on average, for the full year and the fourth quarter, about 70%.
>
> *We believe the range will stay in that 70% to 75% range, based on the information we have today.* And always, in the beginning of the year, with patients resetting deductibles, switching plans -- we make sure all patients have access to the drugs.
>
> *So, we expect that to be higher initially, and then we'll monitor it over time. But nothing so far this year has indicated that we're going to see anything different than we've seen in the past.*
>
> *Prescriptions are tracking well.* We look at a rolling 13-week and a rolling 14-week basis -- or a 13-week and a rolling 4-week basis.
>
> And when you look at DUEXIS, VIMOVO and PENNSAID ranging from 4% to 8% increase in TRx's. On a rolling four-week basis, significantly higher than the rolling 13 weeks.
>
> *So, we are seeing solid momentum coming out of the first month of the year, where you always see an impact; so, feeling good about where the business is.*

232.    Defendant Walbert's statements on the February 29, 2016 earnings call that "[p]rescriptions were tracking well" and that the Company was "seeing solid momentum" in prescriptions, were false and misleading when made because, as discussed at ¶¶ 131–132, above, Horizon would soon reveal that prescription numbers were down in the first quarter 2016, and

net sales had dropped precipitously, after the truth about the PME program had been disclosed and Horizon could no longer rely on it to drive net sales.

### E.    POST-CLASS PERIOD DISCLOSURES FOR EXCHANGE ACT CLAIMS

233.    On May 9, 2016, Horizon issued a press release announcing its first-quarter 2016 financial results. The Company's first-quarter 2016 GAAP net loss was $(45.4) million, compared to a net loss of $(19.6) million in the first quarter of 2015. The Company also reported declining sales of DUEXIS and VIMOVO, which it attributed to in part "increased control by certain pharmacy benefit managers and payors." According to the release: "DUEXIS and VIMOVO sales in the first quarter of 2016 were $29.6 million and $25.5 million, respectively, and sequentially declined compared to the fourth quarter of 2015."

234.    Indeed, sales in Horizon's primary care division declined 32% from Q4 2015 DUEXIS' net sales increased just 3% compared to Q1 2015, to $29.6 million while VIMOVO's net sales dropped 23% compared to Q1 2015, to $25.5 million. The sequential decreases in net sales for the two brands were 51% and 46%, respectively. ***The company lost half of net sales on these two products in just one quarter***. Gross-to-net discounts in Q1 were 79% and average net realized sales price was $411 in Q1 2016 compared to $483 in Q4 2015 and $567 in Q1 2015.

235.    On May 25, 2016, Horizon participated in the UBS Global Healthcare Conference. During the conference, Bob Carey confirmed that the DOJ investigation of Horizon was still ongoing and that the Company had been steadily producing information concerning the structure and nature of Horizon's patient assistance programs.

### F.    LOSS CAUSATION AND ECONOMIC LOSS FOR EXCHANGE ACT CLAIMS

236.    During the Class Period, as detailed herein, Horizon and the Individual Defendants engaged in a course of conduct that artificially inflated the price of Horizon common

stock and operated as a fraud or deceit on the Class Period purchasers of Horizon common stock by making the materially false and misleading statements and omissions recited above.

237.     When the truth was disclosed and became known to the market, the price of Horizon common stock declined precipitously as the prior artificial inflation was removed from the price of the stock.  As a result of their purchases of Horizon common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws).  The price decline in Horizon common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market.  Thus, the defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

238.     The truth about Horizon's business was disclosed through a series of corrective disclosures between October 19, 2015 and April 12, 2016.  As detailed in ¶¶ 113–134, over that period, Horizon's stock price declined approximately 30%, from $19.07 per share on October 19, 2015 to $13.42 per share on April 12, 2016.

239.     Each of the declines discussed above in the price of the Company's common stock was statistically significant at a high level after taking into account changes on the same days in the overall securities market and in relevant industry indices.  Furthermore, as set forth above, each of the price declines in Horizon common stock is attributable to the disclosure of previously concealed information relating to the materially false and misleading statements and omissions alleged herein.  The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiffs and other Class members were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to

the alleged fraudulent conduct.  As the truth about the fraud was revealed, the price of Horizon common stock declined, the artificial inflation came out of the price of the stock, and Plaintiffs and other members of the Class suffered damages.

### G.     ADDITIONAL EVIDENCE OF SCIENTER WITH RESPECT TO THE EXCHANGE ACT CLAIMS

240.     Throughout the Class Period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about Horizon's business, operating model, and PME program.  The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.

241.     Horizon and the Individual Defendants participated in a scheme to defraud investors about the Company's PME program and the control it exercised over the pharmacies that participated in that program. The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein. The Individual Defendants were also personally aware of, or recklessly disregarded, the improper and deceptive marketing tactics forced upon Horizon's sales representatives.

242.     In addition to the allegation set forth above, during the Class Period, Horizon and the Individual Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Horizon and the Individual Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Horizon's securities during the Class Period.

243.     As set forth herein, statements by former employees of Horizon and Horizon-controlled pharmacies and documents from a former pharmacy employee corroborate that Horizon was increasingly dependent on its PME program in order to sell its high-priced drugs, and to prevent insurers and pharmacists from switching patients from Horizon drugs to less expensive generic alternatives. Without the PME program, Horizon's primary care sales were small. As discussed herein, before implementation of its PME program, pharmacies and PBMs would not cover Horizon's RA/OA drugs, its most lucrative and important drugs by far, which had both effective and significantly less expensive generic and therapeutic alternatives.

244.     Further, Horizon's executive compensation plan provided the Individual Defendants with a powerful and direct monetary incentive to commit fraud during the Class Period.  The executive compensation plan provided that the Individual Defendants could dramatically increase their total annual compensation during the Class Period (and thereafter) by driving up the share price of Horizon's stock, and by driving up Horizon's revenue and EBITDA.

### 1.     The PME Program Was Extremely Important to the Company's Short Term Growth

245.     The Individual Defendants designed and implemented every aspect of the PME program, which was central to Horizon's ability to drive prescriptions of DUEXIS and VIMOVO—among the Company's most important drugs during the Class Period.  Indeed, much of the Company's net sales were attributable to those drugs in the PME program.  In 2014, DUEXIS and VIMOVO accounted for 83% of the Company's net sales.  In 2015, roughly two-thirds of Horizon's net sales were attributable to DUEXIS, VIMOVO, and PENNSAID 2%.  In fact, during a June 4, 2015 conference call, Defendant Walbert highlighted the core nature of the PME program, stating that, "About 65% to 70% of the prescriptions of our primary care

products now go through [the PME program]."  The fact that: (i) both DUEXIS and VIMOVO

were such significant parts of the Company's business and were responsible for such a high

percentage of net sales during the Class Period and (ii) the PME program was central to the

Company's success is strong evidence of scienter.

246.   In particular, the PME program was essential to the Company's efforts to mitigate

the impact of Express Scripts' and Caremark's exclusion of DUEXIS and VIMOVO from the

PBM's formularies, which jeopardized the Company's ability to secure reimbursement for at

least 20–30% of the prescriptions for DUEXIS and VIMOVO passing through those two PBMs,

and raised the specter of adverse action by other PBMs.

247.   The critical importance of the PME program was reflected in analysts' and

investors' intense focus on the program throughout the Class Period.  Indeed, as alleged above,

the Individual Defendants held themselves out to investors as the persons most knowledgeable

about the PME program on nearly every conference call with investors during the Class Period.

The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout

the Class Period and in doing so either knew or recklessly disregarded that their statements were

contrary to the underlying facts alleged herein while making the specific and detailed statements

alleged herein.  For example, during a February 27, 2015 conference call, Defendant Walbert

stated: "***We are highly focused on increasing the penetration of PME*** among physicians who

treat a high percentage of commercially insured patients." In a May 8, 2015 earnings conference

call, Defendant Kody also emphasized the importance of the PME, stating: "***We continue to see***

***attractive growth in prescriptions, driven in large part by our acceleration of prescriptions***

***flowing through our PME program in the first quarter of 2015***."

248.    Similarly, in public filings, Horizon emphasized that the PME program was an important driver of prescriptions.  For example, in the 1Q15 Form 10-Q filed May 8, 2015, Defendants stated: "We expect that continued adoption of our PME program by physicians will be important to our ability to counter this action by the two PBMs and to offset pressure from healthcare payors and PBMs to use less expensive generic or over the counter brands instead of our branded products."  Throughout 2014 and most of 2015, Horizon referred to the PME as a "key part" of its commercial strategy in its filings with the SEC.[35]

249.    Given the exponentially growing size of the PME program, its critical importance to the growth of Horizon's overall business, and the fact that it was the Company's revenue life-blood during the Class Period, the illegal practices discussed herein could not have occurred without the Individual Defendants' knowledge and approval.

### 2.    The Nature of the Undisclosed Practices that Drove the PME Program Give Rise to an Inference of Scienter

250.    For most of the Class Period, Horizon relied on only a small number of pharmacies from across the country to handle the Company's PME program and the dispensing of its key DUEXIS and VIMOVO drugs. Given that this network was responsible for the successful implementation and execution of the PME program (and, thus the Company's continued growth) and that the Company hand-picked the specific pharmacies in the network, it is not plausible that the Individual Defendants were not aware of the control that the Company exercised over the pharmacies and the illegal and dishonest conduct of these controlled pharmacies.

---

[35]    *See* 2014 Form 10-K, 1Q15 Form 10-Q, 2Q15 Form 10-Q, and 3Q15 Form 10-Q. Beginning with the 2015 Form 10-K, filed February 29, 2016, with the announcement that the PME program was the subject of a government investigation, Horizon began to downplay the importance of the program, dropping the "key" and referring to it as just "[p]art of our commercial strategy . . ."

251.     For instance, as alleged above, Ben Bove and Todd Smith, then a senior Horizon manager and executive officer, respectively, founded one of the pharmacies responsible for distributing drugs through the PME program—Clybourn Park.  Though Smith left shortly thereafter, Bove stayed at Horizon and, while he was a senior manager responsible for implementing the PME program, Bove actually signed the pharmacies' organizing documents and was involved in running the pharmacy when it was part of the PME pharmacy network.  As detailed herein, Bove was intimately involved with launching the Clybourn Park Pharmacy while he was employed at Horizon, including being copied on emails from a senior manager in the PME program directing Kurup to transfer certain doctors into the "Clybourn Park Pilot."  *See supra* ¶¶ 75. It is implausible that Bove and Smith, while still executives/senior managers of Horizon, would have *created a pharmacy* to sell drugs on Horizon's behalf without the Individual Defendants' approval or reckless disregard.

252.     Nor were Bove and Smith the only Horizon managers involved in starting the Clybourn Park Pharmacy.  As detailed above, Kurup told his employee that he was meeting with the COO and senior VPs of Horizon in the fall of 2014, and again, that he was having breakfast with the COO on another occasion.[36]  Former employees corroborate Horizon's involvement. The Former Clybourn Manager reported recognizing various Horizon employees at Clybourn Park, including the CFO, Paul Hoelscher.

253.     Clybourn Park also generated an outsized share of Horizon's net revenues during its operations in the Class Period.  A former Clybourn Park employee reported that Clybourn Park filled 8,000 to 10,000 prescriptions of VIMOVO, DUEXIS, and PENNSAID 2% a week in

---

[36]     Upon information and belief, Kurup was referring to Barry J. Moze whose LinkedIn profile, accessed on September 26, 2016, indicates that he was  "Executive Vice President, Chief Operating Officer" of Horizon Pharma PLC from "May 2014-Present."

late 2015 (*see supra* ¶ 79), a time when Horizon's total nationwide prescriptions for these drugs never exceeded 30,000[37]—meaning Clybourn Park could have been filling as much as a third of Horizon's total prescriptions.

254.    Halsted and Linden Care were similarly important to Horizon's PME program. Statements and documents obtained from a former Halsted employee demonstrate that Horizon management was intimately involved in the day-to-day operations of Halsted.  *See* ¶¶ 67–71. Likewise, before being discovered by Express Scripts, Linden Care dispensed 1,000 prescription a day and the Former Linden Care Employee recalled seeing Horizon employees on site.  *See* ¶ 87.

255.    Given the importance of Clybourn Park, Linden Care, and Halsted to Horizon's revenue, and the involvement of Horizon employees/managers and executives in their operations, it is implausible that the illegal and dishonest conduct that took place at Clybourn Park to sell Horizon drugs was not done with the Individual Defendants' approval or reckless disregard.

256.    Likewise, Horizon paid commission-type payments, on top of rebates, to pharmacies dispensing its drugs through the PME program.  In the case of Halstead ***alone***, for instance, these payments approximated $100 per single prescription totaling up to $100,000 ***per week***.  Payments of that magnitude would not have occurred without the knowledge and/or reckless disregard of the Individual Defendants.  Linden Care also received commission-type payments from Horizon.

---

[37]    *See* Piper Jaffrey Analyst Report, June 19, 2015; Piper Jaffrey Analyst Report July 31, 2015; Guggenheim Securities Analyst Report, October 12, 2015; and Morgan Stanley Analyst Report, December 1, 2015

257.     Similarly, the major contract that allowed Linden Care to rejoin the PME network after it was expressly terminated from the PME program could only have been approved by the Individual Defendants.  This is especially true given the fact that (i) Linden Care spent months petitioning Horizon for readmission to the network and (ii) the fact that shortly after its readmission to the program, Linden Care became an economic captive to Horizon with the vast majority of its business coming from Horizon.

258.     This level of economic control allowed Horizon to control pharmacies in the PME program.  As discussed above, the Former Linden Care Employee working in a Horizon-only division provided examples of how much sway Horizon held over Linden Care's operations, reporting that Linden Care hired 30 to 40 employees just to work on Horizon's products.  The Former Linden Care Employee recalled that supervisors directed them to put *every* prescription on auto-refill, ***per Horizon's instructions***.  Also telling was the use of these improper tactics at multiple pharmacies.  As described above, Clybourn Park, like Linden Care, improperly put patients on auto-refill.  These allegations strongly suggest central control by Horizon.

259.     This was not the only feature of the PME program that suggests coordination at the top.  Prescriptions had to be moved between pharmacies for varied reasons—for example, Clybourn Park and Linden Care were forced to transfer prescriptions when the PBMs cut ties with them for reasons related to their participation in the PME Program.  That Horizon was able to quickly move new and existing prescriptions between pharmacies is a feat of top-down commercial organization (though it may have violated applicable laws and regulations).  Not only must the old pharmacies shift prescriptions to the new pharmacy, sometimes tens of thousands at a time, Horizon sales representatives across the country must also quickly switch their doctors over to a new pharmacy.  That Horizon was able to do so quickly and on multiple

occasions strongly suggests the Defendants were aware of what was happening at their partner pharmacies.

260.    In addition, the major pharmacies in the PME program were aware of one another's operations, though they tried to hide it.  In an August 27, 2015 text message to a Halstead employee, written just as public concerns about drug companies' relationships with specialty pharmacies were beginning to crystalize, Kurup stated:  "Also please please make sure if ANY md office or patient asks about linden care the answer we say is 'we don't know of or have any knowledge of lindencare' that is what all your staff and you should be saying . . . .  All the staff need to know to say that line about lindencare please."

261.    Additionally, the undisclosed improper marketing practices employed by Horizon sales representatives could not have been implemented without the direction or sanction of the Individual Defendants.  For instance, presentations encouraging employees to form improper relationships with health care providers were broadcast at Company-wide seminars, which the Individual Defendants attended, and sales personnel who boosted sales by cultivating such relationships received official Company-wide praise while employees who failed to do so were reprimanded or terminated by Horizon.  Moreover, official sales scripts and directives instructed employees to dodge questions about pricing and to target health care providers who, almost certainly, would not prescribe Horizon's drugs for indicated uses.

262.    Indeed, Horizon *affirmatively received a subpoena* from the Department of Justice in November 2015, alerting senior management that both Horizon's control over its network of PME pharmacies and its sales and marketing practices were being investigated by the DOJ for improprieties.  At a minimum, senior management's failure to discover the undisclosed misconduct alleged herein after receiving a subpoena *explicitly targeting it* is evidence of

scienter.  Horizon and the Individual Defendants received the subpoena four months before

disclosing it and six months before the end of the Class Period.  As the Company admitted on

May 25, 2016, it had been in a "pretty steady state" with a series of information requests and the

Company providing responses to the Government.  Thus, by no later than November 2015, when

it received the subpoena from the DOJ and started responding to it, the Company knew or

recklessly disregarded the secret control Horizon exercised over the pharmacies in the captive

PME network and the improper marketing practices employed by Horizon.

### 3.   Horizon's Executive Compensation Plan Provided the Individual Defendants A Powerful Motive to Commit Fraud During the Class Period

263.    Horizon's executive compensation plan (the "EC Plan") provided the Individual

Defendants with a powerful and direct monetary incentive to commit fraud during the Class

Period.  The EC Plan provided that the Individual Defendants could dramatically increase their

total annual compensation during the Class Period (and thereafter) by driving up Horizon's share

price, revenue, and EBITDA, all metrics directly influenced by Defendants' fraud.  Indeed, as

alleged above, Individual Defendants' compensation increased ***dramatically*** during the Class

Period; from 2014 to 2015:  Walbert's compensation increased more than ***ten-fold*** (and ***more

than 49-fold*** from 2013); Hoelscher's compensation increased more than ***five-fold***; Kody's

compensation increased more than ***six-fold***; and Carey's compensation increased more than

***three-fold***.

264.    Indeed, the Individual Defendants' total compensation structure at Horizon

emphasizes incentive-based pay.  Total compensation consists of the following components:

(a) base salary; (b) annual bonuses; (c) grants under Horizon's Cash Long-Term Incentive

Program ("Cash LTIP"); (d) grants under Horizon's equity incentive compensation plan; and

(e) severance and change in control benefits.  This compensation structure (which was driven by

Horizon's equity performance *and* was heavily weighted toward equity-based awards) provided a powerful incentive to the Individual Defendants to drive Horizon's stock price up by whatever means available to them.

265.    On March 15, 2016, Horizon filed a preliminary proxy ("2016 Proxy") disclosing, among other things, lavish incentive-based payouts to the Company's executives.

266.    The 2016 Proxy makes clear that executive pay is unusually dependent on Horizon's stock price and the achievement of revenue-based performance metrics.  Indeed, the 2015 Proxy states:  "***We are not aware of another equity incentive program in which senior management has assumed as much risk for generating long-term, above market equity appreciation***[.]"

267.    The 2016 Proxy explains that executive pay was heavily influenced by Horizon's stock price.  "***The vast majority (97%+) of named executive officer compensation . . . is tied directly to the stock price performance of HZNP*** . . . , For example, approximately 99% of our Chief Executive Officer's total 2015 pay package was at risk[.].**[38]**

268.    Horizon executives were eligible for "performance share unit awards" ("PSUs") that were based directly upon the price of Horizon's shares.  The Proxy explained that, "[i]n order for PSUs to have any value at the end of the performance period, our share price needs to consistently trade above the range of $31.58 to $33.86 in the period from December 2017 through June 2018[.]"  (p. 93).  Further, "[i]n order for the maximum number of PSUs to vest, our share price needs to consistently trade above the range of $78.30 to $99.04 in the period from December 2017 through June 2018[.]"  (p. 93).

---

[38]    Notably, the 2016 Proxy acknowledges that the more senior the Horizon executive, the more influence they wield over the Company's stock price:  "Employees in more senior roles have an increasing proportion of their total pay package at risk and tied to performance *because they are in a position to have a greater influence on the Company's performance results*."

269.    In addition to its PSUs, Horizon awarded other forms of compensation to its executives that were based upon performance metrics that were directly influenced by Defendants' fraud.  The Proxy explains, for instance, that Horizon's "2015 Annual Cash Incentive Compensation" awards (cash bonuses) were driven by whether the Company achieved "total net sales of $512 million," whether it achieved "adjusted EBITDA (non-GAAP) of $216 million" and whether it added additional net revenues through the acquisition of "new product(s)." (p. 36).  Importantly, the compensation committee also considered "total shareholder return" (including stock price appreciation) in the award of cash bonuses.  (p. 40).

270.    Likewise, "total shareholder return" drove awards to executives under Horizon's "Cash Long-Term Incentive Program," Horizon's "2015 Equity Incentives" program (stock options and PSUs), and Horizon's "Performance Share Unit Awards" program (pp. 41-44).  In addition, Horizon awarded "Time-Based Equity Grants" (stock options) and "Discretionary Bonuses" among other compensation (pp. 40, 44).

271.    Each of these additional metrics was directly driven by the success of the PME program, which Horizon heavily relied on to generate revenue and grow EBITDA.  Accordingly, under this pay structure, the Individual Defendants were rewarded generously for their actions, statements and omissions during the Class Period:

(a)    All told, Defendant Walbert was awarded total compensation valued at more than $93 million for 2015, which was *more than 10 times* his compensation of $9 million for 2014, and *more than 49 times* his compensation of $1.9 million for 2013.  For 2015, Walbert was awarded (a) $859,375 in salary; (b) $67,650 bonus; (c) $47.4 million in stock options; and (d) $43.5 million in restricted shares, along with other compensation.  (p. 48).

(b)     Defendant Hoelscher was awarded total compensation valued at $18.9 million for 2015, which was *more than five times* his compensation of $3.4 million for 2014.  For 2015, Hoelscher was awarded (a) $454,375 in salary; (b) $46,750 bonus; (c) over $4 million in stock options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

(c)     Defendant Kody was awarded total compensation valued at $18.6 million for 2015, which was *more than six times* his compensation of over $2.8 million for 2014.  For 2015, Kody was awarded (a) $427,000 in salary; (b) $0 bonus; (c) over $4 million in stock options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

(d)     Defendant Carey was awarded total compensation valued at $18.9 million for 2015, which was *more than three times* his compensation of $6 million for 2014.  For 2015, Carey was awarded (a) $454,375 in salary; (b) $46,750 bonus; (c) over $4 million in stock options; and (d) $13.8 million in restricted shares, along with other compensation. (p. 48).

(e)     This compensation structure made Defendant Walbert compensation worth almost ***$100 million*** in 2015 and incentivized him and the other Horizon executives to do whatever was needed to artificially increase Horizon's stock price, despite the long term consequences to Horizon and its shareholders.

## H.     PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR EXCHANGE ACT CLAIMS

272.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Horizon common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer

or director of Horizon during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Horizon's employee retirement and benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

273.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Horizon common stock was actively traded on the NASDAQ.  As of February 29, 2016, Horizon had 159,884,455 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Horizon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

274.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

275.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

276.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:`

> (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by Horizon and the Individual Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Horizon including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices;

(c)     whether the Individual Defendants caused Horizon to issue false and misleading statements during the Class Period;

(d)     whether Horizon and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)     whether the prices of Horizon common stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

277.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## I.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE EXCHANGE ACT CLAIMS

278.    At all relevant times, the market for Horizon's common stock was efficient for the following reasons, among others:

(a)     Horizon's stock met the requirements for listing, and was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, Horizon filed periodic reports with the SEC and Nasdaq;

(c)     Horizon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of

major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Horizon was followed by numerous securities analysts including Piper Jaffray & Co., Stifel, Nicolaus & Co., Inc., JP Morgan; UBS Securities, Morgan Stanley, Guggenheim Securities, LLC, Cowen, Brean Capital, BMO Capital Markets Corp., Citigroup, Goldman Sachs & Co., Inc., Jefferies, Mizuho Securities USA, Inc. which wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

279.    As a result of the foregoing, the market for Horizon stock promptly digested current information regarding Horizon from all publicly available sources and reflected such information in Horizon's stock price. Under these circumstances, all purchasers of Horizon securities during the Class Period suffered similar injury through their purchase of Horizon securities at artificially inflated prices, and a presumption of reliance applies.

280.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Horizon and the Individual Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

**J.     THE SAFE HARBOR PROVISION IS INAPPLICABLE**

281.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the

purportedly forward-looking statements.  Alternatively, to the extent that the statutory

safe harbor is intended to apply to any forward-looking statements pled herein, Horizon and the

Individual Defendants are liable for those false and misleading forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker

knew that the particular forward-looking statement was false and misleading, and/or the forward-

looking statement was authorized and/or approved by an executive officer of Horizon who knew

that those statements were false and misleading when made.

### K.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

#### 1.   COUNT I:  *For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Horizon and the Individual Defendants*

282.   Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

283.   This Count is asserted against Horizon and the Individual Defendants and is based

upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder by the SEC.

284.   During the Class Period, Horizon and the Individual Defendants engaged in a

plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices and courses of business which operated as a fraud and

deceit upon Plaintiffs and the other members of the Class; made various untrue statements of

material facts and omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and employed

devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

285.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive

the investing public, including Plaintiffs and other Class members, as alleged herein; (ii)

artificially inflate and maintain the market price of Horizon common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Horizon common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

286.    Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the defendants made statements in quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Horizon securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Horizon's finances and business prospects, including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices.

287.    As described above, Horizon and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

288.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Horizon.  As officers and/or directors of a publicly-held company, the Individual Defendants had

a duty to disseminate timely, accurate, and truthful information with respect to Horizon's

businesses, operations, future financial condition and future prospects.

289.     As a result of the dissemination of the aforementioned false and misleading

reports, releases and public statements, the market price of Horizon common stock was

artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning

Horizon's business and financial condition which were concealed by defendants, Plaintiffs and

the other members of the Class purchased Horizon common stock at artificially inflated prices

and relied upon the price of the common stock, the integrity of the market for the securities

and/or upon statements disseminated by Horizon and the Individual Defendants, and were

damaged thereby.

290.     During the Class Period, Horizon common stock was traded on an active and

efficient market.  Plaintiffs and the other members of the Class, relying on the materially false

and misleading statements described herein, which Horizon and the Individual Defendants made,

issued or caused to be disseminated, or relying upon the integrity of the market, purchased or

otherwise acquired shares of Horizon common stock at prices artificially inflated by defendants'

wrongful conduct.

291.     Had Plaintiffs and the other members of the Class known the truth, they would

not have purchased or otherwise acquired said common stock, or would not have purchased or

otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or

acquisitions by Plaintiffs and the Class, the true value of Horizon common stock was

substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The

market price of Horizon common stock declined sharply upon public disclosure of the facts

alleged herein to the injury of Plaintiffs and Class members.

292.    By reason of the conduct alleged herein, Horizon and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

293.    As a direct and proximate result of the wrongful conduct of Horizon and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period, upon the disclosure that payor pushback was impacting Horizon's primary care drugs much more than defendants disclosed and the Company was under investigation by the DOJ.

**2.  <u>COUNT II</u>:  *For Violations of Section 20(a) of the Exchange Act Against The Individual Defendants***

294.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

295.    During the Class Period, the Individual Defendants participated in the operation and management of Horizon, and conducted and participated, directly and indirectly, in the conduct of Horizon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Horizon's finances and business prospects, including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices..

296.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Horizon's financial condition and results of operations, and to correct promptly any public statements issued by Horizon which had become materially false or misleading.

297.    Because of their positions of control and authority as senior officers of Horizon, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases, public filings, and other statements which Horizon made and disseminated in the marketplace during the Class Period concerning Horizon's results of operations.  In their capacities as senior officers of Horizon, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in, among other things, the conduct of Horizon's PME program, overseeing the Company's relationships with pharmacies in the PME network, supervising the Company's regulatory and legal compliance, ensuring the Company was fulfilling its contractual obligations to PBMs, and reviewing and approving the Company's public statements.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Horizon to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Horizon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Horizon securities.

298.    Each of the Individual Defendants, therefore, acted as a controlling person of Horizon.  By reason of their senior management positions and/or being directors of Horizon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Horizon to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Horizon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

299.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Horizon.

### III.     THE SECURITIES ACT CLAIMS

### A.     NATURE OF THE ACTION

300.     This is a federal securities class action on behalf of persons or entities who purchased the common stock of Horizon pursuant and/or traceable to the Registration Statement issued in connection with the Company's April 16, 2015 public offering of 17,652,500 shares of common stock at a price of $28.25 per share (defined herein as the "Offering") seeking to pursue remedies under §§ 11, 12(a)(2) and 15 of the Securities Act.

301.     Plaintiffs allege strict liability, negligence, and non-fraud based claims (Counts III – V) under the Securities Act. These claims are brought against those defendants who are statutorily responsible for material misstatements of facts and omissions in the Registration Statement issued in connection with the Offering. The Securities Act defendants include Horizon; the individual members of Horizon's Board of Directors who signed the Registration Statement (the "Director Defendants"); and the underwriters of the Offering ("Underwriter Defendants").

302.     Each of these defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement.

303.     Plaintiffs also assert claims under Section 12(a)(2) of the Securities Act against Horizon and the Underwriter Defendants and control person liability claims under Section 15(a) of the Securities Act against Defendant Walbert.

304.     Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made at the time of the Offering.

**B.      JURISDICTION AND VENUE FOR THE SECURITIES ACT CLAIMS**

305.    The claims asserted herein arise under Sections 11, 12, and 15 of the Securities

Act (15 U.S.C. §§ 77k, 77l(a) and 77(o)).

306.    This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331, Section 22 of the Securities Act.

307.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and

Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the Company's securities trade on

the NASDAQ, located within this Judicial District.

308.    In connection with the acts, transactions, and conduct alleged herein, defendants

directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities

exchange.

**C.      PARTIES FOR THE SECURITIES ACT CLAIMS**

**1.      Plaintiff**

309.    Court-appointed Lead Plaintiff Northern California Carpenters purchased Horizon

common stock pursuant or traceable to the Company's Registration Statement for the Offering,

and suffered damages as a result of the federal securities law violations and false and/or

misleading statements and/or material omissions alleged herein.

**2.      Defendants**

310.    Defendant Horizon Pharma plc is public limited company formed under the laws

of Ireland, with its principal executive office located at Connaught House, 1st Floor, Dublin, 4,

Ireland and its U.S. headquarters at Lake Forest, Illinois.  Horizon's common stock trades on the

NASDAQ under the ticker symbol "HZNP."

311.    Defendant Walbert has served at all relevant times as Chairman, Chief Executive Officer and President of Horizon.  Defendant Walbert signed or authorized the signing of the Registration Statement for the Offering and signed the Company's Report on Form 10-K for the quarter and year ended December 31, 2014.

312.    Defendant William F. Daniel was, at all relevant times a director of the Company. Defendant Daniel signed or authorized the signing of the Registration Statement for the Offering.

313.    Defendant Michael Grey was, at all relevant times a director of the Company. Defendant Grey signed or authorized the signing of the Registration Statement for the Offering.

314.    Defendant Jeff Himawan was, at all relevant times a director of the Company. Defendant Himawan signed or authorized the signing of the Registration Statement for the Offering.

315.    Defendant Virinder Nohria, M.D., Ph.D. was, at all relevant times a director of the Company. Defendant Nohria signed or authorized the signing of the Registration Statement for the Offering.

316.    Defendant Ronald Pauli was, at all relevant times a director of the Company. Defendant Pauli signed or authorized the signing of the Registration Statement for the Offering.

317.    Defendant Gino Santini was, at all relevant times a director of the Company. Defendant Santini signed or authorized the signing of the Registration Statement for the Offering.

318.    Defendant H. Thomas Watkins was, at all relevant times a director of the Company. Defendant Watkins signed or authorized the signing of the Registration Statement for the Offering.

319.     Defendants referred to in ¶¶ 310–318 are collectively referred to in this Complaint as the "Director Defendants."

320.     Defendant Citigroup Global Securities ("Citigroup") served as an underwriter in connection with the Offering.  Citigroup purchased 5,737,062.50 shares of Horizon common stock in the Offering.  Citigroup was paid $7,293,240.70 by Horizon for its participation in the Offering.

321.     Defendant Jefferies LLC (f/k/a Jefferies & Company, Inc.) ("Jefferies") served as an underwriter in connection with the Offering. Jefferies purchased 5,737,062.50 shares of Horizon common stock in the Offering.  Jefferies was paid $7,293,240.70 by Horizon for its participation in the Offering.

322.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter in connection with the Offering. Cowen purchased 3,089,187.50 shares of Horizon common stock in the Offering.  Cowen was paid $3,927,129.61 by Horizon for its participation in the Offering.

323.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in connection with the Offering. Morgan Stanley purchased 3,089,187.50 shares of Horizon common stock in the Offering.  Morgan Stanley was paid $3,927,129.61 by Horizon for its participation in the Offering.

324.     Defendants Citigroup, Jefferies, Cowen, and Morgan Stanley are collectively referred to hereinafter as the "Underwriter Defendants."[39]

---

[39]     The "Securities Act Defendants" includes Horizon, the Director Defendants and the Underwriter Defendants.

**D.     SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS**

**1.     The Offering**

325.     On September 19, 2014, Horizon filed a Form S-3ASR—Automatic Shelf Registration Statement—with the SEC "to register the offer and sale of an indeterminate number of the Company's ordinary shares, nominal value $0.0001 per share, as may from time to time be sold at indeterminate prices" (hereafter called the "Registration Statement"). Horizon reported that on September 19, 2014, "the last reported sale price of our ordinary shares on The NASDAQ Global Market was $12.70 [per share]."  The Director Defendants signed the Registration Statement.

326.     On April 13, 2015, Horizon filed a Preliminary Prospectus Supplement to the Registration Statement for the offering of at least 12,000,000 of its ordinary shares ("Preliminary Prospectus Supplement").

327.     On April 15, 2015, Horizon filed a Final Prospectus Supplement to the Registration Statement for the offering of at least 15,350,000 of its ordinary shares at a price to the public of $28.25 per share ("Final Prospectus Supplement").

328.     On April 21, 2015, Horizon announced the exercise in full by the underwriters of their option to purchase up to 2,302,500 additional ordinary shares—bringing the total number of shares sold in the Offering to 17,652,500 at a price of $28.25 per share. According to Horizon's press release on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million after deducting underwriting discounts and other offering expenses payable by Horizon.

329.     The Preliminary and Final Prospectus Supplements were issued pursuant to the Registration Statement (referred to as the "Offering Documents"). Pursuant to Rule 430B and Rule 430C (17 C.F.R. § 230.430B and 17 C.F.R.§ 230.430C), the information contained in the

prospectus supplements is deemed part of and included in the Registration Statement to which the Prospectus Supplements relate.

330.    Further, the Registration Statement incorporated by reference Horizon's Report on 10-Q for 3Q 2014 (filed on November 6, 2014), Report on Form 10-K for the quarter and year ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015 which contained false and misleading statements as described herein. The Company had a duty to disclose additional information called for under Items 303 and 503 of Regulation S-K [17 C.F.R. § 229.303 and 17 C.F.R. §229.503, respectively] in those filings.

331.    Horizon and the Director Defendants had a duty to update the prospectus and Registration Statement under Section 10(a)(3) of the Securities Act to reflect any fundamental changes.

332.    The Offering Documents were false and misleading as they omitted to disclose the truth about Horizon's Prescriptions-Made-Easy program and the Company's relationships with its specialty pharmacies.

## 2.    Factual Background: Horizon's Prescriptions-Made-Easy Program

333.    As discussed above, Horizon launched its PME program, later renamed HorizonCares, in order to protect the Company's exorbitantly priced drugs from generic substitution and mitigate the financial impact of key PBM's decision to exclude Horizon's leading drugs, DUEXIS and VIMOVO, from their formularies.  The PME program's primary goal was to circumvent PBMs and the plan design of health plans and sponsors by transforming so-called "partner" pharmacies into a Horizon-controlled vertical distribution system for its branded drugs.

334.    Unbeknownst to investors, however, in executing and expanding the PME program, Horizon employed a variety of improper operational, sales, and marketing practices to

artificially boost net sales of Horizon's primary care drugs.  These practices seriously undermined the sustainability of Horizon's business model.

### (a)      Horizon's Controlled Pharmacies

335.    Horizon relied on a small group of pharmacies over which it exercised secret operational control to distribute the Company's drugs through the PME program.  These captive pharmacies included:

### (i)      Halsted Pharmacy

336.    Based in Chicago, like Horizon's U.S. headquarters, Halsted Pharmacy had participated in the pilot of the PME program and continued to participate in the PME program as it rapidly expanded in late 2014 and early 2015.  Statements by a former Halsted employee and documents obtained through Plaintiffs' investigation describe how Horizon employees worked closely with Halsted Pharmacy to boost prescriptions in the PME program, and, when the time came, to transfer prescriptions to a new, Horizon-only pharmacy.  Documents provided by a former Clinical Pharmacist who worked at Halsted from August 2014 through late March 2015 ("Former Halsted Pharmacist")[40] show Horizon's control over Halsted.  For example, a text message that one of Halsted's owners, Renny Kurup, sent to the Former Halsted Pharmacist on August 26, 2014 details Kurup making clear that as a result of their poor Horizon prescription numbers, Horizon was sending Lori Sampson, Horizon's Associate Director, Pharmacy Operations, ("Horizon's Associate Director") to manage the situation.  Specifically, Kurup writes in that text message that they needed "***ppl to type and call. For duexis. Lori, called me yesterday and she's coming today. Our numbers where [sic] that bad yesterday***".  He goes on to inform

---

[40]    The Former Halsted Pharmacist oversaw compounding services at Halsted Pharmacy. From a review of documents obtained from the Former Halsted Pharmacist during the course of Plaintiffs' investigation, it is clear that the Former Halsted Pharmacist has personal knowledge of the PME program at Halsted, its dispensing of Horizon drugs, and the illegal manner in which Halsted operated.

the Former Halsted Pharmacist that although he knows she has compounding duties to attend to

that she needed to "give mail order a lil attn. today." The next day the texts continue with Kurup

writing that "because of yesterday's visit *Lori is going to be coming in every day for awhile*

*[sic] to help organize*."  Internal Halsted emails further confirm that Horizon closely monitored

Halsted's participation in the PME program.  For example, Horizon's Associate Director, Lori

Sampson, exchanged no fewer than 104 emails with Kurup in the fall of 2014 and spring of 2015

and was sent "weekly official reports" from Halsted.[41]

337.     Additional documents obtained from the Former Halsted Pharmacist show that

Sampson was not the only Horizon director making sure Halsted was delivering on Horizon drug

sales.  Text messages exchanged on September 14, 2014 and November 7, 2014, also show that

Kurup met with the "COO and exec vps of Horizon" on or around September 15, 2014 and again

had breakfast with the "COO of Horizon" on or around November 7, 2014.[42]  The Former

Halsted Pharmacist also recalled that Kurup was a close companion to Ben Bove.  Bove was

Horizon's then-Senior Vice President, Commercial Strategy and Prescriptions Made Easy. In an

email communication dated October 24, 2014, Kurup refers to Bove as "the boss of all bosses for

PME" before detailing that he will be meeting with Bove later that day. The Former Halsted

Pharmacist added that Bove would occasionally be physically present at Halsted, but that more

often other Horizon representatives would be on site.  This physical oversight and involvement

by Horizon at every level in Halsted's day to day operations and drug sales demonstrates the

---

[41]     These reports were sent twice weekly to Horizon, on Monday and Thursday, according to
a text message sent January 29, 2015 from Kurup to the Former Halsted Pharmacist.

[42]     On information and belief, Kurup is referring to Barry Moze as COO.  Moze's LinkedIn
profile (accessed September 26, 2016) lists him as the Chief Operating Officer of Horizon from
May 2014 to the Present.  Further bolstering this belief is the Former Clybourn Manager, who
also recognized Barry Moze, the COO of Horizon, reporting that he visited Clybourn Park three
times.

misleading nature of Horizon's statements and that its relationship with its PBM pharmacies was not "arm's length," "conservative," or "standard."

338.    Horizon also wielded enormous economic control over Halsted, which included improper commission-type payments made to Halsted for each Horizon prescription filled.  The Former Halsted Pharmacist added that Halsted was processing approximately 1,000 Horizon prescriptions per week.  This is corroborated by a text message sent from Kurup to the Former Halstead Pharmacist on August 16, 2014 wherein Kurup writes "***I filled the first duexis script myself with the CCO of Horizon April/May of last year. Never really dreamed it would become 1181rx a week in a year***."[43]  The Former Halsted Pharmacist advised that Halsted was earning about $100.00 per Horizon prescription and thought that this represented the majority of Halstead's revenue generated during the Former Halsted Pharmacist's tenure.  The result was that Halsted was likely being paid at least $100,000 a week by Horizon to distribute its drugs. That sort of financial compensation is unheard of in a traditional pharmacy model, creates incentives to do anything to keep sales up or risk losing Horizon's business and related commission like compensation.[44]

339.    Though Halsted worked closely with Horizon to further the PME program, it still had non-Horizon clients.  When Horizon announced to the market in 2014 that it was drastically expanding the PME, Horizon apparently realized that they needed a pharmacy that was completely dedicated to it.  So it created its own.  In response, documents obtained by Plaintiffs show that in September of 2014, Kurup worked with Horizon executives and top management in

---

[43]    In April/May of 2013 the EVP and CCO of Horizon was Todd Smith, later to become Kurup's partner at Clybourn Park.

[44]    A traditional pharmacy model usually involves a very small profit margin on each brand drug dispensed (since its reimbursed cost from the PBM and insurer is only a bit higher, if higher at all) than the pharmacy's acquisition cost), and the pharmacy being only paid a very small "dispensing fee" for its labor cost of dispensing the drug (approximately $0.95–$1.50 per script).

the PME program to create a new pharmacy—Clybourn Park—solely to serve the needs of the PME program by dispensing DUEXIS, VIMOVO, and other Horizon drugs.

### (ii)   Clybourn Park Pharmacy

340.   As Horizon expanded the PME, it sought to create its own pharmacy that would be wholly and exclusively dedicated to dispensing DUEXIS, VIMOVO, and other Horizon drugs.  Documents obtained by Plaintiffs show that in September of 2014, Kurup worked with Horizon executives and top PME management to create Clybourn Park Pharmacy LLC.

341.   Corporate registration documents reveal that Clybourn Park was created by senior Horizon executives—as of September 19, 2014, Todd Smith, Ben Bove, and Renny Kurup were the pharmacy's only Officers.[45]  ***Todd Smith was Executive Vice President and Chief Commercial Officer at Horizon when Clybourn Park was incorporated***.  In his Horizon role, Smith was responsible as an executive for the company's commercial organization, business development and investor relations.[46]  Bove was also at that time ***employed by Horizon as a Senior Vice President, Commercial Strategy and Prescription Made Easy Program***.[47]  In this position, Bove helped oversee all aspects of the PME program.  Emails and text messages

---

[45]   State of Illinois Corporation Report for Clybourn Park Pharmacy LLC (accessed on July 25, 2016), detailed under "Officers and Directors" that Smith, Bove, and Kurup were Clybourn Park's only three officers as of 9/19/14 and that "Clybourn Park Pharmacy LLC" was incorporated as of September 18, 2014.  Other corporate documents, indicate that prior to Clybourn Park's incorporation, if was known as "Sheffield Specialty Pharmacy LLC," until September 16, 2014 when Ben Bove signed a Certificate of Amendment of Certificate of Formation for Sheffield Specialty Pharmacy LLC, to change its name to Clybourn Park Pharmacy LLC.

[46]   *See* http://www.iirusa.com/pharmastrategic/2014-speakers.xml?speakerId=419 (accessed September 28, 2016).

[47]   In his capacity as a Horizon SVP Senior Vice President, Commercial Strategy and Prescriptions Made Easy, Bove also participated on the November 6, 2014 conference call with investors to discuss Horizon's Q3 2014 financial results.  Though that call included extensive discussions of the PME program, neither Bove nor any of the other managers on the call informed investors that Bove and Smith had founded a pharmacy to dispense Horizon products.

obtained in Lead Plaintiffs' investigation make clear that Clybourn Park was developed by Horizon to distribute Horizon drugs.  These documents further show that Bove was communicating with Halsted on his Horizon email, or was copied on Horizon/Halsted emails, as to drug coverage issues and the Clybourn Park Pilot program, through at least February 2015. ***Thus, far from having a "non-exclusive," "conservative," or "arm's length" relationship with its so called "specialty pharmacies, Horizon was instead funneling prescriptions to a pharmacy legally controlled, at times, by both a Horizon executive officer and a member of Horizon's senior management responsible for the PME program.***

342.    An internal Halsted email obtained from the Former Halsted Pharmacist dated November 4, 2014 details that Kurup referred to Clybourn Park as a "new state of the art pharmacy ***to be able to handle the PME program to perfection***." To the Former Halsted Pharmacist's knowledge, Clybourn Park worked exclusively as a mail-order pharmacy for Horizon products when it opened.  This is corroborated by a Former Clybourn Park Pharmacy Technician ("Former Clybourn Technician") who reported that Clybourn Park only kept Horizon's primary care drugs in stock, and if a patient came in with a prescription for any other drug—a rare occurrence—Clybourn Park had to special order the medicine for them.[48] This demonstrates the falsity of Defendant Walbert's statement on November 6, 2015 that, "[t]hese pharmacies are ***non-exclusive*** and ***also fulfill prescriptions for many other drug manufacturers***."

343.    Horizon executives also exercised control over Clybourn Park in other ways, including helping to manage Clybourn Park's operations by providing the pharmacy with a roster

---

[48]    The Former Clybourn Technician was employed by Clybourn Park from August 2015 to February 2016 as a former Pharmacy Technician at Clybourn Park, whose responsibilities included contacting patients and processing prescriptions and insurance claims.

of doctors whose prescriptions should be funneled through the pharmacy.  For example, on February 26 and 27, 2015, Horizon's Associate Director, Lori Sampson emailed Clybourn Park and Halsted employees, copying Bove, with a list of doctors Horizon was directing the pharmacy to enroll in *an ostensibly pharmacy-run* pilot program for Horizon drugs.  Then in a March 10, 2015 text message to the Former Halsted Pharmacist, Renny Kurup detailed how Horizon Associate Director "Lori [Sampson] is gonna add more illinois docs today . . . .  Illinois docs to go to ClyPark I meant."

344.    Moreover, Horizon prescriptions were transferred seamlessly between captive pharmacies Clybourn Park and Halsted, evincing Horizon's control over both.  A lawsuit filed by an investor in Halsted makes clear that Horizon, through Kurup, transferred 23,000 prescriptions from Halsted to Clybourn Park without either patient authorization or payment to Halsted.  The seamless transfer of thousands of prescriptions from one pharmacy to another demonstrates that both Halsted and Clyborn Park were nothing more than instrumentalities of Horizon.  *See* Complaint, *Halsted v. Renny Kurup*, 2015CH18353 (Ill. Cir. Ct., Cook Cty, Chancery Div., Dec. 18, 2015) (the "Halsted Complaint").[49]

345.    The transfer of Horizon prescriptions from Halsted to Clybourn Park took place with the consent and knowledge of Horizon, whose current and former executive and senior manager ran the new pharmacy, and whose employees also directed Clybourn as to what doctors to include in the Clybourn Park Pilot program (*see* ¶ 67).

---

[49]    Internal Halsted documents confirm that drugs transferred to Clybourn Park were *Horizon* drugs.  For example, one Halsted email exchanged between Kurup and the Former Halsted Pharmacist on September 29, 2014 details how Kurup instituted a pharmacist "mail order" bonus in order to incentivize pharmacists to increase "production" levels and ship out more Horizon product at Halsted, so that eventually there would be more *Horizon* prescriptions to transfer to Clybourn Park.

346.    Horizon employees, including high ranking executives, were also regularly on site at Clybourn Park.  A former manager at Clybourn Park from March 2015 through February 2016 ("Former Clybourn Manager")[50] recognized several Horizon employees as having visited Clybourn Park throughout the Class Period.  For example, *the Former Clybourn Manager recognized Defendant Paul Hoelscher, Horizon's CFO, stating that he visited Clybourn Park in December 2015, after it moved to a larger facility*.  *The Former Clybourn Manager also recognized Barry Moze, the COO of Horizon, reporting that he visited Clybourn Park three times*.  According to the Former Clybourn Manager, Horizon's Associate Director, Lori Sampson, attended the regular meetings with Clybourn Park management and the Northeast Regional Account Manager for the PME Program, Russell Wilson, also visited often.

347.    These Horizon visits made sense because not only was Clybourn Park a dedicated arm of the PME program, it processed even more Horizon prescriptions than Halsted, making it even more crucial to the Company's scheme to keep prescription volume up.   In contrast to Halsted processing approximately 1,000 prescriptions weekly (¶ 70), Clybourn Park was filling approximately *900 to 1,000 prescriptions* of Horizon prescriptions *every day in May 2015*, according to the Former Clybourn Manager.  The Former Clybourn Manager added that that number climbed to *1,200 a day in September*, and then to between *8,000 and 10,000 prescriptions a week* in November 2015.  The Former Clybourn Manager recalled Clybourn Park's manager, Matt Cunningham, telling employees in November that Clybourn Park was dispensing more Horizon prescriptions than any other pharmacy.

---

[50]    The Former Clybourn Manager was manager of the filling team, with responsibilities that included overseeing  the filling of prescriptions and customer relations at Clybourn Park.

348.    According to analyst reports, Horizon's total weekly prescriptions for those three drugs were never more than 30,000 in 2015.[51] ***That means that, at times, Clybourn Park could have been processing between 25% and 33% of all Horizon's prescriptions of those drugs***.

349.    Despite Horizon's efforts to conceal its misconduct, the PBMs eventually discovered Clybourn Park's connection to the PME program.  For example, according to Former Clybourn Manager, in the spring of 2016, Express Scripts terminated its contract with Clybourn Park.  The Former Clybourn Manager recalled that prescriptions subsequently dropped to as few as 20 a day.  According to the Former Clybourn Manager, Horizon's prescriptions, along with many of Clybourn Park's employees, were shifted to other area pharmacies, including Lombard Pharmacy and Mall Pharmacy.

### (iii)    Linden Care Pharmacy

350.    Around the time that Horizon executives opened their own pharmacy in Chicago in late 2014, Horizon made a power play to exert more control over another pharmacy that had been an early participant in the PME program.  Based in New York, Linden Care had been one of the four specialty pharmacies that the Company used in 2014 to test the PME program.  In late 2014, Horizon kicked Linden Care out of the PME program.  When Linden Care was allowed back, in early 2015, it created a Horizon-only department, with at least 40 to 50 employees processing prescriptions for Horizon's primary care drugs.

351.    According to a former Horizon Territory Manager in the Northeast Region ("Former Horizon Territory Manager, Northeast") whose tenure stretched from the middle of 2014 to the middle of 2015, there were a lot of problems processing prescriptions through Linden

---

[51]    *See* Piper Jaffrey Analyst Report, June 19, 2015; Piper Jaffrey Analyst Report July 31, 2015; Guggenheim Securities Analyst Report, October 12, 2015; and Morgan Stanley Analyst Report, December 1, 2015.

Care, including Linden Care failing to fulfill prescriptions.[52]  Indeed, another former Horizon Territory Manager, whose territory included Houston, Texas ("Former Horizon Territory Manager, Texas") corroborated that starting in mid-2014, Horizon sales representatives were instructed to stop using Linden Care and to switch instead to filling their PME prescriptions through other specialty pharmacies.[53]  In fact, according to the Former Horizon Territory Manager, Texas, Horizon dropped Linden Care because they were having trouble keeping up with their Horizon business and they were not able to process a lot of prescriptions.

352.    Linden Care's Horizon business had been extremely profitable, as the pharmacy received commission-type payments above and beyond the profits pharmacies normally collect. According to the Former Horizon Territory Manager, Northeast, Horizon would sell its drugs at a discount to their specialty pharmacies (cheaper then what they sold them to McKesson, for instance).  In addition, according to the Former Horizon Territory Manager, Northeast, for every prescription that Linden Care got through insurance, they received a certain dollar amount. The Former Horizon Territory Manager, Northeast explained that specialty pharmacies in the PME network were benefiting from incentives from Horizon as well as back rebates.

353.    The loss of Horizon business was felt at Linden Care. It fought to be hired back, which Horizon permitted in or around early 2015, according to Former Horizon Territory Manager, Texas.  The Former Horizon Territory Manager, Texas added that Linden Care only became a partner pharmacy to Horizon again after it did everything in its power to come back.

---

[52]    Former Horizon Territory Manager, Northeast was previously referred to as FE-2 in the Consolidated Class Action Complaint (ECF No. 77).

[53]    Former Horizon Territory Manager, Texas worked as a Territory Manager at Horizon from February 2012 through February 2015.  Former Horizon Territory Manager, Texas was previously referred to as FE-1 in the Consolidated Class Action Complaint (ECF No. 77).

At some point thereafter, **59% of Linden Care's business stemmed from dispensing Horizon drugs**, as disclosed in November 2015.[54]

354.    The experience of a former Linden Care employee demonstrates the outsized influence Horizon was able to exert when Linden Care was allowed back into the PME program in 2015.  According to a former Customer Service Representative in the Horizon-only department at Linden Care ("Former Linden Care Employee"),[55] the Horizon department only had around a dozen employees in February of 2015.  The Former Linden Care Employee added that between February and October 2015 **Linden Care hired at least an additional 40 to 50 employees to work exclusively** on filling prescriptions for Duexis, Vimovo, and Pennsaid 2%.[56]  At its height, **Linden Care was filling over 1,000 Horizon scripts per day**, according to the Former Linden Care Employee.  And, similar to the employees at other pharmacies, the Former Linden Care Employee recalled seeing Horizon employees on site.

### (b)   Improper Practices by Horizon's Controlled Pharmacies

355.    To accomplish Horizon's goal of maximizing prescription volume and boosting net sales, Horizon and its controlled pharmacies relied on improper, dishonest, and illegal conduct in violation of various laws, regulations, and PBM contractual terms.

### (i)   Systematically Refilling Patient Prescriptions Without Their Consent

356.    To ensure that prescription levels remained high, Horizon directed its controlled pharmacies to automatically ship prescription refills to patients without obtaining their prior

---

[54]     *See* Andrew Pollack, *Express Scripts Cuts Ties to New York Specialty Pharmacy*, N.Y. TIMES (Nov. 10, 2015).

[55] The Former Linden Care Employee worked at Linden Care from February 9, 2015 through January 15, 2016, with responsibilities that included reaching out to patients and processing insurance claims and prescription vouchers.

[56]     At some point, Rayos was added, according to the former Linden Care employee.

approval.  The Former Linden Care Employee recalled that managers at Linden Care told the employees at one point that—***per Horizon's instructions***—all prescriptions should be put on auto-refill.[57]  Likewise, the Former Clybourn Manager advised that the majority of Horizon prescriptions processed by Clybourn Park were being filled by auto-refill—that is, at the end of each month, Clybourn Park employees were instructed to refill the patients' prescription and ship the drug to them, without first contacting the patient.  Horizon's directive to place patients on auto-refill, and the use of the scheme at two high prescribing pharmacies of Horizon, provides strong evidence that Horizon implemented this practice at its other captive pharmacies and that Horizon knew of it and fully intended it.

357.    Such conduct  put the Company at grave risk of liability to the third party payers and PBMs, that paid claims based upon the implicit representation that the patient had requested the refill.  Making such misrepresentations likely violated pharmacy regulations and state laws.  For instance, a pharmacy or drug manufacturer that uses "deceit and misrepresentation" is subject to disciplinary action by various state boards of pharmacy.[58]  A state board may deny, refuse, revoke, or suspend the registration of a drug manufacturer, not renew its registration, or order it to cease and desist from violations.  Similarly, most states have laws banning deceptive practices in business, and consumer protection laws, that could apply.[59]

---

[57]    The Former Linden Care Employee added that initially they were instructed to only put the $0 co-pay patients on auto-refill but then they were told to do the $10 co-pay patients. The Former Linden Care Employee recalled being uncomfortable with charging patient's credit cards without their authorization.

[58]    For example, in Illinois, where Horizon was headquartered and where these three Horizon-controlled pharmacies were located, such actions may be considered "Unprofessional or Unethical Conduct" under 68 Ill. Adm. Code 1330.30(f), as "[s]ubmitting fraudulent billing or reports to a third party payer or claiming a fee for a  service that is not performed or earned")

[59]    For example, the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits companies such as Horizon from employing "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of

### (ii)      Filling Prescriptions Without State Licenses

358.    Horizon also used its controlled pharmacies to fill prescriptions and obtain

reimbursements in states where these pharmacies were not licensed.  For example, the Halsted

Complaint details how Halsted shipped drugs into states it did not have a license, including

Arkansas and Texas.  This practice was also described in a December 10, 2014 email from

Former Halsted Pharmacist to Kurup, including allegations that drugs were improperly mailed

into Kentucky.

359.    Such conduct violated the pharmacy regulations in those states, such as AR Code

§ 17-92-402 (Arkansas), KRS 315.0351 & 0320 (Kentucky), and Tex. Oc. Code § 558.001

(Texas).  Additionally, this conduct threatened Horizon's ability to operate in those states; if the

pharmacies were found out, they would have to stop shipping into those states, and Horizon

would have to transfer those prescriptions to another pharmacy.

### (iii)      Misrepresenting Drug Cost

360.    According to the Former Clybourn Technician, whose responsibilities (as

discussed above at ¶ 342) included contacting patients and processing insurance claims,

Clybourn Park employees were instructed not to tell patients the price of the drugs or what their

insurance company was being billed; patients were only supposed to know their individual co-

pay cost, after the coupon.  As a result of this practice, Horizon provided misleading information

to patients and patients with high insurance deductibles were likely charged for the medicine.

---

any deception, fraud, false pretense, false promise, misrepresentation or the concealment,
suppression or omission of any material fact, with intent that others rely upon the concealment,
suppression or omission of such material fact . . . in the conduct of trade or commerce . . .
whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.
The Illinois CFA can be enforced by the attorney general or via a private right of action.
Similarly, the New York General Business Law  ("NY GBL") makes unlawful "[d]eceptive acts
or practices in the conduct of any  business, trade or commerce." N.Y. Gen. Bus. Law § 349.
The NY GBL is also enforceable by both the state attorney general and via a private right of
action.

This was a practice that was also employed directly at Horizon, whose sales representatives were instructed to avoid disclosing the full cost of DUEXIS and VIMOVO to doctors when pitching the drug and instead to emphasize the patient's low out-of-pocket cost. *See* ¶ 366.

361.    Such conduct harms both patients and, if it convinced them to accept refills or charges to their insurer, harms third party payors as well, triggering some of the same statutory and regulatory protections as Horizon's auto-refill policy. *See* ¶ 357.

### (iv)    Conduct Aimed at Evading PBM Detection

362.    Clybourn Park went to great lengths to conceal its relationship with Horizon and its integral role in the PME program both from the PBM auditors, who routinely inspect pharmacies for compliance with contract provisions, and the state auditors, who verify that pharmacies meet regulations.  The Former Clybourn Manager explained that employees would be given the day off when audits were scheduled so that the auditors could not ask them any questions.  On one occasion, the Former Clybourn Manager said that other managers removed the computers from the office, ostensibly for cleaning, then sent the employees to a bowling alley for a party.  The Former Clybourn Manager subsequently learned that an audit had been scheduled for that day.

363.    In another attempt to hide the relationship between Clybourn Park and Horizon, the Former Clybourn Manager said that before an audit, the managers stayed up all night to ship out all Horizon orders, then hid the remaining Horizon drugs.

364.    The former employees described other attempts by Clybourn Park's management to avoid detection:  On one occasion, the Former Clybourn Technician recalled a top manager hid from an auditor in a closet for hours. On another, The Former Clybourn Manager recalled management hiding Horizon drugs in black garbage bags and then buying non-Horizon drugs to make Clybourn Park look like an ordinary pharmacy.

365.    This conduct runs afoul of PBM contractual obligations and exposed Horizon and its controlled pharmacies to the risk of increased scrutiny and exclusion if caught.

### (c)    Horizon Directs its Sales Staff to Use Improper Sales Tactics

366.    In direct contravention of the Company's Code of Business Conduct and Ethics, Horizon encouraged and incentivized its sales representatives to develop collusive relationships with doctors who could then be relied upon to continue to write these high priced prescriptions to be processed through the PME program.

367.    Specifically, Horizon's Code of Business Conduct and Ethics, which reflects the Company's "practices and principles" to which "every employee . . . must . . . abide," provides, in pertinent part, that "[e]mployees must not offer or provide any gifts or entertainment to any healthcare professional" because such gifts may lead to "improper advantage." Rather than enforce this clear directive, Horizon executives instituted a culture where sales were pushed regardless of the method. Horizon promoted those sales representatives who had formed close knit relationships with doctors that resulted in higher Horizon prescriptions being filled—and bestowed bonuses and praise on them.

368.    For example, Former Horizon Territory Manager, Texas recalled that at Horizon's 2014 National Sales Meeting in Las Vegas Nevada—attended by Horizon's senior management, including Defendant Walbert—a surgeon from Las Vegas, Dr. Randall Yee, was asked to speak along with his Horizon sales representative. According to Former Horizon Territory Manager, Texas, at the National Sales Meeting it was announced that the Horizon sales representative was making over $600,000 a year, which could be attributed to his relationship with Dr. Yee, which included spending weekends hunting together. Former Horizon Territory Manager, Texas interpreted the presentation as intended to motivate sales representatives to cultivate similar relationships with their doctors.

369.     In addition to cultivating conflict-ridden relationships with doctors, Horizon sales representatives were instructed to mislead doctors about the price of the drugs.  When doctors would ask the cash price of DUEXIS or VIMOVO, according the Former Horizon Territory Manager, Texas, the sales representatives were told to avoid such questions and instead talk about the benefits of the program to the patients.  The Former Horizon Territory Manager, Texas added that they were to tell doctors that there would be a minimal copay to the patient if the prescription went through a specialty pharmacy.  According to the Former Horizon Territory Manager, Northeast, when some doctors did find out the price of these drugs was $1,500, they essentially told the sales representatives to get out and that they would not have insurance pay that amount for Advil and Pepcid.

370.     In order to maximize prescription volume, Horizon instructed its sales force to market their primary care drugs to doctors who would prescribe the drugs for off label use. According to the Former Horizon Territory Manager, Texas, sales representatives were given a call plan and a territory with roughly about 150 doctors listed on each plan.  The Former Horizon Territory Manager, Texas explained that the majority of the doctors that they were marketing to were orthopedic surgeons who deal with patients that have "acute" pain related to their surgeries, rather than DUEXIS' indicated use. Former Horizon Territory Manager, Texas added that Horizon instructed their sales representatives to market DUEXIS to patients outside the FDA indications for which it was intended—OA and RA.  Former Horizon Territory Manager, Texas could not understand why they were marketing to surgeons when the products were supposed to be for long-term treatment not short-term acute pain.  Former Horizon Territory Manager, Texas reiterated that despite the medication being intended for OA and RA, the majority of the medical providers they were marketing to were Orthopedic Surgeons and Podiatrists.

371.     Similarly, Former Horizon Territory Manager, Northeast also indicated that Horizon was marketing their drugs off-label.  Indeed, he believed based on conversations with other territory managers, that the bulk of prescriptions brought in by NY sales representatives were being written under worker's compensation guidelines for *off label usage*.

372.     These facts about Horizon's true business practices were omitted from the Offering Documents.

### 3.       The False and Misleading Offering Documents

373.     Among other things, the Final Prospectus Supplement represented the following:

> *Another key part of our primary care commercial strategy is to encourage physicians to have their patients fill prescriptions through our Prescriptions-Made-Easy, or PME, specialty pharmacy program*, which enables uninsured or commercially insured patients to have enhanced access to our products by providing financial assistance to reduce eligible patients' out of pocket costs for prescriptions filled via a PME-participating mail order pharmacy. Through PME, prescriptions for our products are filled by designated mail order specialty pharmacies, with the products shipped directly to the patient. Because our products when dispensed through the PME program do not require involvement of a traditional retail pharmacy, prescriptions filled through our PME program are less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand. *We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and pharmacy benefit managers, or PBMs, to use less expensive generic or over the counter brands instead of branded products increases. We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs.*

374.     The Final Prospectus Supplement also stated that:

> *Weekly prescriptions of our primary care products grew significantly during the first quarter of 2015.* Despite being placed on certain formulary exclusion lists beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS weekly prescriptions rose 42% and VIMOVO weekly prescriptions rose 26%. Compared to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID 2%, during the first 12 weeks of 2015, weekly prescriptions grew each week, representing a 353% increase during the period.  *We also continued to increase PME activation for our primary care products in the first quarter of 201*5, with the percentage of

prescriptions filled through PME rising to 58%, 44% and 56% for DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended March 27, 2015.

375.    Further, the Company warned in the Final Prospectus Supplement:

(a)    that "***the PME program may implicate certain state laws*** related to, among other things, unlawful interference with schemes to defraud, excessive fees for services, tortious interference with patient contracts and statutory or common law fraud. To the extent the PME program is found to be inconsistent with applicable laws, we may be required to restructure or discontinue such program, or be subject to other significant penalties;" and

(b)    that "***[w]e may also experience pressure from payors concerning certain promotional approaches that we may implement such as PME program or any other co-pay programs whereby we assist qualified patients with certain out-of-pocket expenditures for our product.*** In addition, pharmaceutical manufacturer co-pay initiatives are the subject of evolving interpretations of applicable regulatory requirements, and any change in the regulatory or enforcement environment regarding such programs could impact our ability to offer such programs. If we are unsuccessful with our PME program or any other co-pay initiatives, we would be at a competitive disadvantage in terms of pricing versus preferred branded and generic competitors, or be subject to significant penalties."

376.    The warnings in the Final Prospectus Supplement stating that Horizon may experience "pressure from payors concerning . . . programs whereby we assist qualified patients with certain out-of-pocket expenditures" and that the "PME program ***may*** implicate certain state laws," and the statements regarding the PME program's role in Horizon's commercial model failed to disclose that the PME program went beyond assisting patients with "certain out-of-pocket expenditure" and clearly implicated many state laws, specifically that:

138

(a)     Horizon exercised operational and/or financial control over a small network of its PME specialty pharmacies by, among other things, stationing personnel at its controlled pharmacies to direct and monitor the pharmacies' operations (including at Halsted and Clybourn); wielding enormous economic influence over the pharmacies (including Halsted, Clybourn, and Linden Care) through unconventional and exorbitant payment structures (allowing Halsted, for instance, to earn approximately $100 per Horizon prescription, dwarfing the typical margin earned by dispensing pharmacies in typical arms-length relationships) and/or by comprising a substantial portion of these controlled pharmacies sales (for instance, almost *60%* of Linden Care's business involved dispensing Horizon drugs); and even creating and running a pharmacy, Clybourn Park, that was created by then-Horizon executives and managers to be devoted to the distribution of Horizon drugs; such that these pharmacies were nothing more than a vehicle for Horizon to improperly push its high priced drugs on patients, exposing the Company to increased business and regulatory risks, such as the risk of violating state law, contracts with PBMs and payors, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and

(b)     Horizon's PME program relied on illegal sales and marketing tactics, both internally and at its controlled pharmacies, including promoting improper personal and financial relationships between Horizon sales representatives and doctors; instructing employees to hide pricing information from doctors; ordering prescriptions to be automatically refilled without patient authorization; making commission-type incentive payments to personnel at the Company's captive pharmacies when they filled Horizon prescriptions; shipping drugs to states in which the pharmacy in question, e.g., Halsted, was not licensed; concealing material

139

information from PBM auditors (including concealing Horizon drugs and prescriptions from auditors in order to mask the exclusive or near exclusive nature of the relationship between Horizon and its controlled pharmacies); making false statements to patients, including statements that their insurance would not be billed for drugs dispensed to them; and marketing drugs to doctors who would almost certainly not prescribe the drugs for indicated uses; in violation of state laws (as discussed above) and the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies, including the DOJ.

377.   In addition to the above representations, the Final Prospectus Supplement incorporated by reference certain documents and advised that potential investors "should read this prospectus supplement and the accompanying prospectus, including the information incorporated by reference, and any free writing prospectus that we have authorized for use in connection with this offering in their entirety before making an investment decision."

378.   The Final Prospectus Supplement incorporated by reference Horizon's 2014 Form 10-K, in which Defendants discussed the Company's PME program:

(a)     "***In December 2014, we began execution of a comprehensive plan creating a new organization focused on the acceleration of our PME program to ensure continued growth of our NSAID portfolio in 2015***;"

(b)     "We believe the continued expansion of our PME program will allow us to largely mitigate the potential impact of our products being placed on the exclusion lists implemented by PBMs;" and

(c)    "*We expect that continued adoption of our PME program by physicians will be important to our ability to gain market share for our products as pressure from healthcare payors and PBM*s, to use less expensive generic or over the counter brands instead of branded products increases."

379.    The Final Prospectus Supplement also incorporated by reference Horizon's Form 8-K dated April 13, 2015, which stated:

> *Weekly prescriptions of our primary care products grew significantly* during the first quarter of 2015. *Despite being placed on certain formulary exclusion lists* beginning on January 1, 2015, during the first 12 weeks of 2015, DUEXIS ® ibuprofen/famotidine) weekly prescriptions rose 42% and VIMOVO ® (naproxen/esomeprazole magnesium) weekly prescriptions rose 26%.  Compared to the first 12 weeks of 2014, DUEXIS weekly prescriptions rose 55% and VIMOVO weekly prescriptions rose 9%. With respect to PENNSAID ® (diclofenac sodium topical solution) 2% w/w, during the first 12 weeks of 2015, weekly prescriptions grew each week, representing a 353% increase during the period. *We also continued to increase Prescriptions-Made-Easy ("PME") activation for our primary care products in the first quarter of 2015, with the percentage of prescriptions filled through PME rising to 58%, 44% and 56% for DUEXIS, VIMOVO and PENNSAID 2%, respectively, for the week ended March 27, 2015.*

380.    The 2014 Form 10-K and Form 8-K dated April 13, 2015 failed to disclose that Horizon's expansion of the PME program entailed the use of a small network of captive pharmacies and illegal and improper sales and marketing practices as described in ¶ 376(a)-376(b), above:

381.    The Company warned in the Final Prospectus Supplement:

> *We are exposed to the risk that our employees*, independent contractors, principal investigators, consultants, vendors, distributors and CROs *may engage in fraudulent or other illegal activity*.
>
> *       *       *
>
> *We have adopted a Code of Business Conduct and Ethic*s, but it is not always possible to identify and deter misconduct by our employees and other third parties, *and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in*

*protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations*.

382.    Statements in the Offering Documents warning that Horizon employees "may engage in fraudulent or other illegal activity" despite the Company's adoption of a "Code of Business Conduct and Ethics" and the "precautions [Horizon has] taken to detect and prevent this activity" failed to disclose that the expansion of the PME program relied on illegal and improper sales and marketing tactics as described in ¶¶ 366–372, above..

383.    The Final Prospectus Supplement also warned that the "advertising, promotion, export, marketing and distribution and other possible activities relating to our products and our product candidates are, and will be, subject to extensive regulation by the FDA and other regulatory agencies. *Failure to comply with FDA and other applicable regulatory requirements may, either before or after product approval, subject us to administrative or judicially imposed sanctions*."

384.    Statements warning that "Failure to comply with" applicable regulations "may . . . subject us to administrative or judicially imposed sanctions," failed to disclose that the expansion of the PME program relied on illegal and improper sales and marketing tactics as described in ¶¶ 366–372, above.

385.    The statements in the Final Prospectus Supplement regarding the PME program failed to disclose that Horizon's expansion of the PME program entailed the use of a small network of captive pharmacies and illegal and improper sales and marketing practices as described in ¶ 376(a)–(b), above.

386.    The omitted information was required to be disclosed in the Form S-3 pursuant to Item 11 of the instructions to Form S-3, which requires the registrant to "[d]escribe any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal

year . . . and which have not been described in a report on Form 10-Q [or] Form 8-K."
Moreover, pursuant to SEC Regulation C, registrants have an overarching duty to disclose
material information necessary to ensure that representations in a registration statement are not
misleading. Specifically, Rule 408 states "In addition to information expressly required to be
included in a registration statement, there shall be added such further material information, if
any, as may be necessary to make the required statements, in light of the circumstances under
which they are made, not misleading."  17 C.F.R. § 230.408(a).

387.    Further, the Registration Statement  incorporated by reference Horizon's Report
on 10-Q for 3Q 2014 (filed on November 6, 2014), Report on Form 10-K for the quarter and year
ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015
which contained false and misleading statements as described herein. The Company had a duty
to disclose additional information called for under Items 303 and 503 of Regulation S-K [17
C.F.R. § 229.303 and 17 C.F.R. §229.503, respectively] in those filings

388.    Further, the Registration Statement  incorporated by reference Horizon's Report
on 10-Q for 3Q 2014 (filed on November 6, 2014), Report on Form 10-K for the quarter and year
ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015
which contained false and misleading statements as described herein. The Company had a duty
to disclose additional information called for under Items 303 and 503 of Regulation S-K [17
C.F.R. § 229.303 and 17 C.F.R. §229.503, respectively] in those filings.

**E.    PLAINTIFFS' CLASS ACTION ALLEGATIONS FOR SECURITIES ACT CLAIMS**

389.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of persons or entities who purchased
the common stock of Horizon pursuant and/or traceable to the Registration Statement issued in

connection with the Offering and were damaged.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Horizon during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Horizon's employee retirement and benefit plan(s); (vi) and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

390.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Horizon common stock was actively traded on the NASDAQ.  As of February 20, 2015, Horizon had 125,100,210 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Horizon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

391.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

392.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

393.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by Horizon and the Director Defendants in the Offering Documents misrepresented or omitted material facts about the business, operations and management of Horizon including Horizon's relationship with pharmacies in the PME network and the Company's marketing practices;

(c)     whether the price of Horizon stock on the Offering was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

394.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**F.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE WITH RESPECT TO THE SECURITIES ACT CLAIMS**

395.     At all relevant times, the market for Horizon's common stock was efficient for the following reasons, among others:

(a)     Horizon's stock met the requirements for listing, and was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b)     As a regulated issuer, Horizon filed periodic reports with the SEC and Nasdaq;

(c)     Horizon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Horizon was followed by numerous securities analysts  including Piper Jaffray & Co., Stifel, Nicolaus & Co., Inc., JP Morgan; UBS Securities, Morgan Stanley, Guggenheim Securities, LLC,  Cowen, Brean Capital, BMO Capital Markets Corp., Citigroup, Goldman Sachs & Co., Inc., Jefferies, Mizuho Securities USA, Inc. which wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

396.     As a result of the foregoing, the market for Horizon stock promptly digested current information regarding Horizon from all publicly available sources and reflected such information in Horizon's stock price.  Under these circumstances, all purchasers of Horizon common stock during the Class Period suffered similar injury through their purchase of Horizon common stock at artificially inflated prices, and a presumption of reliance applies.

397.     Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Horizon and the Individual Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

### G.     THE SAFE HARBOR PROVISION IS INAPPLICABLE

398.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements

identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Horizon who knew that those statements were false and misleading when made

### H.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

#### 1.   <u>COUNT III</u>:  *For Violations of Section 11 of the Securities Act Against Horizon, the Director Defendants and the Underwriter Defendants*

399.   Plaintiffs incorporate ¶¶ 300–398 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

400.   Lead Plaintiff Northern California Carpenters brings this claim pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of itself and other members of the Class who purchased Horizon common stock in the Offering against Horizon, the Director Defendants and the Underwriter Defendants. Northern California Carpenters and other members of the Class purchased or otherwise acquired Horizon common stock pursuant and/or traceable to the Offering pursuant to a materially inaccurate Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

401.    As issuer of the shares, Horizon is strictly liable to Plaintiffs and the Class for the misstatements and omissions. Horizon, the Director Defendants, and the Underwriter Defendants named herein were responsible for the contents and dissemination of the  Registration Statement.

402.    On or about April 15, 2015, Horizon announced it was planning to offer to sell 12,000,000 of its ordinary shares in an underwritten public offering and that Citigroup, Jefferies, Cowen and Morgan Stanley were acting as joint book-running managers for the Offering. The Offering was conducted pursuant to the Offering Documents.

403.    Pursuant to the Offering Documents, the Company issued and sold a total of 17,652,500 shares of common stock via an underwriting syndicate composed of the Underwriter Defendants. According to Horizon's press release on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million after deducting underwriting discounts and other offering expenses payable by Horizon. The Underwriter Defendants received over $22.4 million. The number of shares sold by each Underwriter Defendant and their resulting discounts and commissions are set forth in the chart below.

| Underwriter | Number of Shares | Discounts and Commissions |
|---|---|---|
| Citigroup | 5,737,062.50 | $7,293,240.70 |
| Jefferies | 5,737,062.50 | $7,293,240.70 |
| Cowen | 3,089,187.50 | $3,927,129.61 |
| Morgan Stanley | 3,089,187.50 | $3,927,129.61 |
| **TOTAL** | **17,652,499** | **$22,440,740.62** |

404.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading. This claim is not based on and does not sound in fraud. For purposes of asserting this claim under the

Securities Act, Plaintiffs do not allege that the defendants named in this count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

405.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

406.    Plaintiffs assert this claim on behalf of the members of the Class who purchased and/or acquired Horizon  shares pursuant and/or traceable to the Registration Statement for the Offering.

407.    The Class has sustained damages. The value of Horizon common stock has declined substantially subsequent to and due to Horizon, the Underwriter Defendants, and the Director Defendants' violations.

408.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the Registration Statement.

Failure to Disclose Information Required Under Items 303 and 503 of SEC Regulation S-K

409.    In addition, Item 303 required the Offering Documents and the 10-Q for 3Q 2014 (filed on November 6, 2014), 10-K for the quarter and year ending December 31, 2014 (filed on February 27, 2015) and Form 8-K dated April 13, 2015 incorporated into the Final Prospectus Supplement to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Similarly, the regulation required the 10-Q for the third quarter of 2014 (filed on November 6, 2014) and the 10-K for the

quarter and year ending December 31, 2014 (filed February 27, 2015) to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i).

410.    In violation of Item 303, the above-listed SEC filings omitted that at the time of the Offering, Horizon exercised control over a number of its PME specialty partner pharmacies, exposing the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers; and that Horizon engaged in illegal sales and marketing tactics, in violation of the Company's own Code of Business Conduct and Ethics, thereby exposing the Company to increased business and regulatory risks, reputational harm, and investigations into the Company's marketing activities by regulatory agencies including the DOJ. Further, Horizon failed to disclose the Company would be forced to slash prices on its biggest growth drivers thereby lowering its margins going forward and that payor pushback would impact Horizon's primary care drugs, primarily DUEXIS and VIMOVO in the short term.

411.    Additionally, Item 503 of SEC Regulations S-K, 17 C.F.R. §229.503 ("Item 503"), required the Offering Documents to include among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §229.503(c). Although the Offering Documents included a discussion or risk factors, it was materially incomplete and therefore misleading.

412.     In violation of Item 503, the Offering Documents did not disclose that one of the most significant factors that made the Offering speculative or risky to investors was the fact that Horizon was operating an unsustainable business model based on undisclosed practices designed to drive short-term sales prices but had exposed the Company to increased business and regulatory risks, such as the risk of violating contracts, incurring reputational harm, investigation by DOJ and other regulators, increased scrutiny from payors, nonpayment, and retaliation by the PBMs and insurers. Nowhere in the Offering Documents did Horizon disclose these material facts which it was required to do under Item 503.

**2.     COUNT IV:  *For Violations of Section 12(a)(2) of the Securities Act Against Horizon and the Underwriter Defendants***

413.     Plaintiffs incorporate ¶¶ 300–398 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

414.     Lead Plaintiff Northern California Carpenters brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of itself and other members of the Class who purchased Horizon common stock in the Offering against Horizon and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). Northern California Carpenters and other members of the Class purchased or otherwise acquired Horizon common stock issued in the Offering pursuant to a materially inaccurate Registration Statement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

415.     This particular cause of action is based on Horizon and the Underwriter Defendants' lack of reasonable care, not fraud or intentional or reckless misconduct. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that Horizon or

the Underwriter Defendants acted with scienter or fraudulent intent which are not elements of a Section 12(a)(2) claim.

416.   The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff Northern California Carpenters and other members of the Class by means of the Registration Statement and Prospectus Supplements and they did so for the benefit of Horizon and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions, and other transaction-related payments. According to Horizon's press release on April 21, 2015, the aggregate net proceeds to the Company from the Offering were approximately $475.2 million, after deducting underwriting discounts and other offering expenses payable by Horizon. The Underwriter Defendants received over $22.4 million. The number of shares sold by each Underwriter Defendant and their resulting discounts and commissions are set forth in the chart below.

| Underwriter | Number of Shares | Discounts and Commissions |
|---|---|---|
| Citigroup | 5,737,062.50 | $7,293,240.70 |
| Jefferies | 5,737,062.50 | $7,293,240.70 |
| Cowen | 3,089,187.50 | $3,927,129.61 |
| Morgan Stanley | 3,089,187.50 | $3,927,129.61 |
| **TOTAL** | **17,652,499** | **$22,440,740.62** |

417.   The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

418.    Horizon and the Underwriter Defendants used the means and instrumentalities of interstate commerce and the U.S. mail.

419.    Each of the defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the Offering Documents including statements regarding Horizon's PME program and failed to do so. Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

420.    Horizon and the Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained therein and incorporated by reference in the Registration Statement at the time of the Offering were true and that there were no omissions of any material fact. Accordingly, Horizon and the Underwriter Defendants are each liable to Northern California Carpenters and/or other members of the Class who purchased in the Offering.

421.    The value of Horizon common stock declined substantially subsequent to the consummation of the Offering and Northern California Carpenters and the other members of the Class have sustained damages.

422.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the falsity of the Registration Statement.

423.     By reason of the foregoing, Horizon and the Underwriter Defendants are liable under Section 12(a)(2) of the Securities Act to Northern California Carpenters and other members of the Class who purchased in the Offering. Northern California Carpenters and other members of the Class have the right to rescind and recover the consideration paid for their securities on which they suffered damages. In addition, Northern California Carpenters and the members of the Class who have sold and suffered damages on their securities that they originally purchased through the Offering are entitled to rescissory damages.

> **3.      COUNT V:** *For Violations of Section 15 of The Securities Act Against Defendant Walbert*

424.     Plaintiffs incorporate ¶¶ 300–398 as though fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

425.     This count is asserted against defendant Walbert and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

426.     Defendant Walbert, by virtue of his executive position and directorship and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of Horizon within the meaning of Section 15 of the Securities Act. Walbert had the power and influence and exercised the same to cause Horizon to engage in the acts described herein.

427.     Walbert's position made him privy to and provided him with actual knowledge of the material facts concealed from Plaintiffs and the Class.

428.     By virtue of the conduct alleged herein, Walbert is liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages.

429.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that

the first complaint was filed asserting claims arising out of the falsity the Offering Documents. Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of the Offering Documents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 7, 2016

LABATON SUCHAROW LLP


/s/Serena P. Hallowell
Jonathan Gardner
Serena Hallowell
Christine M. Fox
Thomas W. Watson
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
            shallowell@labaton.com

155

cfox@labaton.com
twatson@labaton.com

*Counsel for Lead Plaintiffs and the Putative Class*

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
Blair A. Nicholas
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone:  (858) 793-0070
Facsimile:  (858) 793-0323
Email:  BlairN@blbglaw.com

-and-

Hannah G. Ross
Abe Alexander
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
Email:  Hannah@blbglaw.com
         Abe.Alexander@blbglaw.com

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I, Serena P. Hallowell, certify that on this 7th day of October, I electronically filed this Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws with the Clerk of the U.S. District Court using the CM/ECF system which will be sent electronically to all counsel of record.

*/s/ Serena P. Hallowell*
Serena P. Hallowell
