**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x

GEORGE S. SCHAFFER, Individually and on :    Civil Action No. 1:16-cv-01763-JMF
Behalf of All Others Similarly Situated,   :
                               :
             Plaintiff,    :
                               :    **ORAL ARGUMENT REQUESTED**
     vs.                             :
                               :
HORIZON PHARMA PLC, TIMOTHY P.    :
WALBERT, PAUL W. HOELSCHER, JOHN    :
J. KODY, ROBERT F. CAREY, WILLIAM F.    :
DANIEL, MICHAEL GREY, JEFF    :
HIMAWAN, VIRINDER NOHRIA,    :
RONALD PAULI, GINO SANTINI, H.    :
THOMAS WATKINS, CITIGROUP    :
GLOBAL MARKETS, INC., JEFFERIES    :
LLC, COWEN & COMPANY LLC, AND    :
MORGAN STANLEY & CO. LLC,    :
                               :
             Defendants.    :
                               :

———————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF THE HORIZON DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT**

# Table of Contents

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 3

    A.   Defendants. ............................................................................................ 3

    B.   Horizon's Fixed-Dose Combination Therapies. ..................................... 4

    C.   Horizon Makes it Easier for Patients to Get the Drugs their Doctors
        Prescribe. ............................................................................................... 4~~5~~

    D.   Pharmacy Benefit Managers Exclude Two Horizon Drugs From Coverage. ........ 5

    E.   Through "Prescriptions-Made-Easy," Horizon Increases Net Sales. .................. 6

    F.   Horizon Repeatedly Warns Investors about the Risk of its Business
        Model. .................................................................................................... 7

    G.   Horizon's Critics Take Advantage of Bad Press and a Charged Political
        Environment. .......................................................................................... 7

    H.   The Government Requests Information. .................................................. 9

    I.   Litigation Follows. ................................................................................. 9

III. ARGUMENT ................................................................................................... 10

    A.   Plaintiffs' Section 10(b) Claim Should Be Dismissed. ......................... 10

        1.   Plaintiffs fail to allege falsity. ..................................................... 11

            a.   Plaintiffs fail to allege that Defendants knowingly omitted
                information about illegal or improper conduct. .......................... 11

                (1)   The Complaint contains no particularized facts to
                    suggest that Horizon used "captive" pharmacies. ............. 11

                (2)   The Complaint contains no particularized facts to
                    suggest that defendants used "illegal" sales and
                    marketing tactics. ............................................................. 13

                (3)   Horizon had no duty to disclose the subpoena
                    sooner. .............................................................................. 17

                b.   Plaintiffs fail to plead an actionable misstatement. .................... 18

                (1)   Several challenged statements were inactionable
                    expressions of corporate optimism. ................................. 18

                (2)   Several challenged statements were inactionable
                    statements of opinion. ...................................................... 19

                (3)   Several challenged statements were protected by the
                    PSLRA safe harbor and the bespeaks caution
                  doctrine. .......................................................................... 19

**Table of Contents**
(continued)

| | | | | Page |
|---|---|---|---|---|
| | | (4) | Horizon's "risk warnings" are not actionable false statements. | 20 |
| | | (5) | The remaining challenged statements were accurate statements of existing or historical fact. | 21 |
| | 2. | Plaintiffs fail to plead scienter. | | 23 |
| | | a. | Plaintiffs fail to allege a "strong" inference of scienter under the "motive and opportunity" prong. | 23 |
| | | b. | Plaintiffs fail to plead a "strong" inference of scienter under the "conscious misbehavior or recklessness" prong. | 24 |
| | 3. | Plaintiffs fail to plead loss causation. | | 26 |
| | | a. | The New York Times Article | 26 |
| | | b. | The Citron Research Report | 27 |
| | | c. | Depomed and Express Scripts | 27 |
| | | d. | The U.S. Attorney Subpoena | 27 |
| | | e. | Pre-Announced Earnings | 28 |
| B. | Plaintiffs' Section 11 and 12(a) Claims Should Be Dismissed | | | 28 |
| | 1. | The offering materials were not false or misleading. | | 29 |
| | 2. | Regulation S-K is no help to Plaintiffs. | | 29 |
| | 3. | Plaintiffs lack standing to assert a claim under Section 12 | | 30 |
| C. | Plaintiffs' Fail to Plead Control Person Liability | | | 30 |
| IV. | CONCLUSION | | | 30 |

**Table of Authorities**

Page

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ........................................................................24

*In re: Altisource Portfolio Solutions., S.A. Sec. Litig.*,
2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) ........................................22

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012)......................................................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................................................................11, 23

*In re Axis Capital Holdings Ltd., Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................11, 24

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...................................................25

*Boca Raton Firefighters &Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ...............................................................22

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ............................................................21

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................................17

*Callan v. Motrocity Inc.*,
2013 WL 5492957 (W.D. Wash. Oct. 1, 2013), *aff'd*, 649 F. App'x 526 (9th
Cir. 2016) .................................................................................................18

*In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*,
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) .............................................25

*In re China Organic Sec. Litig.*,
2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)........................................24

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)........................................18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ..................................................................18

**Table of Authorities**
**(continued)**

Page

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
 686 F. Supp. 2d 404 (D. Del. 2009)................................................................14, 22, 23

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009)........................................................................10, 23, 24

*In re eSpeed, Inc. Sec. Litig.*,
 457 F. Supp. 2d 266 (S.D.N.Y. 2006)......................................................................23

*In re FBR Inc. Sec. Litig.*,
 544 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................................17, 20, 22

*Fila v. Pingtan Marine Enter. Ltd.*,
 2016 WL 3962015 (S.D.N.Y. July 19, 2016)..........................................................27

*Frazier v. VitalWorks, Inc.*,
 341 F. Supp. 2d 142 (D. Conn. 2004)......................................................................19

*Galati v. Commerce Bancorp, Inc.*,
 220 F. App'x 97 (3d Cir. 2007) ...............................................................................18

*Gillis v. QRX Pharma Ltd.*,
 2016 WL 3685095 (S.D.N.Y. July 6, 2016) ...........................................................19

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
 445 F. App'x 368 (2d Cir. 2011) .............................................................................24

*Janbay v. Canadian Solar, Inc.*,
 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ........................................................27

*In re JP Morgan Chase Sec. Litig.*,
 363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................24

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
 897 F. Supp. 2d 168 (S.D.N.Y. 2012)......................................................................25

*In re Lions Gate Entm't Corp. Sec. Litig.*,
 165 F. Supp. 3d 1 (S.D.N.Y. 2016)..........................................................................17

*Lipow v. Net1 UEPS Techs., Inc.*,
 131 F. Supp. 3d 144 (S.D.N.Y. 2015)................................................................24, 26

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
 724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).....................25

**Table of Authorities**
**(continued)**

Page

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...................................................28

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...................................................................10

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...............................................28

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) .........................26

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)....................................................29

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) .........................30

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...............................................14, 24

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2010) .........................................27

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...............................................26, 27

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ...................................................28

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)......................................................20

*Pharm. Care Mgmt. Ass'n v. D.C.*,
522 F.3d 443 (D.C. Cir. 2008) ...................................................6

*Rochester Laborers Pension Fund v. Monsanto Co.*,
883 F. Supp. 2d 835 (E.D. Mo. Aug. 1, 2012).........................18

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009).......................................................24

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016).............................. *passim*

**Table of Authorities**
**(continued)**

Page

*Shemian v. Research In Motion Ltd.*,
570 F. App'x 32 (2d Cir. 2014) ........................................................................................24

*In re Stratasys Ltd.*,
2016 WL 3636992 (D. Minn. June 30, 2016)...................................................................26

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)...............................................................................................11

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..............................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................................................11

*Total Equity Capital, LLC v. Flurry, Inc.*,
2016 WL 3093993 (S.D.N.Y. June 1, 2016) ....................................................................23

*In re UBS AG Sec. Litig.*,
2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir.
2014) ..................................................................................................................................17

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) .............................................................29, 30

**Statutes**

15 U.S.C.
§78u-4(b)(1)......................................................................................................................18
§ 78u-5(i)(l)(A)-(D) ...........................................................................................................19
§ 78u-5(c)(1)(B)(i)............................................................................................................23

Securities Act of 1933
§ 11..........................................................................................................9, 28, 29, 30
§ 12..........................................................................................................3, 28, 29, 30
§ 15..........................................................................................................9, 30

Securities Exchange Act of 1934
§ 10(b).....................................................................................................9, 10, 22, 29
§ 20(a) ....................................................................................................9, 30

**Table of Authorities**
**(continued)**

**Page**

**Other Authorities**

http://www.arthritis.org/living-with-arthritis/health-care/your-health-care-
team/arthritis-doctors.php ...........................................................................................17

https://OpenPaymentsData.CMS.gov ............................................................................16

http://www.vimovo.com/application/web/pdf/Prescribing_Information.pdf ...................4

Max Nisen, Meet the Middlemen Cutting Drug Prices, Bloomberg, May 5, 2016,
*available at*, https://goo.gl/WUheIg. ..........................................................................6

## I.   INTRODUCTION

Horizon Pharma plc ("Horizon") is a biopharmaceutical company that develops and commercializes treatments for unmet needs in arthritis, pain, inflammation, and rare diseases.  In 2013, as part of its commercial strategy, Horizon created its novel Prescriptions-Made-Easy ("PME") program, now called HorizonCares.  This program was designed to improve the prescribing experience for physicians and patients by removing obstacles built into the pharmaceutical supply chain by insurers, pharmacies, and pharmacy benefit managers (or "PBMs").  With PME, Horizon provides prescribing physicians with information on participating pharmacies, to whom a physician can directly submit a patient's prescription.  The participating pharmacy then processes the prescription as it would any other.  But, if a patient's insurer refuses to cover the medicine, then Horizon will subsidize the cost.  As a result, PME relieves physicians of the hassle of having prescriptions rejected at the pharmacy and of having to issue a replacement prescription with a different drug.  The program also ensures that patients can get the specific medicines their doctors intended.  Horizon benefits from PME when the profits from reimbursed prescriptions more than offset the costs of subsidized prescriptions.

Analysts have called the PME program "innovative" and "novel."  Pharmacy benefit managers, however, have chafed at being sidestepped.  In mid-2014, the two largest PBMs recommended that health plans stop covering two Horizon drugs (DUEXIS and VIMOVO), ostensibly because of price.  In response, and to ensure that patients could still get their prescribed medications, Horizon accelerated its use of the PME program.  Since then, a public relations battle has ensued.

This litigation attempts to repackage negative publicity and conclusory criticisms leveled by pharmacy benefit managers as securities fraud.  But the securities laws do not protect against

a company upsetting other market participants.  And, it is not for the courts to resolve the complex and contentious debate over the cost of prescription drugs.  The only question for this Court on this motion is whether Plaintiffs' Amended Consolidated Complaint ("Complaint") states a viable claim for relief under the federal securities laws.  For the following reasons, it does not.

First, Plaintiffs fail to allege an actionable false or misleading statement.  The predicate for all of Plaintiffs' claims—under both the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act")—is that Horizon hid "improper" pharmacy relationships and its use of "illegal" sales tactics from the market.  There are no particularized facts, however, to suggest that Horizon did anything illegal or improper.  As one Wall Street analyst observed, Horizon's use of "specialty pharmacies" was well vetted.[1]

Second, Plaintiffs fail to plead any particularized facts giving rise to a strong inference of scienter, as required under the Exchange Act.  Plaintiffs labor to support their story with carefully chosen snippets from e-mails and text messages (none of which involved the Defendants) and statements from six confidential sources, one who left Horizon *six weeks* into the class period, another who left in "the middle of 2015," and four who were not even employed at Horizon.  None of these allegations show, or even suggest, that Defendants knowingly misled the market.

Third, Plaintiffs fail to plead loss causation.  As is apparent both on the face of the Complaint and the documents cited therein, the "truth," as Plaintiffs imagine it, was never revealed to the market.  Plaintiff therefore cannot plausibly allege that the purported false statements were the cause of their claimed economic loss.

---

[1] Exh. 52 at 1.

2.

Fourth, Plaintiffs lack standing to bring a claim under Section 12(a)(2) of the Securities Act.  Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of an offering.  The Complaint's vague allegations do not show that any named Plaintiff purchased shares directly in Horizon's April 2015 offering, as opposed to the secondary market.

For all of these reasons, the Complaint should be dismissed with prejudice.

## II.   BACKGROUND

### A.   Defendants.

Horizon is an Irish public limited company with headquarters in Dublin.  ¶3.[2]  Timothy Walbert is Horizon's chairman, President, and CEO (¶36); Paul Hoelscher is CFO (¶37); Robert Carey is CBO (¶39); and John Kody is the Company's former CCO (¶38) (collectively the "Individual Defendants").  Walbert, along with William F. Daniel, Michael Grey, Jeff Himawan, Vrinder Nohria, Ronald Pauli, Gino Santini, and H. Thomas Watkins (collectively, the "Director Defendants") comprise Horizon's Board of Directors.  ¶¶311–19.  The Company went public in 2011, and conducted an additional public offering of 17,652,500 shares of common stock in April 2015.  ¶¶41, 328.  Citigroup, Jefferies LLC, Cowen and Company, LLC, and Morgan Stanley & Co. LLC (collectively, the "Underwriter Defendants") acted as underwriters for the April 2015 offering.  ¶¶320–24.[3]

---

[2] All "¶__" references are to the Complaint.  All "Exh. __" or "Exhibit __" references are to the exhibits accompanying the concurrently-filed Declaration of Peter M. Adams in Support of the Horizon Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint ("Adams Decl.").

[3] This Motion is brought by Horizon, the Individual Defendants, and the Director Defendants (collectively, the "Horizon Defendants").  The Underwriter Defendants are moving separately to dismiss the Complaint, and the Horizon Defendants join that motion as to all claims applicable to them.

B.      **Horizon's Fixed-Dose Combination Therapies.**

Horizon markets and sells drugs for arthritis, pain, inflammation, and orphan diseases. ¶3; Exh. 2 at 5.  Two of its most popular prescription drugs are DUEXIS and VIMOVO.  ¶5. DUEXIS is an FDA-approved, single-tablet drug containing ibuprofen (a widely-prescribed nonsteroidal anti-inflammatory drug, or "NSAID") and famotidine (a well-established gastrointestinal agent).  ¶42.  Similarly, VIMOVO is an FDA-approved, delayed-release tablet combining naproxen (another NSAID) and esomeprazole magnesium (another gastrointestinal agent).  ¶6.  Each drug is prescribed to relieve arthritis while reducing the risk of gastric ulcers and bleeding.  ¶6; Exh. 5 at 10–11, 13.  Although the components of DUEXIS and VIMOVO are separately available, the benefits of these fixed-dose combination therapies are several: they reduce the number of pills a patient must take, improve patient compliance, and ensure that the proper dosage of each component is taken at the correct time.  Exh. 5 at 9–13; Exh. 25 at 3–4, 9–11; *see also* ¶46.[4]

C.      **Horizon Makes it Easier for Patients to Get the Drugs their Doctors Prescribe.**

On January 12, 2015, the first day of the alleged Class Period, Horizon announced the expansion of its Prescriptions-Made-Easy program, now called HorizonCares.  ¶55.  PME is a novel method for distributing prescribed medication.  ¶57.  The program ensures that, when

---

[4] It is estimated that NSAID-induced GI-toxicity causes over 16,500 related deaths in arthritis patients and over 107,000 hospitalizations for serious GI complications each year.  Despite this, physicians frequently fail to prescribe gastroprotective medication when treating arthritis, and patients often fail to take over-the-counter gastroprotective medication until they develop the very GI complications that those medications are designed to prevent.  DUEXIS and VIMOVO directly address these problems.  Exh. 5 at 9–13.  The Court need not accept as true Plaintiffs' unsupported conclusion that there is no "meaningful differentiation" between these drugs and their independently available components.  Indeed, VIMOVO's label states that the drug is "not interchangeable with the individual components of naproxen and esomeprazole magnesium." *See* http://www.vimovo.com/application/web/pdf/Prescribing_Information.pdf.

physicians prescribe one of Horizon's medicines, patients receive the drugs for minimal out-of-pocket costs. ¶¶12, 57. The program was fully described and repeatedly disclosed to investors before and during the Class Period.[5]

PME works like this: Horizon provides prescribing physicians with information on a small number of PME-participating pharmacies, to whom a physician can directly submit a patient's prescription. ¶¶57, 149. The pharmacy then processes the prescription as it would any other prescription. ¶149. If, however, a patient's insurer refuses to cover the medicine, then the pharmacy has full access to Horizon's patient assistance programs, and Horizon will absorb the cost of the rejected prescription. ¶¶57–58, 149. Following this adjudication, and typically within 24 hours of receiving the prescription, the pharmacy then dispenses the prescribed drug (whether covered or not) to the patient. ¶57, 149. PME relieves physicians and their office staff of the hassle of having prescriptions rejected at the pharmacy and then having to issue a replacement prescription with a different drug. The program does not involve Horizon prescribing medication; it merely "takes reimbursement out of the equation and allows doctors and patients to choose the best drug for the patient." Exh. 45 at 4. This leads to more prescriptions being written, and (for patients with adequate coverage) more prescriptions being reimbursed. ¶¶12, 58, 149.

**D.    Pharmacy Benefit Managers Exclude Two Horizon Drugs From Coverage.**

Horizon's shift toward PME was spurred, in part, by the actions of two pharmacy benefit managers, Express Scripts and CVS Caremark. ¶9. Both companies had placed DUEXIS and

---

[5] Exh. 1 at 3; Exh. 4 at 5; Exh. 5 at 5, 14, 19–20, 23, 30; Exh. 6 at 7, 10, 12; Exh. 7 at 4, 9–11, 13–14; Exh. 8 at 5, 10–11, 15–16; Exh. 9 at 5, 8–9, 11, 14; Exh. 11 at 8, 11–12, 14, 16; Exh. 12 at 4, 6, 10–11, 16–17; Exh. 14 at 7–8, 11–13; Exh. 15 at 17; Exh. 18 at 4–5; Exh. 19 at 4–5, 7–10; Exh. 20 at 3, 5; Exh. 21 at 5; Exh. 22 at 10; Exh. 23 at 2, 4, 7–8; Exh. 24 at 5–7, 17; Exh. 25 at 12, 16–17; Exh. 26 at 10; Exh. 27 at 5–6; Exh. 28 at 5, 7; Exh. 29 at 2; Exh. 31 at 2–3; Exh. 32 at 2–3; Exh. 35 at 1; Exh. 37 at 1; Exh. 38 at 1.

VIMOVO on their "exclusion lists" for 2015.  ¶¶9, 52.  These exclusions made it harder for patients to obtain Horizon's drugs at traditional pharmacies. ¶53.

Understanding pharmacy benefit managers is central to this litigation.  In simplest terms, PBMs "act as 'middlemen' hired by health benefit providers (such as employers, health maintenance organizations, and public and private health plans) 'to provide prescription drug benefit administration and management services.'" *Pharm. Care Mgmt. Ass'n v. D.C.*, 522 F.3d 443, 445 (D.C. Cir. 2008) (citation omitted); *see also* ¶9.  One tool that PBMs use to squeeze rebates from drug manufacturers is to recommend that their clients "exclude" drugs from coverage.  ¶51; Exh. 25 at 14.  This results in fewer drug options for patients and more administrative burdens for doctors (and their staff), which may cause them to stop prescribing medicines for which reimbursement is problematic or restricted.  ¶¶9, 53; Exh. 25 at 14.[6]  In 2015, Express Scripts and CVS Caremark placed nearly 150 drugs combined on their exclusion lists, including treatments for erectile dysfunction, diabetes, Hepatitis C, and anemia.  Exh. 63; Exh. 64.  As one analyst explained, PBMs "make money when drug costs are reduced despite differences in the quality of patient care provided." Exh. 45 at 3–4.

### E.    Through "Prescriptions-Made-Easy," Horizon Increases Net Sales.

For Horizon, the PME program more than eased the pain of these PBM exclusions; it eliminated it.  For the first three quarters of 2015, overall net sales of Horizon's products in the program *increased substantially*, driven principally by DUEXIS which posted increases of 107 percent, 148 percent, and 150 percent over prior year quarters.  Exh. 9 at 4; Exh. 11 at 4; Exh. 12 at 8.  Management raised guidance *multiple times*, including in November 2015.  Exh. 10 at 4;

---

[6] *See* Max Nisen, *Meet the Middlemen Cutting Drug Prices*, Bloomberg, May 5, 2016, *available at*, https://goo.gl/WUheIg.

Exh. 13 at 4.  By year end, Horizon's net sales (of all products) had reached $757 million, up 155 percent from the prior year.  Exh. 14 at 15.

Analysts were bullish.  ¶13.  They called Prescriptions-Made-Easy "innovative" and a "novel idea."  Exh. 55 at 2; Exh. 44 at 1.  As one analyst explained: "[I]t now becomes incredibly clear that when clinicians—who have zero financial reason/incentive to prescribe the products—are freed from their patients' managed care burdens (and therefore clinicians do not receive call backs about unfilled prescriptions due to lack of coverage), they very proactively choose to write and prescribe these products."  Exh. 44 at 2.

### F.    Horizon Repeatedly Warns Investors about the Risk of its Business Model.

Before and throughout the Class Period, Horizon was clear about the risks associated with PME.  For example, in February 2015, the Company specifically warned investors that:

> *[W]e depend on a limited number of PME pharmacies* to fulfill patient prescriptions under the PME program. If these PME pharmacies are unable to process and fulfill the volume of patient prescriptions directed to them under the PME program, our ability to maintain or increase prescriptions for our products will be impaired.

*E.g.*, Exh. 5 at 20 (emphasis added).  Horizon further warned that it could "*experience pressure from payers*," and that additional healthcare plans may "*choose to exclude our products from their formularies or restrict coverage to situations where a generic or over-the-counter product has been tried first*."  Exh. 5 at 19, 23 (emphasis added).  These warnings (and others) were repeated to investors throughout the class period.[7]

### G.    Horizon's Critics Take Advantage of Bad Press and a Charged Political Environment.

Meanwhile, in the latter half of 2015, the price of prescription drugs drew increased scrutiny from Congress and the press.  Horizon had a turn in the spotlight on October 19, 2015,

---

[7] *See* **Exhibit A** (cataloguing risk warnings).

when the *New York Times* published an article on its use of "specialty" pharmacies.   ¶114; Exh. 57.   The article did not reveal any facts that *investors* did not already know.   *Cf.* Exh. 44, at 3 (Cowen: "There is nothing new we have learned over the past few months that we weren't aware of earlier . . . .").   But the article gave the Company's critics an excuse to pile on during a political firestorm.

Depomed Inc., for example, issued a statement that the article had "reiterated and validated" its concerns about Horizon's business model.   ¶119; Exh. 36 at 1.   At the time, Depomed's board of directors was fighting a hostile takeover by Horizon.   ¶119; Exh. 12 at 4–5.

Three weeks later, Express Scripts cut ties with Linden Care, a pharmacy mentioned in the piece.   ¶122.   The termination letter to Linden Care ***did not even mention Horizon***.   Exh. 61. But to the public, Express Scripts framed the move as push back against "captive" pharmacies that "predominantly dispensed Horizon prescription drugs."   ¶123; Exh. 40 at  1.   Analysts, however, were not buying it:

- **JMP:** "[I]t is a gross mischaracterization to label Linden as a 'captive pharmacy'. . . . [Express Scripts] is taking advantage of negative press involving specialty pharmacies to gain market share and inhibit competition."  Exh. 47 at 1;

- **Stifel:** "We believe [Express Script's] accusations against Linden are wholly unfounded and based on false information . . . . [N]owhere in the ESI termination letter is any mention about [Horizon], making the accusations and the tie-in to [Horizon] a clear effort to misconstrue the issue in the public."  Exh. 49 at 1;

- **Piper Jaffray:** "[W]e would keep in mind that [Express Scripts] (conveniently) owns Accredo, the largest specialty pharmacy in the U.S. . . .  [W]e think the optics here are less about generating cost savings for patients but rather a business practice that is simply beneficial to [Express Scripts's] own P&L."  Exh. 48 at 1.

Horizon, for its part, assured investors that it did not own any pharmacy, and that its pharmacy relationships were non-exclusive.  *E.g.*, ¶¶118, 121, 191, 193, 196, 197, 201, 208. [8]

### H.     The Government Requests Information.

Around the same time that Express Scripts started its fight with Linden Care, Horizon received a subpoena from the U.S. Attorney's office.  ¶127.  The subpoena requested information related to Horizon's patient assistance programs and other activities.  ¶127; Exh. 14 at 8.  When Horizon disclosed the subpoena on February 29, 2016, analysts mostly shrugged.  *See, e.g.*, Exh. 52 at 1 (Cowen: "We would note that in nearly every instance when there has been a significant public conversation/media/political discussion about an issue (in this case the use of specialty pharmacies), we find that there will be some governmental agency that will 'request information.'  This is very, very common."); Exh. 51 at 1(UBS: "These types of investigations are not so unusual in the pharma sector."); *see also* Exh. 53 at 1, 3.  Plaintiffs' lawyers, on the other hand, raced to the courthouse.

### I.     Litigation Follows.

On March 8, 2016, just a week after the subpoena was disclosed, the first of two securities fraud class actions was filed.  After these two cases were consolidated, Plaintiffs filed a new complaint, which they again amended on October 7, 2016 (the "Complaint").

The Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12(a)(2), and 15 of the Securities Act.  For the Exchange Act claims, the Complaint alleges a class period from January 12, 2015 through April 12, 2016.  For the Securities Act

---

[8] An Express Scripts representative would later testify that nothing in Express Scripts' agreement with Linden Care prohibited the pharmacy from predominantly dispensing Horizon's drugs. Exh. 60 at 11.

claims, Plaintiffs seek to represent those who purchased Horizon stock "pursuant and/or traceable" to Horizon's April 2015 public offering.[9]

In connection with these claims, Plaintiffs allege that Horizon and its executives made numerous material misstatements and omissions about PME.  ¶2.  Plaintiffs do not allege that any statements were literally false.  Rather, they claim that Horizon misled investors by touting the program while failing to disclose its supposed use of (1) "captive" pharmacies, and (2) illegal sales and marketing tactics.  ¶139.  Plaintiffs also allege that Horizon should have disclosed the subpoena sooner.  ¶¶223, 226.

## III.   ARGUMENT

### A.     Plaintiffs' Section 10(b) Claim Should Be Dismissed.

To state a claim under § 10(b) and Rule 10b-5, Plaintiffs must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted).  The pleading requirements are demanding.  To survive a motion to dismiss, the complaint must satisfy both Federal Rule of Civil Procedure 9(b) and the PSLRA.  *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

To satisfy Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Anschutz Corp. v. Merrill Lynch &*

---

[9] The Exchange Act claims are asserted against Horizon and the Individual Defendants.  ¶¶282–99.  The Securities Act claims are asserted against Horizon, the Director Defendants, and the Underwriter Defendants.  ¶¶399–429.

*Co.*, 690 F.3d 98, 108 (2d Cir. 2012).  If the claim is based on omissions, then the complaint must also allege that "the corporation is subject to a duty to disclose the omitted facts."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

To satisfy the PSLRA, a plaintiff must "***state with particularity facts*** giving rise to a ***strong inference*** that the defendant acted with the required state of mind."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (emphasis added).  A "strong" inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Here, (1) Plaintiffs do not plausibly allege that Defendants made a material misrepresentation or omission, (2) Plaintiffs do not properly allege scienter, and (3) Plaintiffs do not plausibly allege loss causation.  Each is an independent ground for dismissal.

### 1. Plaintiffs fail to allege falsity.

#### a. Plaintiffs fail to allege that Defendants knowingly omitted information about illegal or improper conduct.

The predicate for all of Plaintiffs' claims is that Horizon engaged in "illegal" or "improper" business practices, which they failed to disclose.  *E.g.*, ¶¶4, 139.  There are no particularized facts, however, to suggest that Horizon did anything illegal or improper, or that its business practices were somehow not "legitimate" (whatever that means).  Any claims premised on the *nondisclosure* of such a scheme are therefore "fatally flawed."  *See, e.g.*, *In re Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).

##### (1) The Complaint contains no particularized facts to suggest that Horizon used "captive" pharmacies.

Plaintiffs' main charge is that Horizon hid its use of "captive" pharmacies.  *E.g.*, ¶¶16–17.  But, this amorphous term—"captive"— is meaningless on its own.  So too are allegations

11.

that Horizon "controlled" or "manipulated" participating pharmacies. ¶66. The Complaint fails to establish *how* Horizon "controlled" anyone, *how* Horizon utilized that alleged "control" to do anything illegal or improper, and *how* any illegal or improper conduct rendered any statement misleading. Plaintiffs simply invoke the term "captive" and pretend that it speaks for itself. It does not.

Consider allegations attributed to the former "Horizon Territory Manager, Texas." According to this "witness," who left the company **six weeks** into the Class Period, Horizon would station people at pharmacies "to monitor what was happening" and "to ensure that a lot of Horizon prescriptions were going through." ¶67. What those statements are supposed to mean is a mystery. Horizon does not write prescriptions. Doctors do. And, Horizon never hid the fact that it "monitor[ed]" and audited pharmacies to confirm they were in compliance with the Company's policies and guidelines. *See* Exh. 12 at 4.

The mere presence of Horizon employees at a pharmacy is not illegal or improper. ¶¶67, 69, 75, 87. Nor is it illegal or improper for Horizon to assist a pharmacy with logistics, to "monitor" sales, or to sever a relationship if a pharmacy has "problems processing prescriptions." ¶¶67–68, 75, 84. Plaintiffs do not (and cannot) allege otherwise.[10]

Plaintiffs' "economic control" arguments also cannot stand up to scrutiny. Take Halsted Pharmacy. Plaintiffs allege that Halsted made "at least $100,000 a week" processing Horizon drugs, which gave Horizon "enormous economic control" over the business. ¶70. But Halsted made **$10 million** in monthly revenue in 2015. Exh. 62, at 2. A four percent income stream does

---

[10] Plaintiffs' claim that a transfer of prescriptions from one participating pharmacy to another somehow "evince[s] Horizon's control" over both businesses (¶76) is curious, as the source for that allegation (a civil complaint) **does not mention Horizon**. The complaint alleges that a minority owner of Halsted Pharmacy (with no connection to Horizon) transferred prescriptions to Clybourn Park (his other, competing, business). Exh. 62 at 1, 2, 5.

not render a business "captive" to a supplier in any meaningful respect.  More importantly, even if Horizon products did produce the "majority of Halstead's revenue" (or Linden Care's, or any other pharmacy's), Plaintiffs fail to explain why that is illegal or improper, or how Horizon would even know.  *See* Exh. 32, at 4 (Carey: "[T]hey have no responsibility to tell us.").  With the exception of Express Scripts (¶209), Plaintiffs allege no facts to suggest that any insurer cares about the volume of prescriptions flowing through a particular channel.[11]

Plaintiffs' theory about Clybourn Park Pharmacy is also fiction.  ¶66.  Plaintiffs posit that Horizon founded and operated this pharmacy based on the fact that two Horizon employees appeared on Clybourn's corporate formation documents in September 2014.  ¶73, 139.  But, those employees were leaving Horizon.  Todd Smith's employment ended just ***days*** after the formation documents were filed, which Plaintiffs begrudgingly admit in paragraph 251.  *See also* Exh. 3 at 2.  And as for Ben Bove, he ceased being a Horizon employee on December 31, 2014.  In any event, Plaintiffs cannot plausibly allege that Horizon itself had an interest in Clybourn Park (it did not) or that Clybourn Park was even operational in 2014 when Smith and Bove were Horizon employees.

**(2)    The Complaint contains no particularized facts to suggest that defendants used "illegal" sales and marketing tactics.**

Plaintiffs' secondary charge is that Horizon hid "improper, dishonest, and illegal" sales tactics from the market.  ¶89.  These allegations fall into two buckets: what Horizon supposedly

---

[11] Plaintiffs vague but repeated reference to "improper commission-type payments" merely show that Plaintiffs misunderstand how "dispensing fees" work.  ¶70 & n.16.  Dispensing fees are typically calculated as a percentage of a drug's list price.  If Horizon paid higher fees than some, that's because its drugs had higher list prices.  Such payments are not "improper" merely because Plaintiffs' describe them as such.  Nor were they secret.  *See* Exh. 42 at 2 (UBS: "In August Horizon was able to negotiate a better pharmacy fill fee (down from $129 to $75) for its payments to the specialty pharmacies that help with the PME program.").

13.

"directed" pharmacies to do (¶18), and what Horizon supposedly "directed" its sales force to do (¶19).  None are well pled.

**Pharmacies.**  Plaintiffs accuse Horizon of "directly control[ling] pharmacies" to engage in "improper, dishonest, and illegal conduct."  ¶¶18, 89–90.  The Complaint, however, does not contain a *single* well-pled factual allegation to suggest that Horizon "directed" any pharmacy to do anything, much less that it instructed pharmacies to: (i) issue unauthorized refills; (ii) misrepresent drug costs; (iii) conceal their relationship with Horizon from PBMs, with whom they may have had other "contractual obligations"; or (iv) ship drugs to states where the pharmacy was not licensed.  ¶¶18, 92, 94–103.

Accusations about unauthorized refills, for example, are vague hearsay.  At most, Plaintiffs allege that *unnamed* Linden Care "managers" told *unnamed* "employees" at some *unknown* time that all prescriptions should be put on auto-refill—"per Horizon's instructions." ¶92.  This allegation, attributed to an *unnamed* rank-and-file pharmacy employee, is not sufficiently reliable, plausible, or coherent to warrant consideration.  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").  Further, even if "Horizon" issued such an "instruction" (it did not), Plaintiffs do not allege that ***Horizon*** instructed anyone to do anything without a patient's authorization.  Nor do they point to a *single instance* in which Horizon has been found liable for violating a consumer protection law.  ¶93.

Plaintiffs' allegation that "employees" at a single pharmacy "were instructed not to tell patients the price of the drugs or what their insurance company was being billed" is also bereft of detail.  ¶96.  Instructed by whom and when?  Plaintiffs do not say.  Nor do they plead any facts

to suggest that Horizon was aware of, let alone responsible for, such "instructions."  And even if such conduct occurred at this pharmacy, the securities laws do not impose a duty on Horizon to disclose something simply because a *plaintiff* proclaims that it might be unlawful.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) ("[T]he securities laws do not impose a general duty to disclose . . . uncharged criminal conduct.").

Plaintiffs' allegations about "evading PBM detection" are colorful, but they also cannot stand up to scrutiny.  Plaintiffs rely on a former Clybourn Park employee who purportedly recalls attempts—by *unnamed* pharmacy managers at *unknown* times in advance of *unspecified* audits— to hide the pharmacy's relationship with Horizon.  ¶¶99–103.  Plaintiffs contend that this "conduct runs afoul of PBM contractual obligations" thereby exposing Horizon and the pharmacy to "the risk of increased PBM scrutiny and exclusion."  ¶103.  But again, even assuming this supposed conduct occurred, there are no facts to suggest that Horizon directed, controlled, or was even aware of these activities.  Further, Plaintiffs do not even explain how Horizon would know of any "contractual obligations" between a pharmacy and a PBM.  ¶103.

Lastly, Plaintiffs' accusations and conjecture about pharmacies "filling prescriptions without state licenses" do not support falsity.  On this score, Plaintiffs borrow from an untested complaint in another litigation matter, and allege only that Halsted "shipped drugs to states in which it was unlicensed."  ¶94.  This is not enough.  That complaint ***does not even mention Horizon***.  And even assuming improper shipments occurred at Halsted, Plaintiffs do not allege any facts to establish that Horizon directed or controlled or was even aware of those activities.

**Sales Representatives.**  Plaintiffs also fail to allege beyond a speculative level that Horizon directed its own sales force to do anything illegal, fraudulent, or improper.  For example, Plaintiffs accuse Horizon of "mislead[ing] doctors about the price of [its] drugs"

15.

because, according to two confidential witnesses: (i) sales representatives were told to "talk about the benefits of the program to the patients"; (ii) sales representatives advised doctors that there "would be a minimal copay to the patient if the prescription went through a specialty pharmacy"; and (iii) some doctors "told the sales representative to get out" when they found out about the price of DUEXIS and VIMOVO.  ¶109.  None of this demonstrates fraud or illegality. As one analyst observed, "[E]very managed care organization and individual commercial plan is very well aware of the price they are paying for these drugs if they are covered (or if they are not aware, that is a failure of the purchaser, and not Horizon).  ***The pricing is being done with the lights turned on very brightly***."  Exh. 44 at 2–3 (emphasis added).

Plaintiffs' allegations of kickbacks are also baseless—and would be libelous in any other context.  The Complaint identifies a single surgeon who allegedly (i) spoke at a conference, (ii) received $18,000 from Horizon in 2014, and (iii) submitted numerous prescriptions for Horizon's drugs over an unspecified period.  ¶¶105–07.  Even if true, such facts are innocuous. Pharmaceutical companies routinely invite doctors to conferences, and fees paid to them are publicly disclosed.  ¶106.  Nor is it illegal or improper for sales representatives to form "strong" or "close knit relationships with doctors."  ¶¶105, 108.  *See, e.g.*, *Sanofi*, 155 F. Supp. 3d at 399 (dismissing claims where plaintiffs failed to plead any "non-conclusory basis for the belief" that a drug company's contracts were illegal kickbacks).[12]

Lastly, Plaintiffs do not identify any instance of off-label marketing.  Plaintiffs paraphrase two former Horizon sales managers who allegedly (and loosely) described such conduct.  ¶¶110–

---

[12] Compared to other pharmaceutical companies, Horizon's payments to physicians are nominal. Pfizer, for example, paid numerous doctors in excess of $100,000 during the Class Period.  So did Sanofi Avenis USA, Novartis, and others.  All of this information is available from the same public government database that Plaintiffs cite in the Complaint. https://OpenPaymentsData.CMS.gov; *see also* Fed. R. Evid. 201.

11.  But these "witnesses," each of whom left Horizon early in the class period, have no basis to opine about what was happening at the Company later.  *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause CW 3 and CW 5 were not Yahoo! employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period.").  And, even for the periods in which these two witnesses were around, they provide zero specifics.  Who "instructed . . . sales representatives to market DUEXIS to patients outside the FDA indications for which it was intended"?  ¶110.  When did that occur?  To what extent?  Where?  To whom?  Who knew about it?  And what does it even mean to say that prescriptions for off-label usage were "brought in" by Horizon's sales representatives?  ¶111.  There are no answers to these questions in the Complaint.[13]  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354–55 (S.D.N.Y. 2008) ("Securities plaintiffs cannot meet the heightened pleading standards imposed by Rule 9 and the PSLRA with such conclusory claims of undisclosed wrongdoing.").

### (3)    Horizon had no duty to disclose the subpoena sooner.

Plaintiffs perfunctorily allege that Horizon had a duty to disclose the government's subpoena a month earlier than it did.  ¶¶223, 226.  Plaintiffs are wrong.  Horizon never denied that it had received such a request, and the existence of "a government investigation, without more, does not trigger a generalized duty to disclose."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31

---

[13] A single employee's confusion as to why sales representatives "were marketing to surgeons" (¶110) is far too thin a reed on which to base a claim of securities fraud.  As the Arthritis Foundation explains, orthopedic surgeons do not just perform surgeries.  They "also focus on diagnosis, treatment and management of musculoskeletal problems.  In fact, some orthopedists do so exclusively, choosing not to perform surgery in their practices." http://www.arthritis.org/living-with-arthritis/health-care/your-health-care-team/arthritis-doctors.php.  Marketing an osteoarthritis drug to such practitioners is in no way evidence of "off label" marketing.

(S.D.N.Y. Sept. 28, 2012) ("[A]bsent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose 'uncharged, unadjudicated wrongdoings'"), *aff'd*, 752 F.3d 173 (2d Cir. 2014).[14]

### b.     Plaintiffs fail to plead an actionable misstatement.

Plaintiffs not only fail to allege an actionable *omission*, they fail to allege any untrue *statement* of material fact.  As discussed below, the statements that Plaintiffs cite as "misleading" were either inactionable, demonstrably true, or both.

### (1)     Several challenged statements were inactionable expressions of corporate optimism.

Many of the impugned statements were inactionable puffery.  These include representations that Horizon had a "unique" business model (¶137), that prescription growth was "attractive" (¶146) and "exceeding . . . expectations" (¶141), that the company was "on track" (¶143) and "transparent" (¶225), and that the execution of its sales team was "terrific" (¶172.)[15] Such statements "are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005).[16]

---

[14] Plaintiffs allege on "information and belief" that the Department of Health and Human Services also "has an open and ongoing investigation" concerning "Horizon's PME program, its sales and marketing activities, and its relationships with its partner pharmacies."  ¶61 n.11.  But, they provide no *information* to support that belief.  The PSLRA specifically prohibits this manner of pleading.  15 U.S.C. § 78u-4(b)(1).

[15] S*ee* **Exhibit B** (cataloging statements of corporate optimism or puffery).

[16] *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("unique business model" not actionable); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) ("exceeding . . . expectations" not actionable); *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 854 (E.D. Mo. Aug. 1, 2012) ("solid growth" not actionable); *Callan v. Motrocity Inc.*, 2013 WL 5492957, at *7 (W.D. Wash. Oct. 1, 2013) ("on track" not actionable"), *aff'd*, 649 F. App'x 526 (9th Cir. 2016); *Sanofi*, 155 F. Supp. 3d at 401 (general statements about "transparency, accountability, and disclosure" are not actionable).

(2)     **Several challenged statements were inactionable statements of opinion.**

Other statements were prefaced with the words "we believe," "we think," or "we expect." *See, e.g.*, ¶155(a) ("[W]e believe we've got differentiated products where we do the right thing for the patient . . ."). Such statements reflect opinions, and Plaintiffs fail to plead that Defendants did not sincerely believe these statements at the time they were made. *Sanofi*, 155 F. Supp. 3d at 400 ("If a plaintiff challenges as fraudulent a statement of opinion, the plaintiff bears the burden of plausibly alleging that the speaker did not truly hold that opinion."). No facts suggest, for example, that Horizon did not "believe" that expanding PME would "largely mitigate the potential impact of [its] products being placed on the exclusion lists." ¶140(b). And even if sales had declined (which they did not), a "statement that the company 'believes' its business may go in a particular direction, or that it is 'promoting' a particular business plan, would not be interpreted by a reasonable investor as a promise that the plan will be successful." *Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 151 (D. Conn. 2004).

(3)     **Several challenged statements were protected by the PSLRA safe harbor and the bespeaks caution doctrine.**

Defendants' forward-looking statements, meanwhile, are protected by the PSLRA safe harbor and the bespeaks caution doctrine.[17] The safe harbor protects any statements that are identified as forward-looking and accompanied by meaningful cautionary language. *Gillis v. QRX Pharma Ltd.*, 2016 WL 3685095, at *14 (S.D.N.Y. July 6, 2016). Similarly, the "bespeaks caution" doctrine protects an alleged misrepresentation that is "sufficiently balanced by cautionary language . . . such that no reasonable investor would be misled about the nature and

---

[17] The PSLRA broadly defines a "forward-looking statement" to include "a statement containing a projection of [financials]," "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and any "assumptions underlying or relating to any" such forward-looking statement. 15 U.S.C. § 78u-5(i)(l)(A)-(D).

risk of the offered security." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004).

Here, several of the challenged statements were forward looking, and made in documents or during earnings calls that referred to the risk factors disclosed in Horizon's SEC filings. *See, e.g.*, ¶146 ("[N]et sales will continue to increase as we continue to drive prescriptions").[18] Those filings *saturated* the market with warnings about PME. Exh. A. Horizon made clear, for example, (1) that "a key part" of its strategy was "to encourage physicians to have their patients agree to prescriptions through PME," (2) that PME was dependent "on a limited number" of pharmacies, (3) and that if Horizon was "unable to increase adoption" of the program, then its "ability to maintain or increase prescriptions" would be impaired. Exh. 5 at 5, 19–20. Later in 2015, when negative publicity regarding specialty pharmacies intensified, Horizon specifically warned that physicians might be "less willing to participate in our patient access programs and thereby limit our ability to increase patient access and adoption of our medicines." Exh. 14 at 8. No reasonable investor reviewing such disclosures can be heard to complain that Horizon obscured the risks of its business model because it did not disclose, *e.g.*, the precise number of participating pharmacies. ¶63; Exh. 24 at 17 (Walbert telling investors that there are "over six" but "less than 10" pharmacies participating in the PME program).

### (4)    Horizon's "risk warnings" are not actionable false statements.

Plaintiffs argue that certain cautionary language was itself misleading because it emphasized that employees <u>may</u> engage in "fraudulent or other illegal activity," when misconduct was allegedly <u>already</u> taking place. ¶¶183. But this argument is meritless. *See, e.g.*, *FBR*, 544 F. Supp. 2d at 360, 362 ("[C]autionary statements are 'not actionable to the extent

---

[18] *See* **Exhibit C** (cataloguing forward-looking statements).

plaintiffs contend defendants should have disclosed risk factors "are" affecting financial results rather than "may" affect financial results.'"). Risk disclosures are inherently *prospective*; "They are not meant to educate investors on what harms are currently affecting the company." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015). Even if Horizon's executives knew that misconduct was occurring (and there no particularized facts to suggest that they did), "a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms." *Id.*

(5)   **The remaining challenged statements were accurate statements of existing or historical fact.**

For all remaining statements, Plaintiffs fail to explain how they were untrue. These statements fall into four general categories.

- **Descriptions of the PME program.** *E.g.*, ¶157 ("We work with specialty pharmacies to distribute through them to physicians, where patients get access to low co-pays."); ¶196 ("The Company has a compliance program in place to address adherence with various laws and regulations relating to its sales, marketing, and manufacturing of its products, as well as certain third-party relationships, including pharmacies.").

- **Statements about pharmacy independence.** *E.g.*, ¶118 ("Horizon does not own or have an ownership stake in any pharmacy and does not possess an option to purchase any pharmacy."); ¶191 ("All pharmacies . . . are fully independent . . .");

- **Sales results.** *E.g.*, ¶138 ("Early results [ ] are encouraging with PME-activated territories showing a 21 percent increase in DUEXIS and VIMOVO prescriptions . . ."); ¶211 ("DUEXIS prescriptions were up 107% over the third quarter of 2014…");

- **Sarbanes-Oxley certifications.** *E.g.*, ¶¶186–87.

No facts contradict these statements. Plaintiffs concede, for example, that Horizon *did* work with specialty pharmacies, and it *did* subsidize the cost of its drugs. ¶¶57–58. And, although Plaintiffs' challenge the *effectiveness* of the Company's compliance program, ¶196(a),

21.

Horizon's mere description of that program and its aims would not suggest to a reasonable investor that the program would "root out any impropriety." *FBR*, 544 F. Supp. 2d at 359.

Plaintiffs also have failed to adequately allege that Horizon owned or had an interest in any pharmacy. Allegations that pharmacies made money through PME or worked closely with Horizon do not suggest that the relationships were not "independent" or at "arm's length." *See In re: Altisource Portfolio Solutions., S.A. Sec. Litig.*, 2015 WL 12001262, at *6 (S.D. Fla. Sept. 4, 2015) ("[T]he assertion that one overlapping officer, even with several additional senior managers, does not render . . . comments about the companies independence from one another, false or materially misleading.").[19]

There is also no allegation that Horizon inaccurately reported sales for any of its products. At most, Plaintiffs allege that Horizon's sales were improperly obtained or unsustainable. Such allegations do not establish Section 10(b) liability. *Sanofi*, 155 F. Supp. 3d at 404 ("[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.") (citation omitted); *Boca Raton Firefighters &Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) ("easily" rejecting argument that accurate statements about earnings were actionable "because they did not acknowledge the long-term unsustainability" of a company's business model).

Lastly, Plaintiffs mischaracterize Defendants' SOX certifications. ¶¶186–87. Sarbanes-Oxley "does not mandate officers certify that their company's reports are completely devoid of any misleading statements or omissions." *City of Roseville Emps.' Ret. Sys. v. Horizon Lines,*

---

[19] Plaintiffs allege that Mr. Walbert was wrong when he said that "no one pharmacy makes up more than approximately 13% of our net sales" because Clybourn Park "could have been processing between 25% and 33% of all Horizon's prescriptions." ¶¶80, 197(c). Setting aside that prescription *volume* is not the same thing as net sales, Plaintiffs fail to explain how this discrepancy (if true) was even material or how it rendered any other statement about pharmacy ownership or independence misleading.

*Inc.*, 686 F. Supp. 2d 404, 420 (D. Del. 2009).  Officers only certify "that they personally have no *knowledge* of such misleading statements or omissions." *Id.*[20]  The falsity of such certifications is entirely dependent on what the signatories knew, "not on what was objectively true at the time of the statement." *Sanofi*, 155 F. Supp. 3d at 402.  As discussed below, Plaintiffs fail to allege any facts that show that Messrs. Walbert and Hoelscher "did not believe what [they] said." *Id.*

## 2. Plaintiffs fail to plead scienter.

Plaintiffs also fail to allege particularized facts giving rise to a "strong inference" of scienter.  "[A] plaintiff may satisfy the scienter pleading requirement in either of two ways: 'by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Total Equity Capital, LLC v. Flurry, Inc.*, 2016 WL 3093993, at *5 (S.D.N.Y. June 1, 2016) (quoting *ATSI*, 493 F.3d at 99 (2d Cir. 2007)).  The bar is even higher for forward-looking statements.  For forward-looking statements not otherwise immunized by meaningful cautionary language, Plaintiffs must plead facts creating a strong inference that Defendants *actually knew* their statements were false.  15 U.S.C. § 78u-5(c)(1)(B)(i).

### a. Plaintiffs fail to allege a "strong" inference of scienter under the "motive and opportunity" prong.

Plaintiffs typically show "motive" through allegations of insider trading.  *ECA*, 553 F.3d at 198.  Not in this case.  The Complaint does not allege a single stock sale, much less a suspicious one, while the price of Horizon's stock was supposedly inflated.  That omission "undermines" Plaintiffs' scienter allegations.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006).  Instead, Plaintiffs argue that Horizon's executive

---

[20] Exh. 5 at 31–32; Exh. 9 at 17–18; Exh. 11 at 19–20; Exh. 12 at 20–21; Exh. 14 at 17–18.

compensation plan provided "a powerful and direct monetary incentive" to commit fraud.   ¶244. But, in this Circuit, the desire of individual defendants to "'increase their compensation by artificially inflating . . . stock price' is not sufficient to establish motive."   *Axis Holdings*, 456 F. Supp. 2d at 593–94.[21]   Even unusual and "massive monetary awards," *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015), and "multimillion-dollar performance based bonuses," *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 622 (S.D.N.Y. 2005), will not satisfy the PSLRA.[22]

### b.   Plaintiffs fail to plead a "strong" inference of scienter under the "conscious misbehavior or recklessness" prong.

Having failed to allege a cognizable motive, Plaintiffs' scienter allegations must be "correspondingly greater."   *ECA*, 553 F.3d at 198–99.   They are not.

An allegation of conscious misbehavior, for example, "requires very strong circumstantial allegations of deliberate illegal" conduct.   *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *10 (S.D.N.Y. Sept. 30, 2013).   Such behavior is "easily identified" and includes, *e.g.*, a knowing sale of a company's stock at an unwarranted discount.   *Novak*, 216 F.3d at 308.   Nothing of the sort is alleged here.

Recklessness must also be "conscious"—"*i.e.*, a state of mind *approximating actual intent*."   *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).   "Securities

---

[21] *Shemian v. Research In Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014) (allegation that defendants sought to increase "the amount of the target annual incentive awards for each of the Co–CEOs" failed to establish motive); *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (allegations that a defendant received "performance-based compensation tied to the Company's stock price" were "legally insufficient"); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.").

[22] The deficiency of such allegations is particularly acute here because, much of what Horizon awarded in 2015 was restricted stock that that will not vest until 2018, and only then if aggressive performance targets are met.   Exh. 15 at 10, 20–23.   Those shares are worth <u>nothing</u> at present, and in fact, they may <u>never</u> have value.   *Id.*

fraud claims based on recklessness must 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Sanofi*, 155 F. Supp. 3d at 405. "An allegation that a defendant merely ought to have known is not sufficient . . . ." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012).  Indeed, even an "egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 340 (W.D.N.Y. 2008).

Plaintiffs fall well short of what the PSLRA requires.  They point to no "communication or report" received by a Defendant that contradicted his public statement.  *Id.* at 341.  Nor do they allege that any confidential witnesses ever spoke with any Defendant.  *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (no scienter where many of the witnesses "were employed in rank-and-file positions . . . [and] these low-level employees had no contact with the Individual Defendants"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).  Further, the Court cannot infer that Defendants were alerted to Horizon's "misconduct" just because the government requested information about broad topics.  And, the mere fact that the PME program was important to Horizon's business "does not support a finding of scienter." *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *9 (S.D.N.Y. Mar. 7, 2016).

Viewed holistically, Plaintiffs' allegations are neither cogent nor compelling.  As Plaintiffs concede, Horizon management asked a third party to review its "practices," even before receiving the government subpoena.  ¶130.  Why would Horizon commit the resources necessary to undertake such a review if it was knowingly engaged in fraud?  And why would it *increase* guidance in November 2015, just as the "truth" was supposedly starting to leak out. "The idea that defendants would increase guidance to mask problems that would shortly have to

be revealed is incredible, especially in the absence of any facts showing that any individual defendant had anything to gain from such a reckless act." *In re Stratasys Ltd.*, 2016 WL 3636992, at *11 (D. Minn. June 30, 2016).[23]

### 3. Plaintiffs fail to plead loss causation.

Plaintiffs also fail plead loss causation.  Loss causation "is premised on the assumption that a misstatement or omission concealed something from the market." *Lipow*, 131 F. Supp. 3d at 172.  Plaintiffs attempt to make this showing by alleging that Horizon's stock dropped after several "corrective disclosures."  ¶¶113–34, 238. But none of the alleged disclosures "even purported to reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (emphasis added).

### a. The New York Times Article

The New York Times article, for example, did not disclose anything new.  It was simply bad press.  Exh. 57.  Investors were well aware of "Horizon's use of specialty pharmacies" and efforts to avoid generic substitution (¶114) because Horizon repeatedly disclosed such practices in its SEC filings.[24]  "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597

---

[23] "Plaintiffs' insufficient allegations of individual scienter extend to its allegations of corporate scienter." *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *15 (S.D.N.Y. Mar. 12, 2015). While it may be *possible* to plead the requisite scienter against a corporate defendant without successfully pleading scienter against a named individual defendant, such cases require egregious facts. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 192, 195 (2d Cir. 2008). For example, collective scienter might apply where: "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero." *Id.* at 195.  Nothing remotely comparable is alleged here.

[24] *See, e.g.*, Exh. 5 at 5 ("Through PME, prescriptions for our products are filled by designated mail order specialty pharmacies . . ."); *id.* ("[P]rescriptions filled through our PME program are therefore less likely to be subject to the efforts of traditional pharmacies to switch a physician's intended prescription of our products to a generic or over the counter brand.").

F.3d at 512; *see also Fila v. Pingtan Marine Enter. Ltd.*, 2016 WL 3962015, at *5 (S.D.N.Y. July 19, 2016) (applying *Omnicom* at the motion to dismiss stage).

### b.    The Citron Research Report

The "Citron Report" also could not have had a "corrective" effect.  On October 21, 2015, Citron Research, a short-selling firm, issued a report that accused a ***different drug company***, Valeant Pharmaceuticals, of accounting fraud.   ¶117; Exh. 43 at 2–5.  This report did not "implicate" Horizon, as Plaintiffs' claim; ***it did not even mention Horizon***.  Exh. 43.  As one Wall Street analyst noted, "there are fundamental differences" between Horizon and Valeant, even if some in the press had "reflexively painted" the two companies with the same broad brush.  Exh. 48 at 1.

### c.    Depomed and Express Scripts

The statements from Depomed and Express Scripts also did not reveal any previously concealed facts.  Depomed merely regurgitated the New York Times article and "reiterated" its own past criticisms.   ¶119; *see also* Exh. 36 at 1.  Express Scripts, for its part, merely characterized Linden Care and other participating pharmacies as "captive."   ¶122; Exh. 40 at 1.  If the market reacted negatively to that characterization, the loss was caused by the characterization, not by any factual revelation of fraud.  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2010).  The same is true for any criticism of Horizon by PBM lobbyists.  ¶¶125–26.

### d.    The U.S. Attorney Subpoena

Horizon's disclosure of the subpoena from the U.S. Attorney's Office also "corrected" nothing.  This disclosure did not even identify the reasons for the government's request.  Exh. 14 at 8.  "The announcement therefore cannot constitute a corrective disclosure or establish loss causation."  *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *14 (S.D.N.Y. Mar. 28,

2013).  To date, there have been no findings (or even allegations) of wrongdoing.  *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market."); *Meyer v. Greene*, 710 F.3d 1189, 1200–01 (11th Cir. 2013) (commencement of an SEC investigation was not a corrective disclosure where the SEC never issued any finding of wrongdoing).

### e.    Pre-Announced Earnings

Plaintiffs also baldly assert that the market learned the "full truth about the Company PME program" on April 12, 2016 when Horizon pre-announced earnings.  ¶131.  On that day, however, there was no mention of "captive" pharmacies or "improper sales tactics."  ¶¶131–33.  Horizon simply announced lower-than-expected sales for the first half of the year due, in part, to payor pushback.  Exh. 16 at 2.[25]  Far from confirming an "unsustainable" business model (¶133), the Company **reaffirmed** its full-year guidance, indicating that it expected most earnings to come in the second half of the year.  Exh. 16 at 2.[26]  While the market may have reacted negatively to that disclosure (and the uncertainty it created), "loss causation requires more than an earnings miss."  *See, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392, 394 (9th Cir. 2010); *Cf. Meyer*, 710 F.3d at 1202 ("[N]ot every bit of bad news that has a negative effect on the price of a security necessarily has a *corrective* effect for purposes of loss causation.").

### B.    Plaintiffs' Section 11 and 12(a) Claims Should Be Dismissed.

Plaintiffs' Securities Act claims must be dismissed as well.  Sections 11 and 12(a)(2) of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or

---

[25] Investors had long appreciated this risk.  *See, e.g.*, Exh. 46 at 2 ("Payer pressure on the company's primary care products may be stronger than expected . . ."); Exh. 50, at 3 (same).

[26] Horizon made the same assessment the following month.  Exh. 17 at 4; Exh. 34 at 12.

omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). "Section 11 applies to registration statements, and Section 12(a)(2) applies to prospectuses and oral communications." *Id.*

### 1. The offering materials were not false or misleading.

Plaintiffs fail to allege that the offering materials contained any actionable misstatements or omissions. "The standard for a materially misleading statement under Section 11 and Section 12(a)(2) is identical to the standard under Section 10(b)." *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016). Here, the factual allegations underlying Plaintiffs' Securities Act claims are identical to those supporting their Exchange Act claims.[27] Thus, for the same reasons they fail to allege falsity under Section 10(b) (*see* section III.A.1, above), Plaintiffs' Section 11 and 12(a) claims also fail.[28]

### 2. Regulation S-K is no help to Plaintiffs.

Perhaps knowing they cannot allege a false or misleading statement, Plaintiffs argue that Horizon had an independent duty to disclose information about its "captive" pharmacy relationships and "illegal" tactics. Plaintiffs base this claim on two provisions of Regulation S-K: Item 303 and Item 503. ¶¶409–12. But, as discussed in the Underwriter Defendants' opening brief (which the Horizon Defendants join), neither provision requires disclosure of the omitted information that Plaintiffs seek. *See* Underwriter Defs.' Br. at 20–23. For these reasons, Plaintiffs cannot predicate their Section 11 and 12(a)(2) claims on Regulation S-K.

---

[27] *See* **Exhibit D** (cataloguing the overlapping Exchange Act and Securities Act allegations).

[28] Plaintiffs also fail to allege an actionable misstatement or omission under Section 11 and 12(a)(2) for the reasons set forth in the Underwriter Defendants' opening brief, which the Horizon Defendants join and incorporate by reference. *See* Underwriter Defs.' Br. at 10–18.

### 3.    Plaintiffs lack standing to assert a claim under Section 12.

The Complaint also does not establish that any Plaintiff has standing to assert a claim under Section 12.  To bring a Section 12 claim, a plaintiff must adequately allege that he or she purchased the relevant shares directly from an issuer in an offering.  *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010).  Here, the allegations are muddied with qualifiers.  Plaintiffs allege that Northern California Carpenters—the sole named plaintiff for the Securities Act claims—"purchased *or otherwise acquired"* Horizon stock (¶400) *"pursuant or traceable to"* the Registration Statement (¶309).  As discussed in the Underwriter Defendants' opening brief, which the Horizon Defendants join (*see* Underwriter Defs.' Br. at 23–25), such allegations are "insufficient to assert standing for Section 12 claims."  *N.J. Carpenters Health Fund*, 2010 WL 1473288, at *4.

### C.    Plaintiffs' Fail to Plead Control Person Liability

Because Plaintiffs fail to plead a primary violation of 10 or Section 11, its "control person" claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act necessarily fail.  *See, e.g.*, *Waterford*, 2016 WL 1261135, at *11.

### IV.    CONCLUSION

For the reasons discussed above, and because amending would be futile, the Court should dismiss the Consolidated Complaint with prejudice.

DATED:  November 14, 2016            COOLEY LLP

/s/ *Koji F. Fukumura*
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Fax: (858) 550-6420
Email: kfukumura@cooley.com

*Attorneys for the Horizon Defendants*

30.

31.