**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEORGE S. SCHAFFER, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | **No. 1:16-cv-01763-JMF** |
| HORIZON PHARMA PLC, TIMOTHY P. WALBERT, PAUL W. HOELSCHER, JOHN J. KODY, ROBERT F. CAREY, WILLIAM F. DANIEL, MICHAEL GREY, JEFF HIMAWAN, VIRINDER NOHRIA, RONALD PAULI, GINO SANTINI, H. THOMAS WATKINS, CITIGROUP GLOBAL MARKETS, INC., JEFFERIES LLC, COWEN & COMPANY LLC, AND MORGAN STANLEY & CO. LLC, | |
| Defendants. | |

**LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................ 1

I. STATEMENT OF FACTS ........................................................................ 5

    A. Horizon Turns to the PME Program to Drive Revenue ........................... 5

    B. Horizon Attributes the Success of the PME Program to Entirely
    Legitimate Factors ............................................................................... 5

    C. In Truth, the PME Program's Success Is Driven By Horizon's Secret
    Financial and Operational Control Over a Small Network of Captive
    Pharmacies ......................................................................................... 6

        1. Horizon Created and Controlled Clybourn Park Pharmacy .................. 7

        2. Horizon's Control Over Halsted Pharmacy ...................................... 8

        3. Horizon's Control Over Linden Care .............................................. 9

        4. Horizon Relied on Improper Business Practices ............................... 10

    D. As The Truth About Horizon's PME Program Emerges, Defendants
    Attempt to Further Conceal the True Nature of the Program .................. 11

II. ARGUMENT ........................................................................................ 14

    A. EXCHANGE ACT CLAIMS ................................................................ 14

        1. The Complaint Adequately Alleges that Defendants' Statements
        Were Misleading ....................................................................... 14

            (a) Defendants' Statements Purporting to Describe the PME
            Program and the Drivers of Its Success Were False and
            Misleading ..................................................................... 15

                (1) The Complaint Alleges Horizon Operated a Captive
                Pharmacy Network ................................................ 18

                (2) The Complaint Alleges Horizon's PME Pharmacies
                and its Sales Force Employed Improper Sales Practices .. 22

                (3) Defendants' Statements Were Not Inactionable
                Opinions, Corporate Optimism, or "Puffery" .................. 27

i

(b) Defendants' Statements Touting the Company's Drug Sales and the Drivers of Those Sales Were False and Misleading ........ 30

(c) Defendants' Statements Touting the Company's Code of Business Conduct and Ethics and Reassuring Investors About Horizon's Legal and Regulatory Compliance Were Misleading ................................................................................ 31

(d) Defendants' SOX Certifications Were False and Misleading ............................................................................... 33

(e) Defendants' Statements are Not Protected by the PSLRA Safe-Harbor .......................................................................... 33

2. The Complaint Adequately Alleges Scienter ........................................... 35

(a) The PME Program, and the Drugs Distributed Through It, Were Vital to Horizon's Financial Well-Being .......................... 36

(b) Horizon Employees Monitored the Day-to-Day Operations of the Captive Pharmacies ............................................. 38

(c) The Nature of the Undisclosed Practices that Drove the PME Program Give Rise to an Inference of Scienter .................. 39

(d) Horizon's Executive Compensation Plan Bolsters the Inference of Scienter ...................................................... 42

(e) Defendants' Competing Inferences and Challenges Fail ............. 43

3. The Complaint Adequately Alleges Loss Causation ............................... 44

(a) October 19, 2015 *New York Times* article .................................... 46

(b) Depomed and Express Scripts Disclosures ................................... 47

(c) Announcement of a DOJ Investigation ......................................... 48

(d) April 12, 2016 Disclosure ............................................................. 48

B. SECURITIES ACT CLAIMS ................................................................................ 49

1. The Offering Documents Contained Materially False and Misleading Statements .............................................................................. 50

2. Lead Plaintiff Northern California Carpenters Has Standing to Bring Claims Under Section 12(a)(2) of the Securities Act .................... 51

ii

3.      Under Items 303 and 503 of Regulation S-K, Defendants Were
        Obligated to Disclose Horizon's Captive Pharmacy Network and
        Use of Improper Sales Practices In the Offering Documents ................... 52

III.   CONCLUSION ............................................................................................. 55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Kinder–Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ......................................................................25

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
  554 F.3d 342 (3d Cir. 2009)............................................................................44

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ..........................................................................42

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................................40

*Apogee Enters., Inc. v. State St. Bank & Tr. Co.*,
  2010 WL 3632697 (S.D.N.Y. Sept. 17, 2010)................................................38

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................................21

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  941 F. Supp. 1352 (W.D.N.Y. 1996) ..............................................................43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................50

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...................................................54

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012).............................................................44

*Caiola v. Citibank N.A. N.Y.*,
  295 F.3d 312 (2d Cir. 2002)............................................................................17

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010)..........................................................43

*In re Check Point Software Techs. Ltd. Sec. Litig.*,
  2006 WL 1116699 (S.D.N.Y. 2006)................................................................39

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010).............................................................38

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................23

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .............................................29, 51

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)....................................................54

*Coker v. Merck & Co.*,
    2007 WL 2363398 (N.D. Miss. Aug. 16, 2007) ..........................................27

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................. 36-37

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................44

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................44

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)...........................................................45

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)...................................................34

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    2013 WL 11319408 (S.D.N.Y. Dec. 12, 2013) ..........................................29

*Fila v. Pingtan Marine Enter. Ltd.*
    2016 WL 3962015 (S.D.N.Y. July 19, 2016). ..........................................46

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................32

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .........................................................43

*In re Focus Enhancements, Inc. Sec. Litig.*,
    309 F. Supp. 2d 134 (D. Mass. 2001) ..................................................38

*Freeman Grp. v. Royal Bank of Scotland Grp. PLC*,
    540 F. App'x 33 (2d Cir. 2013) ......................................................50

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................39, 40, 44

v

*In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) .................................................................52

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ..................................................................................29

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................18, 27

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ..................................................................................26

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...................................................................46

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .................................................................................26

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ...............................................................................................50

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .........................................................36

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008) ...................................................................36

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) ...................................................................52

*In re LaBranche Sec. Litig.*,
    405 F. Supp. 2d 333 (S.D.N.Y. 2005) ...................................................................18

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................... *passim*

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ..............................................................17, 50

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................................44

*Levitt v. Bear Stearns & Co.*,
    340 F.3d 94 (2d Cir. 2003) ....................................................................................26

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ..................................................................................54

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .................................................................48

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2010) ...................................................................48

*Lorely Financing (Jersey) No. 3 Ltd v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)......................................................................45

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    437 F.3d 588 (7th Cir. 2006) ................................................30, 36, 40

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................35

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011)..............................................................................26

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
    2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012)................................33, 39

*Metz v. U.S. Life Ins. Co.*,
    662 F.3d 600 (2d Cir. 2011).............................................................15, 22

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)..............................................27, 32, 35

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)......................................................................50

*In re Morgan Stanley Tech. Fund Sec. Litig.*,
    643 F. Supp. 2d 366 (S.D.N.Y. 2009)......................................................51

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................34

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ................................................................36

*No. 84 Employee-Teamster v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ....................................................................42

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................23, 35

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).....................................................................46

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ........................................................................27, 28

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 619 (S.D.N.Y. 2014) ...............................................26

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   51 F. Supp. 2d 290 (S.D.N.Y. 1999) ...............................................42

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) .............................................35

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012) .............................................................53

*In re Peoplesoft, Inc., Sec. Litig.*,
   2000 WL 1737936 (N.D. Cal. May 25, 2000) .................................41

*In re Petrobras Sec. Litig.*,
   150 F. Supp. 3d 337 (S.D.N.Y. 2015) .......................................45, 46

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............................................25

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..........................................40, 48

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001) ...............................................18

*Pub. Emps' Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ......................................................44, 48

*In re Regeneron Pharm., Inc. Sec. Litig.*,
   2005 WL 225288 (S.D.N.Y. Feb. 1 2005) .......................................29

*In re Res. Am. Sec. Litig.*,
   202 F.R.D. 177 (E.D. Pa. 2001) .......................................................44

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) .........................................32, 38

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .............................................................50

*Scott v. General Motors Co.*,
   46 F. Supp. 3d 387 (S.D.N.Y. 2014) ...............................................51

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................................34

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)....................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................35, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................35, 40

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)...................................................................51

*United States v. Yanez-Baldenegro*,
    33 F.3d 61 (9th Cir. 1994)...................................................................................41

*In re UnumProvident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005)...............................................................18

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................... *passim*

*In re Vivendi, S.A. Sec. Litig*,
    838 F.3d 223 (2d Cir. 2016)...................................................................44, 47, 49

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................... *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................46

*In re Worldcom, Inc. Sec. Litig.*,
    2003 WL 22533398 (S.D.N.Y. Nov. 7, 2003)....................................................17

*In re WorldCom, Inc. Sec. Litig*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................54

**Rules and Statutes**

Section 11 of the Securities Act of 1933 ...............................................................1, 5

Section 12 of the Securities Act of 1933 .....................................................................1

Section 12(a)(2) of the Securities Act of 1933 .............................................5, 50, 51, 52

Section 15 of the Securities Act of 1933 ............................................................1, 5, 55

15 U.S.C. § 78u-5 .................................................................................................34

17 C.F.R. § 229.303 .............................................................................................52

17 C.F.R. § 229.503(c)..........................................................................................54

FED. R. CIV. P.  8 ....................................................................................................4

FED. R. CIV. P. 8(a) ...........................................................................................5, 51

**Other Authorities**

Securities Act Release No. 8350, 68 Fed. Reg. 75,056 (Dec. 29, 2003) ......................................53

Pharmacy Benefit Management Institute, 2015-2016 PRESCRIPTION BENEFIT COST
   AND PLAN DESIGN REPORT (2015) ........................................................................20

Lead Plaintiffs, Locals 302 & 612 of the International Union of Operating Engineers-Employers Retirement Industry Trust Fund ("I.U.O.E. 302/612") and the Carpenters Pension Fund for Northern California ("Northern California Carpenters") and additional named plaintiff Automotive Industries Pension Trust Fund (together, "Plaintiffs") respectfully submit this memorandum in opposition to the Horizon Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint ("Def. Br.") and the Underwriter Defendants' ("UWs," with the Horizon Defendants, "Defendants") Motion to Dismiss Plaintiffs' Claims Under Section 11 and 12 of the Securities Act ("UW Br.").

## PRELIMINARY STATEMENT

This case arises from Defendants' material misstatements and omissions concerning its most important business program during the Class Period, the "Prescriptions-Made-Easy," or "PME," program—which served as Horizon's revenue engine through which Horizon distributed its most lucrative drugs—and the drivers of the program's apparent success. These misstatements concealed the improper sales and marketing techniques that Horizon, and its small network of controlled pharmacies, had to use to sell its branded drugs at exorbitant prices, despite their lack of meaningful clinical differentiation from generic equivalents. In order to ensure that what amounted to a month's supply of ibuprofen and Pepcid could be sold for close to $2,000 dollars, Horizon had to tightly control its pharmacy distribution channel and utilize and encourage improper sales techniques. As the Company grew more successful, Defendants fueled the misimpression that this success was a result of legitimate practices, well trained sales personnel, and the Company's "differentiated products." In reality, Horizon's success was premised on an unsustainable scheme implemented through Horizon's network of captive pharmacies, and its use of deceptive practices to artificially inflate its drug sales and prices.

1

In response to Plaintiffs' allegations, Defendants follow a simple approach: ignoring and mischaracterizing the Complaint's allegations and claiming it fails to set forth sufficient allegations to state a claim.[1]  Defendants attempt to persuade the Court to dismiss this case by portraying themselves as simply the victims of bad press, and urge the Court not to wade into a "complex and contentious debate over the cost of prescription drugs."  Def. Br. at 1–2.  But this case is not about the cost of prescription drugs.  This case is about the undisclosed measures— which in many cases were improper or illegal—that Horizon took to ***sustain*** its pricing regime, which, unbeknownst to investors, put the Company's future profitability in jeopardy.

The Horizon Defendants further argue that Plaintiffs fail to plead falsity with particularized facts concerning Horizon's illegal and improper conduct or its control over its network of "specialty pharmacies."  Def. Br. at 2, 12–13.  However, this ignores Plaintiffs' detailed allegations describing this control, including:

- The financial dependence of certain PME pharmacies on Horizon, including: (a) a pharmacy that exclusively dispensed Horizon prescriptions (¶¶72–82); (b) a pharmacy that derived the majority of its business from Defendants and had dozens of people working in a Horizon-only department (¶¶83–87); and (c) a pharmacy whose owner bragged that it was netting hundreds of thousands of dollars in commission payments from Horizon during the class period (¶¶67–71).
- The operational control Horizon exerted on these pharmacies, including: (a) routing up to a third of all primary care prescriptions through a pharmacy organized by a Horizon executive and the senior manager in charge of the PME program and operated in close coordination with Horizon employees (¶¶72–82); (b) stationing Horizon employees at the pharmacies to ensure Horizon drugs were being dispensed (¶¶67–69, 87); (c) directing prescriptions to or away from pharmacies depending on their relationships with the payors (¶¶75–76); and (d) sending executives to oversee the pharmacies (¶¶69, 73, 78).

This conduct jeopardized the sustainability of the PME program as Pharmacy Benefit Managers ("PBMs") were highly resistant to doing business with captive pharmacies and were

---

[1] Because the Horizon and Underwriter Defendants raise overlapping arguments in their briefs, Plaintiffs address both sets of Defendants' arguments in the sections on falsity and standing.

excluding such pharmacies from their networks.  The Complaint further details the deceptive and improper practices used by Horizon and its controlled PME pharmacies, including:

- The controlled pharmacies (a) refilling patient prescriptions automatically without their consent ("auto-refill"), as directed by Horizon (¶¶91–93); (b) illegally shipping drugs into states where the pharmacies were not licensed (¶¶94–95); (c)  misleading the representatives of third party payors about their business and relationship with Horizon during audits (¶¶99–103); and (d) misleading doctors and patients about the true costs of Horizon's drugs (¶¶96-97).
- Horizon (a) misleading doctors about the true costs of Horizon's drugs (¶109); (b) promoting Horizon drugs for off-label uses (¶¶110–111); and (c) using gifts to develop conflict-ridden relationships with doctors in violation of the company's own code of conduct (¶¶104–107).

These allegations, and others in the Complaint, demonstrate that Defendants' statements insisting that the PME program pharmacies would "process prescriptions as any retail pharmacy would" (¶149), were "fully independent" (¶191), and had a "conservative" (¶203) and "arm's length" relationship with Horizon (¶196), were false.

Defendants then claim the remaining statements are inactionable opinion, puffery, or forward looking statements (Def. Br. at 18–21).  Defendants are wrong on the law and wrong in their characterization, often overlooking the elements of the statements at issue actually alleged to be false and misleading. *See infra* § II.A(1)(c).

Defendants similarly argue that Plaintiffs have failed to allege scienter, focusing their attacks on the former employees identified in the Complaint and the Horizon Defendants' purported lack of motive.  Def. Br. at 23–26.  As an initial matter, Defendants' argument relies on the implausible underlying assumption that not a single member of Horizon's senior management knew or should have known about key aspects of the Company's most significant revenue engine, even after the Company received a subpoena flagging for management the existence of improprieties in the PME program.  Defendants also ask the Court to overlook

numerous allegations in the Complaint that, in totality, give rise to a strong inference that Horizon senior management was well aware of Horizon's improper sales practices.  ¶¶240–71. Among other things, the Complaint alleges: (1) Horizon executives were regularly present at the handful of pharmacies in the PME network and Horizon employees monitored their day-to-day operations (¶¶250–62); (2) during the Class Period, Horizon used only a handful of PME pharmacies, from between four to fewer than 10 at the end of 2015; (3) Horizon's senior executives, including CEO Timothy Walbert ("Walbert"), attended meetings at which employees were in effect encouraged to provide doctors with gifts and entertainment in violation of the Company's Code of Business Conduct and Ethics (¶¶104–08); (4) Horizon disseminated materials directing pharmacies or sales personnel to engage in improper marketing practices (*see, e.g.,* ¶261); (5) that the PME program was essential to the Company's success and was the distribution channel for its most important drugs (¶¶245–49); and (6) Horizon tied an unusual amount of executive compensation, approaching 99%, "directly to the stock price performance," and indeed, Defendant Walbert's compensation increased from almost ***$9 million to $93 million*** for 2015, bolstering the inference of scienter (¶¶267, 271).  Collectively these allegations support a strong inference of scienter.  *See infra* § II.A(2).

Defendants further argue that the Complaint fails to allege loss causation.  This is wrong. The Complaint alleges loss causation, which is subject to Rule 8's notice pleading standards. The Complaint pleads a series of disclosures that each introduced new information about the PME program to the market, followed by precipitous declines in Horizon's share price. *See infra* § II.A(3).  Indeed, when the truth emerged, Horizon was forced to curtail its use of controlled pharmacies and improper sales and marketing tactics, resulting inevitably in a hit to Horizon's revenue, a stock decline of 65% from the Class Period closing high, Congressional scrutiny, and

an investigation by the Department of Justice.

Plaintiffs' claims under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 are also properly pled. Because these claims are based on strict liability against Horizon and the UWs, these claims easily meet the relevant Rule 8(a) pleading standards. In sum, Defendants' motions should be denied in their entirety.

## I.   STATEMENT OF FACTS

### A.   Horizon Turns to the PME Program to Drive Revenue

Prior to the start of the Class Period, in July 2014, two of the largest Pharmacy Benefit Managers,[2] Caremark and Express Scripts, announced that they would exclude Horizon's key revenue driving drugs, DUEXIS and VIMOVO, from coverage effective January 2015, (¶52), due to the availability of significantly less expensive over-the-counter and generic alternatives (¶¶41, 45, 47). Because DUEXIS and VIMOVO accounted for approximately 83% of Horizon's net sales in 2014 (¶50), investors were concerned that these exclusions would hurt the Company's profitability (¶¶53–54). To allay investors' concerns, Defendants announced that they would be accelerating their use of the PME program, which they claimed would allow Horizon to maintain the profitability of these drugs. ¶¶55–56.

### B.   Horizon Attributes the Success of the PME Program to Legitimate Factors

Defendants publicly described the PME program as a "patient assistance" program "designed to ensure access to the medicine the physician intended the patient to get" and "doing the right thing for the patient." ¶¶55, 142; *see also* ¶¶149, 151, 155, 157. Defendants told investors that pursuant to the PME program, doctors would simply "fax prescriptions into a local specialty pharmacy, ***which then will process prescriptions as any retail pharmacy would***." *See,*

---

[2] As explained in the Complaint, pharmacy benefit managers are third parties who administer a health plan on behalf of a payor, such as an insurer. ¶9.

*e.g.*, ¶¶149, 217.   Importantly, when analysts asked about Horizon's relationships with the pharmacies participating in the PME program, Defendants characterized those relationships as "arm's length," "conservative," and "standard." *See, e.g.*, ¶¶64, 149, 191, 193, 196, 197, 200–01, 203–05, 208–09, 211–13, 216–19, 221–22, 225, 230.

The PME program appeared successful at first.   ¶61.   On a February 27, 2015 earnings call, for example, Walbert told investors that sales were "exceeding" expectations, and that everything was "on track" in the PME program.   ¶61.   Defendants attributed the PME program's apparent success to entirely legitimate factors and business conditions, including Horizon's "differentiated products" and its well-trained sales force. ¶155. Defendants also assured investors that Horizon complied with applicable laws and regulations, and touted Horizon's adoption of a "Code of Business Conduct and Ethics" as a check on malfeasance.   ¶197.

### C.   In Truth, the PME Program's Success Is Driven By Horizon's Secret Financial and Operational Control Over a Small Network of Captive Pharmacies

Contrary to Defendants' statements to investors, the pharmacies participating in the PME program did not "process prescriptions as any retail pharmacy would," and Horizon's relationship with them was anything *but* "arm's length," "conservative," and "standard."   In reality, the PME program critically depended on Horizon's use of a small network of captive pharmacies, which relied on improper and unsustainable practices to sell Horizon drugs, and over which the Company exerted operational and financial control.   ¶¶62–66.   Defendants knew this scheme endangered Horizon's ability to receive reimbursement for its drugs, because PBMs were highly resistant to doing business with captive pharmacies, in which the pharmacy functions as little more than a distribution center for a drug maker, because patients and insurers rely on pharmacies to exercise oversight over the delivery of drug therapy to patients and enforce contractual and regulatory mechanisms aimed at lowering the cost of care.   ¶¶55–59.

Accordingly, the undisclosed truth that the PME program was powered by a small network of captive pharmacies would have been highly material to investors.

### 1.     Horizon Created and Controlled Clybourn Park Pharmacy

One of the most important pharmacies in the PME network, Clybourn Park ("Clybourn"), was actually created in September 2014 by two Horizon executives, Senior Vice President Ben Bove ("Bove") and Executive Vice President and Chief Commercial Officer Todd Smith ("Smith"), along with Renny Kurup ("Kurup"), a part-owner of another PME pharmacy, Halsted. ¶¶ 72–73.   At Horizon, Smith directed the company's commercial organization, business development and investor relations, while Bove oversaw all aspects of the PME program. ¶73. Emails and text messages obtained in Lead Plaintiffs' investigation make clear that Clybourn was developed by Horizon to distribute Horizon drugs.   ¶¶ 74–79.   As Kurup wrote in a November 4, 2014 email to his employee at Halsted, Clybourn was a "new state of the art pharmacy *to be able to handle the PME program to perfection*."   ¶74.   Further, it almost exclusively dispensed Horizon drugs.   ¶¶74, 79.   In late 2015, Clybourn was filling 10,000 prescriptions a week—up to one third of the DUEXIS, VIMOVO, and PENNSAID 2% prescriptions written nationwide.   ¶¶79–80.   Because of its importance, numerous Company executives personally visited: Defendant Paul Hoelscher ("Hoelscher"), Horizon's CFO, visited Clybourn in December 2015, after it moved to a larger facility; Barry Moze, the COO of Horizon ("Moze") visited Clybourn three times; and Lori Sampson ("Sampson"), Horizon's Associate Director of Pharmacy Operations, attended regular meetings with Clybourn management.   ¶78.

Horizon's operational control over Clybourn is further evidenced by Sampson's emails to Clybourn managers, copying Bove's Horizon email address, indicating which doctors Clybourn should enroll in an ostensibly pharmacy-run pilot program.   ¶75.   Horizon also exercised operational control over the PME pharmacies, including Clybourn, by seamlessly transferring

prescriptions from one captive pharmacy to another.  For instance, approximately 23,000 prescriptions were transferred from another PME pharmacy, Halsted, to Clybourn **while Bove was both running Clybourn and acting as an executive at Horizon**.[3]  ¶¶76–77.  Then, when PBMs discovered Clybourn's connection to Horizon, a former manager at Clybourn reported that Horizon again shifted prescriptions to other pharmacies, including Lombard Pharmacy and Mall Pharmacy, ¶81, highlighting the control Horizon exercised over Clybourn.  When Horizon severed ties with Clybourn, the pharmacy's business evaporated, dropping from 1,200 prescriptions a day to 20.  ¶¶79–81.

In addition, knowing that its relationship with Horizon was improper, Clybourn went to great lengths to hide that relationship from PBM auditors.  For instance, a Clybourn manager reported that other managers stashed Horizon drugs in black garbage bags and locked pharmacy computers in back rooms to conceal them from auditors, worked overtime to ship out as many Horizon drugs as possible in advance of audits, and gave employees the day off during the audit to prevent them from coming into contact with auditors.  ¶¶99–101.

### 2.    Horizon's Control Over Halsted Pharmacy

Horizon also exercised operational control over Halsted.  ¶¶67–71.  For instance, Horizon employees stepped in to manage Halsted's operations when drug sales slumped.  ¶¶67, 78.  On August 26, 2014, Halsted owner Kurup sent text messages to a former Halsted pharmacist stating that Horizon manager Sampson "called me yesterday and she's coming today" because the pharmacy's "numbers [for DUEXIS] where [sic] that bad yesterday." ¶67.  As a result of that visit, Halsted owner Kurup wrote, "Lori is going to be coming in every day for awhile [sic] to

---

[3] A September 29, 2014 email from Kurup to one of his employees suggests that the plan to transfer these prescriptions was in place in September, **while Smith was still an executive at Horizon**.  The email describes an incentive to increase "production" levels and ship out more Horizon products from Halsted, so more Horizon prescriptions can be to transferred to Clybourn.  ¶76 n.21.

help organize." *Id*.  Moreover, as with Clybourn, senior Horizon executives met with Halsted management and visited the pharmacy, including Horizon's COO, who met with Kurup twice in the fall of 2014.  ¶69.

Again, as with Clybourn, Horizon also exercised economic control over Halsted.  In text messages, Kurup bragged to other pharmacy personnel about how lucrative Horizon's business was, and that the pharmacy was processing over 1,000 Horizon prescriptions per week.  ¶70. Halsted also routinely shipped Horizon drugs into states in which Halsted was unlicensed, including Texas, Arkansas, Louisiana, and Kentucky, among others. Evincing Horizon's operational control over the pharmacy, Horizon fed Halsted prescriptions from these states, and the pharmacy shipped the drugs wherever Horizon needed them to go.  ¶94.

Also like Clybourn, Halsted understood that its relationship with Horizon had to be concealed from PBMs and payors.  In an October 15, 2014 text message, Kurup wrote to a former Halsted pharmacist, "remember how everything looked and was quiet and NOT looking like we are running mail order out of Halsted for last audit[?] This is the same thing."  ¶102.

### 3. Horizon's Control Over Linden Care

Linden Care was also integral to the program and subject to Horizon's operational and economic control.  ¶¶83–88.  Dispensing Horizon prescriptions constituted 59% of Linden Care's business; indeed, Horizon cut ties with Linden Care before the start of the Class Period, but Linden Care "did everything in its power to come back," and even established a 40–50 person unit devoted *solely* to dispensing Horizon drugs.  ¶¶86–87.  Significantly, *per Horizon's instructions*, Linden Care employees were instructed to automatically refill patient prescriptions without patient authorization.  ¶92.  That this practice was also used at Clybourn further suggests that Horizon issued the instruction to do so.  At its height, Linden Care filled over 1,000 Horizon scripts a day.  ¶87.  And as with Clybourn and Halsted, Horizon employees were stationed at the

9

pharmacy.  *Id.*

### 4.    Horizon Relied on Improper Business Practices

Moreover, contrary to Defendants' statements that the causes of the PME program's success were entirely legitimate, Horizon directed its captive pharmacies to engage in a host of improper business practices.  For instance, Horizon directed its PME pharmacies to refill patient prescriptions without patient authorization (¶91), ship drugs to states in which the individual pharmacies were not licensed (¶94), and withhold pricing information and coverage information from patients and doctors (¶96).

Horizon also instructed its own sales force to engage in improper sales and marketing practices that violated applicable laws, regulations, and the Code of Business Conduct and Ethics to which the Company publicly claimed to adhere.  ¶104.  For instance, Horizon directed sales personnel to market Horizon drugs to doctors who would almost certainly prescribe them for off-label uses (¶110–11), and to provide gifts and entertainment to prescribing physicians in order to win their business in direct violation of the Company's Code of Business Conduct and Ethics, which explicitly states that "[e]mployees must not offer or provide any gifts or entertainment to any healthcare professional" (¶¶105–06).  According to Horizon's former sales manager for Texas, one high-prescribing doctor received perks like weekend hunting trips.  *Id.*  Rather than reprimanding the responsible sales representative for failing to comply with Company policy, the employee was publicly praised at Horizon's National Sales Meeting, attended by senior Company management, including CEO Walbert.  *Id.*  The former sales manager's account of this close relationship was corroborated by an employee at Clybourn pharmacy, who recalled a manager calling the same doctor and telling him they hadn't seen any prescriptions that day. ¶107. That doctor sent over 200 prescriptions shortly thereafter.  *Id.*  Finally, in a striking parallel to the instructions given to PME pharmacies, sales personnel were directed to give evasive

answers to doctors when asked about the price of Horizon drugs.  ¶109.  For instance, if doctors asked about the cash price of DUEXIS and VIMOVO, Horizon sales representatives were instructed to reply that patients would have a minimal copay if the prescription went through a specialty pharmacy.  *Id*.  Of course, Horizon never publicly disclosed these practices to investors.

### D.   As The Truth About Horizon's PME Program Emerges, Defendants Attempt to Further Conceal the True Nature of the Program

Beginning in October 2015, through a series of partial disclosures, the market learned that, contrary to Defendants' false and misleading statements and omissions throughout the Class Period, Horizon exercised operational and financial control over the pharmacies participating in the PME program, the profitability of which was predicated on unsustainable, illegal, and improper business practices.  ¶¶113–34.  Throughout this period, Defendants continued to falsely assert that Horizon's relationship with the PME pharmacies was "arm's length," "conservative," and "standard" in an effort to prevent the market from learning the truth.  *Id*.

On October 19, after the close of the market, the *New York Times* published an article that raised concerns about Horizon's use of specialty pharmacies, including Linden Care, in its PME program.  ¶114.  The article reported, for the first time, the possibility that Horizon might have more than an "arm's length" relationship with the PME pharmacies.  *Id*.  Specifically, the article compared Horizon's PME program to Valeant Pharmaceuticals International's infamous captive pharmacy network.  *Id*.  Analysts understood that the article raised serious questions about the PME program's viability.  For instance, on October 20, 2015, UBS published a note observing that "with the recent article in the *New York Times*, investors are now very focused on the sustainability of the PME program and whether the business model is dead."  ¶116.  The analysts noted that the *Times* article raised "new concerns" about the PME program.  *Id*.  In response to this news, Horizon's stock fell $3.81, or 19.98%, from $19.07 per share to $15.26.  ¶115.

The next day, analysts at Citron Research released a report raising additional concerns about drug manufacturers' use of specialty pharmacies to support "massive price raises on pharmaceuticals." ¶117. While the report focused primarily on Valeant's own captive pharmacy network, it mentioned the *Times* article, and the market recognized that this report had serious negative implications for Horizon's PME program, which as the *Times* article had made clear, was driven by a similar business model. *Id.* Immediately following these reports, Horizon responded, denying any wrongdoing and issuing a press release after the market closed on October 21, 2015, reassuring investors that "[a]ll pharmacies that distribute Horizon branded medicines are ***fully independent***." ¶118.

Then, on October 22, 2015, Depomed, Inc., a company that Horizon had been attempting to acquire, published a letter underscoring the concerns raised in the Citron report and criticizing Horizon's "use of specialty pharmacies." ¶119. Analysts reacting to this news gained a deeper appreciation for the parallel between Horizon's and Valeant's use of specialty pharmacies. ¶120. For instance, one financial reporter noted that Horizon's "business model . . . shares similarities to that of Valeant," further substantiating Depomed's concerns about the "sustainability" of Horizon's PME. *Id.* On this news, Horizon's stock fell an additional 11.5%, from a close of $14.83 per share on October 21, 2015, to a close of $13.12 per share on October 22, 2015. *Id.* In response, Horizon issued another press release to assuage investor concern on October 22, 2015, denying any impropriety in the PME program, again claiming that the PME pharmacies were "***fully independent***," and attributing the Company's strong prescription growth to a variety of legitimate factors. ¶121.

On November 10, 2015, the market learned additional information about Horizon's control over the PME pharmacies when Express Scripts cut ties with Linden Care, concluding

that it was a "'captive' pharmacy" of Horizon.  ¶122.  Indeed, a November 10 *New York Times* article reporting on Express Scripts' decision stated that 59% of Linden Care's business was generated by dispensing Horizon drugs.  ¶123.  That same day, *Reuters* also reported that Express Scripts was "evaluating several other pharmacies that appear to be predominantly dispensing Horizon drugs." *Id.*  In response to this news, Horizon's stock fell $4.39 per share, or 19.62%, from $22.38 per share on November 10, 2015 to $17.99 per share on November 11, 2015.  ¶124.

In response to Express Scripts' announcement that it was terminating its relationship with captive Horizon pharmacies, Horizon issued a press release that same day, once again stating that the claim it had a captive relationship with any of the PME pharmacies was "***entirely false***." ¶208.  The very next morning, Horizon issued yet another press release, reiterating its denials from the previous day's release and accusing Express Scripts of profiteering.  ¶209.

On February 29, 2016, the market learned additional information indicating that Horizon controlled its PME pharmacies and employed improper marketing practices.  ¶127.  Specifically, on February 29, 2016, Horizon disclosed that the DOJ had been investigating the PME program and the Company's "marketing and commercialization activities" since November 2015.  *Id.*  On this news, Horizon's stock fell 13.3%, from $19.79 per share to $17.16 per share.  ¶128.  Analysts specifically noted that the market was reacting negatively to the news of the government investigation.  ¶129.  Cowen analysts, for instance, noted the market's "unfavorable reaction" to that news.  *Id.*  Likewise, Guggenheim analysts stated that "overhang from the subpoena announced earlier today (related to its patient assistance programs) is weighing on the stock."  Hallowell Decl. Ex. A.  Jefferies analysts similarly noted that Horizon's "positive [earnings] results were trumped however by the disclosure of a subpoena from the Southern

13

District NY Attorney related to the co's sales & marketing practices—causing the stock to drop 11% intraday." Hallowell Decl. Ex. B.  Additionally, Morgan Stanley analysts reported that the "**subpoena on patient assistance programs [was] causing concern**," and advised investors to "[r]ecall that Valeant received a subpoena from the same [office] . . .  on its patient assistance programs in Oct' 15."  Hallowell Decl. Ex. C.

As the above disclosures emerged, and the Company could no longer rely on its captive pharmacy network and improper sales tactics, the market learned the full truth about Horizon's PME program.  Specifically, on April 12, 2016, investors learned the full truth when Horizon announced that it was facing dwindling primary care drug sales, driven by negative pricing pressure on VIMOVO and DUEXIS, and was revising its expected revenues for the first half of 2016.  ¶131.  With this disclosure, investors for the first time understood the undisclosed risk posed by the PME program's dependence on captive pharmacies to drive prescriptions and that having been exposed, the program was unsustainable.  Although the Company maintained its full-year guidance for the company, it lowered guidance for DUEXIS and VIMOVO.  ¶132. Following this revelation, Piper Jaffray recognized that there were "real questions regarding HZNP's primary care segment," and UBS Securities said that it was "clear from our conversations with management that our sales estimates for DUEXIS/VIMOVO were too high." ¶132.  In reaction to this disclosure, Horizon's stock price fell from $18.22 per share to $13.42, a decline of more than 25%.  ¶134.

## II.   ARGUMENT

### A.   EXCHANGE ACT CLAIMS

#### 1.   The Complaint Adequately Alleges that Defendants' Statements Were Misleading

The Court must "accept all factual allegations as true and draw all reasonable inferences

in favor of the plaintiff." *Metz v. U.S. Life Ins. Co.*, 662 F.3d 600, 602 (2d Cir. 2011).  To allege a false or misleading statement or omission for purposes of Section 10(b) of the Securities Exchange Act, a plaintiff need only identify the statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent" by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003).  Plaintiffs easily meet this standard.

The Complaint provides ample allegations demonstrating that Defendants made at least the following types of actionable false and misleading statements and omissions throughout the Class Period: (1) statements purporting to describe the PME program and the drivers of its success, including statements characterizing Horizon's relationship with the PME pharmacies as "arm's length" and "independent" (*see* ¶¶136–58, 191–230); (2) statements touting the Company's drug sales and the drivers of those sales (*see* ¶¶159–81); (3) statements assuring investors that Horizon complied with applicable laws, regulations, and the Company's Code of Business Conduct and Ethics (*see* ¶¶182-85); and (4) statements certifying that the Company's SEC filings were free from materially misleading statements (*see* ¶¶186-88).

### (a) Defendants' Statements Purporting to Describe the PME Program and the Drivers of Its Success Were False and Misleading

Defendants' statements purporting to describe the PME program were materially false and misleading when made.  *See* ¶¶136–58, 191–230.  For instance, Defendants stated:

- "So this program has several facets, but it's simple in its construct.  We get physicians to either sign up on their e-prescribing tool or to fax prescriptions into a local specialty pharmacy, ***which then will process prescriptions as any retail pharmacy would***."  ¶149.

- "I think what makes our PME program work is several facets.  First, you have to have products that have ***clinical differentiation*** that our sales force can sell effectively. Distribution model does ***not*** sell products.  ***Sales reps who are well trained, motivated to***

*differentiate the products and drive prescriptions that can then be managed through our distribution system is what drives the success*." ¶150.

After the truth about the PME program began to emerge in October 2015, Defendants denied Horizon controlled the pharmacies participating in the program, falsely characterizing their relationship as "arm's length" and "independent." For instance, Defendants stated:

- "All pharmacies that distribute Horizon branded medicines are *fully independent*." ¶191.

- "*The Company's relationship* with each pharmacy is *non-exclusive* and *arm's length*."¶196.

- "When it comes to how pharmacies are incented, retail pharmacies, mail order *pharmacies are all incented through the system working with payers and PBMs* and for filling prescriptions.  *That is it, nothing more to add*." ¶197.

- "*The notion that Linden Care is a so-called 'captive pharmacy'* of Horizon Pharma is *entirely false*." ¶208.

- "Worth [noting] along with these facts is that we don't pay for any fees, you know, *there's no fee-for-service arrangement with any pharmacy*.  So, we have *a very standard relationship* there and, actually, probably *more conservative than they ever appear*." ¶203.

- "So the question for everyone was, have we moved the Linden Care prescriptions and what is our plan moving forward? *We are not involved with Linden Care*, so *we haven't moved anything*." ¶211.

These statements were false and misleading when made.  Contrary to Defendants' statements to investors, the pharmacies participating in the PME program were not "fully independent" and Horizon's relationship with them was not "arm's length," "conservative," and "standard."  In reality, the PME program relied on a small number of captive pharmacies, one of which was founded by Horizon executives, and all of which were closely monitored by Horizon employees who controlled the flow of prescriptions to the pharmacies and directed operations, such as instructing staff to put patients on auto-refill or coming in every day when the pharmacy's numbers were down.  ¶¶66–87.

Similarly, Defendants' statements about the operation and success of the PME program were false and misleading because, having undertaken to describe the PME program to investors,

Defendants were obligated to provide a materially accurate and complete description of the PME program.  *See, e.g.*, *Caiola v. Citibank N.A. N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011); *see also Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements that analysts provided "truly independent investment research" were misleading in light of conflicted relationship with issuers); *In re Worldcom, Inc. Sec. Litig.*, 2003 WL 22533398, at *3 (S.D.N.Y. Nov. 7, 2003) (same).

In particular, Defendants' statements attributing the PME program's success to a variety of legitimate causes, including Horizon's "differentiated products" and its well-trained sales force, (*see, e.g.*, ¶¶142, 150, 151, 155, 157), were false and misleading when made because, having put the drivers of the PME program's success at issue, Defendants were obligated to disclose that those results were driven, at least in significant part, by Horizon's use of captive pharmacies and its own sales force to pursue improper business practices, such as automatically refilling prescriptions without patient authorization, shipping drugs into states where the pharmacies were not licensed, promoting off label uses, and using gifts to develop conflict-ridden relationships with doctors (¶¶104–111).[4] Courts uniformly hold that when a company puts at issue the cause of its financial success, it materially misleads investors if the company fails to disclose that the use of improper, illegal, or unusually risky business practices is a material

_____

[4] Defendants argue that Horizon was "clear about the risks associated with PME."  Def. Br. at 7; *see also* UW Br. at 11–12, 15-16.  But the risk warnings Defendants highlight simply do not encompass the risk posed by a captive pharmacy network employing improper business practices.  For example, Defendants' warning regarding the "limited number of PME pharmacies" was explicitly regarding those pharmacies' capacity to "process and fulfill the volume of patient prescriptions directed to them under the PME program," not about their independence or their adherence to regulation.  Def. Br. at 7; UW Br. at 15-16.  Similarly, general warnings about "pressure from payors" do not serve as meaningful notice of Horizon's illicit use of the PME program. Def. Br. at 7; UW Br. at 12. And, as more fully described in Section I.A.3, below, risk warnings that cast as contingent risks events that have already come to fruition are misleading.

source of that success.  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (statements "concerning the sources and significance of the revenue," *e.g.*, that "trading volumes and price volatility determine our opportunities to trade," held misleading because they failed to disclose that revenue had been generated in part by a subsidiary's trading activities that violated NYSE rules).[5]

In their motions, Defendants argue that their statements purporting to describe the PME program, including the supposed "independence" of its participating pharmacies and the causes of its success, were not misleading because the Complaint fails to allege either that Horizon controlled the pharmacies in the PME program or that the practices described in the Complaint were actually improper, illegal, or risky.  Def. Br. at 11–17; UW Br. at 13–18. Defendants' argument fails, however, in the face of the Complaint's detailed allegations.

> (1)    The Complaint Alleges Horizon Operated a Captive Pharmacy Network

Tellingly, Defendants do not argue that the existence of a captive relationship between Horizon and the PME pharmacies would have been material to investors.  Rather, they argue that the Complaint fails to properly allege such a relationship.  Def. Br. at 11–13; UW Br. at 15–16. First, Defendants argue that the Complaint could not possibly allege that Horizon operated a

---

[5] *See also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368–69 (E.D.N.Y. 2013) (statements attributing Medicare revenue to "increased patient admissions and revenue per episode," held misleading where statements failed to disclose that revenue was due in part to allegedly fraudulent business practices); *Lapin*, 506 F. Supp. 2d at 240 (statements attributing issuer's success to its integrity "obligated [the issuer] to disclose information concerning the source of its success," including improper business practices (internal quotations omitted)); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 337, 364-65 (S.D.N.Y. 2005); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000).  Courts outside the Second Circuit are in accord.  *In re Unum Provident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 885-86 (E.D. Tenn. 2005) (false statement adequately pled where plaintiff alleged defendants "conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then both failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the potential liabilities in the company's financial disclosures"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001).

"captive pharmacy" network because the term itself is meaningless.  Def. Br. at 11–12.  This argument overlooks that the Complaint spells out exactly what made the pharmacies in the PME network "captive": Horizon exercised operational and economic control over them.  ¶¶62–88, 335.  Participants in Horizon's own industry use the phrase the same way the Complaint does; Express Scripts for instance explains that "captive pharmacies [are] operated by manufacturers to push a particular product, or derive the vast majority of prescription volume from one manufacturer and/or product."[6]  In fact, Horizon itself publicly denied that Linden Care was a "captive pharmacy" in the fall of 2015[7]—a difficult task if it had (and still has) no idea what the phrase means, and it begs the question why Defendants felt compelled to issue a denial if it was meaningless to the market.

Defendants incorrectly argue that the Complaint fails to allege they exercised any operational control over the PME pharmacies because "[t]he mere presence of Horizon employees at a pharmacy is not illegal or improper," nor was it "illegal or improper" to "assist a pharmacy with logistics" and "monitor sales." Def. Br. at 12.  As an initial matter, the proper question is whether Horizon's involvement in managing a pharmacy's day-to-day operations contributes to an inference the Company controlled the PME pharmacies, not whether such involvement is "illegal."  In fact, the Complaint's allegations demonstrate that Horizon had the power to direct, and did direct, the PME pharmacies in their day-to-day business.  ¶¶254, 297.  For instance, the Complaint alleges that Horizon directed pharmacies to enroll certain doctors in ostensibly pharmacy-run pilot programs,[8] and place patients on "auto-refill" status.[9]  ¶¶91–93,

---

[6] http://lab.express-scripts.com/lab/insights/pharmacy-options/captive-pharmacies-what-weve-learned.

[7] http://www.chicagotribune.com/business/ct-express-horizon-spat-1112-biz-20151111-story.html.

[8] In a March 10, 2015 text message, for example, Kurup writes to a pharmacy employee that senior Horizon executive Lori Sampson "is gonna add more illinois [sic] docs today" to be enrolled in the **pharmacy's** pilot program.  ¶75.

353–357.  Moreover, the Complaint alleges far more than the "mere presence" of Horizon employees at PME pharmacies; it alleges that Horizon employees, including the Company's CFO and COO, visited PME pharmacies, attended regular management meetings, and were present "every day for a while" in order to manage a pharmacy's Horizon business when prescription sales slumped.  ¶¶67, 78, 336, 346.

Defendants also argue that the Complaint fails to allege that Horizon wielded economic control over the PME pharmacies, but only addresses allegations relating to a single pharmacy, Halsted—and even then, ignore many Halsted-specific allegations.   Def. Br. at 11–13. Specifically, Defendants argue that Horizon lacked economic control over Halsted because the $100,000 a week in income Halsted generated from commission-type payments was only a small portion of the pharmacy's revenue.  Def. Br. at 12–13.  This argument ignores Kurup's own text messages bragging about how lucrative and important Horizon's business was to the pharmacy, ¶70, and that the Complaint alleges that Horizon paid commission-type payments in addition to rebates and other incentives.[10]  *See* ¶85, 352.  Further, Defendants cite a complaint filed by Halsted's owners related to losing Horizon's business, but ignore that the very filing of that

[9] Defendants argue that the seamless transfer of tens of thousands of Horizon prescriptions from one pharmacy in Horizon's PME network (Halsted) to another (Clybourn) is irrelevant to the question of operational control because there is no evidence Horizon was aware of that transfer.  Def. Br. at 12 n.10. But the Court should not credit Defendants' unsupported claim that a new pharmacy could simply assume the place of a key pharmacy in Horizon's PME network without the Company's knowledge and acquiescence, certainly not when it involves such a large volume of prescriptions.

[10] Defendants also make the unsupported factual assertion that these payments were ordinary dispensing fees, stating that dispensing fees are calculated on a percentage basis.  Besides being inappropriate on a motion to dismiss, Defendants are incorrect; dispensing fees are almost invariably below $3.00, and the national average is $1.80.  *See* Pharmacy Benefit Management Institute, 2015-2016 PRESCRIPTION BENEFIT COST AND PLAN DESIGN REPORT, at 11 (2015).  Thus, however Horizon characterized the payment of commissions, one can infer Horizon was paying these pharmacies above-market rates for *something*.  This incentive arrangement between Horizon and the pharmacies was hidden by the Company's denials during the Class Period that "there's no fee-for-service arrangement with any pharmacy," and statements that they had "a very standard relationship . . . probably more conservative than they ever appear."  ¶ 64.

complaint demonstrates that Horizon's business was sufficiently important to merit a lawsuit. ¶76, 344.

Defendants do not seriously attempt to argue the Complaint fails to allege Horizon wielded economic control over Clybourn and Linden Care—nor could they, given that Clybourn went from filling 1,200 prescriptions a day to 20 when Horizon shifted its business elsewhere (¶¶79–81), and the Horizon prescriptions handled by Linden Care's 40 to 50 person Horizon-only department accounted for 59% of its business (¶86).[11]  Nor do Defendants acknowledge that Linden Care fought to rejoin the PME program when it was kicked out before the Class Period. Instead, Defendants claim that such control is not "illegal or improper" (Def. Br. at 11–13), once again misstating the relevant inquiry.  As Defendants acknowledge, the Complaint alleges the largest PBM in the country, Express Scripts, refuses to do business with pharmacies subject to such control, but nevertheless asks the Court to hold, as a matter of law, that such control is immaterial to investors.  Def. Br. at 13.  This argument is belied by the precipitous drop in Horizon's stock when Express Scripts began severing ties with Horizon-controlled pharmacies. ¶¶122–24.  At a minimum, Defendants' argument is highly factual and therefore inappropriate in a motion to dismiss.  *See Metz*, 662 F.3d at 602.[12]

---

[11] Defendants contend the Complaint's allegation that Clybourn processed up to one third of Horizon's prescriptions during the Class Period has no bearing on whether Horizon wielded economic control over the PME pharmacies.  Def. Br. at 22 n.19.  This is wrong.  That Clybourn processed one third of the nationwide prescriptions for Horizon's drugs, and that this represented essentially all of Clybourn's business, demonstrates that Clybourn was beholden to Horizon, and belies Walbert's characterization of the PME pharmacies as "local specialty pharmacies." ¶149.  For this same reason, Defendants' argument that this allegation does not render false Walbert's statement that "no one pharmacy makes up more than approximately 13% of our net sales" fails.  Def. Br. at 22 n.19.  Defendants' argument is blind to the purpose and import of Walbert's statement: namely, to reassure investors that Horizon's relationship with the PME pharmacies was entirely "arm's length." Disclosure that so much of the Company's revenue depended on a single PME pharmacy would have alerted the market that Horizon's relationship with the PME was not entirely arm's length and thus "altered the total mix of information made available" to investors. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).

[12] Defendants also ask the Court to infer that Horizon wielded outsized economic control over the PME

Finally, Defendants argue that the Complaint fails to allege Horizon controlled Clybourn because the two senior Horizon executives who helped start the pharmacy later resigned from Horizon.   Defendants' facts here are suspect—they provide no support for their assertion that Bove left Horizon on December 31, 2014.  Def. Br. at 13.  By contrast, the Complaint cites an email dated February 27, 2015 copying Ben Bove at his Horizon email address.  ¶75.  This strongly suggests that Bove continued to oversee the PME program for Horizon for at least five months after the pharmacy was incorporated in September 2014, (¶73), during which time tens of thousands of Horizon prescriptions were transferred from Halsted to Clybourn and Horizon directed Clybourn to enroll doctors in the pharmacy's pilot program (¶75).   Defendants' argument at most raises a fact question and fails to address the remaining indicia of Horizon's control, operational and economic, over Clybourn, including Horizon executives'  monitoring and managing the pharmacy's day-to-day operations.  *See supra* pp. 6–7.

> (2)     The Complaint Alleges Horizon's PME Pharmacies and
> its Sales Force Employed Improper Sales Practices

Defendants also argue that the Complaint fails to allege that either the PME pharmacies or the Company's sales force employed "improper, dishonest," or "illegal" sales practices. Notably, Defendants do not, for the most part, argue the practices described in the Complaint were not improper or illegal, nor do they deny that the existence of such practices would have been material to investors.   Instead, Defendants largely gripe about the Complaint's use of statements from former employees of Horizon and its captive pharmacies.  Def. Br. at 13–17. But the Complaint's use of such witnesses is perfectly consistent with Second Circuit law.  As

---

pharmacies without the Company's knowledge (Def. Br. at 13), but, as discussed in Section I.B. below, given the degree to which Horizon monitored the limited number of PME pharmacies, this inference is not more plausible than the competing inference. This is particularly true with respect to Linden Care, which ardently petitioned Horizon for readmission to the PME program.  ¶86.

Defendants concede, a complaint may rely on confidential sources so long as "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); Def. Br. at 14. The former employee reports here easily meet this standard. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012) (allegations "corroborated by multiple confidential witnesses" are particularly reliable). For instance, those former employees who worked at PME pharmacies participated in filling and shipping Horizon drugs, processing claims, and interfacing with patients and/or with Horizon personnel. ¶¶67–70, 74 and n.20, 75, 78 and n.22, 79, 87 and n.27, 91–92. One former Halsted employee also provided dated emails and text messages that corroborated many allegations. *See, e.g.*, ¶¶73–77 and n.21, 252. Likewise, the former Horizon sales personnel stated that they received documents or attended the meetings concerning the events and facts they reported. ¶¶78, 105, 108.

Defendants' remaining arguments about the specific practices identified in the Complaint are equally unavailing. *First*, Defendants argue that the Complaint fails to "plausibl[y]" allege that Horizon instructed the PME pharmacies to refill prescriptions without patient authorization. Def. Br. at 14. But the Complaint cites mutually corroborating reports from **two different** employees responsible for implementing those instructions at **two different** PME pharmacies confirming they were told to refill Horizon prescriptions "even if they had not received patient authorization." ¶91. A former employee at Linden Care from February 2015 to January 2016 responsible for processing insurance claims and interfacing with patients, confirmed that pharmacy management directed that Horizon prescriptions be refilled without authorization "per Horizon's instructions." ¶92. This former employee described those instructions in detail,

reporting that employees were first told to only put the $0 co-pay patients on auto-refill, then later to include $10 co-pay patients.   ¶92 n.30.   Indeed, the Former Linden Care Employee recalled being uncomfortable with charging patient's credit cards *without* their authorization.   *Id.* The fact that employees at *two different* PME pharmacies were instructed to place all Horizon patients on "auto-refill," supports the inference that Horizon disseminated those instructions to its PME pharmacies.   Further confirming these former employees' accounts, the Complaint cites a patient complaint about receiving unauthorized refills of Horizon prescriptions.   ¶91 n.29.

*Second*, Defendants claim that the Complaint fails to allege Horizon was "aware" that Clybourn misrepresented drug costs to patients. Def. Br. at 14–15.   As discussed in Section II.A(2) below, however, the Complaint's allegations that senior Horizon employees extensively monitored and managed the day-to-day operations of Clybourn—a pharmacy established and run by Horizon executives to distribute Horizon drugs nearly exclusively—yields such an inference. Moreover, the fact that the instructions Clybourn employees received to dodge doctor and patient questions about drug pricing *mirror* instructions Horizon disseminated to its own sales force supports the inference that those instructions were authored by the senior-most Horizon executives.   Defendants further argue that they were under no duty to disclose that PME pharmacies misrepresented drug costs to patients (Def. Br. at 14–15); however, as discussed above, an issuer is obligated to disclose such conduct where, as here, it puts the drivers and causes of its financial results at issue. *Van der Moolen*, 405 F. Supp. 2d at 400-01.

*Third*, Defendants argue that Plaintiffs' allegations about misleading PBM auditors are insufficiently detailed, dismissing them as "colorful." Def. Br. at 15.   Defendants object that the particular audits are "unspecified," the exact time at which the conduct took place is "unknown," and the managers who issued the relevant orders are "unnamed." Def. Br. at 15.   Yet, to take one

example, the Complaint cites an October 15, 2014 text message (known time) from a Halsted owner, Renny Kurup (named manager), to the Former Halsted Pharmacist instructing the pharmacist to make sure it did "NOT look[] like we are running mail order out of Halsted" for an audit that same day (specific audit).  ¶102.  In another example, the Complaint pleads, in detail, how Clybourn managers hid Horizon drugs and pharmacy computers from auditors, worked overtime to ship out as many Horizon drugs as possible in advance of audits, and gave employees the day off to prevent them from coming into contact with auditors.  ¶¶99–101.  In any event, such details are not required at this stage because "[t]he PSLRA did not . . .  purport to move up the trial to the pleadings stage." *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1101–02 (10th Cir. 2003); *see also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478 (S.D.N.Y. 2004).  The Complaint's allegations more than "support a reasonable belief that the defendant's statements [identified by the plaintiff] were false or misleading"; nothing more is required.  *Philip*, 383 F. Supp. 2d at 479.[13]

*Finally*, Defendants argue the Court may not consider the allegations that PME pharmacies shipped drugs to states where they were unlicensed because they are borrowed from "an untested complaint" in another matter.  Def. Br. at 15.  Defendants here ignore a corroborating internal Halsted email from a Halsted pharmacist to Kurup expressing concern about past shipments of drugs into states where Halsted was unlicensed.  ¶94.  Even without those allegations, numerous courts—including the Supreme Court and the Second Circuit—have approved a plaintiff's reliance on unadjudicated allegations from other complaints when drafting

---

[13] Defendants' argument that Horizon, which had extensive experience transacting with PBMs, would not know that the PME pharmacies' affirmative efforts to hide information from PBM auditors violated the pharmacies' contractual duties to PBMs (Def. Br. at 15), defies common sense.  It is even more incredible in the case of Clybourn, which was *created* by senior Horizon executives, an act which it would be reasonable to infer familiarized them with the pharmacy's contractual obligations.

their own pleadings.  *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011); *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 103 (2d Cir. 2003); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014).[14]

The Complaint also adequately alleges that Horizon sales representatives employed tactics that were improper or risked exposing the Company to adverse legal, regulatory, or PBM action.  *First*, contrary to Defendants' argument, the Complaint provides specific allegations that Horizon directed its sales force to market DUEXIS and VIMOVO for off-label use.  Def. Br. at 16–17.  The Complaint alleges, among other things, that Horizon's sales manager in Texas reported receiving lists of doctors, the majority of whom sales personnel had no expectation would prescribe the drugs for their indicated use in view of the doctors' specialties.  ¶110; *see also* ¶111.  Defendants' factual argument that this senior sales manager was "confused" is both wrong and inappropriate at this stage of the litigation.[15]  *Second*, while Defendants argue that it is "innocuous" for a pharmaceutical company to provide gifts and entertainment to doctors in order to influence their prescribing choices (Def. Br. at 16), they wholly ignore that Horizon's **own Code of Business Conduct and Ethics** provides that "[e]mployees must **not** offer or provide any gifts or entertainment to any healthcare professional."[16]  ¶105.  Defendants' argument that other

---

[14] *See also Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999).

[15] While Defendants claim that orthopedic surgeons treat arthritis (Def. Br. at 17 n.13), "surgery is a treatment option reserved for patients with particularly severe forms of arthritis, for whom conservative treatments have been ineffective." http://www.arthritis-health.com/treatment/specialists/orthopedic-surgeon-arthritis-treatment. Even allowing for their claim that "some" orthopedic surgeons do not perform surgery (Def. Br. at 17 n.13), Defendants' argument simply cannot explain why *most* of the doctors to whom DUEXIS and VIMOVO were marketed were surgeons. Indeed, the website Defendants cite indicates that patients with OA or RA are far more likely to be regularly treated by a rheumatologist. http://www.arthritis.org/living-with-arthritis/health-care/your-health-care-team/arthritis-doctors.php.

[16] UWs incorrectly suggest allegations that an issuer's practices violated a code of conduct to which it publicly claimed to adhere are inadequate to allege materiality as a matter of law.  UW Br. at 14. Numerous courts have held that "it defies logic to suggest" that reasonable investors do not rely on an issuer's statements touting its adherence to a particular code of conduct.  *Lapin*, 506 F. Supp. 2d at 240;

drug companies engage in similar conduct (Def. Br. at 16 n.12), does not prove that this conduct

is proper; moreover, Defendants offer no evidence that the other companies they identify had,

like Horizon, publicly touted their compliance with a code of ethics that proscribed providing

gifts and entertainment to doctors.   *Finally*, Defendants argue that it is not fraudulent or illegal

to instruct sales representatives to evade doctors' questions about drug pricing (Def. Br. at 15-

16), but the law does not support this claim.   *See, e.g.*, *Coker v. Merck & Co.*, 2007 WL

2363398, at *3 (N.D. Miss. Aug.  16, 2007) ("The Complaint alleges that Merck instructed their

sales representatives to intentionally 'dodge' any questions posed by doctors regarding certain

harmful  effects  of  [its  drug].    These  allegations  alone  suggest  that  the  resident  sales

representatives were joint-tortfeasors along with Merck . . . .").[17]

(3)    Defendants' Statements Were Not Inactionable
Opinions, Corporate Optimism, or "Puffery"

Defendants  also  argue  that  statements  prefaced  with  the  words  "we  think"  or  "we

believe," particularly statements describing the PME program and attributing its success to

legitimate drivers, are inactionable opinions because "Plaintiffs fail to plead that Defendants did

not sincerely believe these statements at the time they were made." Def. Br. at 19.   Even

assuming Plaintiffs failed to plead Defendants subjectively believed these statements, they are

not required to do so.   *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

135 S. Ct. 1318, 1329, 1333 (2015).   Even if honestly held, an opinion statement is actionable

where, as here, it does not "fairly align[] with the information in [the defendant's] possession" or

---

see also *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009).

[17] UWs similarly argue that the Complaint fails to allege that any of the sales practices identified in the
Complaint "have ever been found by any court or regulator to have been improper." UW Br. at 17.
Contrary to UWs claims, a formal adjudication that Horizon engaged in illegal conduct is not required for
Plaintiffs to state a claim.  *See, e.g.*, *Gentiva*, 932 F. Supp. 2d at 363, 368-69, 380 (rejecting argument
that the absence of a formal regulatory finding of wrongdoing required dismissal of claims for failure to
disclose improper business practices); *Lapin*, 506 F. Supp. 2d at 240.

27

where the defendant "lacked the basis for making those statements that a reasonable investor would expect." *Id*.

For instance, Defendants characterize as inactionable opinion Walbert's statement, in response to an analyst's question about "why the PME program worked so well for Horizon," that "for us what it does is we believe we've got differentiated products where we do the right thing for the patient, the right thing for the physician and that has led as you can see in the second-quarter results to strong growth in both all three [sic] primary care products." Def. Br. at 19. Even were this statement an opinion (which it is not),[18] it misleadingly failed to disclose the improper drivers of the program's success, *Van der Moolen*, 405 F. Supp. 2d at 400-01, and thus did not "fairly align[] with the information in [Defendants'] possession." Defendants' statement that they believed the PME program would "largely mitigate" adverse PBM action is similarly actionable. Def. Br. at 19. A "reasonable investor" would ***not*** expect "the basis for making those statements" to include Horizon's ability to maintain and support a captive pharmacy network powered by improper sales practices. *Omnicare*, 135 S. Ct. at 1333.

Defendants also argue that their statements, including statements attributing stellar sales results to "clinical differentiation," a "well-trained, motivated" sales force, and attuning their model to physician and patient preferences (*see* Def. Br. Ex.  B), are mere expressions of "corporate optimism" or "puffery" that the Court must hold are immaterial as a matter of law. Def. Br. at 18–19. The Second Circuit has held, however, that "a complaint may not properly be

---

[18] Defendants' claim that Walbert's (gratuitous) use of the word "believe" transforms his statement about the drivers of the PME program's success into an opinion is dubious at best.  Walbert expresses none of the "uncertainty" characteristic of opinion statements, *Omnicare,* 135 S.  Ct.  at 1329, when he explains that the two drivers he identified "***led* . . .  to strong growth**" in second quarter drug sales.  The word "believe" modifies his statement about product differentiation; it does not modify his claim about the causal relationship between *all* of the factors articulated (including factors not modified by the word "believe") and the quarter's sales results. In any event, as discussed above, even if the entire statement were an opinion, it is actionable.

dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are *so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance*." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (emphasis added). Accordingly, materiality "is generally not an appropriate basis on which to dismiss a complaint." *Vivendi*, 381 F. Supp. 2d at 182. Defendants' attempt to satisfy the heavy burden articulated in *Ganino* by cherry-picking words or phrases out of context in an effort to obscure the import of the statements at issue is unavailing.[19] Def. Br. at 18–19.

Several facts preclude finding these statements immaterial as a matter of law. The statements at issue concern the Company's most important drugs and its most important sales channel, the PME program—a program Horizon touted to allay investor concern about the viability of the Company's business model. The gravity of the subject of Defendants' statements thus strongly weighs against a finding of immateriality as a matter of law. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 11319408, at *23 (S.D.N.Y. Dec. 12, 2013) (collecting cases); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1 2005). Additionally, having repeatedly touted the PME program's success during the Class Period, Defendants cannot now argue that the undisclosed practices through which that success was achieved are immaterial as a matter of law. Moreover, Defendants ignore that a number of the statements at issue were specifically made in response to analyst questions or to reassure the market in the wake of adverse Company news (sometimes accompanied by a stock decline) or both, thus underscoring their materiality. *See* ¶¶142, 143, 150, 151, 155, 157, 193,

---

[19] Similarly, Walbert's statements that everything was "on track" in the PME program were not "squishy." Def. Br. at 18. Walbert's representation referred directly to concrete metrics such as prescription numbers, pricing, and expenses. Even without those metrics, representations that a business plan is "on track" when the speaker knows the opposite is true are materially false and misleading. *See, e.g., City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *11 (S.D.N.Y. Mar. 25, 2013) (holding a statement about getting the brand "back on course" was actionable when the company did not disclose that it anticipated the problem would continue).

197, 200, 204, 205, 208, 211, 217, 218, 225, 227, 230, 231; *see Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statements made in response to analyst questions are material).  For instance, Defendants argue that their statement, in the wake of public scrutiny of the PME program, reassuring investors that Horizon had been "very transparent," and that there was nothing material about the program investors did not already know, is immaterial as a matter of law.  Def. Br. at 18.  But they ignore that not only was the topic one of utmost importance to investors, the statement at issue was made in direct response to an analyst question and in an effort to mitigate the impact of adverse news on the subject, demonstrating its materiality.  ¶225.

> **(b)   Defendants' Statements Touting the Company's Drug Sales and the Drivers of Those Sales Were False and Misleading**

Defendants' statements touting Horizon's growing sales of VIMOVO, DUEXIS, and other drugs, and statements attributing those growing sales to legitimate causes, including the "expansion of [the Company's] sales force" (*see, e.g.*, ¶¶163, 168, 171), "terrific execution by our sales, marketing, and analytics teams" (*see, e.g.*, ¶¶166, 172), and the "differentiated clinical benefits" of the Company's products (*see, e.g.*, ¶172), were materially false and misleading when made.  Again, having put the causes of Horizon's success at issue, Defendants were obligated to provide a materially complete accounting of those causes, and disclose that the sales growth they touted was driven in material part by Horizon's maintenance of a captive pharmacy network and improper sales practices, as described above.  *See, e.g.*, *Van der Moolen*, 405 F. Supp. 2d at 400-01 and cases cited *supra* at n.5.  While Defendants argue these statements recite nothing more than historical sales results (Def. Br. at 21–22), they omit the portions of their statements attributing those results to legitimate drivers and wholly ignore *Van der Moolen* and progeny.

30

**(c)** **Defendants' Statements Touting the Company's Code of Business Conduct and Ethics and Reassuring Investors About Horizon's Legal and Regulatory Compliance Were Misleading**

Defendants represented that Horizon had "a compliance program in place to address adherence with various laws and regulations relating to its sales, marketing, and manufacturing of its products, as well as certain third-party relationships, including pharmacies" (¶196), and that "for any pharmacy that uses [the PME] program we work diligently to ensure that they are meeting all of our strict compliance criteria and standards.  If they don't, we quickly terminate participation and we have done so" (¶¶182–85, 197).  Defendants also issued "risk warnings" during the Class Period  that served as an implied representation that Horizon and its affiliates adhered to a robust compliance program, for example that employees and third parties ***may not*** adhere to the Company's Code of Business Conduct and Ethics or engage in fraudulent or illegal activity and that the Company may not be "able to ***maintain*** regulatory compliance".  ¶¶182–183.  Defendants' statements that Horizon was complying with applicable laws and regulations governing the promotion and sale of its drugs, and that the risk of such failure was merely contingent (¶182–183), were false and misleading when made because Horizon was presently violating such laws and regulations (¶184).  *See, e.g.*, *Van der Moolen*, 405 F. Supp. 2d at 400 (statements purporting to warn that a company's business "could" be negatively impacted "if" it failed to comply with applicable regulations were materially misleading where the company's traders were violating NYSE regulations at the time it issued those purported warnings).

As described above, the Complaint contains numerous allegations that not only were employees and distributors violating applicable laws and regulations and the Company's own code of conduct, these violations were directed by Defendants and central to Defendants' secret business strategy during the Class Period.  *See, eg,* ¶¶89–112.  Thus, representations about compliance with regulations were false and misleading when made.

31

There is no basis in Second Circuit law for Defendants' argument that statements presenting a risk as hypothetical when it is presently occurring are categorically inactionable. *See, e.g.*, *Facebook*, 986 F. Supp. 2d at 516 ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized," and collecting cases). As courts in this Circuit have often observed, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Van der Moolen*, 405 F. Supp. 2d at 400 (internal quotations omitted).[20]

Defendants' statements touting its Code of Business Conduct and Ethics were likewise false and misleading when made because Horizon flouted that Code as part of its regular course of business. *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 277 (S.D.N.Y. 2012) (statement that "[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest" held actionable where company engaged in transactions that presented such conflicts).[21] Defendants argue that they never made statements guaranteeing their adoption of a Code of Business Conduct and Ethics "would root out any impropriety" (Def. Br. at 21–22), but the allegations in the Complaint do not concern low-level "impropriety," they detail how the

---

[20] Defendants misstate the holding of *In re FBR Inc. Securities Litigation*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008). Contrary to Defendants' claims, *FBR* did not hold that cautionary statements are "not actionable." *Id*. In the passage Defendants excerpt, the court merely observed that some courts outside the Second Circuit had declined to follow *Van der Moolen*; ultimately, the *FBR* court actually "***decline[d]*** to find that boilerplate risk factors can never provide a basis for liability." *Id*. The court distinguished *Van der Moolen* by noting that the issuer in the case before it, unlike here, "did not imply such full [regulatory] compliance by touting their compliance policies, or a special corporate culture regarding compliance." *Id*.

[21] *See also Lapin*, 506 F. Supp. 2d at 240 (statements touting issuer's "dedication to complying with the letter and spirit of the laws" and its "business principles" actionable); *Moody's*, 599 F. Supp. 2d at 509 (statements touting issuer's "independence" and steps it was taking to "ensure its independence" held actionable); *see also FBR*, 544 F. Supp. 2d at 362 (noting that statements "touting [an issuer's] compliance policies" can "imply [] full compliance" with those policies)

PME program was premised on improper business practices.

### (d)  Defendants' SOX Certifications Were False and Misleading

Because Horizon's SEC filings did contain false and misleading statements, Walbert's and Hoelscher's certifications that they did not, pursuant to Section 302 of the Sarbanes-Oxley Act, serve as independent additional false and misleading statements.  Defendants are wrong that these statements are actionable only if the Individual Defendants had actual knowledge of their falsity.  Def. Br. at 22–23.  As the Supreme Court made clear in *Omnicare*, statements of opinion, although couched in the speaker's subjective mental state, express objective factual propositions, including representations about the reasonableness of the speaker's basis for the opinion expressed.  135 S. Ct. 1329, 1333.  Here, as discussed below, the Complaint alleges a widespread, continuing course of conduct, affecting the Company's most important business segment and most important drugs, the existence of which rendered the Company's statements false.  Thus, the Individual Defendants either "failed to perform the monitoring they claimed to have performed or they uncovered [the truth and] knowingly or recklessly misrepresented the circumstances to plaintiffs." *Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *3 (S.D.N.Y. Sept. 14, 2012).  Even if Plaintiffs were required to allege actual knowledge of falsity, they have done so.  For instance, the Complaint alleges that while the SEC filings in which the certifications appeared touted Horizon's compliance with its Code of Business Conduct and Ethics, the Company's senior managers, including CEO Walbert, attended a meeting at which sales personnel were in effect encouraged to violate that Code.  ¶¶105–06.

### (e)  Defendants' Statements are Not Protected by the PSLRA Safe-Harbor

Defendants also argue that some of their statements are shielded by the PSLRA's "safe harbor" (Def. Br. at 19–20; UW Br. at 18–20), which protects wholly forward-looking

statements that are either accompanied by meaningful cautionary language or made without actual knowledge of their propensity to mislead.  *See* 15 U.S.C.  § 78u-5.  Defendants, however, gloss over the core statements of present and historical fact the Complaint alleges are false and misleading.  *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (statements that "incorporate forward-looking aspects into statements of present or historical fact" are not protected by the PSLRA safe harbor); *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014).  For example, Defendants claim Walbert's statements at Horizon's May 8, 2015 earnings call were forward-looking, but they ignore that the crux of the statement concerns the Company's historical performance and the reasons behind it, touting the success of the PME program over the quarter ("we have now achieved [significant] penetration" of primary care products) and attributing the Company's impressive sales growth to "the execution of our commercial organization." ¶146.  Likewise, the UWs inaccurately claim that the ***only*** statements in the Offering Documents alleged to be false and misleading are forward-looking.  UW Br. at 18–20.  However, they ignore the Offering Documents' misleadingly incomplete descriptions of the PME program (*see, e.g.*, ¶373), statements touting the PME program's success (*see, e.g.*, ¶¶374, 379), and statements that Horizon was compliant with applicable laws and regulations, and had implemented a Code of Business Conduct and Ethics in order to ensure such compliance (*see, e.g.*, ¶¶375, 381–83).[22]

---

[22] Moreover, as discussed below, even if these statements were forward-looking, they are not protected by the PSLRA safe harbor because (1) the so-called "risk warnings" UWs cite failed to disclose then-existing facts about Horizon's control over the PME pharmacies and improper sales practices,. *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) ("To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." (internal quotations omitted)); and (2) the Complaint alleges that Walbert knew, among other things, that Horizon sales personnel were violating (and being encouraged to violate) the Company's Code of Business Conduct and Ethics.  Defendants' argument that Plaintiffs have pleaded "themselves out of court" ignores that the allegations about Walbert's attendance at sales meetings that provided him with his knowledge are repeated in the Securities Act section of the Complaint.  ¶366–68.

## 2.     The Complaint Adequately Alleges Scienter

Scienter may be pled by alleging facts (a) showing "that [the] defendants had both motive and opportunity to commit the fraud" or (b) constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307.   A strong inference of scienter exists where a complaint alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Id*. at 311.   Scienter allegations must be viewed holistically.   The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.   308, 322-23 (2007).   The inference of "scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*.   at 324.   Instead, a scienter inference is "strong" when it is as likely as any other inference. *Id*.[23]

The Complaint's allegations collectively raise a strong inference of scienter here.   In addition to allegations that Individual Defendants were present at the PME pharmacies and at Horizon sales meetings, and that compensation for the Individual Defendants was unusually

---

[23] Defendants misstate the standard for pleading corporate scienter in the Second Circuit and misunderstand the Court's holding in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).   Def. Br. at 26 n.23.   In the Second Circuit, "there is no requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006); *see also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) ("[C]ourts in this jurisdiction consistently interpret *Dynex*" as holding that "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement."); *Moody's*, 599 F. Supp. 2d at 516 (same).   Indeed, "courts have readily attributed the scienter of management-level employees to corporate defendants." *Marsh*, 501 F. Supp.2d at 481.   Thus, where, as here, a complaint identifies one or more management-level employees with scienter, corporate scienter is alleged, the employee need not also be a named defendant. *See, e.g., id.* While it is also possible, in cases like those outlined by the Seventh Circuit in *Tellabs*, to allege corporate scienter without alleging scienter as to any corporate agent, *Dynex*, 531 F.3d at 195, Plaintiffs here need not rely on this manner of pleading.

linked to stock price performance, the scheme described in the Complaint was vital to Horizon's business, generating the vast majority of Horizon's net sales during the Class Period. Consequently, Horizon employees directed the operations of the PME pharmacies, determining, among other things which prescriptions they would dispense and how they refilled patient prescriptions.  Indeed, Defendants represented to the market that they monitored and audited the PME pharmacies.  Further, the Complaint contains allegations that the same improper practices were implemented at different PME pharmacies and mirrored by Horizon's sales staff.   In addition, the most important PME pharmacy, Clybourn, was created by an executive vice president and a very senior manager while they worked at Horizon.  Thus, Defendants Horizon, Walbert, Hoelscher, Kody, and Carey knew or recklessly disregarded that Horizon exercised operational and economic control over the PME pharmacies and that the pharmacies, as well as Horizon's own sales force, implemented a host of improper business practices to boost drug sales.

### (a)  The PME Program, and the Drugs Distributed Through It, Were Vital to Horizon's Financial Well-Being

Allegations that DUEXIS and VIMOVO were the Company's most important drugs and that the PME program was critical to Horizon's success yield a strong inference of scienter.  *See, e.g.*, *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) (fact that "defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company" supported inference of scienter).[24]

---

[24] *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (inferring scienter with respect to misstatements about inventory where defendants "had reason to focus on [company's] inventory levels: inventory, especially when taken in relation to the company's overall sales, was key to measuring [company's] financial performance and was a subject about which investors and analysts often inquired."); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (senior "members of [issuer's] senior management team . . . can be presumed to have knowledge of the company's core operations."); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d

As alleged, the drugs sold through the PME program—DUEXIS, VIMOVO, and PENNSAID 2%—contributed the *vast majority* of all the Company's net sales: 83% in 2014 and roughly two-thirds in 2015.   ¶245.   Moreover, the PME program was the most important distribution channel for Horizon's primary care drugs: Walbert told investors in mid-2015 that, "65%–70% of the prescriptions of our primary care products now go through [the PME program]." *Id*.   Indeed, as Walbert and the other Defendants repeatedly stated throughout the Class Period, the PME program was critical to the Company's ability to mitigate the negative financial impact of adverse PBM action, including formulary exclusions.   ¶246.   For instance, in public filings, Defendants stated, "We expect that continued adoption of our PME program by physicians will be important to our ability to counter this action by the two PBMs and to offset pressure from healthcare payors and PBMs . . . ." ¶248.   Consistent with this, Walbert told investors the "attractive growth in prescriptions" Horizon was "continu[ing] to see" was "driven in large part by our acceleration of prescriptions flowing through our PME program." ¶247.

Additionally, Clybourn, the pharmacy that was most obviously captive, and at which improper sales practices occurred most routinely and egregiously, was also the most integral to the overall PME program.   In late 2015, Clybourn filled 10,000 prescriptions a week, as many as *one third* of all primary care prescriptions *nationwide*—earning the pharmacy visits from senior Horizon executives, including the Company's CFO and COO.   ¶¶78–79.   The Complaint also alleges that Bove, a Senior Vice President and Smith, an Executive Vice President, were current Horizon executives when they set up Clybourn and that ***Bove continued to oversee the PME program on behalf of Horizon*** for months ***while managing Clybourn's affairs***, including

---

314, 325 (S.D.N.Y. 2001) ("[O]n a motion to dismiss, making all reasonable assumptions in favor of the plaintiff includes assuming that principal managers of a corporation are aware of matters central to that business's operation.").

receiving emails from a manager in the PME program directing Clybourn to transfer certain doctors into the "Clybourn Pilot." ¶¶73, 75.  Yet, the pharmacy routinely refilled prescriptions without authorization and evaded PBM audits.  ¶¶78–79, 91, 94–95, 99–101.

Thus, the size of the PME program, its contribution to the Company's overall drug sales, and its indispensability to Horizon's future, give rise to an inference that Defendants knew or recklessly disregarded that the most salient features of the program included Horizon's control over the PME pharmacies and the use of improper sales practices to push prescription volume.

### (b)   Horizon Employees Monitored the Day-to-Day Operations of the Captive Pharmacies

The Complaint's allegations that Horizon managers monitored the day-to-day operations of the handful of pharmacies in the PME network also gives rise to an inference of scienter.  *See Richman*, 868 F. Supp. 2d at 283 (scienter with respect to company's short position in subprime assets where employees "monitored the status of" those assets); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010); *Apogee Enters., Inc. v. State St. Bank & Tr. Co.*, 2010 WL 3632697, at *5 (S.D.N.Y. Sept. 17, 2010).

Here, the Complaint alleges that Horizon executives made frequent visits to the PME pharmacies.  *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 150 (D. Mass. 2001) (allegations that executive visited warehouses at which misconduct was occurring contributed to inference of scienter).  For instance, the Complaint alleges that Horizon's CFO (Defendant Hoelscher); COO; Associate Director of Pharmacy Operations; and Regional Account Manager for the PME Program all visited, or worked closely with, Clybourn.  ¶¶78–79.  Likewise, emails and text messages with Halsted's owner show that Horizon vigilantly monitored Halsted's affairs and that Horizon managers, including both Horizon's COO and Bove, met with pharmacy managers, required the pharmacy to submit bi-weekly reports, and

exchanged no fewer than 104 emails with pharmacy management in just a few months.  ¶¶67–69; *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198, 201 (S.D.N.Y. 2010) (frequent communications and access to information contrary to public statements alleged scienter); *In re Check Point Software Techs. Ltd. Sec. Litig.*, 2006 WL 1116699, at \*3 (S.D.N.Y. 2006) (regular teleconferences and meetings to address problems with an important product alleged scienter).  Indeed, a Horizon Associate Director stepped in, on an "every day" basis, to direct Halsted's affairs when the pharmacy's sales of Horizon drugs slumped.  *Id.*  The Complaint further alleges that Horizon exercised such oversight across the small PME network, and, according to former pharmacy and Horizon personnel, that the Company would station its personnel for a week at a time at various specialty pharmacies to monitor their operations.  ¶67.

Moreover, as Defendants admit, Horizon specifically told investors that it "monitor[ed] and audited pharmacies [including those that participate in the PME program] to confirm [their activities, adjudication and practices are consistent with the Company's] compliance with the Company's policies and guidance." Def. Br. at 12 (citing Def.  Ex.  12 at 4).  Indeed, Walbert assured investors that Horizon management "***work[ed] diligently*** to ensure that [the PME pharmacies] are meeting all of our strict compliance criteria and standards." ¶197.  Defendants' affirmative representations strengthen the inference of scienter here.  *See, e.g.*, *Meridian*, 2012 WL 4049953, at \*2–3 (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements).

### (c)    The Nature of the Undisclosed Practices that Drove the PME Program Give Rise to an Inference of Scienter

The Complaint's allegations that Horizon directed or acquiesced in the undisclosed practices that drove the PME program give rise to an inference of scienter.  *First*, the Complaint's allegations that Horizon's senior executives, ***including CEO Walbert***, attended

meetings at which: (1) employees discussed the fact that Horizon sales personnel were providing doctors with gifts and entertainment in violation of the Company's Code of Business Conduct and Ethics; and (2) sales personnel were encouraged to continue engaging in such conduct (¶¶105–06), give rise to an inference of scienter. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 198 ("[D]irect conversations with Individual Defendants [and] meetings at which Individual Defendants were present . . . demonstrate their access to and actual knowledge of facts which contradicted their public statements.").[25]

*Second*, reports of former pharmacy employees responsible for overseeing drug dispensing, claims adjudication, and interfacing with patients, make clear that Horizon directed PME pharmacies to implement the improper sales practices described in the Complaint. For instance, a former Linden Care employee who handled prescription fills stated that supervisors ordered employees to place every patient on auto-refill, per Horizon's instructions. ¶92. The fact that employees at Clybourn were also instructed to place all Horizon patients on "auto-refill" (¶91), corroborates these allegations and supports the inference that in fact, Horizon disseminated those instructions to the PME pharmacies. Indeed, the Complaint contains allegations that the major pharmacies in the PME program were aware of one another's operations, though they tried to hide it. In an August 27, 2015 text message to a Halsted

---

[25] Defendants' argument that the Complaint fails to identify a "communication or report" received by a Defendant (Def. Br. at 25), ignores these allegations. They also ignore allegations that a **member** of Horizon senior management was managing Clybourn and the PME program at the same time. More fundamentally, Defendants' argument—along with their argument that no former employee is alleged to have spoken with an Individual Defendant (*id.*)—ignores the Supreme Court's admonition in *Tellabs* that "smoking gun" evidence is not required to satisfy the PSLRA. 551 U.S. at 322-23; *see also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 532-33 (S.D.N.Y. 2010) (finding that defendants had access to information contradicting their financial statements dating back to 2005 even though plaintiffs did not make allegations concerning specific reports); *Sgalambo*, 739 F. Supp. 2d at 482 (concluding that defendants "surely relied on some sort of document or report" based solely on the content of their public statements) *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015) ("[T]he plaintiff does not need a smoking gun to allege sufficient facts to support a strong inference of scienter.").

employee, Kurup warned Halsted Pharmacy employees to tell any patients or doctors inquiring about Linden Care that "we don't know of or have any knowledge of lindencare [sic]."   ¶260. Notably, this text message was written just as public concerns about drug companies' relationships with pharmacies were beginning to crystalize, but ***before*** Horizon's relationship with Linden Care was exposed.

*Third*, and relatedly, Horizon's ability to transfer Horizon prescriptions *en masse* from one pharmacy to another on multiple occasions—and, indeed, to transfer huge swaths of PME operations from one pharmacy to another in response to PBM scrutiny—gives rise to an inference that such conduct was coordinated by Horizon.   ¶¶77, 81, 259; *See United States v. Yanez-Baldenegro*, 33 F.3d 61 (9th Cir. 1994) ("The coordinated actions of the co-defendants in this case are strong circumstantial evidence of an agreement.").   And, each time Horizon changed pharmacies, Horizon employees had to coordinate with doctors, as Horizon manager Sampson did when doctors were being transferred to Clybourn.   ¶75.   Indeed, it is implausible that one PME pharmacy could be substituted for another in Horizon's small PME network without the Company's knowledge and acquiescence.   *See In re Peoplesoft, Inc., Sec. Litig.*, 2000 WL 1737936, at *3–4 (N.D. Cal. May 25, 2000) (scienter alleged because senior management is assumed to know of "loss of major customers").

*Fourth*, materials directing pharmacies or sales personnel to engage in improper marketing practices came from Horizon itself.   For instance, the Complaint alleges that Horizon management identified the doctors to whom sales personnel were to market the Company's drugs, including the lists that identified doctors who almost certainly would prescribe those drugs for off-label uses.   ¶110.   Similarly, official sales scripts directed Horizon personnel to dodge doctors' questions about drug pricing.   ¶¶109, 261.

*Fifth*, Horizon received a subpoena from the Department of Justice in November 2015—months before the end of the Class Period and at the same time Defendants were vigorously denying any impropriety in the PME program and affirming the independence of participating pharmacies—alerting senior management that Horizon's sales and marketing practices were under investigation. ¶262. At a minimum, senior management's failure to discover the undisclosed misconduct alleged herein **after** receiving a subpoena explicitly targeting it gives rise to an inference of scienter. *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 293 (S.D.N.Y. 1999) (notice of government investigation raised an inference of scienter with respect to post-investigation misstatements).[26]

### (d)    Horizon's Executive Compensation Plan Bolsters the Inference of Scienter

As alleged in the Complaint, the Individual Defendants' compensation was unusually dependent on Horizon's stock price and the achievement of revenue-based performance metrics. ¶¶263–71.  Horizon's 2016 proxy states that in 2015, 97% or more of named executive officer compensation, and 99% of Defendant Walbert's compensation, was "tied directly to the stock price performance of HZPN."  ¶267.    Horizon itself acknowledged how unusual this compensation structure was, stating in the Company's 2015 proxy that "[w]e are not aware of another equity incentive program in which senior management has assumed as much risk for generating long-term, above market equity appreciation[.]" ¶266.  Thus, as Horizon's stock was buoyed by Defendants' conduct, including false statements during the Class Period, Walbert's compensation increased more than ten-fold (from **$9 million to $93 million** for 2015), Hoelscher's compensation increased more than five-fold, Kody's compensation increased more

---

[26] *See also No. 84 Employee-Teamster v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003); *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1538 (8th Cir. 1996).

than six-fold; and Carey's compensation increased more than three-fold.  ¶263.[27] These

allegations bolster the inference of scienter here.  *Chamberlain v. Reddy Ice Holdings, Inc.*, 757

F. Supp. 2d 683, 711 (E.D. Mich. 2010) ("[T]he magnitude of a defendant's compensation

package, together with other factors, may provide a heightened showing of motive to commit

fraud." (internal quotations omitted)); *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352,

1360 (W.D.N.Y. 1996) (same).[28]

### (e)    Defendants' Competing Inferences and Challenges Fail

In response to the Complaint's well-pled allegations of scienter, Defendants make a

series of arguments that lack merit. First, Defendants argue that the Complaint must be dismissed

and that scienter cannot be alleged because Horizon supposedly hired a third party to review its

"practices."  Def. Br. at 25. But Defendants offer no evidence that the Individual Defendants

were behind the decision to retain the third party consultant, or that the decision to retain the

consultant was anything more than an empty gesture made to mollify the market in the wake of

adverse news about the PME program. The mere existence of a review—the scope, extent, and

results of which Defendants have not disclosed—cannot negate scienter, and, at most, raises fact

questions.  Second, Defendants argue that the Court must conclude as a matter of a law that the

Complaint fails to allege scienter because Horizon increased its guidance in November 2015.

---

[27] Defendants argue that the fact that "much of" the Individual Defendants' compensation "was restricted
stock that will not vest until 2018" negates the inference of scienter.  Def. Br. at 24 n.22.  This argument
is a red herring.  Defendants' compensation was tied almost entirely to Horizon's stock price such that
Defendants were incentivized to artificially inflate that stock price.  The timing of the stock awards does
not negate that incentive, it prolongs it.

[28] Defendants' claim that the absence of insider trading allegations undermines the inference of scienter
here (Def. Br. at 23–24), is incorrect because Plaintiffs do not rely on insider trading to establish motive.
*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 n.14, 663 (8th Cir. 2001)
(explaining that under Second Circuit law, while the absence of insider trading allegations as to some
defendants may undermine an inference of scienter *where a plaintiff relies on such allegations with
respect to other defendants*, "[i]n this case, however, the investors do not rely on allegations of inside
transactions, but on other motives, such as the hope of huge bonuses, that are not directly undermined by
their abstention from trading").

Def. Br. at 25–26.  But securities fraud defendants routinely issue soothing statements designed to prevent the truth about their fraud from leaking out or mitigate the impact of any disclosure on the issuer's stock price.  *See, e.g.*, *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 346, 351 (3d Cir. 2009) (noting that "defendants' repeated defense of the [study] and their optimism regarding a potential label change" prevented full truth from emerging).[29]  Thus, at most, Defendants have merely raised another fact question.

### 3.     The Complaint Adequately Alleges Loss Causation

All that is required to plead loss causation in connection with a Rule 10b-5 claim is a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting Fed.  R.  Civ.  P.  8); *see also, e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd*., 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012).  To establish loss causation, the alleged misstatement or omission must have "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  In short, a plaintiff must "allege the truth that emerged was 'related to' or 'relevant to' the defendant's fraud." *Pub. Emps' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014).  There is no requirement that there be a single corrective disclosure; "rather, ***the truth can be gradually perceived in the marketplace through a series of partial disclosures***." *Id*.  at 322.

Moreover, a "corrective disclosure [need not] be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202.  The Second Circuit recently reaffirmed this principle in *In re Vivendi, S.A. Sec. Lit.,* 838 F.3d 223 (2d Cir. 2016).  There, the

---

[29] *See also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1172 (C.D. Cal. 2008) (noting "corrective disclosures [were] coupled with continued misrepresentations to blunt the effect of the corrections"); *In re Res. Am. Sec. Litig.*, 202 F.R.D.  177, 185 (E.D. Pa. 2001) (defendants made "aggressive public comments . . .  aimed at countering the [curative] effect of" an analyst report calling its accounting into question).

court found loss causation with respect to an issuer's statements concealing its liquidity risk, where "a series of events. . . made the truth about that liquidity risk come to light," notwithstanding the absence of a "specific corrective disclosure" that "describe[ed] the precise fraud inherent in the alleged misstatements." *Id.* at 261–63.

Plaintiffs' loss causation allegations satisfy the applicable pleading standards.  Plaintiffs have alleged a connection between the five disclosures in question and Defendants' misrepresentations about the PME program, including its sales and marketing practices and use of captive pharmacies.  ¶¶ 113–114, 116–118, 119–121, 122-123, 127–130, 131–134.  Moreover, they have alleged that each of these disclosures caused the Company's stock price to fall precipitously.  ¶¶ 115, 120, 124, 128, 134.  Such averments are all that is required at the motion to dismiss stage.  *See, e.g., In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343–44 (S.D.N.Y. 2015) (plaintiffs adequately alleged loss causation where they described disclosures as "news" and alleged that the price of the company's securities "declined in response to each disclosure").

In response, Defendants primarily argue that the market already knew the truth about Horizon's PME program, and that when Horizon's stock dropped significantly after each disclosure, the market had to be reacting to something else—to "negative characterizations," (Def. Br. at 26–27), or "uncertainty."  *Id.* at 28.  As an initial matter, loss causation is generally "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  Defendants' arguments require exactly the kind of fact-intensive analysis that courts consistently reject in a motion to dismiss.  *See, e.g., Lorely Financing (Jersey) No. 3 Ltd v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) ("The requirement...to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal

45

explanations."); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) (noting the truth on the market defense is "a fact-intensive query that cannot be disposed of on a motion to dismiss").[30]  Even assuming, *arguendo*, that this was the proper time for such arguments, Plaintiffs have properly alleged loss causation as to the corrective disclosures.

**(a)      October 19, 2015 *New York Times* article**

Plaintiffs allege that investors first became concerned about the sustainability of the PME program when an October 19, 2015 story in the New York Times revealed new details about Horizon's use of specialty pharmacies, and compared Horizon's PME program to Valeant Pharmaceuticals' infamous captive pharmacy network, raising for the first time the possibility that Horizon might have more than an arm's length relationship with the PME pharmacies. ¶114.   The price of Horizon's stock plunged 19.98% on this news.   ¶115.   Contrary to Defendants' claim that investors were reacting to a "negative . . . characterization," analysts specifically attributed the sharp decline in Horizon's stock price to the disclosures about Horizon's business practices in the article.   ¶116.   For example, a UBS analyst attributed the

---

[30] Tellingly, Defendants' loss causation arguments rely heavily on *In re Omnicom Group, Inc. Sec. Litig.*, a decision on a motion for summary judgment.  597 F.3d 501 (2d Cir. 2010).  In *Omnicom*, the Second Circuit determined, on a full record and with the aid of expert briefing, that the information in the alleged corrective disclosure was previously known to the market, and that the market was therefore not reacting to the revelation of the alleged fraud.  *Id.* at 511–12.  In an attempt to apply this summary judgment opinion to the instant motion to dismiss, Defendants treat Omnicom as announcing a novel pleading standard.  But "*Omnicom* did not purport to re-define the law of loss causation, or to overrule the previous Second Circuit cases . . . [it] simply applied this circuit's existing loss causation principles to the particular factual context before it . . . ." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 559 (S.D.N.Y. 2011).  As such, the standard for pleading loss causation remains the same after *Omnicom* as it was before: "all that is required is 'some indication of the loss and the causal connection that plaintiff has in mind.'" *Petrobras*, 150 F. Supp. 3d at 343–44 (declining to apply *Omnicom* on a motion to dismiss) (quoting *Dura*, 544 U.S. at 347).  Defendants cite only one case applying *Omnicom* on a motion to dismiss, and that case is readily distinguished.  In *Fila v. Pingtan Marine Enterprise Ltd.* (Def. Br. at 27), the single alleged corrective disclosure was an article purporting on its face only to give the author's non-professional interpretation of the company's SEC filings, which the author called "surprisingly candid." 2016 WL 3962015 (S.D.N.Y. July 19, 2016).  By contrast, Plaintiffs here allege a series of corrective disclosures in which new information was disclosed by both Horizon and other sources, and analysts discussed them as being new disclosures (¶¶114–16,119, 122–23, 127–30, 131–34).

46

drop to "new concerns" raised by the New York Times article, including questions about the "sustainability of the PME program."  ¶116.  Plaintiffs also allege that after the story broke, Horizon continued to make false statements, claiming that its pharmacies were "fully independent."  ¶118.  Defendants cannot have it both ways—arguing that the market was "well aware" of Horizon's relationship with its specialty pharmacies and at the same time issuing false statements about those relationships contending they were "fully independent," "non-exclusive," and "arm's length." ¶196.

### (b)    Depomed and Express Scripts Disclosures

Defendants' insistence, in Class Period press releases and conference calls, that the pharmacies in its PME program were "fully independent" and "arm's length" is at odds with Defendants' argument that the "statements from Depomed and Express Scripts" did not "reveal any previously concealed facts." Def. Br. at 27.   In fact, the Depomed and Express Scripts' disclosures revealed not only that the pharmacies in the PME program were not "fully independent," but that certain of the pharmacies were captive, in that they derived a significant portion of their overall sales and revenues from Horizon.  ¶¶119, 122–23.[31]  Moreover, Express Scripts' announcement that it was cutting ties with Linden Care after concluding that it was in fact, a "captive pharmacy," controlled by Horizon, serves as a corrective "event[] that constructively disclos[ed] the fraud." *Vivendi*, 838 F.3d at 261–62.   Defendants' failure to disclose the true nature of the PME program understated the risk that PBMs would take adverse action against Horizon.   In the case of both the Express Scripts and Depomed disclosures,

---

[31] Defendants also claim that Plaintiffs failed to allege loss causation as to the October 21, 2016 Citron Report.  Def. Br. at 27. But Citron cited to the *New York Times* article about Horizon from the previous day, and provided new information to suggest that the relationship between drug manufacturers and specialty pharmacies was something more than "arm's length."   Analysts noted that "hammered" Horizon's stock. ¶117. The contrasting analyst reports Defendants offer raise fact questions not appropriate for resolution on this motion. Def. Br. at 27.

Horizon's stock price reacted significantly, dropping 11.5% on the Depomed release (¶120), on 19.62% on the Express Scripts news (¶123).

### (c) Announcement of a DOJ Investigation

On February 29, 2016, Horizon disclosed that the DOJ had been investigating the Company's PME program and its "marketing and commercialization activities" since November 2015.  ¶127.  This disclosure revealed to the market that the Company had engaged in improper "marketing and commercialization activities" in connection with the PME program.  *Id.* As discussed above, and contrary to Defendants' claims, analysts recognized that the ***market*** was not "shrugging,"  (Def. Br. at 9), but instead reacting negatively to the news that the PME program was being investigated.  Plaintiffs have alleged that Horizon disclosed an investigation into the program at the heart of Plaintiffs' allegations (¶127), that analysts specifically identified Horizon's disclosure of the DOJ investigation of its use of "specialty pharmacies" as the cause of the sharp decline in the Company's shares (¶¶129–30), and that the market reacted to the news with a 13.3% drop in share price (¶128).  *See Orthofix*, 89 F. Supp. 3d at 620–211.

Defendants incorrectly argue that disclosure of a government investigation cannot serve as a corrective disclosure.  The weight of authority in this district and many circuits holds that "disclosure of a government investigation 'into a particular business practice can be sufficient to allege loss causation . .  . .'" *Orthofix*, 89 F. Supp. 3d at 620 (collecting cases); *see also Amedisys*, 769 F.3d at 324–25; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).[32]

### (d) April 12, 2016 Disclosure

Plaintiffs allege that the truth about the PME program was revealed when, following the

---

[32] Defendants rely on a Ninth Circuit case, *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2010), but ignore a more recent decision from the same circuit, *Lloyd*, which clarified the earlier case and aligned itself with the Fifth Circuit's holding in *Amedisys* that the loss causing effect of the disclosure of a government investigation should be "viewed together with the totality of other. . . partial disclosures." 811 F.3d at 1210 (quoting *Amedisys*, 769 F.3d at 324).

above disclosures, Horizon "could no longer rely on its captive Horizon-controlled pharmacies and its aggressive and improper sales tactics," leading to "dwindling primary care drug sales." ¶131.   On April 12, 2016, Horizon filed a Form 8-K pre-announcing lower than expected revenues for the first half of 2016, citing "pricing pressure" on DUEXIS and VIMOVO, and lowering guidance for these two drugs.  ¶131.  This sudden—and apparently permanent—drop in profitability in what had been key revenue drivers for Horizon confirmed the "new concerns" about the PME program that had been raised by the previous disclosures, and the market reacted accordingly.  ¶¶131–32, 134.  On this news, Horizon's share price dropped over 25%—a drop that analysts attributed to "real question marks regarding HZNP's primary care segment" due to "an incrementally more restrictive payor environment."  ¶¶131–32.  That Horizon chose not to adjust its overall full year guidance is irrelevant to whether investors understood reduced guidance in the primary care division to confirm concerns about that division.  Def. Br. at 28. Nor does it matter that Horizon did not fully admit that it used improper sales tactics or controlled the PME pharmacies (*id.*); Plaintiffs need not plead that the corrective disclosure "describe[ed] the precise fraud inherent in the alleged misstatements;" it is enough to plead "events constructively disclosing the fraud." *Vivendi,* 838 F.3d at 261–62.  The April 12, 2016 announcement of dwindling sales of Horizon's key PME drugs is such an event, as it revealed that without employing improper business practices, the PME program would flounder.

### B.   SECURITIES ACT CLAIMS

Counts III through V of the Complaint assert claims under §§ 11, 12 and 15 of the Securities Act in connection with Horizon's April 16, 2015 Offering.   Specifically, Plaintiffs allege that the Registration Statement and Prospectus issued in connection with the Offering reiterated a number of the false and misleading statements contained in Horizon's SEC filings and press releases discussed above.  "Sections 11 and 12 of the Securities Act impose strict

liability on certain enumerated categories of parties for material misstatements or omissions contained in covered financial communications." *Lehman,* 799 F. Supp. 2d at 308.   Under Section 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S.  375, 382 (1983).  Similarly, Section 12(a)(2) of the Securities Act imposes liability for a false or misleading statement in a prospectus "on those who issue and underwrite a security." *Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F. App'x 33, 36 (2d Cir. 2013).  Like Section 11, Section 12(a)(2) does not require a plaintiff to plead scienter or reliance.  *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).

Securities Act claims are governed by the notice pleading standard set forth in Fed. R. Civ. P. 8(a)  (*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010)), which "do[es] not require heightened pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.  544, 570 (2007).

1.      **The Offering Documents Contained Materially False and Misleading Statements**

As explained above, the Offering Documents contained materially false and misleading statements and omissions.  *See supra* at II.A(1); *see also* 373–384.  The UWs cite a number of so-called "risk disclosures" that supposedly warned investors that DUEXIS and VIMOVO "were at risk of competition from generic drug manufacturers and marketers" (UW Br. at 11); that Horizon planned to increase the price of VIMOVO (*id.*  at 11-12); that Horizon "may experience a significant decline in DUEXIS and VIMOVO prescriptions as a result of formulary exclusions" (*id.* at 12); that PBMs may take "adverse actions against [Horizon], which could materially affect [its] operating results" (*id.*); and that the number of PME pharmacies was "limited" (*id.* at 13).

The UWs ignore that "risk warnings" cannot insulate them from liability for misstatements or omissions of "current or historical fact." *Aeropostale, Inc.*, 2013 WL 1197755, at *12 (collecting cases). None of the so-called risk warnings the UWs cite actually disclosed the presently known adverse facts Plaintiffs allege were wrongfully withheld, namely Horizon's captive relationship with the PME pharmacies, which it used to direct those pharmacies to implement improper business practices.[33] *Id.*[34]

## 2. Lead Plaintiff Northern California Carpenters Has Standing to Bring Claims Under Section 12(a)(2) of the Securities Act

Defendants argue that Northern California Carpenters lacks standing to bring claims under Section 12(a)(2) because the Complaint fails to allege it "purchased any common stock at all at the time of, or that can be traced to, the Offering." UW Br. at 23–25. This argument mischaracterizes the Complaint's allegations. The Complaint alleges that Northern California Carpenters "purchased or otherwise acquired Horizon common stock issued in the Offering," (¶414), and that Northern California Carpenters made the purchases "set forth in the previously filed certification," some of which were "pursuant and traceable to the Company's Registration

---

[33] The UWs reliance on *In re TVIX Securities Litigation*, 25 F. Supp. 3d 444 (S.D.N.Y. 2014) is, therefore, inapposite. In *TVIX*, the plaintiffs alleged that an issuer "misleadingly implied" that certain securities it issued "should be held for longer than a single trading session" and failed to disclose the risks associated with doing so. The registration statement however disclosed the *specific* risk alleged to have been omitted, stating that the securities "may not suitable for investors who plan to hold them for longer than one day," and provided mathematical examples of the consequences of doing so. *Id.* at 452–53. Defendants also cite *Scott v. General Motors Co.*, 46 F. Supp. 3d 387 (S.D.N.Y. 2014), in which the complaint alleged in only conclusory fashion that GM had engaged in the accounting malfeasance it allegedly omitted to disclose, and *In re Morgan Stanley Technology Fund Securities Litigation*, 643 F. Supp. 2d 366 (S.D.N.Y. 2009), in which the plaintiffs failed to identify any statement triggering a duty to disclose the allegedly omitted information, but these such facts are not present here.

[34] UWs also argue that "Plaintiffs' contention that Horizon failed to disclose in the Offering Documents that Horizon 'was operating an unsustainable business model' and 'would be forced to slash prices on its biggest growth drivers' is specious" because Horizon had no "obligation to disparage itself." UW Br. at 10–11. But this argument mischaracterizes the Complaint. Plaintiffs allege that Defendants had a duty to disclose Horizon's control over the PME pharmacies and its improper business practices and these disclosures would have led investors to conclude that Horizon's business model was unsustainable. *See, e.g,* ¶¶332, 376.

Statement for the Offering" (¶33).   That certification, (Dkt. #36-1), shows that Northern California Carpenters purchased 7,300 shares of Horizon common stock on **the exact date of the offering**, April 16, 2015, at the **exact offering price**, $28.25.   "[T]hat Plaintiffs purchased stock on the date of the offering at the offering price is sufficient at [the motion to dismiss] stage to establish that [it] purchased in the offering and thus has standing to pursue Plaintiffs' Section 12(a)(2) claims." *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1368 (N.D. Ga. 2005); *see also In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010) (allegations that plaintiffs "purchased a specified number of Certificates on specified dates (some of which corresponded to the initial offering dates) at specified prices" sufficient to allege standing under Section 12(a)(2)).

### 3.   Under Items 303 and 503 of Regulation S-K, Defendants Were Obligated to Disclose Horizon's Captive Pharmacy Network and Use of Improper Sales Practices In the Offering Documents

Items 303 and 503 of Regulation S-K imposed a duty on Defendants to disclose in the Offering Documents the Company's reliance on both a captive network of pharmacies and a host of illegal sales practices to drive the PME program.   Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or incomes from continuing operations." 17 C.F.R. § 229.303.   Specifically, Item 303 mandates that the registrant's "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported information not to be necessarily indicative of future operating results or of future financial condition." *Id*.   The SEC has explained that Item 303, and the management discussion and analysis more broadly, is designed to "provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management." SEC Guidance Regarding Management's

52

Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), Securities Act Release No. 8350, 68 Fed. Reg. 75,056 (Dec. 29, 2003). Accordingly, in *Panther Partners Inc. v. Ikanos Communications, Inc.*, the Second Circuit held that Item 303 required a registrant to disclose quality issues with computer chips it manufactured. 681 F.3d 114, 120 (2d Cir. 2012). In particular, the Court held that while the registrant did not undertake to replace its chips—or even ascertain the defect rate of its manufacturing process —prior to the offering, it was nevertheless "aware of the 'uncertainty' that it might have to accept returns of a substantial volume, if not all, the chips it had delivered to its major customers" at the time the registration statement became effective. *Id*. at 121–22.

Here, as in *Panther Partners*, Horizon was required to disclose that its reliance on a captive pharmacy network and improper sales practices created substantial "uncertainty" about the Company's future operating performance and could have a material impact on future financial results. The Complaint alleges that in the months leading up to the Offering, Horizon faced an increasingly adverse payor environment, marked by PBM hostility towards Horizon's best-selling drugs. While that adverse environment forced the Company to expand its use of practices and business arrangements that were either contractually proscribed, or openly opposed, by PBMs, it also made the use of those practices ever more hazardous, creating a real risk that Horizon would not only be unable to boost sales through the PME program, but would face further negative PBM action if those PBMs learned the truth about the program. The UWs respond by quibbling about whether the Complaint identifies an undisclosed "trend," and claim the Complaint relies "exclusively on market developments that occurred long after" the Offering. UW Br. at 20–23. Putting aside the fact that Defendants ignore Item 303's mandate to disclose "uncertainties" as well as "trends," they also ignore the Complaint's allegations that a shifting

payor environment created risks of increasingly serious magnitude to the PME program in the nine months leading up to the Offering.[35]

Likewise, Item 503 of Regulation S-K, which mandates that the registrant disclose "the most significant factors that make the offering speculative or risky," 17 C.F.R. § 229.503(c), required the Offering Documents to disclose both the Company's reliance on a captive network of pharmacies and its use of illegal sales practices to sustain sales channeled through the network. Here, the Company's use of captive business relationships and improper sales practices drove sales of the Company's most important drugs and were integral to the operation of a business segment Horizon itself repeatedly called "key." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("[C]ourts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard"). Defendants claim it is "inarguable" that Horizon disclosed all of the "commercial, regulatory, and reputational risks" associated with the PME program (UW Br. at 23), but they are wrong. Horizon nowhere disclosed that the PME program relied on captive business relationships and improper business practices, the discovery of which could not only eviscerate sales of DUEXIS and VIMOVO, but lead to termination of existing PBM contracts. *See In re WorldCom, Inc. Sec. Litig*, 346 F. Supp. 2d 628, 691-92 (S.D.N.Y. 2004) (although registration statement disclosed intense competition in long-distance market and declining revenue in that business line, violation of Item 503 alleged where it failed to disclose the "precarious" state of that business and the

---

[35] While Defendants cite *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010), for the proposition that "a two month period does not establish a 'trend'" (Def. Br. at 22-23), the Complaint alleges that this shifting payor environment had been in place for **nine months** before the Offering took place. Note that even where the "trend" itself is publicly known, Item 303 still requires the registrant to disclose the manner in which that trend will affect its business. *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718-19 (2d Cir. 2011) (notwithstanding fact that trends, including downward trend in real estate market, were publicly disclosed, issuer required to disclose impact of those trends on business).

impact a loss of that business would have on issuer "as a whole").[36]

## III.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

Dated: December 21, 2016

LABATON SUCHAROW LLP

/s/Serena P. Hallowell
Jonathan Gardner
Serena Hallowell
Christine M. Fox
Thomas W. Watson
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
         shallowell@labaton.com
         cfox@labaton.com
         twatson@labaton.com

***Counsel for Lead Plaintiffs and the Putative Class***

BERNSTEIN LITOWITZ BERGER &
  GROSSMANN LLP
Blair A. Nicholas
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone:  (858) 793-0070
Facsimile:  (858) 793-0323
Email: BlairN@blbglaw.com

-and-

Hannah G. Ross
Abe Alexander
1251 Avenue of the Americas

---

[36] Individual Defendants further argue that the Complaint fails to plead control person liability under Section 15 of the Securities and Section 20(a) of the Exchange Act, but do not dispute that they "controlled" Horizon within the meaning of either statute.  Def. Br. at 30.  Instead, they argue only that there was no primary violation of either the Securities or the Securities Exchange Acts.  As above, they are wrong.

New York, New York 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
Email:  Hannah@blbglaw.com
        Abe.Alexander@blbglaw.com

***Counsel for Plaintiffs and the Putative Class***