UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/18/2018

------------------------------------------------------------------- X
                        :

GEORGE S. SCHAFFER, et al.,            :

                        :

              Plaintiffs,      :       16-CV-1763 (JMF)

                        :

        -v-                  :       OPINION AND ORDER

                        :

HORIZON PHARMA PLC, et al.,         :

                        :

            Defendants.      :

                        :

------------------------------------------------------------------- X

JESSE M. FURMAN, United States District Judge:

      In this putative class action, Plaintiffs bring securities fraud claims against Horizon

Pharma PLC ("Horizon" or the "Company"), a number of Horizon's executives, (the

"Individual Defendants"), and various underwriters (collectively, the "Underwriter

Defendants" and, together with Horizon and Individual Defendants, "Defendants"). Plaintiffs

allege that Horizon and the Individual Defendants made certain material misstatements and

omissions in connection with its "Prescriptions-Made-Easy" or "PME" program and, in so

doing, committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities Exchange Commission

("SEC") Rule 10b-5, 17 C.F.R. § 240 (the "Exchange Act claims"). The Amended

Complaint also contains claims against the Underwriter Defendants — in addition to Horizon

and the Individual Defendants — under Sections 11, 12(a)(2), and 15 of the Securities Act of

1933 (the "Securities Act claims"). Defendants now move, pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the Amended Complaint. For the reasons stated

below, Defendants' motion is GRANTED, and the Amended Complaint is dismissed.

## BACKGROUND

The following facts, which are taken from the Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Horizon is a "specialty biopharmaceutical company" that develops drugs to treat arthritis, pain, inflammation, and rare diseases. (Docket No. 103 ("Am. Compl.") ¶¶ 3, 41). As a biopharmaceutical company, Horizon can be greatly affected by the conduct of Pharmacy Benefit Managers ("PBMs"). In simplest terms, PBMs are entities that "act as 'middlemen' hired by health benefit providers (such as employers, health maintenance organizations, and public and private health plans) 'to provide prescription drug benefit administration and management services,'" *Pharm. Care Mgmt. Ass'n v. D.C.*, 522 F.3d 443, 445 (D.C. Cir. 2008) (citation omitted). As alleged in the Amended Complaint, one way that PBMs seek to reduce their clients' costs is to recommend that their clients "exclude" drugs from insurance coverage. (Am. Compl. ¶ 51). That is, if the costs of a drug are high in comparison to the costs of an another therapeutically identical or similar treatment, a PBM may "exclude — or suggest excluding — the high-cost drug[]." (*Id.*).

In July 2014, prior to the start of the Class Period, two large PBMs — CVS Caremark and Express Scripts — announced that they were adding Horizon's two major revenue generating drugs, DUEXIS and VIMOVO, to their exclusion lists due to the availability of significantly cheaper over-the-counter and generic alternatives. (*Id.* ¶¶ 9, 41, 47, 52). To allay investors' concerns over the effect these decisions would have on the company's

profitability, Horizon announced that it would be accelerating its use of a program called "Prescriptions-Made-Easy" or "PME." (*Id.* ¶ 55). Through the PME program, Horizon sales representatives provided doctors with the means to transmit prescriptions directly to specialty pharmacies designated by Horizon. (*Id.* ¶ 57). Horizon guaranteed that if the doctor prescribed the drug through the PME program (that is, routed the prescription to one of the designated pharmacies), patients would receive the drugs — whether or not their insurance covered the medications — for little or no money. (*Id.*). If the patient's health plan later rejected coverage, Horizon, through a third party vendor, would step in and pay for it. (*Id.*). The idea was to ensure that doctors would continue to prescribe Horizon's drugs — even if they were excluded from coverage — by avoiding the the hassles of repeated rejection by payors (namely, calls from pharmacists, further consultation with patients, and decisions whether to substitute other drugs). As long as the profits from reimbursed prescriptions exceeded the costs of subsidized prescriptions, Horizon would benefit.

The PME program appeared to be successful at first. (*See id.* ¶¶ 57, 60-61). But an increase in negative media attention and Horizon's disclosure of an investigation by the Department of Justice in late 2015 and early 2016 led to a steep decline in the price of Horizon's stock. (*Id.* ¶¶ 114-16, 127-28, 131-34). In March 2016, the perhaps inevitable securities fraud lawsuits followed. (Docket No. 1; *see also* 16-CV-1789, Docket No. 1). In their operative complaint — the Amended Complaint — Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. With respect to the former claims, Plaintiffs allege that, between January 12, 2015, and April 12, 2016 (the "Class Period"), Horizon and the Individual Defendants misled investors about the sustainability of the PME business model by failing to

disclose its "control" over various pharmacies and allegedly improper sales and marketing techniques. (*Id.* ¶ 4, 14). The reality, according to Plaintiffs, was that contrary to Horizon's public statements about the "arm's length" nature of its relationships with the pharmacies, the Company "exerted both financial and operational control" over them. (*Id.* ¶¶ 14, 67-88). Plaintiffs also maintain that Defendants' misstatements concealed improper sales and marketing practices that Horizon and its network of pharmacies used to sell its drugs at exorbitant prices. (*Id.* ¶¶ 89-112).

As noted, Plaintiffs also bring claims under the Securities Act — on behalf of those who purchased Horizon stock "pursuant and/or traceable" to offering materials (the "Offering Documents") issued in connection with an April 2015 offering of Horizon's common stock. (*Id.* ¶ 300). Like the Exchange Act claims, these claims are aimed at disclosures with respect to the PME program. Specifically, Plaintiffs allege various omissions and misleading affirmative statements in the Offering Documents in connection with the PME program. (*Id.* ¶ 419). Unlike the Exchange Act claims, however, these claims are brought not only against Horizon and the Individual Defendants, but also against the Underwriter Defendants.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). The Court will not dismiss claims unless Plaintiffs have failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). More specifically, Plaintiffs must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If Plaintiffs have not "nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). A plaintiff may do so by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* For an inference of scienter to be "strong," a reasonable person must deem the inference

"cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

As noted above, Plaintiffs bring claims under both the Exchange Act and the Securities Act. The Court will address each set of claims in turn.

### A.  Exchange Act Claims

Plaintiffs first seek to hold Defendants liable for securities fraud under Sections 10(b) and 20(a) of the Exchange Act and Securities Exchange Commission Rule 10b-5. To state a claim that Defendants made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). Relatedly, to state a claim under Section 20(a), Plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 10(b). *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).

Significantly, some alleged misstatements, like "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174; *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly

gloomy or cautious picture of current performance and future prospects."). The PSLRA also

provides a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u-5(c). Forward-

looking statements are those that contain, among other things, "a projection of revenues,

income . . ., [or] earnings," "plans and objectives of management for future operations," or "a

statement of future economic performance." *Id.* § 78u-5(i)(1). A forward-looking statement

is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is

immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was

false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (describing

15 U.S.C. § 78u-5(c)). To qualify as "meaningful," cautionary language "must convey

substantive information about factors that realistically could cause results to differ materially

from those projected in the forward-looking statement." *Id.* at 771. Finally, "subjective

statements of opinion are generally not actionable as fraud." *In re Sanofi Sec. Litig.*, 87 F.

Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir.

2016). Statements of opinion are only actionable "if they (1) were not honestly believed

when made; (2) were supported by untrue facts; or (3) omit to mention facts that conflict with

what a reasonable investor would take away from the statements themselves." *Gillis v. QRX

Pharma Ltd.*, 197 F. Supp. 3d 557, 589 (S.D.N.Y. 2016).

Applying all of the foregoing standards here, Plaintiffs' Section 10(b) and Rule 10b-5

claims fail for at least two independent reasons: first, Plaintiffs do not adequately plead a

material misrepresentation or omission; and second, Plaintiffs do not adequately allege

scienter. The Court will address each of these defects in turn.

### 1. Material Misrepresentations or Omissions

Plaintiffs' Exchange Act claims are based on three categories of statements: (1) statements relating to the relationship between Horizon and the PME pharmacies; (2) statements relating to alleged improper business practices; and (3) statements relating to the sustainability and drivers of success of the PME program.

### a. Statements Relating to the Relationship Between Horizon and the PME Pharmacies

First, Plaintiffs allege that Defendants made false and misleading statements by describing the relationship between Horizon and the pharmacies participating in the PME program — namely, Clybourn Park, Linden Care, and Halsted — as "fully independent," "non-exclusive," and "arm's length." (Am. Compl. ¶¶ 22, 88). Plaintiffs do not allege (or allege plausibly) that Horizon owned a stake in any of the pharmacies or had an exclusive relationship with any of the pharmacies. Instead, they contend that the pharmacies were "captive" because Horizon controlled them both financially and operationally. (*Id.* ¶ 66). Conclusory assertions aside, Plaintiffs' allegations do not support such contentions.

For their financial control argument, Plaintiffs rely principally on the following alleged facts: (1) that Clybourn Park primarily dispensed Horizon prescriptions (*id.* ¶¶ 72–82); (2) that Linden Care derived the majority of its business from Defendants and had dozens of people working in a Horizon-only department (*id.* ¶¶ 83–87); and (3) that Halsted's owner bragged that the pharmacy was netting thousands of prescriptions (worth at least $100,000) a week from Horizon during the Class Period (*id.* ¶¶ 67–71; *see* Docket No. 15 ("Pls.' Opp'n"), at 2). But financial dependence — whether in the form of prescriptions, employees dedicated to a certain account, or commissions — does not equate to financial control. *See, e.g., D.N. & E. Walter & Co. v. United States*, 38 Cust. Ct. 634, 635 (Cust. Ct. 1957) ("There is some

8

evidence to show that Nagata exercised some sort of financial control over Shimizu, but it, nevertheless, appears that they were independent entities, each carrying on its own business and having the general relationship of buyer and seller."). Indeed, many suppliers have leverage over their vendors. But that does not necessarily render the vendors "captive." *See, e.g.*, *Omidi v. Wal-Mart Stores, Inc.*, No. 14-CV-857 (JAH) (BLM), 2017 WL 1336782, at *6 (S.D. Cal. Mar. 24, 2017) (holding that the allegation that the defendants had control over optometrists was insufficient to establish that defendants actually "pressured or exerted such control" such that "the optometrists were not independent"); *cf. Tyszka v. Edward McMahon Agency*, 188 F. Supp. 2d 186, 194 (D. Conn. 2001) ("[U]nfettered discretion in the running of his agency, as an independent contractor, is the antithesis of common ownership or financial control.").[1] Thus, the pharmacies' financial reliance on Horizon does not alone establish that Defendants misled investors in claiming that the pharmacies were independent entities.

Plaintiffs similarly fall short in establishing that Defendants misled investors about their purported operational control over the pharmacies. On that score, Plaintiffs rely on the following facts: (1) that Clybourn Park was organized by a Horizon executive and senior manager and operated in close coordination with Horizon employees (*id.* ¶¶ 72-82); (2) that Horizon employees and executives visited, and were sometimes stationed at, the pharmacies

---

[1] That conclusion is underscored by a fact that Plaintiffs — inexplicably — seem to think cuts in their favor: that "Horizon cut ties with Linden Care before the start of the Class Period, but Linden Care 'did everything in its power to come back,' and even established a 40-50 person unit devoted *solely* to dispensing Horizon drugs." (Pls' Opp'n 9 (quoting Am. Compl. ¶¶ 86-87); *see also id.* at 21 ("Nor do Defendants acknowledge that Linden Care fought to rejoin the PME program when it was kicked out before the Class Period.")). It would make no sense for Horizon to cut ties with Linden Care if it actually controlled the pharmacy; nor would one think that the pharmacy would then have to put up a fight to rejoin the PME program. That is, Plaintiffs' own allegations support a conclusion contrary to the one they press: that Linden Care was in fact independent of Horizon.

(*id.* ¶¶ 67-69, 73, 78, 87); and (3) that Horizon transferred prescriptions from one pharmacy to another (*id.* ¶ 76; Pls.' Opp'n 2). The fact that Clybourn Park was founded by Horizon executives — and that its formation documents were completed while those executives were still employed by Horizon — does lend some credence to Plaintiffs' argument that the relationship between the pharmacy and Horizon was closer than "arm's length." (Am. Compl. ¶73). But, for several reasons, those allegations fall short of demonstrating that Defendants' were pulling the strings behind Clybourn Park. First, one of the employees left Horizon just days after the formation documents were filed. (See Am Comp. ¶ 251; Docket No. 112 ("Adams Decl."), Ex. 3, at 2). As for the other employee, Ben Bove, the only evidence Plaintiffs provide to support the contention that he "continued to oversee the PME program for Horizon for at least five months after [Clybourn Park] was incorporated," (Pls.' Opp'n 22), is that his Horizon email address was copied on an email in February 2015. (Am. Compl. ¶ 75). That is too thin reed — particularly given the heightened standards of Rule 9(b) — upon which to base the allegation that Bove was simultaneously running Horizon's PME program and Clybourn Park. (*Id.* ¶ 73). Second, Plaintiffs do not allege, and certainly do not allege plausibly, that Horizon had any direct financial interest in Clybourn Park. Third, Plaintiffs do not allege that Clybourn Park was even operational in 2014 when the executives at issue were still at Horizon. And finally, there is nothing particularly noteworthy, let alone sinister, about employees starting a new company to fill a need of their original employer, thereby benefitting both them and their original employer. Thus, the mere fact that Clybourn Park was founded by employees of Horizon does not establish that the pharmacy was "captive" to Horizon. *Cf. In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *6 (S.D. Fla. Sept. 4, 2015) ("[T]he assertion that one overlapping

officer, even with several additional senior managers, does not render . . . comments about the companies independence from one another, false or materially misleading.").

Nor does the fact that Clybourn Park and the other pharmacies worked closely with Horizon undermine Defendants' claim that they operated at arm's length. Because the PME program was Horizon's main revenue driver and the central pipeline to its customers — and because there were only a limited number of participating pharmacies — there is nothing surprising or improper about the fact that Horizon coordinated closely with them (Am. Compl. ¶ 68), monitored their operations (*id*. ¶ 67), assisted them with logistics and doctor enrollment (*id*. ¶ 75), visited their sites (*id*. ¶ 67), and met with their management (*id*. ¶ 69). In fact, it would have been odd if such close collaboration between the pharmacies and their most significant supplier did *not* take place. For example, Plaintiffs' allegation that Horizon would pass along lists of doctors to its pharmacies is indicative of neither control nor illegality, as Plaintiffs point to no authority suggesting that it is improper for a supplier to suggest customers to a vendor. (*Id*. ¶ 110). The purportedly nefarious nature of the collaboration between Horizon and the PME pharmacies is further belied by Horizon's own admission, in an SEC filing, that it "monitor[ed]" and "audit[ed]" pharmacies to "confirm their activities" and to ensure they were in compliance with its policies and guidelines. (Adams Decl., Ex. 12, at 4). Thus, these allegations are not sufficient "to show that the basis for [Plaintiffs'] securities fraud claim exists beyond a 'speculative level.'" *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 400 (S.D.N.Y. 2016) (quoting *Twombly*, 550 U.S. at 555).

Finally, Plaintiffs claim that the captive nature of the pharmacies is evidenced by the transferring of prescriptions from one pharmacy to another. (Am. Compl. ¶ 76). But that claim suffers from a fundamental defect: the source for it is a civil complaint that does not

even mention Horizon.  (Adams Decl., Ex. 62).  The civil complaint alleges that a minority owner of both Halsted Pharmacy and Clybourn Park — not Horizon — transferred prescriptions from one pharmacy to the other.  (*Id.* at 1, 2, 5).  Thus, Plaintiffs provide no allegations plausibly linking Horizon to the prescription-swapping allegations.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 399 ("This 'upon information and . . . belief' allegation from a different lawsuit incorporated into the [Complaint] does not suffice under the PSLRA."); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)."), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).  In short, although Plaintiffs certainly establish that Horizon and the PME pharmacies had close and synergistic relationships, they fall short of establishing that the pharmacies were dominated financially and operationally by Defendants, let alone "captive" (whatever that means).  It follows that Plaintiffs fail to establish that Defendants' statements about Horizon's relationships with the PME pharmacies were false or misleading within the meaning of the Exchange Act.

**b.  Statements Relating to Alleged Improper Business Practices**

Next, the Court turns to Plaintiffs' allegations concerning the use of improper business techniques in connection with the PME program.  These allegations concern (1) conduct in which Defendants supposedly directed the pharmacies to engage (Am. Compl. ¶ 18); and (2) conduct in which Defendants supposedly directed their employees to engage (*id.* ¶ 19).  After analyzing the sufficiency of those allegations, the Court will address whether Defendants' statements relating to these supposed practices were misleading.

### i. Horizon's Direction of the Pharmacies

First, Plaintiffs allege that in order to boost prescription volume, Horizon instructed the PME pharmacies to resort to certain "improper and illegal practices." (*Id.* ¶ 90). Specifically, Plaintiffs claim that Horizon directed the pharmacies to (1) refill prescriptions without patient authorization, (2) withhold pricing information from patients, (3) ship drugs to states in which the individual pharmacies were not licensed, and (4) conceal their relationship with Horizon from PBMs. (Am. Compl. ¶¶ 18, 92, 94-103). These allegations, considered both separately and in tandem, fail to meet the heightened pleadings standards of Rule 9(b) and thus fall short of establishing that Horizon systematically directed its pharmacies to engage in improper or illegal practices in order to increase its sales.

Plaintiffs' first allegation fails because it is not sufficiently particularized to establish that Horizon itself directed the pharmacies to refill prescriptions without authorization. As an initial matter, the allegation that Clybourn Park's management instructed employees to auto-refill prescriptions bears no direct nexus to Horizon. (*Id.* ¶ 91). By contrast, the information attributed to a Linden Care employee does allege that Horizon instructed the pharmacy to place all prescriptions on auto-refill, (*id.* ¶ 92), but it falls short for a separate reason: it is not pleaded "with sufficient specificity." *Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011). In light of Rule 9(b)'s heightened pleadings standards, the fact that one unnamed employee heard unnamed managers at some unknown time in some unknown place say that Horizon instructed them to place all prescriptions on auto-refill is insufficiently particularized to establish that Horizon in fact issued such an instruction. *See, e.g.*, *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008) ("[T]he PSLRA requires [confidential] sources to be 'described in the complaint with sufficient particularity to support

the probability that a person in the position occupied by the source would possess the information alleged.'"). Notably, the Amended Complaint does not allege that Horizon instructed Linden Care, or any pharmacy for that matter, to do anything without a patient's authorization.

Plaintiffs' allegation that Horizon instructed its pharmacies to withhold pricing information from patients also lacks sufficient particularity. Here too, one unnamed rank-and-file employee claims that he was "instructed" — at an unknown time, in an unknown place, and by an unknown person — "not to tell patients the price of the drugs or what their insurance company was being billed." (Am. Compl. ¶ 96). Without more information regarding who instructed him — and whether Horizon had any connection to the directive — the Court finds this allegation to be lacking "sufficient particularity to support the probability that the witness[] possessed the information alleged." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).

For similar reasons, Plaintiffs' final two allegations — that the pharmacies shipped drugs to states where they were not licensed and concealed their relationship with Horizon from PBMs — also fail. For one, both allegations do not allege conduct by Horizon. In the case of the former, Plaintiffs once again rely on a complaint from another civil case, as well as an email exchange between two Halsted employees from before the Class Period — neither of which even mention Horizon. (Am. Compl. ¶ 94). It is therefore unsurprising that Plaintiffs offer up conclusory assertions about Horizon's conduct rather than providing any specific allegations tying the Company to the shipments at issue. So too, Plaintiffs provide no basis for their allegation that Horizon instructed the pharmacies to conceal their relationship from PBMs. All of the conduct alleged is on the part of the pharmacies, not Horizon. (*See, e.g.*, *id.*

¶¶ 99-102). And, once again, Plaintiffs' confidential sources fail to provide sufficient context for their statements or to allege that any of this information reached Horizon. *In re Elan*, 543 F. Supp. 2d at 207 (noting that "the detail provided by the confidential sources" should be considered in determining whether allegations meet the PSLRA's particularity requirement).

### ii. Horizon's Direction of Its Employees

In addition, Plaintiffs allege that Horizon directed its own employees to engage in improper conduct. (Am. Compl. ¶ 19). Specifically, Plaintiffs claim that Horizon directed its employees to (1) "mislead doctors about the price of [its] drugs"; (2) provide gifts and entertainment to doctors in order to influence their prescribing choices; and (3) market their drugs to doctors who would prescribe the drugs for off label use. (Am. Compl. ¶¶ 104-11). Here too, Plaintiffs' allegations fail to meet the standards of Rule 9(b).

First, the allegations in the Amended Complaint do not support the conclusory assertion that Horizon improperly directed its sales representatives to mislead doctors about the price of its drugs. Plaintiffs cite two confidential sources as support for their assertion: one who states that he was instructed to focus on the "benefits of the program" and another who was directed to tell doctors that there would be "minimal copay to the patient if the prescription went through a specialty pharmacy." (*Id*. ¶ 109). Focusing on the benefits of the program, however, is little more than basic salesmanship; it certainly does not support an inference that Horizon acted improperly. And telling doctors that a patient who goes through a participating pharmacy would have a minimal co-pay is anything but a fraud since it was a truthful description of the PME program. (*Id*. ¶ 89). Regardless, Horizon's pricing model was no secret. To the extent it was, Plaintiffs point to no obligation for Horizon salespersons to affirmatively disclose the intricacies of their business model to every prescribing physician.

(*See* Adams Decl., Ex. 44, at 2-3 (an analyst observing that "every managed care organization and individual commercial plan is very well aware of the price they are paying for these drugs if they are covered (or if they are not aware, that is a failure of the purchaser, and not Horizon). The pricing is being done with the lights turned on very brightly.")).

Plaintiffs' second claim — that Horizon directed its employees to provide gifts to doctors in order to influence their prescribing choices — also falls short. When push comes to shove, the claim is based on a single surgeon, Dr. Randall Yee, who spoke at Horizon's 2014 National Sales Meeting; apparently went on hunting trips with a Horizon sales representative; submitted many prescriptions over an unspecified period of time; and received $18,234.50 from Horizon, largely for "services other than consulting." (Am. Compl. ¶ 105-07). Even taken together, however, these allegations demonstrate only that Horizon and its employees sought to cultivate relationships with doctors — no doubt because its business model depended on physicians prescribing Horizon's drugs. (Docket No. 108 ("Rosen Decl."), Ex. A, at S-34 ("If we are unsuccessful in convincing physicians to complete prescriptions through our PME program . . . sales of DUEXIS . . . and VIMOVO may suffer.")). Inviting a doctor to speak at a conference or training is not persuasive evidence of a kickback. Nor is the fact that a salesperson went on a hunting trip with a doctor — absent any allegation that Horizon paid for the trip — indicative of an improper relationship between the two. And the fees Horizon paid Dr. Yee were neither substantial nor secret. (Am. Compl. ¶ 106). In fact, given that the fees paid to doctors are publicly available (*see* Am. Compl. ¶ 106 n.33), it is telling that Plaintiffs cannot muster anything more significant than the allegations relating to Dr. Yee. Put simply, "[s]ecurities plaintiffs cannot meet the heightened pleading standards imposed by Rule 9 and the PSLRA with such conclusory claims of

undisclosed wrongdoing." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354–55 (S.D.N.Y. 2008).

Plaintiffs' final claim — that Horizon directed its sales representatives to market drugs to doctors for off label use — fares no better, for several reasons. As an initial matter, the claim rests on two confidential sources, both of whom left Horizon early in the Class Period. *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause CW 3 and CW 5 were not Yahoo! employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period."). Second, as neither source indicates who, when, or how he or she was directed to market drugs in this manner, the statements fall short of establishing, with the requisite degree of particularity, the existence of a company-wide practice. *See, e.g.*, *In re Elan*, 543 F. Supp. 2d at 207. Third, despite the fact that one of the witnesses "could not understand why they were marketing to surgeons" (*id.* ¶ 110), it does not necessarily follow that surgeons' only uses of Horizon's drugs would be "off-label." (*See* Docket No. 110 ("Horizon Mem."), at 17 n.3). And finally, the mere fact that prescriptions were written for off-label purposes, per the other witness' account (Am. Compl. ¶ 111), does not necessarily imply that Horizon was actively marketing its drugs as such. In fact, "courts and the FDA have recognized the propriety and potential public value of unapproved or off-label drug use." *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012); *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (noting that off-label use is an "accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine."); *Caronia*, 703 F.3d at 153 ("FDA[-]approved indications were not intended to limit or interfere with the practice of medicine nor to preclude physicians from using their

best judgment in the interest of the patient.").  Accordingly, the Complaint fails to adequately allege that Horizon improperly instructed its employees to market its drugs for off-label uses.

### iii.    Statements Relating to the Alleged Improper Practices

Having established that Plaintiffs have failed to allege that Horizon engaged in, or directed its partner pharmacies to engage in, improper practices, the Court turns to the question of whether Defendants misled investors when referring to their general conduct and their legal and regulatory compliance.  Specifically, Plaintiffs allege that Horizon "employees and distributors violat[ed] applicable laws and regulations and the Company's own code of conduct" in implementing its PME program.  (Pls.' Opp'n 31).  Plaintiffs also maintain that Horizon's statements assuring investors that it had a compliance program for its pharmacies — and that it enforced the standards of that program — were false and misleading.  (*Id.*).

Plaintiffs' arguments here can be easily dismissed.  First, as noted above, Plaintiffs fail to allege that Horizon employed improper practices in connection with the PME program. Without a plausible allegation that Horizon acted — or directed its employees or pharmacies to act — improperly or illegally, Horizon's statements concerning its compliance with laws, regulations, and its own Code of Conduct cannot have been misstatements.  *Cortina v. Anavex*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016) (dismissing claim of material misrepresentations or omissions when the complaint failed "to adequately allege that Defendants orchestrated" the underlying scheme); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) (finding that while confidential witnesses "muster a litany of criticisms" of the firm's accounting practices, the witnesses do not support an inference that "defendants' statements or omissions regarding their controls were known to be false at the time made."), *aff'd*, 616 F. App'x 442 (2d Cir.

2015).  Second, Horizon explicitly disclosed that it was "exposed to the risk that our employees [and third parties] may engage in fraudulent or other illegal activity" and that despite adopting an internal code of conduct, "it is not always possible to identify and deter misconduct by our employees and other third parties, and the precautions we take to detect and prevent this activity may not be effective . . . ." (Am. Compl. ¶ 183).  Nor were these risk warnings themselves misleading, as Plaintiffs argue, because Horizon was "presently violating such laws and regulations."  (Pls.' Opp'n 31).  Aside from the fact that Plaintiffs have failed to allege any underlying violations, no reasonable investor would interpret such a generic risk warning as an assurance of present compliance.  *In re FBR*, 544 F. Supp. 2d at 360 ("[C]autionary statements . . . have only rarely been found to be actionable by themselves."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (finding that the defendant's cautionary warnings, which detailed numerous *specific* and illegal trading practices, could have been misleading where the company was violating those regulations at the time it issued the purported warnings).  The same is true with respect to Defendants' statements about its internal Code of Business Ethics and Conduct.  Far from "touting" the Code (Pls.' Opp'n 31), Horizon merely announced that it had been adopted, a statement that is "not actionable under the securities laws," *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 401 (concluding that defendant's statement that it "maintain[s] an effective compliance organization" to be insufficient to form the basis of a misstatement).  Plaintiffs therefore fall short in claiming that Defendants made any misstatements on this score.

### c. Statements Relating to the Sales Results, Sustainability, and the Drivers of Success of the PME program

Finally, the Court concludes that the final set of statements at issue — Defendants' statements about Horizon's sales results, as well as the sustainability and drivers of success of its PME program — is inactionable under the Exchange Act for several reasons. First, many of the challenged statements are textbook cases of corporate puffery or optimism. For example, statements by Defendants extolling their "unique commercial business model" (Am. Compl. ¶ 137), noting that the company was "on track" (*id.* ¶ 143), and highlighting that prescription growth was "exceeding [their] expectations" (*id.* ¶ 141) are not actionable under the securities laws. *See, e.g.*, *Kleinman*, 706 F.3d at 153 (headline in press release describing results of findings as "encouraging" was puffery); *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) ("unique business model" not actionable); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that company was "optimistic" about earnings and "expected" good performance were puffery). Put simply, these statements — and the many others like them in the Amended Complaint (*see* Am. Compl. ¶¶ 140, 145, 150, 151, 157, 166, 193, 197, 211, 227) — are "too general to cause a reasonable investor to rely upon them." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 77 (S.D.N.Y. 2015) (finding defendant's characterizations of its underwriting as "solid" and its approach to risk and expense management as "disciplined" to be inactionable puffery).[2]

---

[2] After Defendants' motions were fully briefed, Plaintiffs submitted a supplemental letter alerting the Court to statements made in Horizon's SEC filings for the first quarter of 2017 — namely that the company "had entered into PBM rebate agreements '[d]uring the second half of 2016' as part of a change in the commercial model of the Company's primary care business" and that "sales in its 'primary care business unit' — the unit which included

Similarly, many of the statements at issue were either accurate statements of existing or historical fact or forward-looking statements protected by the PSLRA's safe harbor provision. With respect to the former, it is well established that "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404. Many of the statements in the Complaint, however, are just that: Defendants' explaining their business model (*see* Am. Compl. ¶¶ 157, 196) or reporting their past sales results (*id.* ¶¶ 138, 211). Other statements, meanwhile, fall squarely within the PSLRA's safe harbor for forward-looking statements. (*See* Am. Compl. ¶¶ 140, 145, 157). For example, during a conference call in the wake of the Company's release of its quarterly financial results, Horizon's Chief Executive Officer, Defendant Timothy P. Walbert, "touted" the prior success of the PME program and noted that Defendants "anticipate continued attractive growth." (Am. Compl. ¶ 146). But in the quarterly statement that was the subject of the call, Horizon disclosed various related risk factors, including that (1) acceptance by patients and doctors could hurt their bottom line; (2) the price of the drugs could negatively impact sales; (3) two of the largest PBMs had already put Horizon's drugs on their exclusion lists; and (4) if Horizon was "unable to increase adoption" of the program, then its "ability to maintain or increase prescriptions" would be impaired. (Adams Decl., Ex. 9, at 41-43). Plaintiffs argue that, despite that cautionary language, the PSLRA's safe harbor should not apply to Walbert's statements because the "crux" of the statement concerned "the Company's historical performance and the reasons

---

DUEXIS and VIMOVO and was 'central to Horizon's revenue and growth model' — dropped 41% in Q1 2017 as compared to Q1 2016." (Docket No. 120, at 1-2). Those statements, however, do little more than confirm that Defendants' statements of optimism proved to be wrong. They do not change the Court's analysis or conclusions.

behind it." (Pls.' Opp'n 34). But Plaintiffs fail to allege that any of the statements made by Walbert were misrepresentations of present or historical facts. Nor do they plausibly allege that Walbert did not honestly believe the statements when they were made. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (noting that only "the *misrepresentation* of present or historical facts cannot be cured by cautionary language" (emphasis added)); *cf. In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) ("Because the Nortel Complaint alleges that the Defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions."). The statements are therefore not actionable under the securities laws.

Finally, some statements characterized by Plaintiffs in the Complaint as misleading qualify as inactionable opinions. These include statements prefaced with terms such as "I think" (Am. Compl. ¶ 150), "we believe," (*id.* ¶¶ 155(a), 193), and "we expect" (*id.* ¶ 373). "Rather than addressing existing objective facts," these statements expressed Defendants' views about the PME program and its chances for success. *Gillis*, 197 F. Supp. 3d at 589. For example, when Walbert was asked why the PME program was so successful for Horizon, he responded: "So for us what it does is *we believe* we've got differentiated products where we do the right thing for the patient, the right thing for the physician and that has led as you can see in the second-quarter results to strong growth in both all three [sic] primary care products[]." (Am. Compl. ¶ 155(a) (emphasis supplied)). Plaintiffs argue that this statement — and others attributing the PME program's initial success to a variety of causes such as Horizon's "differentiated products" and its well-trained salesforce (*see, e.g.*, *id.* ¶¶ 142, 150, 151, 155) — were misleading because the Company was obligated to disclose that those

results were also driven by Horizon's use of "captive" pharmacies and improper business practices. (Pls.' Opp'n 17). But, as noted above, Plaintiffs fail to plausibly allege that Horizon's success was due to its secret control of the PME pharmacies or the employment of improper business techniques. *See, e.g.*, *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (dismissing an omission-based claim on the ground that the plaintiffs had "offer[ed] nothing more than conclusory allegations that an anticompetitive scheme existed"). Nor have Plaintiffs demonstrated that Horizon's explanations for its success were untrue or "not honestly believed when made." *Gillis*, 197 F. Supp. 3d at 589. Accordingly, these statements — and indeed all of the statements challenged by Plaintiffs — are inactionable under the Exchange Act.[3]

## 2. Scienter

In any event, Plaintiffs' Exchange Act claims are subject to dismissal for a related, albeit independent, reason: failure to adequately plead scienter. As noted above, the PSLRA requires a plaintiff to plead scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity. *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted). To satisfy that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Moreover, a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant." *In re Lions Gate Entm't Corp. Sec. Litig.*,

---

[3]    Plaintiffs claim that Defendants' certification that Horizon's SEC filings did not contain false and misleading statements were themselves misrepresentations. (Am. Compl. ¶¶ 186-88). Because the Court finds that the Amended Complaint does not plausibly allege that any statements in the filings were materially false and misleading, this claim fails as well.

165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (emphasis added). The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. The necessary inquiry is "inherently comparative." *Id.* at 323. That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'cns*, 493 F.3d at 99. The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted). The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted). As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such

circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

In this case, Plaintiffs make no attempt to establish scienter with respect to each Individual Defendant. By itself, that warrants dismissal of their Exchange Act claims. *See, e.g.*, *C.D.T.S. v. UBS AG*, No. 12-CV-4924 (KBF), 2013 WL 6576031, *6 (S.D.N.Y. Dec. 13, 2013) (noting that scienter "must be separately pled and individually supportable as to each defendant"). But even on their own terms, Plaintiffs' allegations of scienter fall short.

### a. Motive and Opportunity

Plaintiffs' "motive and opportunity" arguments can be swiftly rejected. Plaintiffs do not allege that any Defendant sold shares during the Class Period. *See, e.g.*, *San Leandro Emergency*, 75 F.3d at 814 (noting that the failure of some individual defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit); *see also Rombach*, 355 F.3d at 177 (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period"). Instead, they assert that motive and opportunity are established only because "the Individual Defendants' compensation was unusually dependent on Horizon's stock price and the achievement of revenue-based performance metrics." (Pls.' Opp'n 42). The Second Circuit has made clear, however, that "it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted); *see*

*also, e.g.*, *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015) ("massive monetary awards" insufficient to establish motive to defraud); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 622 (S.D.N.Y. 2005) ("multimillion-dollar performance-based bonuses" were "deficient, as they involve motives that are generally possessed by most corporate directors and officers." (internal quotation marks and brackets omitted)); *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02-CV-4483 (RCC), 2005 WL 735937, at *12 (S.D.N.Y. Mar. 30, 2005) ("highly unusual compensation package" involving multimillion dollar bonus insufficient to establish motive). That is all Plaintiffs do here. Because they fail to allege that Defendants received a "concrete and personal" benefit from the alleged scheme, and certainly do not allege that each Defendant received such a benefit, they fail to demonstrate a cognizable motive. *See ECA*, 553 F.3d at 198.

### b. Circumstantial Evidence of Conscious Misbehavior or Recklessness

Whether Plaintiffs satisfy the conscious-misbehavior-and-recklessness prong of the scienter test requires a more detailed discussion. Plaintiffs contend that Defendants "knew or recklessly disregarded" the fact that Horizon controlled the PME pharmacies and that the pharmacies, as well as Horizon's employees, implemented improper business practices. (Pls.' Opp'n 36). To support their argument, Plaintiffs rely on the following: (1) that the PME program was vital to Horizon's financial well-being; (2) that Horizon monitored the day-to-day operations of the PME pharmacies; and (3) the "nature of the undisclosed practices that drove the PME program." (Pls.' Opp'n 36-42). Whether viewed individually or together, however, these allegations fail to satisfy Plaintiffs' burden under the PSLRA.

Plaintiffs' first point — that the PME program was vital to Horizon's financial well-being — implicates the "core operations doctrine," which "permits an inference that a

company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income." *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks omitted). Significantly, however, "there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid." *Id.*; *see, e.g.*, *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (noting that the "thrust of the case law indicates continued movement away from the doctrine"); *see also Cortina*, 2016 WL 7480415, at *7 (declining to consider the "core operations doctrine" in analogous circumstances). In any event, even if the doctrine is still valid, it would provide little help to Plaintiffs here. Core operations allegations "constitute supplementary but not independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011). Thus, while the PME program "constituted a significant area of business for [Horizon], that alone does not allow for an inference of scienter." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 738 (S.D.N.Y. 2015). Instead, Plaintiffs must still "allege facts available to Defendants that would have illuminated the falsities." *Id.* And here, as detailed below, Plaintiffs fail to do so.

Plaintiffs' second point — that Horizon monitored the day-to-day operations of the PME pharmacies — also comes up short. Plaintiffs make an inferential leap in positing that routine communication between Horizon employees and the pharmacies and visits by Horizon's executives to the pharmacies are sufficient to establish scienter for the abuses allegedly occurring at those pharmacies. Any such leap is undermined, however, by the fact that that there are no allegations that any of the Individual Defendants ever knew or observed

any of the abuses. Indeed, "nowhere in the . . . Complaint do Plaintiffs identify with specificity the documents or way in which this contrary information was communicated to Defendants." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."). Instead, Plaintiffs rely on allegations that Horizon's lower level managers monitored the pharmacies to establish scienter. (Pls.' Opp'n 39). Such allegations are insufficient to establish a strong inference of scienter with respect to these managers, and are certainly insufficient with respect to the Company's senior executives. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (finding no scienter where witnesses "were employed in rank-and-file positions or by outside contractors . . . . [and] had no contact with the Individual Defendants"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *In re Elan,* 543 F. Supp. 2d at 220 (finding the allegations of a neurologist who tested and was "intimately involved" with a company's key drug insufficient to support an inference of scienter on behalf of the company's management because his allegations were silent as to whether the neurologist actually communicated with management). Accordingly, Defendants' knowledge cannot be inferred from Horizon's monitoring activities, especially in the absence of allegations of motive. *See, e.g., Kalnit,* 264 F.3d at 142 (noting that, in the absence of a motive allegation, "the strength of the circumstantial allegations [of scienter] must be correspondingly greater" (internal quotation marks omitted)).

Plaintiffs' final basis for establishing scienter — the "nature of the undisclosed practices that drove the PME program" (Pls.' Opp'n 39-42) — requires a more extended

discussion, as it involves five distinct points that taken together, Plaintiffs contend, demonstrate that "Horizon directed or acquiesced in the undisclosed practices that drove the PME program." (Pls.' Opp'n 39). First, Plaintiffs highlight the allegation that Horizon's senior executives, including Walbert, attended the Company's 2014 National Sales Meeting where employees were allegedly encouraged to provide doctors with improper gifts. (Pls.' Opp'n 39-40). As noted above, however, Plaintiffs, fail to plausibly allege the existence of any such kickbacks, much less knowledge of such kickbacks by Horizon's senior management. *See In re JP Morgan Chase Sec. Litig.,* 363 F. Supp. 2d at 632 (finding that the plaintiffs' claim that the defendants had failed to disclose an illegal kickback scheme was not pleaded with sufficient particularity as the plaintiffs provided "no particular factual allegations that support the conclusory assertion that these investment opportunities were provided as 'kickbacks,' let alone that these opportunities were offered with fraudulent intent"). In any event, Plaintiffs' argument that the attendance of Walbert and unnamed "senior executives" at an annual sales conference gives rise to an inference of scienter is weak at best. Plaintiffs do not allege that any of the executives were even in the room when sales personnel "were encouraged" to engage in the improper conduct, let alone that any of the Individual Defendants were the ones who did the encouraging. *See, e.g.*, *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 36 (D. Mass. 2009) (finding no scienter where "there is no allegation that any of the Individual Defendants was present at those meetings or that anyone conveyed to them the information discussed"). Instead, Plaintiffs assert, in a rather conclusory manner, that Horizon's "senior executives" were "present" — with few details about who was present and no details about when they were present or what was actually said. That is insufficient to allege scienter under the PSLRA. *See In re Doral Fin. Corp. Sec.*

*Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (discounting a confidential informant's statement that he personally attended meetings where the defendants' representatives were in attendance and relevant reports were discussed as "so vague as to be meaningless" because the informant did not identify the positions of any of the representatives, when the meetings occurred, or how the reports were discussed), *aff'd,* 344 Fed. App'x 717 (2d Cir. 2009).

Next, Plaintiffs argue that the reports of former pharmacy employees make clear that Horizon directed PME pharmacies to implement the allegedly improper sales practices described in the Complaint. (Pls.' Opp'n 40; *see* Am. Compl. ¶ 91-92). But these reports are from pharmacy employees — not Horizon employees — and thus shed little, if any, light on the state of mind of any of the Individual Defendants. *See, e.g.*, *In re Am. Express Co. Sec. Litig.,* No. 02-CV-5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing that the confidential sources — [several executives at American Express Financial Advisors] — had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010). What is more, the reports are largely from rank-and-file pharmacy employees and there is no suggestion that they had contact with Horizon or its employees, let alone the Individual Defendants. *See, e.g.*, *Local No. 38,* 724 F. Supp. 2d at 460 (discounting confidential sources "employed in rank-and-file positions . . . [who] had no contact with the Individual Defendants"). For similar reasons, Plaintiffs' third point — that Horizon prescriptions were transferred "en masse" between pharmacies — also fails to give rise to a strong inference that Defendants acted with the required state of mind. (Pls.' Opp'n 41). As

noted above, that allegation arises from a complaint in another action that does not mention Horizon or any of the Individual Defendants. (*See* Adams Decl., Ex. 62).

Fourth, Plaintiffs point to purported directives from Defendants to the PME pharmacies and Horizon's sales personnel instructing them to engage in improper marketing practices. (Pls.' Opp'n 41). Here too, the Court already concluded that Plaintiffs fail to plausibly allege that Horizon directed its employees or the pharmacies to engage in such practices. But even if Plaintiffs did plausibly allege such conduct, it would do little to further their scienter claims, as the underlying allegations are severely lacking in particularity. For example, Plaintiffs cite a "Former Horizon Territory Manager" who noted that sales representatives "were told" to avoid questions from physicians about the price of Horizon drugs. (Am. Compl. ¶ 109). But Plaintiffs offer nothing to impute such an instruction to any specific individual, let alone any of the Individual Defendants. Such a vague allegation barely moves the needle on Plaintiffs' scienter requirement.

Plaintiffs' final argument — based on Horizon's receipt of a subpoena from the Department of Justice in November 2015 (Pls.' Opp'n 42) — also comes up short. For one thing, "government investigations cannot bolster allegations of scienter that do not exist, and, as currently plead, the government investigations are just that, investigations." *Lipow*, 131 F. Supp. 3d at 167; *see also City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665 (PGG), 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) ("[T]he existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter."). Significantly, "the precise nature and outcome[] of the investigation[] [is] unclear, as Plaintiffs do not plead any facts suggesting that Defendants' actions were even the focus of the inquir[y] or that Defendants were sanctioned as a result of [it]." *Cortina*, 2016

WL 7480415, at *8.   Additionally, the Complaint does not contain any facts connecting the investigation to the state of mind of any of the Individual Defendants with respect to Plaintiffs' allegations.   Instead, it merely "asserts in conclusory terms," *id.*, that the focus of the Department of Justice investigation must have been the PME program even though the Company's disclosure states that the subpoena was broadly directed at its "marketing and commercialization activities."  (Am. Compl. ¶ 127).   An inconclusive investigation with an undefined scope cannot "give rise to a compelling inference of scienter."  *Cortina*, 2016 WL 7480415, at *8.

In the final analysis, Plaintiffs fall short of adequately alleging either actual intent or conscious recklessness on the part of Defendants.  Moreover, Plaintiffs' allegations of misconduct are ultimately less "compelling" than the nonculpable explanation presented by Defendants: that Horizon's stock price declined when it became clear to the market that the PME program was bound to fail.  *Tellabs*, 551 U.S. at 324.  Notably, the risks that led to that failure were disclosed to investors over and over again.  (*See, e.g.*, Rosen Decl., Ex. A, at S-23-25, S-47).  Additionally, as Plaintiffs themselves note, Horizon itself engaged a third party to review its "practices" — even before it received the Department of Justice subpoena.  (Am. Compl. ¶ 130).  It makes little sense that Defendants would engage a third party to undertake such a review if they were involved in committing (or covering up) a fraud.  In short, Plaintiffs fail to adequately plead scienter and their Exchange Act claims must be dismissed.

## B.  Securities Act Claims

In contrast to their Exchange Act claims, Plaintiffs' claims under Sections 11, 12(a)(2), and 15 of the Securities Act do not require a showing of scienter, reliance, or loss causation.  *Tongue*, 816 F.3d at 209.  Instead, Plaintiffs need only show that "Defendants

issued or signed a registration statement containing an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.* (internal quotation marks omitted). Nevertheless, the parties acknowledge that the alleged misstatements in the Offering Documents concern the same underlying allegations discussed above in connection with the Exchange Act claims — "namely Horizon's captive relationship with the PME pharmacies, which it used to direct those pharmacies to implement improper business practices." (Pls.' Opp'n 51; *see also id.* at 49 ("Plaintiffs allege that the Registration Statement and Prospectus issued in connection with the Offering reiterated a number of the false and misleading statements contained in Horizon's SEC filings and press releases discussed above [in the section concerning the Exchange Act claims]."); Docket No. 107, at 4 (Underwriter Defendants noting that the factual allegations in the Securities Act claims are all "also featured" in the Exchange Act claims); Adams Decl., Ex. D (cataloging the overlapping allegations between the two sets of claims)). Indeed, Plaintiffs' Securities Act claims track their Exchange Act claims — often verbatim. It follows that Plaintiffs' Securities Act claims must be and are dismissed for failure to adequately plead a material misrepresentation or omission as well.

## C. Items 303 and 503

Finally, Plaintiffs contend that SEC regulations — namely, Items 303 and 305 of Regulation S-K — imposed on Horizon an affirmative duty to disclose its "captive" relationship with the PME pharmacies and its improper business practices. (Pls.' Opp'n 52-55). Item 303 compels disclosure of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues." 17 C.F.R. § 229.303(a)(3)(ii). Item 503 provides that offering documents must

describe "under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). Plaintiffs' arguments on both fronts are largely redundant of those addressed above and, thus, unpersuasive.

With respect to Item 303, Plaintiffs claim that Defendants' failure to disclose its relationship with the PME pharmacies and its improper business practices created substantial "uncertainty" about the Company's future operating performance. (Pls.' Opp'n 53). But Plaintiffs fail to identify any adverse economic event or trend that occurred prior to the Offering that was not disclosed in the Offering Documents. Nor do Plaintiffs plead, with any specificity, facts establishing that Defendants possessed any actual knowledge of the purported "trend" or event. *See, e.g.*, *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, No. 07-CV-10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) ("While it is true that Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend."). Meanwhile, the only "trend" identified by Plaintiffs — "that a shifting payor environment created risks of increasingly serious magnitude to the PME Program in the nine months leading up to the Offering" (Pls.' Opp. 53-54) — was explicitly identified in the Offering Documents. (*See* Rosen Decl., Ex. B, at 23, 41 (noting that "two of the largest PBMs" already put Horizon's drugs on their exclusion lists and that Horizon was facing increasing "pressure from healthcare payors and pharmacy benefit managers"). Finally, Plaintiffs' claim that Defendants failed to disclose a negative trend around the time of the Offering is further undermined by the fact that Horizon was enjoying a positive upward swing during this period,

as its sales were increasing. (Am. Compl. ¶ 13). Accordingly, Plaintiffs' Item 303 claim fails.

Plaintiffs' claim under Item 503 similarly falls short. "[C]ourts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard." *Rudman v. CHC Grp. LTD.*, 217 F. Supp. 3d 718, 730 (S.D.N.Y. 2016). Given that Plaintiffs failed to adequately allege that Horizon dominated the PME pharmacies or engaged in improper conduct, they also fail to identify a material omission in Horizon's Offering Documents. Instead, the "most significant" risk factor for Horizon was that its PME-focused strategy would fail because Horizon was selling drugs at higher prices than its competition. And this was disclosed by Horizon in its fifty-eight-page "Risk Factors" section. (*See* Rosen Decl., Ex. A, at S-23 (warning that if it was unable to execute the PME program successfully, Horizon "may not be able to generate significant product revenues or execute on [its] business plan"); *id.* at S-24 (noting that the PME program relied on "physician and patient awareness and comfort with the program"); *id.* at S-47 (cautioning that due to the cost of its products, Horizon's success depends "on the availability of governmental and third-party payor reimbursement")). Thus, Plaintiffs' claims under Item 503 are also dismissed.

## CONCLUSION

For all of the reasons stated above, Plaintiffs' claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 must be and are dismissed. It follows that their claims for control person liability under Section 20(a), which depend upon the existence of a "primary violation," also fail. *See, e.g.*, *First Jersey Sec., Inc.*, 101 F.3d at 1472. Moreover, Plaintiffs' claims under Sections 11, 12(a)(2), and 15 of the Securities Act also fail.

That leaves only the question of whether Plaintiffs should be granted leave to amend their complaint for a second time. The Court declines to grant Plaintiffs leave for a combination of three reasons. For starters, amendment here would likely be futile. Indeed, given the various grounds for the Court's decision, there is nothing to suggest that Plaintiffs would be able to state a valid claim should the Court grant them leave to amend. *See, e.g., Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). Second, and related, Plaintiffs have not "given any indication that [they are] in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 619 F. App'x 34 (2d Cir. 2015); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."). Finally, in granting leave to file the amended consolidated complaint, the Court expressly warned that Plaintiffs would not be given another opportunity to address the issues raised in Defendants' motion to dismiss. (*See* Docket No. 113). *See, e.g., Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (affirming the district court's denial of leave to amend in part because of the previous opportunities that the plaintiff had received to amend the complaint).

The Clerk of Court is directed to terminate Docket Nos. 106 and 109, and to close this case.

SO ORDERED.

Date: January 18, 2018
      New York, New York

          JESSE M. FURMAN
         United States District Judge